# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------- x

In re:                                                :
                                                      :
SHILOH INDUSTRIES, INC.,[1]                           :        Chapter 11
*et al.*,                                             :
                                                      :        Case No. 20-____ (____)
       Debtors.                                       :
                                                      :        (Joint Administration Requested)
                                                      :
                                                      :
-------------------------------------------------------- x

## MOTION OF THE DEBTORS, PURSUANT TO SECTIONS 105, 361, 362, 363, 364 AND 507 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2, FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) SCHEDULING FINAL HEARING AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors (collectively, the "Debtors"), pursuant to sections

105, 361, 362, 363, 364 and 507(b) of title 11 of the United States Code (the "Bankruptcy

Code"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), hereby move (the "Motion")

for entry of interim and final orders:  (a) authorizing the Debtors to obtain senior secured

---

[1]     The Debtors are the following nineteen entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses):  Shiloh Industries, Inc. (7683), Greenfield Die & Manufacturing Corp. (8114), Jefferson Blanking Inc. (7850), Shiloh Automotive, Inc. (1339), Shiloh Corporation (5101), Shiloh Industries, Inc. Dickson Manufacturing Division (5835), Shiloh Holdings International, Inc. (1446), C & H Design Company (9432), Liverpool Coil Processing, Incorporated (0571), Medina Blanking, Inc. (0707), The Sectional Die Company (3562), VCS Properties, LLC (1094), Shiloh Die Cast LLC (5814), Shiloh Manufacturing Holdings LLC (0853), FMS Magnum Holdings LLC (6471), Sectional Stamping, Inc. (8967), Albany-Chicago Company LLC (4687), Shiloh Die Cast Midwest LLC (4114), and Shiloh Manufacturing LLC (1628).  The noticing address of each of the Debtors in these chapter 11 cases is 880 Steel Drive, Valley City, Ohio 44280.

postpetition financing on a priming basis; (b) authorizing the Debtors to use Cash Collateral (as

defined in the Interim Order); (c) granting liens and providing superpriority claims with respect

to such postpetition financing; (d) approving the form of adequate protection to be provided by

the Debtors; (e) modifying the automatic stay to the extent necessary to effectuate the terms of

the DIP Orders (defined below); (f) scheduling a final hearing to consider entry of the Final

Order; and (g) granting related relief in connection with the DIP Financing (as defined below).

In support of this Motion, the Debtors respectfully represent as follows:

**<u>Background</u>**

1.    On the date hereof (the "<u>Petition Date</u>"), each of the Debtors commenced a

case under chapter 11 of the Bankruptcy Code.[2]  The Debtors are authorized to continue to

operate their businesses and manage their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.  By a motion filed on the Petition Date, the Debtors

have requested that their chapter 11 cases be consolidated for procedural purposes only and

administered jointly.

2.    The Debtors are a global innovative solutions provider focusing on

lightweighting technologies that provide environmental and safety benefits to the mobility

market.  The Debtors have a global network of manufacturing operations and technical centers in

Asia, Europe, and North America.  The Debtors' multi-material solutions consist of a variety of

alloys in aluminum, magnesium, and steel grades, along with proprietary lines of noise and

vibration reducing acoustic laminate products.  The Debtors deliver these solutions in body

structure, chassis, and propulsion systems to original equipment manufacturers ("<u>OEMs</u>") and

---

[2]    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core
proceeding pursuant to 28 U.S.C. § 157(b).  Venue for this matter is proper in this district pursuant to
28 U.S.C. § 1409.

"Tier 1" suppliers in the automotive and commercial vehicle markets.  For the twelve months ending October 31, 2019, the Debtors generated approximately $1.045 billion in revenue.

3.      Additional detail regarding the Debtors, their businesses, and the commencement of these cases is set forth in the Declaration of Jeffrey Ficks in Support of First-Day Pleadings (the "Ficks Declaration").  In further support of this Motion, the Debtors also incorporate herein by reference the *Declaration of Jeffrey Lewis in Support of Motion of the Debtors, Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2, for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling Final Hearing and (IV) Granting Related Relief* (the "Lewis Declaration"), attached hereto as Exhibit C and filed contemporaneously herewith.

## Relief Requested

4.      To operate their businesses, preserve value and successfully consummate their sale process in these chapter 11 cases, the Debtors require access to the proposed DIP Financing and the use of Cash Collateral.  Through the DIP Financing and the use of Cash Collateral, the Debtors will have access to the necessary funding to (a) continue the day-to-day operations of their businesses, (b) preserve critical relationships with their employees, customers and suppliers, (c) continue to market their assets in a manner designed to preserve value for the benefit of all stakeholders, and (d) fund these chapter 11 cases.  The DIP Financing in particular signals to the Debtors' vendors, suppliers, customers and employees that the Debtors will continue to meet their commitments during these cases.  The DIP Financing, together with the consensual use of Cash Collateral, provides the Debtors with their best available opportunity to

maintain their current operations and implement a successful, orderly sale process for the benefit of their creditors.

5.     The Debtors seek authorization to obtain postpetition financing and use Cash Collateral pursuant to the terms set forth in (a) this Motion; (b) that certain Superpriority Secured Debtor-in-Possession Credit Agreement, attached hereto as <u>Exhibit B</u> (the "<u>DIP Credit Agreement</u>"); (c) the Interim Order; and (d) after a final hearing, the Final Order.  The Debtors anticipate that they will access the DIP Facility immediately upon the entry of, and on the terms set forth in, the Interim Order.

6.     By this Motion, the Debtors seek entry of the DIP Orders:

(a)     <u>DIP Financing</u> – authorizing the Debtors to obtain postpetition financing (the "<u>DIP Financing</u>"), consisting of a senior secured superpriority revolving facility in the aggregate availability amount of up to $123.5 million (the "<u>DIP Facility</u>"), from the lenders from time to time party to the DIP Credit Agreement (the "<u>DIP Lenders</u>"), with Bank of America, N.A. ("<u>BOA</u>") acting as administrative agent (in such capacity and together with any respective successor thereto, the "<u>DIP Agent</u>" and, together with the DIP Lenders, the "<u>DIP Secured Parties</u>") under the DIP Credit Agreement for itself and the other DIP Lenders;

(b)     <u>DIP Documents</u> – authorizing the Debtors to execute and enter into the DIP Credit Agreement and any exhibits attached thereto, all related or ancillary documents and agreements, including all security and pledge agreements and any mortgages contemplated thereby (collectively, as may be amended, supplemented, or otherwise modified pursuant to their respective terms, the "<u>DIP Documents</u>") and to perform all such other and further acts as may be required in connection with the DIP Documents;

(c)     <u>Use of Proceeds</u> – authorizing the Debtors to use the proceeds of loans made by the DIP Lenders (the "<u>DIP Proceeds</u>") as permitted in the DIP Documents and in accordance with the Interim Order;

(d)     <u>Adequate Protection</u> – authorizing the granting of adequate protection in the form of the Adequate Protection Superpriority Claim and Adequate Protection Liens (as each is defined below) solely to the lenders (collectively, the "<u>Prepetition Lenders</u>") under that certain Credit Agreement, dated October 25, 2013, with the Shiloh Industries, Inc. ("<u>Shiloh Parent</u>") and Shiloh Holdings Netherlands B.V. (together with

Shiloh Parent, the "<u>Prepetition Credit Agreement Borrowers</u>"),[3] as borrowers; BOA, as administrative agent (the "<u>Prepetition Agent</u>" and with the Prepetition Lenders, the "<u>Prepetition Secured Parties</u>"); and the lenders signatory thereto (the "<u>Prepetition Credit Agreement</u>"), whose liens and security interests (collectively, the "<u>Prepetition Security Interests</u>") are being primed by the DIP Financing;

(e)    <u>Cash Collateral</u> – authorizing the Debtors to continue to use the Cash Collateral and all other Prepetition Collateral (as defined below) in which any of the Prepetition Secured Parties have an interest, and the granting of adequate protection in the form of the Adequate Protection Superpriority Claim and the Adequate Protection Liens to the Prepetition Secured Parties, as applicable, with respect to, *inter alia*, such use of their Cash Collateral and all use and diminution in the value of such Cash Collateral and the Prepetition Collateral, as applicable;

(f)    <u>Debtor Stipulations</u> – approving of certain stipulations in paragraph D of the Interim Order by the Debtors with respect to the Existing Credit Documents and the liens and security interests arising therefrom subject to the Challenge Period described in paragraph 19 of the Interim Order;

(g)    <u>Grant of DIP Lender Superpriority Claims</u> – authorizing the granting of superpriority claims under section 364(c)(1) of the Bankruptcy Code to the DIP Lenders payable from, and having recourse to, all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, subject to the Carve-Out (as defined in the Interim Order);

(h)    <u>506(c) Limitation</u> – subject only to and effective upon entry of the Final Order, the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code;

(i)    <u>Interim Hearing</u> – pursuant to Bankruptcy Rule 4001, that an interim hearing (the "<u>Interim Hearing</u>") on the Motion be held before this Court to consider entry of an order granting the Motion on an interim basis (the "<u>Interim Order</u>")[4] (i) authorizing the Debtors, on an interim basis, to borrow from the DIP Lenders under or as permitted by the DIP Documents up to an aggregate principal or face amount not to exceed (A) $18.1 million under the DIP Facility (the "<u>Interim Funding Amount</u>"), to provide operating cash for the Debtors' businesses, (ii) authorizing the Debtors' continued use of Cash Collateral and all other Prepetition Collateral, and (iii) granting adequate protection in the form of the Adequate Protection Superpriority Claim and the Adequate Protection Liens;

---

[3]    Shiloh Holdings Netherlands B.V. is a non-Debtor, foreign subsidiary.

[4]    The proposed Interim Order is attached hereto as <u>Exhibit A</u>.

(j)     <u>Final Hearing</u> – scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of a final order (the "<u>Final Order</u>" and collectively with the Interim Order, the "<u>DIP Orders</u>")) granting the relief requested in this Motion on a final basis; and

(k)     <u>Other Relief</u> – granting the other relief set forth in the Interim Order and the Final Order.

<u>**Facts Relevant to This Motion**</u>

**I.    The Prepetition Credit Agreement**

7.      The Prepetition Credit Agreement, as executed, provided a secured revolving line of credit in the amount of $300 million and a term of five years.  After a series of amendments, however, the Prepetition Credit Agreement's term has been extended through October 31, 2022, with an aggregate borrowing limit of up to $350 million (depending on compliance with certain covenants).

8.      As of the Petition Date, the Debtors owed approximately $341.3 million under the Prepetition Credit Agreement.  As of June 11, 2020, the Debtors negotiated the Tenth Amendment to the Prepetition Credit Agreement, which, among other things, waived certain financial covenants, added certain additional other financial covenants, amended the interest rate provisions, and implemented certain transactional milestones.  Including the approximately $4.8 million in issued letters of credit under the Prepetition Credit Agreement, unused commitments thereunder were approximately $8.7 million as of the Petition Date; however, the Debtors' actual borrowing capacity is subject to certain covenants included in the Prepetition Credit Agreement, so such unused commitments may fluctuate.

9.      The Debtor-Subsidiaries that are guarantors under the Prepetition Credit Agreement are Shiloh Corporation, Greenfield Die & Manufacturing Corp., Jefferson Blanking Inc., Shiloh Automotive, Inc., Shiloh Industries, Inc. Dickson Manufacturing Division, Liverpool Coil Processing, Inc., Medina Blanking, Inc., The Sectional Die Co., Sectional Stamping, Inc.,

- 6 -

Shiloh Die Cast LLC, Albany-Chicago Company LLC, Shiloh Die Cast Midwest LLC, Shiloh

Holdings International, Inc., FMS Magnum Holdings LLC, Shiloh Manufacturing LLC, and

Shiloh Manufacturing Holdings LLC.

    10. The Debtors' borrowings under the Prepetition Credit Agreement bear

interest at the London Interbank Offering Rate or the base rate, established from time to time by

the administrative agent, in each case plus an applicable margin.  Under the terms of the

recently-enacted Tenth Amendment to the Prepetition Credit Agreement, the margin on the

LIBOR borrowing rate was between 5.0% (subject to a LIBOR floor of 1.0%) and under the base

rate 4.0%, unless the Debtors businesses met certain financial metrics, in which case the margin

on the LIBOR borrowing rate was between 1.5% and 3.0% and under the base rate 0.5% and

2.0% (each depending upon the Debtors' leverage ratio).

**II.**  **The Debtors' Immediate Need for Access to the DIP Financing and Cash Collateral**

    11. After determining that the commencement of these cases was necessary,

and in order to preserve the value of their estates and fund the sale process described in the Ficks

Declaration, the Debtors, with the assistance of their professional advisors, explored various

options with respect to postpetition financing.  <u>See</u> Lewis Declaration, at ¶¶ 14-16.  Having

received no third party financing proposals as part of Houlihan Lokey Capital Inc.'s

comprehensive marketing efforts, the Debtors determined that the financing proposal from their

existing lenders under the Prepetition Credit Facility provided the Debtors with the best

opportunity to emerge from these cases in a timely manner and maximize the value of their

estates.  <u>Id.</u> at ¶¶ 15-16.

    12. The DIP Facility consists of a $123.5 million senior secured superpriority

credit facility provided by the Debtors' existing lenders under the Prepetition Credit Facility.

Borrowings under the DIP Facility will be secured by a first priority lien on substantially all of

the Debtors' assets.  The DIP Facility, coupled with cash flow from operations, will permit the

Debtors to fund their businesses through a controlled and orderly sale process.  Without the

funding provided by the DIP Facility, the Debtors will experience a near-term liquidity shortfall

and will be unable to conduct a sale process in a way that preserves value for their creditors.

See Ficks Declaration, at ¶ 42.  The DIP Facility will therefore enhance the Debtors' ability to

minimize immediate disruption to their business and instill confidence among customers,

employees and service providers and ensure their continued support pending a sale of the

Debtors' assets.  Id., at ¶ 44.

13.    The Debtors, in consultation with their proposed financial advisor, Ernst &

Young LLP ("EY LLP"), have reviewed and analyzed the Debtors' projected cash needs and

have prepared a 13-week budget (the "13-Week Budget") outlining the Debtors' postpetition cash

needs in the initial 13 weeks of these cases.[5]  Id., at ¶ 42.   The Debtors, in consultation with

their advisors, believe that the 13-Week Budget appropriately reflects the Debtors' estimated

funding requirements over the identified period, and it shows the Debtors being able to meet

their obligations – including administrative expenses in these chapter 11 cases – and is

reasonable and appropriate under the circumstances.  Id., at ¶¶ 42, 45.

14.    Immediate and ongoing access to funding under the DIP Facility is

intended to demonstrate to customers, employees, vendors, suppliers, and other key

constituencies that the Debtors have sufficient resources available to meet their obligations in the

ordinary course during these cases.  Id., at ¶ 44.  Absent funds available under the DIP

Financing, access to Cash Collateral and the cooperation of key business partners at this critical

early stage, the Debtors could (a) face a significant interruption in their businesses; (b) face

---

[5]    A copy of the 13-Week Budget is attached hereto as Exhibit D.

diminished customer confidence in the Debtors' products and ability to fulfill customer requirements; and (c) undermine the support of important groups on whom the Debtors' businesses and restructuring depend, which, in turn, would hinder their ability to preserve the value of their estates.  Id.

15.     Thus, the Debtors seek to borrow (a) up to $18.1 million under the DIP Facility on an interim basis.  The Debtors will use these funds to (a) continue the day-to-day operations of their businesses, (b) maintain "business as usual" relationships with their employees, customers, and vendors to the extent practicable, (c) complete a robust sale process designed to yield the highest and best bids for the Debtors' assets, and (d) adequately fund these chapter 11 cases.[6]

16.     In sum, without the relief requested in the Motion, the Debtors would suffer substantial, irreparable, and ongoing harm.  Accordingly, the Debtors' need for access to postpetition financing and the use of Cash Collateral on the terms set forth in the DIP Credit Agreement and the DIP Orders is immediate and urgent.

## III.    Principal Terms of DIP Facility

17.     The principal terms of the DIP Facility required to be highlighted or disclosed pursuant to relevant Bankruptcy Rules are as follows:[7]

---

[6]     As described and for the reasons set forth below, subject to entry of the Final Order, $100 million of such borrowings are proposed to be used to repay that amount of outstanding Prepetition Obligations (defined below) under the Prepetition Credit Agreement.

[7]     Capitalized terms used and not otherwise defined herein will have the meanings given to them in the DIP Credit Agreement or the Interim Order, as applicable.  This disclosure above is qualified in its entirety by reference to the applicable provisions of the DIP Credit Agreement or the Interim Order, as applicable. To the extent there exists any inconsistency between the disclosure above and the provisions of the DIP Credit Agreement or the Interim Order, the provisions of the DIP Credit Agreement or the Interim Order, as applicable, shall control.

RLF1 23936709v.1

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| **Parties**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement, p. 1<br><br>Interim Order, p. 2 | <u>Borrower</u>:   Shiloh Industries, Inc.<br><br><u>Guarantors</u>:   Each of the Debtors.<br><br><u>DIP Agent</u>:   Bank of America, N.A.<br><br><u>DIP Lenders</u>: Exclusively comprised of Prepetition Lenders. |
| **Commitment**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement, p. 1.<br><br>Interim Order, ¶ 2. | On an interim basis, during the period prior to entry of the Final Order, subject to the terms of the Interim Order, the Approved Budget and the DIP Documents, an aggregate principal amount not to exceed $18,100,000.00 ("<u>Interim Borrowings</u>").  The maximum principal amount that may be borrowed following entry of the Final Order cannot exceed $123,500,000.00 (inclusive of any outstanding Interim Borrowings). |
| **Maturity/Termination Date**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 1.01<br><br>Interim Order ¶ 9. | The DIP Lenders' commitments under the DIP Documents will terminate and the DIP Obligations (as defined in the Interim Order) will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Documents and the Interim Order by way of acceleration or otherwise), and the Debtors' authority to use Cash Collateral in accordance with the Interim Order will terminate, on the date that is the earliest to occur of (in each case, the "<u>Maturity Date</u>"):  (i) four (4) months after the commencement of these chapter 11 cases; (ii) the date which is thirty (30) days following the entry of the Interim Order if the Court has not entered the Final Order on or prior to such date; (iii) the acceleration of the DIP Obligations upon five (5) business days' prior written notice of an event of default under the DIP Credit Agreement (an "<u>Event of Default</u>") and at the written request of the Required Lenders; (iv) the date upon which any plan of reorganization or liquidation becomes effective in any of these Chapter 11 Cases; (v) entry of an order by the Bankruptcy Court in any these Chapter 11 Cases (a) dismissing any of these Chapter 11 Cases or converting any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code without the consent of the Required Lenders or (b) appointing a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Borrower (powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case without the consent of the DIP Agent and the Required |

| **REQUIRED DISCLOSURE** | **MATERIAL TERMS** |
|---|---|
| | Lenders; (vi) the effective date of a sale of all or substantially all of the assets of the Debtors and (vii) the filing or support by any Debtor of a plan of reorganization or liquidation (a "Plan") that is not otherwise reasonably acceptable to the DIP Agent and the Required Lenders in their sole discretion; provided, that, a Plan that, upon its effective date, pays the DIP Obligations and the obligations under the Prepetition Credit Agreement in full in cash on the effective date of such Plan shall be deemed reasonably acceptable to such parties. |
| **Interest Rate and Premiums**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement §§ 1.01, 2.08 | Subject to the Default Rate, (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the sum of the Eurocurrency Rate for such Interest Period plus the Applicable Rate, and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the sum of the Base Rate plus the Applicable Rate.  To the extent that any calculation of interest or any fee required to be paid under the DIP Credit Agreement shall be based on (or result in) a calculation that is less than zero, such calculation shall be deemed zero for purposes of the DIP Credit Agreement.<br><br>Upon the occurrence and during the continuance of any Event of Default, at the election of the Administrative Agent with the written consent of the Required Lenders or at the written instruction of the Required Lenders, all outstanding Obligations shall bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable on demand.<br><br>Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law. |
| **Fees & Expenses**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | The Company shall pay to the Administrative Agent, for the account of each Lender in accordance with its Applicable Percentage, a commitment fee in Dollars (the "Commitment Fee") at a rate per annum equal to the product of (i) one half |

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| DIP Credit Agreement §§ 2.09, 11.04(a).<br><br>Interim Order ¶¶ 11, 16(c). | of one percent (0.50%) per annum times (ii) the actual daily amount by which the Aggregate Revolving Commitments exceed the Outstanding Amount of Revolving Loans, subject to adjustment as provided in Section 2.15.  For the avoidance of doubt, for purposes of determining the Commitment Fee, and the Commitment Fee shall be determined based on the full $23,500,000 of Revolving Commitments prior to entry of the Final Order and thereafter.  The Commitment Fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in Article V is not met, and shall be due and payable monthly in arrears on the first Business Day of each month, commencing with the first such date to occur after the Closing Date, and on the Maturity Date; provided, that (A) no Commitment Fee shall accrue on the Revolving Commitment of a Defaulting Lender so long as such Lender shall be a Defaulting Lender and (B) any Commitment Fee accrued with respect to the Revolving Commitment of a Defaulting Lender during the period prior to the time such Lender became a Defaulting Lender and unpaid at such time shall not be payable by the Company so long as such Lender shall be a Defaulting Lender.  The Commitment Fee shall be calculated monthly in arrears.<br><br>The Company shall pay to the Administrative Agent for its own account, in Dollars, fees in the amounts and at the times specified in the Fee Letter.  Such fees shall be fully earned when paid and shall be non-refundable for any reason whatsoever.<br><br>The Loan Parties shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, and any Lender (including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent, any Lender and Alix Partners (as financial advisors to the Administrative Agent)), and shall pay all fees and time charges for attorneys who may be employees (with no profit margin) of the DIP Agent or any DIP Lender in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of the DIP Credit Agreement and the other Loan Documents, the Interim Order, the Final Order or any amendments, modifications or waivers of the provisions thereof or of the DIP Credit Agreement (whether or not the transactions contemplated thereby or by the DIP |

| Required Disclosure | Material Terms |
| --- | --- |
| | Credit Agreement shall be consummated), (ii) [reserved], (iii) [reserved] and (iv) all out-of-pocket expenses incurred by the Administrative Agent, any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent, any Lender, and Alix Partners (as financial advisors to the Administrative Agent)), and shall pay all fees and time charges for attorneys who may be employees (with no profit margin) of the Administrative Agent or any Lender, in connection with the Chapter 11 Case and any successor case, including, without limitation (A) in connection with the enforcement or protection of its rights, (B) in connection with the DIP Credit Agreement or the other Loan Documents, including its rights under section 11.04 of the DIP Credit Agreement, or (C) in connection with the Loans made under the DIP Credit Agreement, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans, in each case subject to receipt by the Loan Parties of an invoice.  The Loan Parties will be invoiced on a monthly basis for the foregoing fees and expenses.  All such fees and expenses shall be paid by the Loan Parties on the twelfth (12th) Business Day following delivery of the applicable invoice; provided, that the Administrative Agent or any Lender, as applicable, shall provide copies of each invoice to the United States Trustee and the Unsecured Creditors Committee in the Chapter 11 Case and allow such parties at least (10) Business Days to review and object to any such invoice.  In the event that an objection is asserted, the Loan Parties shall:  (A) pay the undisputed portion of the applicable fees and expenses pursuant to the terms of section 11.04 of the DIP Credit Agreement; and (B) not be required to pay the disputed portion of the applicable fees and expenses until such time as the Bankruptcy Court has made a determination regarding such objection.  For the avoidance of doubt, the reasonable fees and expenses of the Administrative Agent and the Lenders shall not be subject to the limitations set forth in the Budget. |

| | |
|---|---|
| **Use of Funds**<br><br>Fed. R. Bankr.<br>P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 7.11<br><br>Interim Order ¶¶ 2, 4(a), and 20. | Each Loan Party shall, and shall cause each of its Subsidiaries to, use the proceeds of the Credit Extensions, subject to the Interim Order and the Final Order: (a) for working capital and other general purposes of the Loan Parties, including the payment of professional fees and expenses; (b) as provided in the DIP Orders to pay the reasonable fees and expenses of the Administrative Agent and the Lenders (including the reasonable fees and expenses of counsel and financial advisors); (c) to pay claims in respect of certain Prepetition creditors, which may include, without limitation, employees, customers, lienholders, insurers, vendors and taxing authorities in the ordinary course, in each case to the extent authorized by the Interim Order or the Final Order, as applicable; and (d) to make adequate protection payments to the Prepetition Agent and the Prepetition Lenders to the extent authorized by orders of the Bankruptcy Court, in each case in accordance with the Budget; provided, that in no event shall the proceeds of any Credit Extension be used (i) in contravention of any Law or of any Loan Documents; or (ii) for the payment of professional fees and disbursements incurred in connection with any challenge to (A) the amount, extent, priority, validity or enforcement of the indebtedness of the Loan Parties owing to the Administrative Agent, the Lenders, the Prepetition Agent or the Prepetition Lenders or (B) the collateral securing such indebtedness or the amount, extent, perfection, priority, enforcement or validity of the Liens granted in favor of the Administrative Agent, the Lenders, the Prepetition Agent or the Prepetition Lenders with respect thereto; provided, notwithstanding anything to the contrary herein, no more than an aggregate of $50,000 of the Carve-Out may be used by the Unsecured Creditors Committee to investigate the matters in the foregoing clauses (A) and (B).<br><br>Available financing and advances under the DIP Credit Agreement shall, on an interim basis, be made to fund, in accordance with the DIP Documents and the Approved Budget, working capital and general corporate requirements of the Debtors, adequate protection to the Prepetition Lenders, bankruptcy-related costs and expenses (including interest, fees and expenses in accordance with the Interim Order and the DIP Documents), and any other amounts required or allowed to be paid in accordance with the Interim Order, but only as and to the extent authorized by the Approved Budget and the DIP Documents. Upon entry of the Final Order and subject to paragraph 19 of the Interim Order, $100,000,000.00 of the principal amount of the Prepetition Obligations held by DIP |

- 14 -

| Required Disclosure | Material Terms |
|---|---|
| | Lenders (allocated in accordance with their respective shares of the DIP Loans) shall be converted into DIP Loans, and such portion (once converted into DIP Loans) may not be reborrowed after any repayment (whether full or partial) thereof. |
| | The Debtors have delivered to the DIP Agent a detailed budget that sets forth projected cash receipts and cash disbursements on a weekly basis for the time period from and including the Petition Date through November 27, 2020 that has been approved by the Required Lenders (defined below), and a copy of which is attached hereto as Exhibit A (as updated, amended, supplemented or otherwise modified in accordance herewith, the "Approved Budget").  The Approved Budget also sets forth, for each week, the amount of DIP Loans anticipated to be advanced or otherwise used for such week after giving effect to any budgeted inflows.  The Debtors shall provide to the DIP Secured Parties financial reporting in accordance with the terms of the DIP Documents. Funds borrowed under the DIP Credit Agreement and Cash Collateral used under the Interim Order shall be used by the Debtors in accordance with the DIP Documents, including the Approved Budget, and the Interim Order.  The consent of the Required Lenders to the Approved Budget shall not be construed as a commitment of the DIP Lenders to provide DIP Loans or of the DIP Secured Parties or Prepetition Lenders to permit the use of Cash Collateral (subject to the Carve-Out) after the occurrence of a Termination Event (as defined below) under the Interim Order, regardless of whether the aggregate funds shown on the Approved Budget have been expended. |
| | Notwithstanding anything in the Interim Order or the DIP Documents to the contrary, without the express written consent of the DIP Agent and the Prepetition Agent, no proceeds of the DIP Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay any claims for services rendered by any professionals retained by the Debtors, any creditor or party in interest, any Creditors' Committee, any trustee appointed under these Chapter 11 Cases or any Successor Case(s) or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364 of the Bankruptcy Code or otherwise, other than from the DIP |

- 15 -

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | Secured Parties, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash all DIP Obligations, or (b) investigate (except as set forth in this paragraph below), assert, join, commence, support or prosecute any Challenge or other action or claim, counter-claim, proceeding, application, motion, objection, defense, or other adversary proceeding or contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of the DIP Secured Parties or any other Releasee with respect to any transaction, occurrence, omission or action including, without limitation, (i) any actions under chapter 5 of the Bankruptcy Code, (ii) any action relating to any act, omission or aspect of the relationship between or among any of the Releasees, on the one hand, and any of the Debtors, on the other, (iii) any action with respect to the validity and extent of the DIP Obligations, the Prepetition Obligations or the validity, extent and priority of the DIP Liens, the Prepetition Liens or the Adequate Protection Liens, (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the Prepetition Obligations, the Prepetition Liens, the Adequate Protection Superpriority Claim or the Adequate Protection Liens or (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) any DIP Secured Party in respect of the enforcement of the DIP Liens, (c) subject to authority provided to the Debtors pursuant to the DIP Documents, pay any claim (as defined in the Bankruptcy Code) of a prepetition creditor (as defined in the Bankruptcy Code) if the Debtors have received a written objection to such payment from the DIP Agent, and/or (d) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted by the Interim Order or by the DIP Documents, without the express written consent of the applicable DIP Secured Parties.  Notwithstanding the foregoing, up to $50,000 in the aggregate of the DIP Facility, DIP Collateral, Cash Collateral and Carve-Out may be used by a Creditors' Committee during the Challenge Period to investigate claims against the Releasees. |

| | |
|---|---|
| **Material Conditions to Closing – Interim Funding Conditions**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 5.01 | This DIP Credit Agreement shall become effective upon and the obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent: (a) receipt by the Administrative Agent of executed counterparts of the DIP Credit Agreement and the other Loan Documents, each properly executed by a Responsible Officer of the signing Loan Party and, in the case of the DIP Credit Agreement, by each Lender; (b) receipt by the Administrative Agent of favorable opinions of legal counsel to the Loan Parties, addressed to the Administrative Agent and each Lender, dated as of the Closing Date, and in form and substance reasonably satisfactory to the Administrative Agent; (c) Receipt by the Administrative Agent of the following, in form and substance satisfactory to the Administrative Agent and its legal counsel: (i) copies of the Organization Documents of each Loan Party certified to be true and complete as of a recent date by the appropriate Governmental Authority of the state or other jurisdiction of its incorporation or organization, where applicable, and certified by a secretary or assistant secretary of such Loan Party to be true and correct as of the Closing Date; (ii) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with the DIP Credit Agreement and the other Loan Documents to which such Loan Party is a party; and (iii) such documents and certifications as the Administrative Agent may require to evidence that each Loan Party is duly organized or formed, and is validly existing, in good standing and qualified to engage in business in its state of organization or formation; (d) Receipt by the Administrative Agent of the following: (i) searches of Uniform Commercial Code filings in the jurisdiction of formation of each Loan Party or where a filing would need to be made in order to perfect the Administrative Agent's security interest in the Collateral, copies of the financing statements on file in such jurisdictions and evidence that no Liens exist other than Permitted Liens; (ii) UCC financing statements for each appropriate jurisdiction as is necessary, in the Administrative Agent's sole discretion, to perfect the Administrative Agent's security interest in the Collateral; (iii) subject to Section 4(a) of the Pledge Agreement, all certificates evidencing any certificated Equity Interests pledged to the Administrative Agent pursuant to the Pledge Agreement, together with duly executed in blank and undated stock powers attached thereto; |

| Required Disclosure | Material Terms |
|---|---|
| | (iv) searches of ownership of, and Liens on, intellectual property of each Loan Party in the appropriate governmental offices; and (v) duly executed notices of grant of security interest in the form required by the Security Agreement as are necessary, in the Administrative Agent's sole discretion, to perfect the Administrative Agent's security interest in the intellectual property of the Loan Parties; (e) receipt by the Administrative Agent of a certificate signed by a Responsible Officer of the Company certifying that the conditions specified in Sections 5.02(a) and (b) have been satisfied; (f) receipt by the Administrative Agent and the Lenders of any fees required to be paid on or before the Closing Date, to the extent invoiced prior to the Closing Date; (g) unless waived by the Administrative Agent, the Company shall have paid all fees, charges and disbursements of counsel to the Administrative Agent to the extent invoiced prior to the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Company and the Administrative Agent); (h) receipt by the Administrative Agent of a Request for Credit Extension in accordance with the requirements hereof with respect to the Loans to be made on the Closing Date; (i) the Administrative Agent and the Lenders shall have received all documentation and other information required under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act, at least three Business Days prior to the requested Borrowing.  If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, it shall deliver a certification regarding beneficial ownership required by the Beneficial Ownership Regulation to each Lender that so requests; (j) on or prior to the Closing Date, the Security Agreement, the Pledge Agreement and the Interim Order, upon entry of the Interim Order, shall be effective to create in favor of the Administrative Agent, for the benefit of the holders of the Obligations, a legal, valid and enforceable: (i) first priority (except for Existing Liens entitled to priority under applicable Laws) perfected (to the extent required by the Security Agreement, the Pledge Agreement or the DIP Orders) security interest in and Lien on the Collateral, subject to the Carve-Out; |

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | and (ii) with respect to the Collateral subject to Existing Liens entitled to priority under applicable Laws, junior perfected (to the extent required by the Security Agreement, the Pledge Agreement or the DIP Orders) security interest in and Lien on such Collateral, subject to such applicable Existing Lien and the Carve-Out; (k) prior to the Closing Date, the Bankruptcy Court shall have entered the Interim Order, which Interim Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed.  If the Interim Order is the subject of a pending appeal in any respect, neither the Interim Order nor the making of the Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal; (l) on the Closing Date, all of the "first day orders" entered reasonably soon after the commencement of the Chapter 11 Case by the Bankruptcy Court in the Chapter 11 Case and all adequate protection payments and critical vendor payments approved by the Bankruptcy Court in the Interim Order or otherwise shall be reasonably satisfactory in form and substance to the Administrative Agent and the Lenders in all material respects; (m) on the Closing Date, all orders (if any) providing for payment of Prepetition indebtedness of the Loan Parties or affecting in any way the Obligations or Collateral submitted for entry in the Chapter 11 Case shall be reasonably satisfactory in form and substance to the Administrative Agent, as entered, and shall not deviate from the form thereof approved by the Administrative Agent in any material respect which is adverse to the interests of the Lenders or the Prepetition Lenders; (n) on the Closing Date, the Lenders shall have received and be satisfied with the initial Budget; and (o) the Loan Parties shall have commenced the Chapter 11 Case in the Bankruptcy Court. |
| **Material Conditions to Subsequent Borrowings**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>DIP Credit Agreement § 5.02 | The obligation of each Lender to honor any Request for Credit Extension is subject to the following conditions precedent: (a) the representations and warranties of the Company and each other Loan Party contained in Article VI of the DIP Credit Agreement or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (or, if any such representation or warranty is qualified by materiality or Material Adverse Effect, it shall be true and correct in all respects) on and as of the date of such Credit Extension, except to the extent that such representations |

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or reference to Material Adverse Effect) as of such earlier date; (b) no Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof; (c) the Administrative Agent and shall have received a Request for Credit Extension in accordance with the requirements hereof; and (d) at the time of each Borrowing, and also after giving effect thereto, (i) if an extension of credit has been requested before the Final Order has been entered by the Bankruptcy Court, the Interim Order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified, rescinded or amended in any respect without the prior written consent of the Administrative Agent other than in respect of immaterial modifications (with the prior written consent of the Administrative Agent not to be unreasonably withheld for such modifications), and (ii) if an extension of credit is requested after the Final Order has been entered by the Bankruptcy Court, the Administrative Agent and the Lenders shall have received a copy of the Final Order and the Final Order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified or amended in any respect without the prior written consent of the Administrative Agent (with the prior written consent of the Administrative Agent not to be unreasonably withheld for such modifications).  If either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of such DIP Order, the making of the Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.  The Loan Parties, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with the DIP Credit Agreement, notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction. |
| **Events of Default**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B) | Any of the following shall constitute an Event of Default:<br><br><u>Non-Payment</u>.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within three (3) Business Days |

| Required Disclosure | Material Terms |
|---|---|
| DIP Credit Agreement § 9.01 | after the same becomes due, any interest on any Loan, or any fee due hereunder, or (iii) within five (5) Business Days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or |
| | Specific Covenants.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 7.01, 7.02, 7.03, 7.05, 7.10, 7.11, 7.12 or 7.14 or Article VIII; |
| | Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) of section 9.01 of the DIP Credit Agreement) contained in any Loan Document on its part to be performed or observed and such failure continues for ten (10) days; |
| | Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading when made or deemed made; |
| | Cross-Default.  (i) Any Loan Party or any Subsidiary (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash |

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | collateral in respect thereof to be demanded; <u>provided</u> that, with respect to any such failure that occurred prior to the Petition Date or with respect to the Prepetition Credit Agreement, such failure or event shall be an Event of Default solely to the extent not subject to the automatic stay by the Bankruptcy Court or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which the Company or any Subsidiary is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which the Company or any Subsidiary is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Company or such Subsidiary as a result thereof is greater than the Threshold Amount; <u>provided</u> that, with respect to any such occurrence prior to the Petition Date or with respect to the Prepetition Credit Agreement, such occurrence shall be an Event of Default solely to the extent not subject to the automatic stay by the Bankruptcy Court; <br><br> <u>Bankruptcy Matters</u>.  Any of the following shall occur: <br><br> (i) any Chapter 11 Case shall be dismissed (which dismissal does not require as a condition to such dismissal the termination of the Lenders' Commitments and the payment in full in cash of all Secured Obligations and the Prepetition Facility Obligations) or converted to a case under Chapter 7 of the Bankruptcy Code or the Loan Parties (or any of them) shall file a motion or other pleading seeking the dismissal or conversion of any Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Required Lenders; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any Chapter 11 Case, provided that the appointment of a Chapter 11 trustee or officer or examiner with enlarged powers shall not be an Event of Default hereunder if (A) such relief is sought by the Administrative Agent or (B) the Required Lenders waive such Event of Default in connection with |

- 22 -

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | such appointment; the Board of Directors of one or more of the Loan Parties shall authorize a liquidation of any Loan Party's business, except with the prior written consent of the Administrative Agent; an application shall be filed by the Loan Parties for the approval of any other Superpriority Claim (other than the Carve-Out, which shall have a Superpriority Claim ranking senior to the Secured Obligations, and which shall be paid by the Loan Parties at the times and in the amounts permitted by an order of the Bankruptcy Court) or any Primed Liens in any Chapter 11 Case which is equal to or senior to the claims of the Lenders against the Loan Parties hereunder or under any of the other Loan Documents if it is not used to repay the Secured Obligations in full in cash, or there shall arise or be granted any such senior or pari passu Superpriority Claim; or the Loan Parties shall file an application or motion for the approval of any Lien in any Chapter 11 Case that is *pari passu* with or senior to the Liens of the Secured Parties or the Liens of the Prepetition Agent and the Prepetition Lenders granted or created hereunder, under any of the other Loan Documents or either of the Orders (other than Liens of third parties securing the Carve-Out and any other Liens permitted by the DIP Credit Agreement and the other Loan Documents, which shall have the respective priorities set forth in the Interim Order, the Final Order or the DIP Credit Agreement, as applicable); <br><br> (ii)      the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code pertaining to the Collateral to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Loan Parties in an amount in excess of $250,000, individually or in the aggregate (except as otherwise permitted in writing by the Administrative Agent) or (ii) permit other actions that would have a Material Adverse Effect; <br><br> (iii)      (1) the Final Order Entry Date shall not have occurred on or prior to the date occurring thirty (30) calendar days after the entry of the Interim Order, (2) an order of the Bankruptcy Court shall be entered |

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | reversing, amending, supplementing, vacating or otherwise amending, supplementing or modifying the Interim Order and/or the Final Order without the prior written consent of the Administrative Agent, or any Loan Party shall apply for authority to do so, without the prior written consent of the Administrative Agent, (3) an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Required Lenders to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Secured Parties in respect of the Secured Obligations except as otherwise provided in the DIP Credit Agreement, (4) [reserved], (5) the Interim Order and/or the Final Order shall cease to create a valid and perfected first priority Lien on the Collateral or otherwise cease to be valid and binding and in full force and effect, (6) [reserved], (7) any Loan Party shall seek any modification of the Interim Order and/or the Final Order or assert in any pleading filed in any court that any material provision of the Interim Order and/or the Final Order is not valid and binding for any reason or otherwise modifying the Interim Order and/or the Final Order in a manner adverse to the Secured Parties, or (8) if any Loan Party is enjoined, restrained or in any way prevented by court order from continuing or conducting all or any material part of its business or affairs; <br><br> (iv)    except as permitted by the DIP Credit Agreement, the DIP Orders, the Budget or as otherwise agreed to by the Administrative Agent and the Required Lenders, the Loan Parties shall make (or shall have made) any Prepetition Payment other than Prepetition Payments authorized by the Bankruptcy Court in accordance with orders of the Bankruptcy Court entered without objection by the Administrative Agent; <br><br> (v)    the Bankruptcy Court shall enter an order avoiding or requiring disgorgement by the Secured Parties of any material amounts received in respect of the Secured Obligations; |

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | (vi)     the Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of any assets, properties or equity of any Loan Party pursuant to Section 363 of the Bankruptcy Code without the consent of the Administrative Agent and Required Lenders unless such order or orders contemplate the repayment in full in cash of the Secured Obligations and the termination in full of all Commitments under the DIP Credit Agreement;<br><br>(vii)    any of the Loan Parties shall take any action in support of any matter set forth in clauses (i)-(vi) above or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;<br><br>(viii)    any Loan Party shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment;<br><br>(ix)    any Loan Party shall file a motion in the Chapter 11 Case (A) to use cash collateral under Section 363(c) of the Bankruptcy Code without the consent of the Lenders, (B) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under the DIP Credit Agreement or (C) to take any other action or actions materially adverse to Administrative Agent or the Lenders, or their rights and remedies hereunder or under any of the other Loan Documents, or the DIP Orders, or Administrative Agent's interest in any of the Collateral;<br><br>(x)    the filing or support by any Loan Party of any plan of reorganization or liquidation that is not reasonably approved by the Administrative Agent and the Required Lenders unless such plan of reorganization or liquidation provides for the repayment in full in cash of and termination in full of all Commitments and Secured Obligations upon its effective date;<br><br>(xi)    any Loan Party shall take (or support any Person in taking) any action in order to restrict or prohibit the |

| Required Disclosure | Material Terms |
|---|---|
| | Administrative Agent, any Lender, the Prepetition Agent or any Prepetition Lender from submitting a "credit bid" for any assets of the Loan Parties; |
| | (xii)   subject to any requirements to the contrary in the DIP Orders, the Loan Parties fail to disburse the sale proceeds to the Administrative Agent contemporaneously with the closing of a sale of substantially all of the Loan Parties' assets, subject to payment of the Carve-Out and any wind-down fund provided for in the DIP Orders; |
| | (xiii)   the grant of a change of venue with respect to the Chapter 11 Case without the consent of the Administrative Agent and the Required Lenders (such consent not to be unreasonably withheld); |
| | (xiv)   other than with respect to the Carve-out, entry of a final non-appealable order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral; |
| | (xv)   the filing of a challenge by any Loan Party to the Liens or claims of the Prepetition Agent or the Prepetition Lenders based on upon the Prepetition Agent's or any of the Prepetition Lender's conduct; or |
| | (xvi)   except as otherwise permitted in the DIP Credit Agreement, the failure of any Loan Party to comply in any material respect with the terms of the Interim Order or the Final Order (after giving effect to any applicable grace period or periods in the Interim Order or Final Order, as applicable); or |
| | Attachment.  Any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty (30) days after its issue or levy; |
| | Judgments.  There is entered against any Loan Party or any Subsidiary (i) one or more final judgments or orders for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage), or (ii) any one or more non-monetary final |

- 26 -

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; |
| | ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount and such ERISA Event would result in a Material Adverse Effect, or (ii) the Company or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount and such failure would result in a Material Adverse Effect; provided that, with respect to any such events that occurred prior to the Petition Date or with respect to the Prepetition Credit Agreement, such failure or event shall be an Event of Default solely to the extent not subject to the automatic stay of the Bankruptcy Court; |
| | Invalidity of Loan Documents.  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect or ceases to give the Administrative Agent any material part of the Liens purported to be created thereby; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or |
| | Change of Control.  There occurs any Change of Control without the consent of the Administrative Agent. |

- 27 -

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| **Effectiveness of Interim Order Provisions if Final Relief Is Denied**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Interim Order, ¶¶ 15, 17(b)(v) | The DIP Liens, DIP Superpriority Claim, Adequate Protection Liens and Adequate Protection Superpriority Claim and other rights and remedies granted under the Interim Order to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders shall continue in these Chapter 11 Cases and any Successor Case(s), and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Chapter 11 Cases and upon the dismissal of any or all of the Debtors' Chapter 11 Cases, or in any Successor Case(s), and such liens and security interests shall maintain their first priority as provided in the Interim Order until all the DIP Obligations and the Prepetition Obligations have been indefeasibly paid in full in cash and the DIP Lenders' commitments have been terminated in accordance with the DIP Documents and the Interim Order.<br><br>The Carve-Out shall be effective upon entry of the Interim Order and shall not be rendered ineffective as a result of the occurrence, or non-occurrence, of any event or circumstance thereafter. In no event shall any Approved Budget, the Carve-Out or any Carve-Out Reserve Account be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors. |
| **Security and Priority**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(i, vii)<br><br>DIP Credit Agreement, § 2.16<br><br>Interim Order ¶¶ 13, 14 | Security for DIP Obligations:<br><br>To secure the DIP Obligations, the Interim Order grants the DIP Secured Parties, pursuant to and in accordance with Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, valid, enforceable and fully perfected liens (the "DIP Liens") in and on all of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all of each Debtor's now owned or hereafter acquired right, title and interest in and to all cash, accounts, accounts receivable, goods, inventory, property, plant and equipment, commercial tort claims, intellectual property, contract rights, tax refunds, prepaid expenses, deposits, general intangibles, real estate, leaseholds (provided, however, with respect to the Debtors' non-residential real property leases, no liens or encumbrances shall be granted or extend to such leases themselves under the |

- 28 -

| Required Disclosure | Material Terms |
|---|---|
| | Interim Order, except as permitted in the applicable lease or pursuant to applicable law, but rather any liens granted shall extend only to the proceeds realized upon the sale, assignment, termination, or other disposition of such leases, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds), all proceeds or property recovered in connection with actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions") (provided that the lien on Avoidance Actions and proceeds of Avoidance Actions shall be limited to the proceeds and property recovered in connection therewith and shall only attach hereunder to the extent approved in the Final Order), all intercompany claims, all claims and causes of action of each Debtor or its respective estate (including, without limitation, all commercial tort claims of every kind and description, whether described in specificity in the DIP Documents or not) and any and all proceeds and property recovered therefrom, any and all proceeds arising from insurance policies, all intellectual property, and the equity interests of each direct subsidiary of each Debtor, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of each Debtor that constitute Prepetition Collateral, and all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above (collectively, the "DIP Collateral"), subject only to prior payment of the Carve-Out.<br><br>The DIP Liens shall be effective immediately upon the entry of the Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date or created thereafter, including under sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than prior payment of the Carve-Out.<br><br>Pursuant to the Interim Order, the DIP Liens shall be deemed fully perfected liens and security interests, effective and perfected upon the date of the Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements or any other agreements, filings or instruments, such that no additional |

- 29 -

| Required Disclosure | Material Terms |
|---|---|
| | actions need be taken by the DIP Agent, the DIP Lenders or any other party (including, without limitation, any depository bank or securities intermediary) to perfect such interests. |

Priority of DIP Obligations:

At all times prior to indefeasible payment in cash in full of the DIP Obligations, the priority of the DIP Liens will:  (a) pursuant to sections 361, 362 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, be perfected first priority liens (subject to Senior Third-Party Liens (as defined in the Interim Order), if any) on all DIP Collateral; (b) Pursuant to section 364(c)(3) of the Bankruptcy Code, be perfected junior liens on all DIP Collateral that was, as of the Petition Date, subject to valid, properly perfected, (before the Petition Date or in accordance with section 546(b) of the Bankruptcy Code), non-avoidable and senior in priority as a matter of law liens in existence at the time of the commencement of these Chapter 11 Cases (other than the liens in favor of the Prepetition Lenders, which liens are "primed" pursuant to the liens described in subsection (iii) below) with a priority immediately junior to any such ("Senior Third-Party Liens"), with a priority immediately junior to any such Senior Third-Party Liens; (c) pursuant to section 364(d) of the Bankruptcy Code, be perfected first priority, senior priming liens on all DIP Collateral that is subject to (i) the existing liens that secure the obligations of the applicable Debtors under or in connection with the Prepetition Credit Agreement and, (ii) existing liens junior in priority to the liens granted in favor of the Prepetition Lenders, all of which existing liens (the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first priority senior liens granted to the DIP Secured Parties hereunder, which senior priming liens in favor of the DIP Secured Parties shall also prime any liens granted after the commencement of these Chapter 11 Cases to provide adequate protection in respect of any of the Primed Liens; and (d) pursuant to the terms of this Interim Order, be subject to the Carve-Out and any senior liens, if any, permitted under the DIP Documents.

Pursuant to the Interim Order the DIP Secured Parties are shall be granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in each of these Chapter 11

- 30 -

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | Cases and in any successor case(s) under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, the "Successor Case(s)") for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 726, 1113 and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof including, without limitation, any proceeds or property recovered in connection with the pursuit of Avoidance Actions.  The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out.  The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases including, without limitation, on account of any break-up fee or expense reimbursement that may be granted by the Court in connection with any sale of the Debtors' assets, and the Adequate Protection Superpriority Claim (as defined below). |
| **Adequate Protection**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(ii)<br><br>Interim Order, ¶¶ 16. | As adequate protection in respect of, and as consideration for any Diminution resulting from any of the incurrence and payment of the DIP Obligations, the use of Cash Collateral, the use of other Prepetition Collateral, the granting of the DIP Liens and the DIP Superpriority Claim, the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, Pursuant to the Interim Order, the Prepetition Lenders shall be granted (in each case subject only to the DIP Liens, the DIP Superpriority Claim, and prior payment of the Carve-Out) the following adequate protection.<br><br>Adequate Protection Liens.  To secure the Adequate Protection Superpriority Claim (as defined below), pursuant to the Interim Order,  the Prepetition Agent, for itself and for the benefit of the other Prepetition Lenders, shall be granted |

(effective and perfected by operation of law immediately upon entry of the Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements, filings or instruments) valid, perfected, postpetition security interests and liens (the "Adequate Protection Liens") in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens and (ii) prior payment of the Carve-Out.

Adequate Protection Superpriority Claim.  As further adequate protection, the Prepetition Agent, for itself and for the benefit of the other Prepetition Lenders, pursuant to the Interim Order, shall be granted a superpriority claim to the extent of any Diminution, which claim shall have priority over all other administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 552, 726, 1113 and 1114 and any other provision of the Bankruptcy Code (the "Adequate Protection Superpriority Claim"), provided however, such Adequate Protection Superpriority Claim shall (i) be subordinate and subject only to the DIP Superpriority Claim and prior payment of the Carve-Out, and (ii) shall be entitled to all protections and benefits of section 507(b) of the Bankruptcy Code.

Prepetition Lenders' Fees and Expenses.  Subject to paragraph 19 of the Interim Order, the Debtors shall pay the reasonable fees, charges and expenses (including attorneys' fees and other professional expenses) of the Prepetition Lenders who are also DIP Lenders, and shall pay all fees and time charges for attorneys who may be employees (with no profit margin) of the Prepetition Lenders who are also DIP Lenders, in connection with these Chapter 11 Cases and any Successor Case(s), including, without limitation, in connection with (i) the preparation, negotiation, execution and delivery of the DIP Documents, the Interim Order and any Final Order, and the funding of all DIP Loans under the DIP Facility, (ii) the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Documents, the Interim Order and any Final Order, (iii) the administration of these Chapter 11 Cases and any Successor Case(s), and (iv) the enforcement or protection of the DIP Secured Parties' or the

- 32 -

Prepetition Lenders' rights and remedies under DIP Documents, the Prepetition Credit Agreement, the Interim Order and any Final Order.  The Debtors' obligations to make such payments shall include, in each instance, any of such fees, charges, expenses and other amounts which were incurred or accrued but unpaid as of the date hereof, including amounts incurred prior to the Petition Date.  Prior to any conversion of these Chapter 11 Cases to chapter 7, all such fees, costs and expenses shall be paid by the Debtors within twelve (12) days after delivery of a summary invoice (redacted for privilege) to the Debtors and without the need for further application to or order of the Court.  A copy of such summary invoice shall be provided by the Prepetition Lender to the U.S. Trustee, counsel for the DIP Agent and counsel for any Creditors' Committee at the same time as delivery to the Debtors.  Notwithstanding the foregoing, if (x) the Debtors, the U.S. Trustee or any Creditors' Committee object to the reasonableness of a summary invoice submitted by the Prepetition Lenders and (y) the parties cannot resolve such objection, in each case within the ten (10) day period following the Debtors' receipt of such summary invoice, the Debtors, the U.S. Trustee or such Creditors' Committee, as the case may be, shall file with the Court and serve on the Prepetition Lenders a fee objection (a "<u>Prepetition Lenders Fee Objection</u>"), which objection shall be limited to the issue of the reasonableness of such fees and expenses.  The Debtors shall promptly pay and/or the DIP Lenders are, pursuant to the Interim Order, will be authorized to make an advance under the DIP Credit Agreement to timely pay, any submitted invoice after the expiration of the ten (10) day period if no Prepetition Lenders Fee Objection has been filed with the Court and served on the DIP Agent in such ten (10) day period.  If a Prepetition Lenders Fee Objection is timely filed and served, the Debtors shall promptly pay and/or the DIP Secured Parties shall be authorized under the Interim Order to make an advance under the DIP Credit Agreement to timely pay, the undisputed amount of the summary invoice, and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the Prepetition Lenders Fee Objection.  In all events, the payments pursuant to paragraph 16, subsection (c) of the Interim Order shall be subject to the rights reserved to third parties under paragraph 19 of the Interim order.

<u>506(c) and 552(b) Waivers</u>.  Subject to the entry of the Final Order, the Prepetition Lenders' consent to use of Cash Collateral and Prepetition Collateral under the Interim Order

and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any section 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Chapter 11 Cases; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code, which exceptions are shall be waived pursuant to the Final Order.

Access to Debtors' Management and Investment Banker. The Debtors shall cause their management team and their investment bankers (the "Investment Bankers") to be made available to provide periodic telephonic updates of such reports to the DIP Agent, the DIP Lenders and the Prepetition Lenders from time to time (but not more than weekly), as reasonably requested by the DIP Agent, at reasonable times to be mutually agreed.

Reporting. As and when required under the terms of the DIP Credit Agreement, the Debtors shall provide to the DIP Agent and each DIP Lender all of the financial information, operational information and related reports, documents and analyses required under the terms of the DIP Credi Agreement.

Credit Bidding Rights. The Debtors and the DIP Secured Parties agree that in any sale of the DIP Collateral or Prepetition Collateral other than a sale in the ordinary course of business, the DIP Lenders and the Prepetition Lenders shall have the right to credit bid the DIP Obligations and Prepetition Obligations (as applicable) in accordance with section 363(k) of the Bankruptcy Code, provided that any such credit bid of the Prepetition Lenders that does not also contain a credit bid of the DIP Obligation must contain a cash component satisfactory to satisfy in full the DIP Obligations. The Debtors agree that any motion filed by the Debtors seeking approval of bid procedures will contain a request for approval of the right of the DIP Lenders and the Prepetition Lenders to credit bid the DIP Obligations and Prepetition Obligations (as applicable) and the DIP Lenders consent to the Prepetition Lenders being granted the right to credit bid in accordance with paragraph 16, subsection (h), of the Interim Order. Subject to entry of a Final Order, the foregoing agreement shall operate as a finding that the DIP Lenders and the Prepetition Lenders shall have the right to credit bid the DIP Obligations and Prepetition Obligations (as applicable) in accordance with section 363(k) of the Bankruptcy Code (as set forth above) and the right of the DIP Lenders and

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | Prepetition Lenders to credit bid in accordance with pargraph 16, subsection (h), of the Interim Order shall not be modified or altered by any event, including entry of a subsequent order of the Court, without the prior written consent of each of the DIP Lenders and Prepetition Lenders. |
| | <u>Further Adequate Protection</u>.  Nothing in the Interim Order shall, or shall be deemed to, limit, abridge or otherwise affect the rights of the Prepetition Lenders to request at any time that the Court provide additional or further protection of their interests in the Prepetition Collateral (including the Cash Collateral) or to seek further or additional adequate protection in the event the adequate protection provided herein proves to be inadequate, subject to the Debtors' rights to contest any such request |
| **Acknowledgements & Stipulations** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B)(iii) <br><br> Interim Order ¶ D | In requesting the Postpetition Financing Arrangement and in exchange for and as a material inducement to, the DIP Secured Parties to agree to provide the Postpetition Financing Arrangement, and to the Prepetition Lenders in exchange for the Diminution (as defined below), the Debtors acknowledge, represent, stipulate and agree, for themselves and their estates, subject to the challenge rights set forth in paragraph 19 of the Interim Order, as follows (collectively, the "<u>Debtors Stipulations</u>"): <br><br> • the Borrower, certain of the Debtors as guarantors (in such capacity, the "<u>Debtor Guarantors</u>" and collectively with the Borrower, the "<u>Prepetition Obligors</u>"), and Shiloh Holdings Netherlands B.V., *a besloten vennootschap met beperkte aansprakelijkheid* organized under the laws of the Netherlands (the "<u>Dutch Borrower</u>") are parties to the Prepetition Credit Agreement, dated as of October 25, 2013 (as the same has been amended, restated, supplemented or modified from time to time, the "<u>Prepetition Credit Agreement</u>") with Bank of America, N.A. as administrative agent, swing line lender, Dutch swing line lender and L/C issuer (the "<u>Prepetition Agent</u>") and certain lender parties thereto (collectively with the Prepetition Agent and providers of hedge products and treasury management services secured by the Prepetition Collateral (as defined below), the "<u>Prepetition Lenders</u>"); |

- 35 -

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | • to secure the "Obligations" (as defined in the Prepetition Credit Agreement, the "Prepetition Obligations"), the Prepetition Obligors, but not the Dutch Borrower, granted to the Prepetition Agent, for the benefit of the Prepetition Lenders, liens upon and security interests in (the "Prepetition Liens") all of the Prepetition Obligors' property and assets (other than the "Excluded Property" (as defined in the Prepetition Credit Agreement)), as set forth in certain security documents and instruments including: (i) the Pledge Agreement, dated as of October 25, 2013, by and among the Borrower, the other Prepetition Obligors and the Prepetition Agent (as the same has been amended, restated, supplemented or modified from time to time, the "Prepetition Pledge Agreement"), (ii) the Security Agreement, dated as of October 25, 2013, by and among the Borrower, the other Prepetition Obligors, and the Prepetition Agent (together with the Prepetition Credit Agreement, the Prepetition Pledge Agreement and all other agreements, documents, notes, guarantees, subordination agreements, instruments, amendments and any other agreements delivered pursuant thereto or in connection therewith, each as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Loan Documents"), and, in all instances, the proceeds and products thereof (collectively, the "Prepetition Collateral"): <br><br> • as of the Petition Date: (A) the current outstanding principal balance of the Prepetition Obligations (exclusive of interest, fees, reimbursable expenses and other charges) is not less than $341.3 million, which amount consists of (I) $273.3 under the domestic facility and (II) $68 million under the Dutch facility (for which the Dutch Borrower is primarily obligated); (B) all of the Prepetition Obligations are absolutely and unconditionally owed by the Prepetition Obligors to the Prepetition Lenders; (C) the Prepetition Obligations constitute legal, valid and binding obligations of the Prepetition Obligors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code to the extent applicable); (D) no recoupments, |

- 36 -

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | offsets, defenses or counterclaims exist to the Prepetition Obligations; and (E) no portion of the Prepetition Obligations or any payments or other transfers made to the Prepetition Agent or any other Prepetition Lender or applied to the Prepetition Obligations prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, recoupment, offset, counterclaim, defense or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; <br><br> • the Prepetition Liens constitute valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code) and perfected liens with priority over any and all other liens in the Prepetition Collateral (except for any Senior Third-Party Liens (as defined in paragraph 13(d)(ii) of the Interim Order) and are not subject to any challenge or defense, including without limitation, respectively, avoidance, subordination, recharacterization, recovery, reduction, set-off, offset, attack, counterclaim, cross-claim or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law; <br><br> • the Debtors have waived, discharged and released any right they may have to challenge the Prepetition Obligations and the Prepetition Liens on the Prepetition Collateral and to assert any recoupments, offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against any Prepetition Lender with respect to the Prepetition Loan Documents, the Prepetition Obligations, the Prepetition Liens or the Prepetition Collateral; <br><br> • any payments made on account of the Prepetition Obligations before the Petition Date were (A) payments out of the Prepetition Collateral and/or (B) made in the ordinary course of business and in exchange for reasonably equivalent value and did not diminish any property otherwise available for distribution to unsecured creditors; |

- 37 -

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | • all of the Debtors' cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral (as defined below);<br><br>• none of the DIP Secured Parties or the Prepetition Lenders is a control person or insider (as defined in section 101(31) of the Bankruptcy Code) of any Debtor;<br><br>• until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens provided to the DIP Secured Parties by offering subsequent lender or any party-in-interest a superior or *pari passu* lien or claim with respect to the DIP Collateral pursuant to section 364(d) of the Bankruptcy Code or otherwise, except with respect to the Carve-Out;<br><br>• until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time seek allowance of any administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the Bankruptcy Code that is superior to or *pari passu* with the DIP Superpriority Claim (as defined below) provided herein, except with respect to the Carve-Out; and<br><br>• the Prepetition Lenders are entitled, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date (the "Diminution"), caused by or arising as a result of (A) the incurrence and payment of the DIP Obligations, (B) the use of Prepetition Collateral (including Cash Collateral), (C) the granting of the DIP |

- 38 -

| Required Disclosure | Material Terms |
|---|---|
| | Liens and the DIP Superpriority Claim, (D) the subordination of the Prepetition Obligations to the Carve-Out, and (E) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code. |
| **Automatic Stay**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(iv)<br><br>Interim Order ¶ 21. | The following provisions are each subject to the Carve-Out.<br><br>The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following, and neither section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies regardless of any change in circumstances (whether or not foreseeable), whether or not an Event of Default (as defined in the DIP Credit Agreement) under the DIP Documents or a default by any of the Debtors of any of their obligations under the Interim Order has occurred:  (i) the right to require all cash, checks or other collections or proceeds from DIP Collateral received by any of the Debtors to be deposited in accordance with the requirements of the DIP Documents or written instructions of the DIP Agent, and to apply any amounts so deposited and other amounts paid to or received by the DIP Secured Parties under the DIP Documents in accordance with any requirements of the DIP Documents; (ii) the right to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests and liens upon the DIP Collateral; (iii) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Documents as provided therein; and (iv) the right to give the Debtors any notice provided for in any of the DIP Documents or the Interim Order.<br><br>Subject to paragraph 21(d) of the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified without the need for further Court order to permit the DIP Secured Parties, upon the occurrence and during the continuance of an Event of Default under the DIP Credit Agreement or the Debtors' violation of any provision of the Interim Order, and without any interference from the Debtors or any other party in interest, to (i) (A) cease making DIP Loans and/or suspend or terminate the commitments under |

| Required Disclosure | Material Terms |
|---|---|
| | the DIP Documents, and (B) declare all DIP Obligations immediately due and payable, and (ii) subject to five (5) calendar days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtors, their counsel, counsel to any Creditors' Committee and the U.S. Trustee, to exercise all rights and remedies provided for in the DIP Documents, the Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (A) take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (B) foreclose or otherwise enforce the DIP Liens on any or all of the DIP Collateral; (C) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Secured Parties); and/or (D) exercise any other default-related rights and remedies under the DIP Documents, the Interim Order or applicable law.  The Remedies Notice Period shall run concurrently with any notice period provided for under the DIP Documents.<br><br>Notwithstanding anything herein to the contrary, immediately upon the occurrence of a Termination Event or a default by any of the Debtors of any of their obligations under the Interim Order, the DIP Lender may charge interest at the default rate set forth in the DIP Documents, regardless of any notice thereof and without being subject to the Remedies Notice Period.<br><br>The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Creditors' Committee, if any and/or the U.S. Trustee have not obtained an order providing otherwise from this Court prior to the expiration of the Remedies Notice Period.<br><br>If the DIP Secured Parties are entitled, and have elected in accordance with the provisions hereof, to enforce their liens or security interests or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Secured Parties in connection with such enforcement by, among other things, in accordance with applicable non-bankruptcy law, (A) providing at all reasonable times access to the DIP Collateral and the |

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | Debtors' premises to representatives or agents of the DIP Secured Parties (including any collateral liquidator or consultant), (B) providing the DIP Secured Parties and their representatives or agents, at all reasonable times, access to the Debtors' books and records and any information or documents requested by the DIP Secured Parties or their representatives or agents, (C) performing all other obligations set forth in the DIP Documents and (D) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Secured Parties' enforcement of rights.<br><br>Upon the occurrence and during the continuance of an Event of Default under the DIP Documents, a violation of the terms of the Interim Order or any other Termination Event, and including during the pendency of any applicable Remedies Notice Period, the DIP Secured Parties shall have no further obligation to provide financing under the DIP Documents, except to the extent necessary to allow the Debtors to fund any payroll obligations scheduled to be paid in the five (5) business days after the initiation of a Remedies Notice Period.  Upon (i) initiation of a Remedies Notice Period or (ii) the occurrence of a Maturity Date, the DIP Secured Parties and the Prepetition Lenders shall have no further obligation to permit the continued use of Cash Collateral, except to the extent necessary to allow the Debtors to fund any payroll obligations scheduled to be paid in the five (5) business days after the initiation of a Remedies Notice Period.  Once the Debtors' right to use Cash Collateral is no longer permitted by the Interim Order, the Debtors shall be prohibited from using any Cash Collateral under the Interim Order until such time (if any) as the Prepetition Lenders and the DIP Secured Parties have consented to further use of Cash Collateral except to the extent necessary to allow the Debtors to fund any payroll obligations scheduled to be paid in the five (5) business days after the Debtors are no longer permitted to use Cash Collateral pursuant to the Interim Order.<br><br>Upon the occurrence and during the continuance of an Event of Default under the DIP Documents, a violation of the terms of the Interim Order, or any other Termination Event, the DIP Secured Parties may at all times continue to collect and sweep cash as provided herein or as provided in the DIP Documents, provided that sufficient funds are (or have been) set aside to |

- 41 -

| REQUIRED DISCLOSURE | MATERIAL TERMS | |
|---|---|---|
| | fund the Carve-Out and payment of all accrued but unpaid expenses set forth in the Approved Budget through the date of the commencement of the Remedies Notice Period.<br><br>This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders pursuant to the provisions of the Interim Order and relating to the application, re-imposition or continuance of the automatic stay of section 362(a) of the Bankruptcy Code or other injunctive relief requested. | |
| **Milestones**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi)[8]<br><br>Interim Order ¶ 35 | Three business days following Petition Date | File sale motion and bidding procedures for sale of all of the assets of the Debtors, which motion shall seek approval of a bid of a stalking horse bidder reasonably acceptable to the Required Lenders and Required Lenders and the Prepetition Lenders constituting the "Required Lenders" under the Prepetition Credit Agreement (the "Required Prepetition Lenders") |
| | September 28, 2020 | Deadline to obtain entry of order approving bidding procedures and the approval of a stalking horse bidder reasonably acceptable to the Required Lenders and the Required Prepetition Lenders. |
| | October 26, 2020 | Deadline for interested parties to submit bids for purchase of assets of the Debtors. |

---

[8] Bankruptcy Rule 4001(c)(1)(B)(vi) applies only the milestones related establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order. See Fed. R. Bankr. 4001(c)(1)(B)(vi). However, in the abundance of caution and to ensure that all parties in interest are fully informed, the Debtors have elected to provide certain Sale Milestones.

| REQUIRED DISCLOSURE | MATERIAL TERMS | |
|---|---|---|
| | | |
| | October 29, 2020 | Deadline to hold auction. |
| | November 10, 2020 | Deadline for hearing to approve sale. |
| | December 15, 2020 | Deadline to consummate sale(s) of substantially all of the Debtors' assets. |
| **Lien Perfection/Enforcement** Fed. R. Bankr. P. 4001(c)(1)(B)(vii) Interim Order ¶ 13(c) | Pursuant to the Interim Order, the DIP Liens shall be deemed fully perfected liens and security interests, effective and perfected upon the date of the Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements or any other agreements, filings or instruments, such that no additional actions need be taken by the DIP Agent, the DIP Lenders or any other party (including, without limitation, any depository bank or securities intermediary) to perfect such interests.. | |
| **Release** Fed. R. Bankr. P. 4001(c)(1)(B)(viii) Interim Order ¶ 18 | The release, discharge, waivers, settlements, compromises and agreements set forth in paragraph 18 of the Interim Order and the stipulations set forth in paragraph D of the Interim Order shall be deemed effective upon entry of the Interim Order, subject only to the rights set forth in paragraph 19 of the Interim Order.  Upon entry of the Interim Order, the Debtors shall forever and irrevocably release, discharge and acquit each of the DIP Secured Parties, their affiliates and predecessors in interest, and their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants and attorneys (collectively, the "DIP Lender Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type at any time arising prior to the Petition Date, and all claims and causes of action under chapter 5 of the Bankruptcy Code.  Upon entry of the Interim Order, the Debtors forever and irrevocably release, discharge and acquit each of the Prepetition Lenders and their respective affiliates and predecessors in interest, and their respective former, current or future officers, employees, | |

- 43 -

| **REQUIRED DISCLOSURE** | **MATERIAL TERMS** |
|---|---|
| | directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants and attorneys (collectively, with the DIP Lender Releasees, the "Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type at any time arising prior to the Petition Date, and all claims and causes of action under chapter 5 of the Bankruptcy Code. |
| **Indemnity**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(ix)<br><br>DIP Credit Agreement § 11.04(b-f) | <u>Indemnification by the Loan Parties.</u>  The Loan Parties shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable and documented out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all reasonable and documented fees and time charges for attorneys who may be employees (with no profit margin) of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Company or any other Loan Party) arising out of, in connection with, or as a result of (i) the execution or delivery of the DIP Credit Agreement, any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties under the DIP Credit Agreement of their respective obligations thereunder or the consummation of the transactions contemplated by the DIP Credit Agreement, any other Loan Document or any agreement or instrument contemplated thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of the DIP Credit Agreement and the other Loan Documents (including in respect of any matters addressed in Section 3.01), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by a Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to a Loan Party or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Company or any |

| Required Disclosure | Material Terms |
|---|---|
| | other Loan Party, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  Without limiting the provisions of Section 3.01(c), section 11.04(b) of the DIP Credit Agreement shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim. |
| | Reimbursement by Lenders.  To the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of section 11.04 of the DIP Credit Agreement to be paid by them to the Administrative Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposure at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender), such payment to be made severally among them based on such Lenders' Applicable Percentages (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), provided, further that, the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under section 11.04(c) of the DIP Credit Agreement are subject to the provisions of Section 2.12(d). |
| | Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, no Loan Party shall assert, and each Loan Party shall waive upon entry of the Interim Order, |

- 45 -

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | and shall acknowledge upon entry of the Interim Order, that no other Person shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, the DIP Credit Agreement, any other Loan Document or any agreement or instrument contemplated thereby, the transactions contemplated by the DIP Credit Agreement, any other Loan Document or any agreement or instrument contemplated thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in section 11.04(b) of the DIP Credit Agreement shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with the DIP Credit Agreement or the other Loan Documents or the transactions contemplated thereby. <br><br> Payments.  All amounts due under section 11.04 of the DIP Credit Agreement shall be payable not later than ten (10) Business Days after demand therefor. <br><br> Survival.  The agreements in section 11.04 of the DIP Credit Agreement and the indemnity provisions of section 11.02(e) of the DIP Credit Agreement, shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations. |
| **506(c) Waiver** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B)(x) <br><br> Interim Order ¶¶  16(e), 22 | Subject to the entry of the Final Order, the Prepetition Lenders' consent to use of Cash Collateral and Prepetition Collateral under the Interim Order and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any section 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Chapter 11 Cases; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code, which exceptions shall be waived upon entry of the Interim Order. <br><br> Without limiting the terms of the Carve-Out and subject to the entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases or any Successor Case(s) at any time shall be surcharged against, and no person may seek to surcharge |

- 46 -

| Required Disclosure | Material Terms |
|---|---|
| | any costs or expenses of administration against the DIP Secured Parties, the Carve-Out (other than parties entitled to assert a right to be paid amounts in respect of the Carve-Out), the DIP Collateral or the Prepetition Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and the Prepetition Agent (and the beneficiaries of the Carve-Out in the case of a surcharge in respect of the Carve-Out).  No action, inaction or acquiescence by the DIP Secured Parties or the Prepetition Lenders shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the DIP Secured Parties, the DIP Collateral, the Prepetition Lenders or the Prepetition Collateral. |
| **Liens on Avoidance Actions**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(xi)<br><br>Interim Order ¶¶  13(a), 16(a) | To secure the DIP Obligations, the DIP Secured Parties shall be, upon entry of the Interim Order granted pursuant to and in accordance with Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, valid, enforceable and fully perfected liens (the "DIP Liens") in and on all of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including, without limitation, all of each Debtor's now owned or hereafter acquired right, title and interest in and to all cash, accounts, accounts receivable, goods, inventory, property, plant and equipment, commercial tort claims, intellectual property, contract rights, tax refunds, prepaid expenses, deposits, general intangibles, real estate, leaseholds (provided, however, with respect to the Debtors' non-residential real property leases, no liens or encumbrances shall be granted or extend to such leases themselves under the Interim Order, except as permitted in the applicable lease or pursuant to applicable law, but rather any liens granted shall extend only to the proceeds realized upon the sale, assignment, termination, or other disposition of such leases, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds), all proceeds or property recovered in connection with Avoidance Actions (provided that the lien on Avoidance Actions and proceeds of Avoidance Actions shall be limited to the proceeds and property recovered in connection therewith and shall only attach hereunder to the extent |

- 47 -

| Required Disclosure | Material Terms |
|---|---|
| | approved in the Final Order), all intercompany claims, all claims and causes of action of each Debtor or its respective estate (including, without limitation, all commercial tort claims of every kind and description, whether described in specificity in the DIP Documents or not) and any and all proceeds and property recovered therefrom, any and all proceeds arising from insurance policies, all intellectual property, and the equity interests of each direct subsidiary of each Debtor, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of each Debtor that constitute Prepetition Collateral, and all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above (collectively, the "DIP Collateral"), subject only to prior payment of the Carve-Out. |
| | To secure the Adequate Protection Superpriority Claim (as defined below), the Prepetition Agent, for itself and for the benefit of the other Prepetition Lenders, upon entry of the Interim Order, shall be granted (effective and perfected by operation of law immediately upon entry of the Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements, filings or instruments) valid, perfected, postpetition security interests and liens (the "Adequate Protection Liens") in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens and (ii) prior payment of the Carve-Out. |
| **Termination of the Use of Cash Collateral**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B)(iii)<br><br>Interim Order ¶¶ 10 | Subject to paragraph 21(f) of the Interim Order, the Debtors' ability to use Cash Collateral prior to the Maturity Date will terminate immediately upon the occurrence of any event described below (each a "Termination Event"):<br><br>• any Debtor fails to comply in any material respect with any of the terms or conditions of the Interim Order, and such failure is not cured during any applicable Remedies Notice Period;<br><br>• any Debtor seeks any modification or extension of the Interim Order, without consent of the Required Lenders;<br><br>• an application (other than the application for financing |

- 48 -

| REQUIRED DISCLOSURE | MATERIAL TERMS |
|---|---|
| | provided by a third party which seeks authority to pay all of the DIP Obligations and the Prepetition Obligations in full upon entry of the order approving such financing) is filed by any Debtor for the approval of (or an order is entered by the Court approving) any claim arising under section 507(b) of the Bankruptcy Code or otherwise, or any lien in any of these Chapter 11 Cases, which is pari passu with or senior to the Prepetition Obligations, the Adequate Protection Liens or the Adequate Protection Superpriority Claim, excluding liens arising under the Interim Order or pursuant to any other financing agreement made with the prior written consent of the Required Lenders; <br><br> • the commencement or support of any action by any Debtor or any party exercising the authority of the Debtor (other than an action pursuant to paragraph 19 of the Interim Order) against any of the DIP Lenders or the Prepetition Lenders, or their respective agents and employees, to subordinate or avoid any liens made in connection with the Prepetition Loan Documents or the DIP Documents or to avoid any obligations incurred in connection with the Prepetition Loan Documents or the DIP Documents; <br><br> • any Order shall be entered granting relief from the stay arising under section 362 of the Bankruptcy Code to the holder or holders of any security interest, lien or right of setoff to permit foreclosure (or the granting of a deed in lieu of foreclosure or similar instrument), possession, set-off or any similar remedy with respect to any assets of the Debtors with an aggregate value of more than $250,000; <br><br> • (i) any Debtor shall assert in any pleading filed in any court that any material provision of the Interim Order is not valid and binding for any reason, or (ii) any material provision of the Interim Order shall for any reason, or any other order of this Court approving the Debtors' use of Cash Collateral, without the prior written consent of the Required Lenders, cease to be valid and binding; <br><br> • any Debtor withdraws or modifies the motion to approve the sale of all or substantially all of the |

| Required Disclosure | Material Terms |
|---|---|
| | Debtors' assets without the consent of the Required Lenders; |
| | • the Debtors fail to comply with any Sale Milestone; or |
| | • the occurrence of the Maturity Date. |

## IV.      Requirements Under Local Rule 4001-2

18.      Local Rule 4001-2(a)(i) requires that motions for approval of postpetition financing (a) recite whether the proposed form of order and/or underlying Cash Collateral stipulation or loan agreement contain any of several types of provisions identified in Local Rule 4001-2(a)(i)(A) through (H) (collectively, the "Specified Provisions"), (b) identify the locations of any Specified Provisions in the proposed form of order, stipulation, or loan agreement, and (c) justify the inclusion of such Specified Provisions.  The Debtors identify and discuss the following provisions of the DIP Facility and Interim Order in accordance with Local Rule 4001-2(a)(i) in the context and circumstances of these cases.

19.      In addition, Local Rule 4001-2(b) provides that, with respect to interim orders approving postpetition financing, "[s]uch interim relief shall be only what is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.  In the absence of extraordinary circumstances, the Court shall not approve interim financing orders that include any of the [Specified Provisions other than those referenced in Local Rule 4001-2(a)(i)(G) and (H)]."  Del. Bankr. L.R. 4001-2(b).  For the reasons set forth below, the Debtors submit that this requirement is satisfied because the Interim Order does not contain such a provision.

A. **_Cross Collateralization_**

20.     Local Rule 4001-2(a)(i)(A) requires disclosure of:

> [p]rovisions that grant cross-collateralization protection
> (other than replacement liens or other adequate protection)
> to the prepetition secured creditors (i.e., clauses that secure
> prepetition debt by postpetition assets in which the secured
> creditor would not otherwise have a security interest by
> virtue of its prepetition security agreement or applicable
> law)[.]

Del. Bankr. L.R. 4001-2(a)(i)(A).

21.     No provision of the DIP Credit Agreement, the Interim Order, or the Final

Order grants cross-collateralization protection of the type contemplated by Local Rule 4001-

2(a)(i)(A).

B. **_Stipulation and Challenge Provisions_**

22.     Local Rule 4001-2(a)(i)(B) requires disclosure of:

> [p]rovisions or findings of fact that bind the estate or other
> parties in interest with respect to the validity, perfection or
> amount of the secured creditor's prepetition lien or the
> waiver of claims against the secured creditor without first
> giving parties in interest at least seventy-five (75) days from
> the entry of the order and the creditors' committee, if formed,
> at least sixty (60) days from the date of its formation to
> investigate such matters[.]

Del. Bankr. L.R. 4001-2(a)(i)(B).

23.     The Interim Order does contain provisions that bind the Debtors with

respect to the validity, perfection or amount of the Prepetition Lenders' prepetition liens.

See Interim Order, at ¶¶ D, 19.  However, the acknowledgments and stipulations provided for in

Paragraph D of the Interim Order are subject to the challenge rights contained in Paragraph 19 of

the DIP Order.  See id., at ¶ 19.  Paragraph 19 provides parties in interest seventy-five (75) days

from the entry of the Interim Order and the creditors' committee, if formed, at least sixty (60)

RLF1 23936709v.1

days from the date of its formation, to investigate the matters subject to Paragraph D of the

Interim Order.  Id.  Therefore, the Debtors respectfully submit that the Interim Order does not

implicate Local Rule 4001-2(a)(i)(B).

>    **C.**    ***Section 506(c) Waiver***

24.    Local Rule 4001-2(a)(i)(C) requires disclosure of "[p]rovisions that seek

to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c)."  Del.

Bankr. L.R. 4001-2(a)(i)(C).

25.    The Interim Order does not waive the protections of section 506(c) of the

Bankruptcy Code as contemplated in Local Rule 4001-2(a)(i)(C).  As is customary for financing

transactions of this type, it is intended that the Final Order will provide for a waiver of the

Debtors' rights under section 506(c) of the Bankruptcy Code.  See Interim Order, at ¶ 16(e)

(stating that the 506(c) waiver will be effective as of the entry of the Final Order).  However,

such provisions are not contrary to Local Rule 4001-2(a)(i)(C).

>    **D.**    ***Liens on Avoidance Actions***

26.    Local Rule 4001-2(a)(i)(D) requires disclosure of "[p]rovisions that

immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of

action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549."  Del. Bankr. L.R. 4001-

2(a)(i)(D).

27.    The Interim Order does not contain any provision of the type

contemplated by Local Rule 4001-2(a)(i)(D).  As is customary for financing transactions of this

type, the DIP Documents are conditioned on the Final Order providing the DIP Lenders with a

lien on the Debtors' claims and causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548

and 549 (collectively, "Avoidance Actions").  Interim Order, at ¶ 13(a) (stating that the DIP

Lenders will be provided with a lien on Avoidance Actions upon the entry of the Final Order).

- 52 -

However, such provisions are not contrary to Local Rule 4001-2(a)(i)(D).  Further, the Interim

Order also provides that the DIP Superpriority Claim shall be payable from and have recourse to

all "pre- and postpetition property of the Debtors and all proceeds thereof including, without

limitation, any proceeds or property recovered in connection with the pursuit of Avoidance

Actions."  See DIP Credit Agreement at § 2.16(a); Interim Order, at ¶ 14.  While this provision

will be effective as of the entry of the Interim Order, the Debtors respectfully submit that this

provision does not implicate Local Rule 4001-2(a)(i)(D) as it does not immediately grant a lien

on the Debtors' claims and causes of action arising under any Avoidance Actions.

        **E.**     ***Roll-Up***

        28.      Pursuant to Local Rule 4001-2(a)(i)(E), a movant must disclose

"[p]rovisions that deem prepetition secured debt to be postpetition debt or that use postpetition

loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition

debt, other than as provided in 11 U.S.C. § 552(b)."  Del. Bankr. L.R. 4001-2(a)(i)(E).

        29.      The Interim Order does not contain any provision of the type

contemplated by Local Rule 4001-2(a)(i)(E).  As is customary for financing transactions of this

type, the DIP Documents are conditioned on the Final Order authorizing the use of the DIP

Proceeds to repay a remaining portion of the prepetition amounts owed under the Prepetition

Credit Agreement.  Specifically, the DIP Documents are conditioned on the Final Order

authorizing the Debtors to use the DIP Proceeds to repay $100 million of the remaining

outstanding amount as of the Petition Date (the "Roll-Up").  See DIP Credit Agreement,

at §2.01(b).  However, such provision, because it is pursuant only to the Final Order, is not

contrary to Local Rule 4001-2(a)(i)(E).

F.    *Creditors' Committee Professionals*

30.    Pursuant to Local Rule 4001-2(a)(i)(F), a movant must describe "[p]rovisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out."  Del. Bankr. L.R. 4001-2(a)(i)(F).

31.    Payment of the fees of professionals retained by the Debtors and any Creditors' Committee is provided for in the Carve-Out.  See Interim Order, at ¶ 17.  The Debtors submit that the treatment of the Debtors' and Creditors' Committee's professionals under the Carve-Out is substantially the same.  More specifically, under the Carve-Out, prior to delivery of a Carve-Out Trigger Notice (as defined in the Interim Order), the Carve-Out will encompass all of the Debtors' and Creditors' Committee's accrued and unpaid professional fees up until that point in time.  Id.  Accordingly, the Debtors submit that the Carve-Out does not provide "disparate treatment" of the type contemplated in Local Rule 4001-2(a)(i)(F).

G.    *Priming Liens*

32.    Pursuant to Local Rule 4001-2(a)(i)(G), a movant must describe "[p]rovisions that prime any secured lien without the consent of that lienor."  Del. Bankr. L.R. 4001-2(a)(i)(G).

33.    The DIP Credit Agreement does not implicate Local Rule 4001-2(a)(i)(G) because all priming thereunder is consensual.  Specifically, although the DIP Facility will be secured by, among other things, a first-priority, senior, priming, perfected lien on and security interest in the Prepetition Collateral, the Prepetition Lenders are willing to permit the terms of the DIP Credit Agreement and the Interim and Final Orders, including the priming of their liens over the Prepetition Collateral, based on the granting of various protections, including the adequate protection liens and other terms contained in the DIP Credit Agreement relating to the

- 54 -

Prepetition Credit Agreement.  Moreover, such priming liens are expressly junior to any Senior Third-Party Liens.

### H.    *"Equities of the Case" Exception*

34.    Pursuant to Local Rule 4001-2(a)(i)(H), a movant must describe provisions of the proposed postpetition financing facility that "seek to affect the Court's power to consider the equities of the case under section 552(b)(l) of the Bankruptcy Code."  Del. Bankr. L.R. 4001-2(a)(i)(H).

35.    The Interim Order does not contain any provision limiting the Court's ability to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code as contemplated in Local Rule 4001-2(a)(i)(H).  As is customary for financing transactions of this type, it is intended that the Final Order will include provisions that affect the Court's power to consider the equities of the case under section 552(b)(1) of the Bankruptcy Code.  See Interim Order, at ¶ 16(e) (stating that the 552(b)(2) waiver will be effective as of the entry of the Final Order).  However, such provisions are not contrary to Local Rule 4001-2(a)(i)(H).

### <u>Argument</u>

### I.    Entry into the DIP Facility Is an Exercise of the Debtors' Sound Business Judgment.

36.    As described above, the Debtors' determination to enter into the DIP Facility, in consultation with their advisors, represents a reasonable exercise of their business judgment.  See Ficks Declaration, at ¶ 46 (describing how the size of the DIP Facility is appropriate to meet the Debtors' financing and liquidity needs); see also Lewis Declaration, at ¶¶ 20-21 (describing how the terms of the DIP Facility are consistent with market practice).  Bankruptcy courts routinely defer to a debtor's business judgment on certain business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  See U.S. Bank Tr. N.A. v. Am. Airlines, Inc. (In re AMR Corp.), 485 B.R. 279, 287 (Bankr.

S.D.N.Y. 2013) ("In determining whether to approve a debtor's request [for postpetition financing] under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment.") (citation omitted); Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA ... [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); cf. In re Filene's Basement, LLC, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) ("Transactions under § 363 must be based upon the sound business judgment of the debtor or trustee.").  In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

37.     The Debtors' determination to enter into the DIP Facility represents a reasonable exercise of their business judgment and should be approved.  The funding contemplated by the DIP Facility will provide the Debtors with working capital to maintain their facilities and corporate functions and pay their employees, together with funding the costs of conducting the sale and these chapter 11 cases.  See Ficks Declaration, at ¶¶ 42, 45.

38.     The Debtors worked closely with their advisors to determine their cash needs for the chapter 11 process.  See id., at ¶ 42.  The Debtors then negotiated the various components of the DIP Facility with the DIP Lenders at arms'-length and in good faith.  Lewis Declaration, at ¶ 19.  The Debtors determined that the terms of the resulting DIP Facility were reasonable and the only viable option.  Id.  As such, and as further described in the Ficks and

- 56 -

Lewis Declarations, the Debtors' decision to enter into the DIP Facility was a reasonable exercise of their business judgment.  Ficks Declaration, at ¶¶ 45-46 (describing how the size of the DIP Facility is appropriate to meet the Debtors' financing and liquidity needs); see also Lewis Declaration, at ¶¶ 20-21 (describing how the terms of the DIP Facility are consistent with market practice).

**II.    The Debtors Should Be Authorized to Obtain
       Postpetition Financing Under Section 364(c) of the Bankruptcy Code.**

39.    As described above, it is essential that the Debtors obtain access to sufficient postpetition financing and are authorized to use Cash Collateral to avoid immediate and irreparable harm to their assets pending the sale of their assets.  The preservation of estate assets, the Debtors' continuing viability and their ability to preserve value for stakeholders depend heavily upon the expeditious approval of the relief requested herein.

40.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  See 11 U.S.C. § 364.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or incur debt, the repayment of which is (a) entitled to superpriority administrative expense status, (b) secured by a senior lien on unencumbered property, (c) secured by a junior lien on encumbered property, or (d) a combination of the foregoing.  See 11 U.S.C. § 364(c).[9]

---

[9]    Section 364(c) of the Bankruptcy Code provides as follows:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

- 57 -

41.     The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under [section 503(b)(l) of the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c); see also In re Satcon Tech. Corp., No. 12-12869, 2012 WL 6091160, at *5 (Bankr. D. Del. Dec. 7, 2012) ("Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Bankruptcy Court may authorize the debtor to obtain credit or incur debt."); In re Republic Airways Holdings Inc., No. 16-10429, 2016 WL 2616717, at *10 (Bankr. S.D.N.Y. May 4, 2016) ("The debtor is not required to seek credit from every possible source but rather must demonstrate that it has made a reasonable effort to seek other sources of credit available under section 364(a) and (b).") (citing In re Ames Dep't Stores, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)) (quotation marks omitted); In re Crouse Grp., Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under section 364(c) of the Bankruptcy Code must establish that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code), modified on other grounds, 75 B.R. 553 (Bankr. E.D. Pa. 1987).

42.     Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code:

(a)     the debtor is unable to obtain unsecured credit under section 364(b) (i.e., by granting a lender administrative expense priority);

(b)     the credit transaction is necessary to preserve the assets of the estate; and

---

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

(c)     the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (applying these factors); In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (same).

### A.     *The Necessary Postpetition Financing Is Not Available on an Unsecured Basis.*

43.     The Debtors could not obtain postpetition financing on an unsecured or junior basis.  See Lewis Declaration at ¶¶ 9-15.  To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code. Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  Id.  Where few lenders are likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the] Debtor to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989).

44.     The Debtors reasonably concluded that postpetition financing was not available on an unsecured basis following their good faith efforts to obtain funding prior to the Petition Date.  As set forth above and in the Lewis Declaration, given the Debtors' efforts to obtain financing prior to the Petition Date, the Debtors have a clear understanding of the current availability of postpetition financing.  See Lewis Declaration, at ¶¶ 9-12.  The Debtors received no proposal from interested third parties that contemplated an unsecured facility.  Id., at ¶ 15. In declining to provide proposals, the financing sources generally cited concerns about the loan-to-value ratio of any proposed third-party postpetition financing, potential litigation risk tied to priming efforts and the relatively low return on invested dollars.  Id.  The Debtors' efforts to seek

the necessary postpetition financing from sources within the Debtors' existing capital structure and from third parties were reasonable and sufficient and satisfy the statutory requirements of section 364(c) of the Bankruptcy Code.  The Debtors therefore made appropriate and sufficient efforts to confirm that postpetition financing is not available on an unsecured basis.

**B.      *The DIP Facility Is Necessary to Preserve and Protect the Assets of the Debtors' Estates.***

45.      It is essential that the Debtors immediately obtain the financing contemplated by the DIP Facility to preserve and protect the value of their estates.  See Ficks Declaration, at ¶¶ 44-45.  The funding contemplated by the DIP Facility will provide the Debtors with sufficient liquidity (a) to continue operating and (b) to pursue their restructuring goals.  Id., at ¶ 46.  The funding contemplated by the DIP Facility will provide the Debtors with working capital to maintain their facilities and corporate functions and pay their employees, together with funding the costs of conducting the sale and these chapter 11 cases.  See Id., ¶¶ 42, 45.  Accordingly, the DIP Facility is necessary to ensure that the Debtors are able to maximize the value of their estates.  See Burtch v. Ganz (In re Mushroom Transp. Co.), 382 F.3d 325, 339 (3d Cir. 2004) (noting debtors in possession have a duty to maximize their estates' assets).

**C.      *The Terms of the DIP Facility Are Fair, Reasonable, and Adequate Under the Circumstances.***

46.      In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances and disparate bargaining power of both the debtor and the potential lender.  See In re Farmland Indus., Inc., 294 B.R. 855, 885-86 (Bankr. W.D. Mo. 2003); see also Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen Maclean Oil Co.), 65 B.R. 358,365 n.7 (W.D. Mich. 1986) (noting a debtor may have to enter into hard bargains to acquire funds).

- 60 -

47.     The terms of the DIP Facility and the proposed Interim Order were negotiated in good faith and at arm's-length between the Debtors and the DIP Lenders. Lewis Declaration, at ¶ 19. As a result, the Debtors believe that the terms of the DIP Facility are within the range of reasonableness and consistent with market expectations for facilities of this type.

48.     Specifically, the Debtors believe that the terms of the DIP Facility are acceptable because:

- The DIP Lenders were able to move quickly to offer and negotiate the DIP Credit Agreement, which was important in light of the Debtors' current financial situation (Lewis Declaration at ¶ 16)

- The fees, interest rate and other economics are consistent with market rates for other postpetition financing facilities in similar circumstances (Id., at ¶ 21); and

- The DIP Lenders would not have agreed to provide the financing under the DIP Documents without the sale milestones contained therein. The Debtors submit that they are able to run a value maximizing sale process in the timeline proscribed by the sale milestones (Id., at ¶ 17).

**D.      *The Debtors Should Be Authorized to Obtain Priming Liens Under Section 364(d) of the Bankruptcy Code.***

49.     Section 364(d) of the Bankruptcy Code provides that a debtor may incur debt "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the court finds, after notice and hearing, that (a) the debtors in possession are "unable to obtain such credit otherwise" and (b) "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d); see also Shaw Indus., Inc. v. First Nat'l Bank of PA (In re Shaw Indus., Inc.), 300 B.R. 861, 863 (Bankr. W.D. Pa. 2003) (where debtor made efforts by "contact[ing] numerous lenders" and was unable to obtain credit without a priming lien, it met its burden under section 364(d) of the Bankruptcy Code); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (holding that debtor must make an effort to obtain credit without the

- 61 -

requirement of a priming lien but is not required to seek credit from every possible lender);

In re Dunes Casino Hotel, 69 B.R. 784, 791 (Bankr. D.N.J. 1986) (holding that the debtor had

made required efforts under section 364(d) of the Bankruptcy Code based on evidence that the

debtor had attempted unsuccessfully to borrow funds on an unsecured basis or secured by junior

liens, but that at least three such lenders were willing to advance funds secured by a superpriority

lien).

50.     Here, the DIP Liens prime the liens against the Debtors only of the

Prepetition Lenders.  Although these parties have consented to this treatment, subject to approval

of the adequate protection provisions described in the DIP Credit Agreement, the priming of the

Prepetition Security Interests nevertheless satisfies the requirements of section 364(d) of the

Bankruptcy Code.

> *1.     The Necessary Postpetition*
> *Financing Is Available Only on a Priming Basis.*

51.     As described above and in the Lewis Declaration, the Debtors reasonably

determined that postpetition credit was available to them only on a priming basis.  See Lewis

Declaration at ¶¶ 19.  This confirmed the Debtors' expectations, given their experiences

attempting to secure financing prior to the Petition Date, their communications with key creditors

and their analysis of the Prepetition Collateral.  Id., at ¶¶ 9-15.  Accordingly, the Debtors

reasonably determined that postpetition financing was available only on a priming basis.

> *2.     The Interests of the Prepetition Lenders Are Adequately Protected.*

52.     The DIP Facility also satisfies section 364(d)'s adequate protection

requirement.  Section 364(d)(l)(B) of the Bankruptcy Code requires a debtor to establish that

"there is adequate protection of the interest of the holder of the lien on the property  of the estate

on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(l)(B).

- 62 -

Whether the offered protection is "adequate" is determined on a case-by-case basis and "depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given to the post-petition loan." Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.), 16 F.3d 552, 564 (3d Cir. 1994) (internal citations and quotations omitted); 495 Cent. Park, 136 B.R. at 631 (explaining that "[t]he goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest") (citations omitted).

53.      Although section 361 of the Bankruptcy Code sets forth three non-exclusive forms of adequate protection (i.e., periodic cash payments, granting replacement liens or for the creditor's realization of the indubitable equivalent of its claim), the concept of adequate protection is designed to give the "parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its [interest] in the property involved." 495 Cent Park, 136 B.R. at 631 (quoting H.R. Rep. No. 95-595, 95th Cong., 1st Sess. (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6296 (1978)).

54.      In order to permit priming, the Prepetition Lenders required that the terms of the DIP Facility include adequate protection to the extent of the aggregate diminution in the value of their respective interests, if any, in the Prepetition Collateral from and after the Petition Date.

55.      It is well-recognized that "adequate protection" is not equivalent to "absolute protection." In re Beker Indus., Inc., 58 B.R. 725, 741 (Bankr. S.D.N.Y. 1986) ("Adequate protection, not absolute protection, is the statutory standard."). Further, "[i]n order to encourage reorganization, the courts must be flexible in applying the adequate protection

- 63 -

standard" as long as such flexibility does "not operate to the detriment of the secured creditor's interest." Martin v. United States (In re Martin), 761 F.2d 472, 476 (8th Cir. 1985).

56.     The Interim Order provides for adequate protection for the Prepetition Secured Parties that is customary for financings of this type.  As discussed in greater detail in the summary chart of the DIP Financing terms above, these adequate protection provisions include the Adequate Protection Liens, the Adequate Protection Superpriority Claim, the reimbursement of the Prepetition Lenders' Fees and Expenses, and certain other rights and waivers.  See Interim Order, at ¶ 16.

57.     By providing such adequate protection, the Debtors have satisfied their burden of demonstrating that the Prepetition Secured Parties are adequately protected.  In addition, the Prepetition Secured Parties are adequately protected because the proceeds of the DIP Facility will be used to fund these chapter 11 cases and allow the Debtors to pursue consummation of the contemplated asset sale.  Moreover, numerous courts have held that a secured creditor is adequately protected where the debtor reasonably anticipates that its secured creditors will receive more on account of their collateral taking into account the imposition of the priming lien than if the debtor were unable to obtain the loan.  See, e.g., 495 Cent. Park, 136 B.R. at 631 (finding that financed improvements would increase the value of the collateral and serve as adequate protection for the prepetition secured lender); Tr. of Hr'g at 18:5-12, In re Aeropostale, Inc., No. 16-11275 (Bankr. S.D.N.Y. May 5, 2016) (Docket No. 113) (finding that secured lenders were adequately protected where liquidity was anticipated to increase slightly allowing the debtors to pursue a sale of their assets, as opposed to forcing an immediate liquidation); In re Hudson, No. 208-9480, 2011 WL 1004630, at *9-10 (Bankr. M.D. Tenn. Mar. 16, 2011) (approving financing to construct a shed required to service a valuable contract, which

- 64 -

would increase the value of the collateral more than the amount of the postpetition loan);

In re Yellowstone Mountain Club, LLC, No. 08-61570-11, 2008 WL 5875547, at *17

(Bankr. D. Mont. Dec. 17, 2008) (finding that a postpetition financing would provide a "net

economic benefit" because it would be used to finance operation of the debtor's business rather

than allowing it to "go dark" while it pursued a sale); In re Hubbard Power & Light,

202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) (holding that lien on debtor's property was

adequately protected where proceeds of loan would be used to clean up environmental damage

on the debtor's property, which was worthless absent such remediation).

58.    Here, the DIP Facility will enable the Debtors to, among other things,

pursue an organized sale process.  The Prepetition Secured Parties support the DIP Facility

because they anticipate that the net proceeds of the Prepetition Collateral will increase during the

course of the anticipated term of the DIP Facility as a result of the sale.  Because the prepetition

interests of these parties are adequately protected, the requirements of section 364(d)(l)(B) of the

Bankruptcy Code have been satisfied, and the proposed DIP Facility, including its priming

provisions, should be approved.

### E.    *The Roll-Up is Appropriate*

59.    The proposed use of the DIP Loans to repay a portion of the Prepetition

Credit Facility is justified under the circumstances.  As mentioned above, the Debtors, on the one

hand, and the DIP Lenders, on the other, engaged in arm's-length negotiations and ultimately

agreed to the Roll-Up as consideration for, among other things, the DIP Lenders making

available millions of dollars in additional "new money" to fund the chapter 11 cases.  Indeed, the

DIP Documents are conditioned on the Final Order authorizing the Debtors to use the DIP

Proceeds and postpetition cash receipts to repay $100 million of the outstanding amount owed

under the Prepetition Credit Agreement as of the Petition Date.

- 65 -

60.     Roll-ups and repayments of prepetition debt are a common feature of debtor-in-possession financings and have been approved in a variety of cases, including pursuant to interim financing orders.  See, e.g., In re Checkout Holding Corp., No. 18-12794 (KG) (Bankr. D. Del. Jan. 17, 2019) (approving in final order the "roll-up" of prepetition term loans owed to lenders under debtor-in-possession financing facility); In re Remington Outdoor Co., Inc., No. 18-10684 (BLS) (Bankr. D. Del. Mar. 28, 2018) (approving in interim order the "roll-up" of prepetition bridge term loan); In re The Bon-Ton Stores, Inc., No. 18-10248 (MFW) (Bankr. D. Del. Feb. 6, 2018) (approving in interim order the "roll-up" of all outstanding prepetition revolving obligations); In re Charming Charlie LLC, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 13, 2017) (approving in interim order the "roll-up" of all outstanding prepetition revolving obligations); In re NewPage Corp., No. 16-10163 (Bankr. D. Del. Jan. 27, 2016) (approving on interim order "roll up" of all outstanding prepetition ABL obligations); In re American Apparel, Inc., No. 15-12055 (BLS) (Bankr. D. Del. Oct. 6, 2015) (approving in interim order the payment in full of all outstanding prepetition revolving obligations); In re Energy Future Holding Corp., 527 B.R. 157, 167 (D. Del. 2015) (approving settlement that "was simply a roll-up of the first lien noteholders with the new DIP financing"); In re Every WareGlobal, Inc., No. 15-10743 (LSS) (Bankr. D. Del. Apr. 28, 2015) (approving roll-up of prepetition revolving debt in post-petition revolving  facility); In re RadioShack Corp., No. 15-10197 (BLS) (Bankr. D. Del. Feb. 10, 2015)  (approving "roll-up" of prepetition debt); In re Tuscany Int'l Holdings (U.S.A.) Ltd., et al., No. 14-10193 (Bankr. D. Del. Mar. 21, 2014) (approving roll-up of prepetition debt).

**F.      *The Debtors Should Be Authorized to Pay the Fees Required by the DIP Secured Parties.***

61.     The Debtors believe that the fees contemplated by the DIP Facility are reasonable under the circumstances of these chapter 11 cases.  The fees that the Debtors agreed

- 66 -

to pay to the DIP Secured Parties—which consist of:  (a) an Unused Fee (<u>see</u> DIP Credit Agreement at § 2.09 (a); (b) a Structuring Fee (<u>see id.</u>, at § 2.09(b)); (c) Commitment Fees (<u>see id.</u>), (d) an Administrative Agency Fee (<u>see id.</u>);[10] and (e) all reasonable and documented out of pocket expenses incurred by the DIP Agent and its Affiliates (as defined in the DIP Credit Agreement), and any DIP Lender (including the reasonable fees, charges and disbursements of any counsel for the DIP Agent, any DIP Lender, Alix Partners (as financial advisors to the DIP Agent) and the fees and time charges for attorneys who may be employees (with no profit margin) of the DIP Agent or any DIP Lender) in connection with (i) the syndication of the credit facilities provided for under the DIP Credit Agreement, the preparation, negotiation, execution, delivery and administration of the DIP Credit Agreement and the other Loan Documents (as defined therein), the Interim Order, the Final Order or any amendments, modifications or waivers of the provisions thereof  and (ii) all out of pocket expenses incurred by the DIP Agent, any DIP Lender (including the fees, charges and disbursements of any counsel for the DIP Agent, any DIP Lender and Alix Partners (as financial advisors to the Administrative Agent) and the fees and time charges for attorneys who may be employees (with no profit margin) of the DIP Agent or any DIP Lender)—represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the DIP Facility available.  The Debtors considered these fees when determining, in their business judgment, that the DIP Facility constituted the best terms on which they could obtain postpetition financing.

---

[10]     Section 2.09(b) of the DIP Credit Agreement requires the Debtors to pay certain fees under the DIP Documents as further described in that certain fee letter by and among the Debtors and the DIP Agent (the "<u>Fee Letter</u>").  The Fee Letter will be provided to the Court, the Office of the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>"), and any professionals retained by an official committee appointed in these Chapter 11 Cases, subject to the confidentiality provisions set forth therein.

62.     Courts routinely authorize postpetition lenders to impose fees beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code.  Moreover, such charges often are permitted where the associated financing is, in the debtor's business judgment, beneficial to the debtor's estate.  See, e.g., In re Original Soupman, Inc., No. 17-11313 (LSS) (Docket No. 136) (Bankr. D. Del. July 18, 2017) (approving postpetition financing fees including upfront and unused line premiums each of 2% and an exit premium of 2.5%); In re Suniva, Inc., No. 17-10837 (KG) (Docket No. 171) (Bankr. D. Del. May 19, 2017) (approving postpetition financing fees including an unused line premium of 2% and an exit premium of 3%); In re Horsehead Holding Corp., No. 16-10287 (CSS) (Docket No. 252) (Bankr. D. Del. March 3, 2016) (approving postpetition financing fees including an upfront premium of 2%, an unused line premium of 4% and an exit premium of 2.5% in connection with a total commitment of $90,000,000).  The Debtors submit that the fees are in line with transactions of this type and should be approved on the facts and circumstances of these cases.

### G.     *The Scope of the Carve-Out Is Appropriate*

63.     The proposed DIP Facility subjects the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, the Adequate Protection Superpriority Claim, and the Prepetition Liens to the Carve-Out.  See Interim Order, at ¶ 17.  Carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  See Ames Dep't Stores, 115 B.R. at 40.  The DIP Facility does not directly or indirectly restrict the services for which professionals may be paid in these chapter 11 cases beyond that which is standard in DIP facilities, and thus does not deprive the Debtors' estates or other parties in interest of possible rights and powers.  See id. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest

- 68 -

are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of these chapter 11 cases by ensuring that assets remain for the payment of professional fees of the Debtors and any official committees, notwithstanding the grant of superpriority and administrative liens and claims under the Interim Order and Final Order.

64.     Given the likelihood that the Debtors' professionals would be necessary to effect any winddown following an event that triggers a Carve-Out Triger Notice, the Carve-Out provides Allowed Professional Fees of Professional Persons other than Investment Bankers in an aggregate amount not to exceed $300,000.00, plus Allowed Professional Fees of Investment Bankers, in each case incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, shall be included in the Carve-Out.  In addition, the Carve-Out includes the fees to be paid to this Court and the U.S. Trustee, and the reasonable expenses in an aggregate amount not to exceed $50,000 incurred by any trustee appointed under section 726(b) of the Bankruptcy Code, and does not impair the ability of any party to object to such fees, expenses, reimbursement, or compensation. Accordingly, the Debtors submit that the proposed Carve Out is appropriate in these circumstances.

### III.     Request for Use of Cash Collateral

65.     In connection with their implementation of the DIP Facility, the Debtors require access to the DIP Proceeds to the extent that they may be considered Cash Collateral solely as a result of the fact that they are held in one or more bank accounts over which the DIP Secured Parties may be granted a security interest, or in one or more bank accounts in which the Prepetition Secured Parties hold a security interest, as well as any other Cash Collateral of the Debtors.  Section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use, sell or lease Cash Collateral unless "(A) each entity that has an interest in such cash collateral

- 69 -

consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).  With respect to the DIP Proceeds, the DIP Secured Parties and the Prepetition Secured Parties are the only entities that possess an interest in such Cash Collateral, and they consent to its use in accordance with the DIP Documents.  Accordingly, the Debtors request authorization to use the DIP Proceeds pursuant to section 363(c)(2)(A) of the Bankruptcy Code.

66.     The preservation of estate assets and the Debtors' ability to preserve value for stakeholders depend heavily upon the expeditious approval of the relief requested herein. The Debtors must maintain sufficient access to cash to satisfy their obligations and to maintain their assets pending consummation of their asset sales.  It is, therefore, essential to the success of these chapter 11 cases that the Debtors immediately obtain authority to use Cash Collateral. The Debtors, therefore, seek immediate authority to use Cash Collateral on an interim basis as set forth in this Motion and in the Interim Order to prevent immediate and irreparable harm to their estates pending the Final Hearing pursuant to Bankruptcy Rule 4001(b).

## IV.     Request for Modification of the Automatic Stay

67.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The proposed Interim Order contemplates the modification of the automatic stay to permit the DIP Secured Parties, upon the occurrence and during the continuance of an Event of Default under the DIP Credit Agreement or the Debtors' violation of any provision of the Interim Order, and without any interference from the Debtors or any other party interest, to:  (i) (A) cease making DIP Loans and/or suspend or terminate the commitments under the DIP Documents, and (B) declare all DIP Obligations immediately due and payable, and (ii) subject to five (5) calendar days' prior written notice (which may be delivered by electronic mail) to the Debtors, their counsel, counsel to any Creditors' Committee and the U.S.

- 70 -

Trustee, to exercise all rights and remedies provided for in the DIP Documents, the Interim

Order or under other applicable bankruptcy and non-bankruptcy law including, without

limitation, the right to (A) take any actions reasonably calculated to preserve or safeguard the

DIP Collateral or to prepare the DIP Collateral for sale; (B) foreclose or otherwise enforce the

DIP Liens on any or all of the DIP Collateral; (C) set off any amounts held as Cash Collateral

(including, without limitation, in any Cash Collateral account held for the benefit of the DIP

Secured Parties); and/or (D) exercise any other default-related rights and remedies under the DIP

Documents or the Interim Order or applicable law.  See Interim Order, at ¶ 21(b).  Accordingly,

the Debtors respectfully request that this Court authorize the modification of the automatic stay

in accordance with the terms set forth in the Interim Order.

## V.      Request for a Finding of Good Faith

68.      The terms and conditions of the DIP Facility were negotiated by the

parties in good faith and at arm's-length.  See Lewis Declaration, at ¶ 19.  Therefore, the DIP

Lenders should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent

any or all of the provisions of the DIP Facility, or any interim or final order of this Court

pertaining thereto, are hereafter modified, vacated, stayed, or terminated by subsequent order of

this or any other court.

## VI.     Request for Interim Hearing and
## Authority to Make Interim Borrowings under the DIP Facility

69.      Pursuant to Bankruptcy Rule 4001, the Debtors request that this Court

conduct a hearing on the Debtors' request for interim relief, including for access to the Interim

Funding Amount and for the other relief contemplated by the Interim Order.  Bankruptcy Rule

4001(c)(2) provides that a final hearing on a motion to obtain credit pursuant to section 364 of

the Bankruptcy Code may not be commenced earlier than 14 days after the service of such

- 71 -

motion.  Fed. R. Bankr. P. 4001(c)(2).  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  See, e.g., In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985); see also Ames Dep't Stores, 115 B.R. at 38.  After the 14-day period prescribed by Bankruptcy Rule 4001(c), the request for financing is not limited to those amounts necessary to prevent disruption of the debtor's business, and the debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  See, e.g., Simasko Prod. Co., 47 B.R. at 449; Ames Dep't Stores, 115 B.R. at 36.

70.     Pursuant to Bankruptcy Rule 4001(c), the Debtors respectfully request that the Court conduct a preliminary hearing on the Motion and authorize the Debtors from the entry of the Interim Order until the Final Hearing to obtain access to the Interim Funding Amount under the terms set forth in the DIP Documents and the Interim Order, and to utilize Cash Collateral to avoid immediate and irreparable harm to the Debtors' estates.

## VII.    Request to Establish Notice Procedures and Schedule Final Hearing

71.     The Debtors respectfully request that the Court schedule the Final Hearing and authorize the Debtors to serve the signed Interim Order, which fixes the time, date, and manner for the filing of objections, on the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(3).

## Reservation of Rights

72.     Unless specifically articulated herein or in the Interim or Final Orders, nothing contained herein is intended or shall be construed as:  (a) an admission as to the validity

of any claim against the Debtors; (b) a waiver of the Debtors' rights to dispute any claim, including the amount or priority thereof, on any grounds; (c) a promise to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined hereunder; or (e) the assumption of any executory contract or unexpired lease.

## Consent to Jurisdiction

73.     Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## Notice

74.     Notice of this Motion shall be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' fifty largest unsecured creditors on a consolidated basis, as identified in their chapter 11 petitions; (iii) all known holders of liens upon the Debtors' assets; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; and (vi) counsel to DIP Agent.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Local Rule 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

## No Prior Request

75.     No prior request for the relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtors respectfully request that the Court:  (a) enter the Interim Order substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested

herein on an interim basis; (b) after the Final Hearing, enter the Final Order; and (c) grant such other and further relief to the Debtors as the Court may deem proper.

[*The remainder of the page is intentionally blank*]

Dated:    August 30, 2020                  Respectfully submitted,
          Wilmington, Delaware

                                            */s/ Daniel J. DeFranceschi*
                                            Daniel J. DeFranceschi (No. 2732)
                                            Paul N. Heath (No. 3704)
                                            Zachary I. Shapiro (No. 5103)
                                            David T. Queroli (No. 6318)
                                            RICHARDS, LAYTON & FINGER, P.A.
                                            One Rodney Square
                                            920 N. King Street
                                            Wilmington, Delaware 19801
                                            Telephone: (302) 651-7700
                                            Facsimile: (302) 651-7701

                                                         -and-

                                            Thomas M. Wearsch
                                            T. Daniel Reynolds
                                            JONES DAY
                                            North Point
                                            901 Lakeside Avenue
                                            Cleveland, Ohio 44114
                                            Telephone: (216) 586-3939

                                            Timothy W. Hoffmann
                                            JONES DAY
                                            77 West Wacker
                                            Chicago, Illinois 60601
                                            Telephone: (312) 782-3939

                                            PROPOSED ATTORNEYS FOR DEBTORS

## **Exhibit A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-------------------------------------------------------- x
In re:                                                    :
                                                          :    Chapter 11
SHILOH INDUSTRIES, INC.,[1]                              :
*et al.*,                                                 :    Case No. 20-____ (____)
                                                          :
        Debtors.                                          :    (Joint Administration Pending)
                                                          :
-------------------------------------------------------- x

**INTERIM ORDER PURSUANT TO SECTIONS**
**105, 361, 362, 363, 364 AND 507 OF THE BANKRUPTCY**
**CODE, BANKRUPTCY RULE 4001 AND LOCAL RULE 4001-2,**
**(I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION**
**FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING**
**ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES,**
**(III) SCHEDULING FINAL HEARING AND (IV) GRANTING RELATED RELIEF**

This matter coming before the Court on the *Motion of the Debtors, Pursuant to Sections*

*105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule*

*4001-2, for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition*

*Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured*

*Parties, (III) Scheduling Final Hearing and (IV) Granting Related Relief* [Docket No. [__]]

(the "Motion"),[2] filed by the above-captioned debtors and debtors in possession (collectively,

---

[1]    The Debtors are the following nineteen entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses):  Shiloh Industries, Inc. (7683), Greenfield Die & Manufacturing Corp. (8114), Jefferson Blanking Inc. (7850), Shiloh Automotive, Inc. (1339), Shiloh Corporation (5101), Shiloh Industries, Inc. Dickson Manufacturing Division (5835), Shiloh Holdings International, Inc. (1446), C & H Design Company (9432), Liverpool Coil Processing, Incorporated (0571), Medina Blanking, Inc. (0707), The Sectional Die Company (3562), VCS Properties, LLC (1094), Shiloh Die Cast LLC (5814), Shiloh Manufacturing Holdings LLC (0853), FMS Magnum Holdings LLC (6471), Sectional Stamping, Inc. (8967), Albany-Chicago Company LLC (4687), Shiloh Die Cast Midwest LLC (4114), and Shiloh Manufacturing LLC (1628).  The noticing address of each of the Debtors in these chapter 11 cases is 880 Steel Drive, Valley City, Ohio 44280.

[2]    Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the Motion or the DIP Documents (defined below), as applicable.

the "Debtors"), seeking entry of (i) an interim order (this "Interim Order") and (ii) a final order (the "Final Order"); and the Debtors' having requested on the record at the interim hearing on the Motion (the "Interim Hearing") that the Court enter this Interim Order, *inter alia*:

(a)     authorizing Shiloh Industries, Inc. ("Shiloh" or "Borrower") and its affiliated Debtors to obtain secured postpetition financing on a superpriority basis (the "DIP Facility", and the loans provided to Shiloh thereunder, the "DIP Loans") pursuant to the terms and conditions of that certain Superpriority Secured Debtor-in-Possession Credit Agreement filed as Exhibit B to the Motion (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "DIP Agreement"), by and among (i) the Borrower, (ii) the other Debtors, as guarantors, (iii) Bank of America, N.A. as administrative agent (the "DIP Agent") and (iv) the lenders from time to time party thereto (each a "DIP Lender" and collectively, the "DIP Lenders" and collectively with the DIP Agent and providers of hedge products and treasury management services secured by the DIP Collateral (as defined below), the "DIP Secured Parties");

(b)     authorizing the Debtors to execute the DIP Agreement and the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Secured Parties (as the same may be amended, restated, supplemented or otherwise modified from time to time, and collectively with the DIP Agreement, the "DIP Documents");

(c)     authorizing the Debtors to consummate the transactions contemplated by the DIP Documents;

(d)     granting to the DIP Secured Parties the DIP Liens (as defined below) on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Documents, as applicable, and this Interim Order and

- 2 -

any Final Order, as applicable (collectively, and including all "Secured Obligations" as defined in the DIP Agreement, the "<u>DIP Obligations</u>"), subject only to prior payment of the Carve-Out (as defined in paragraph 17 below) and the Senior Third-Party Liens (as defined in paragraph 13(d)(ii));[3]

(e)    granting allowed superpriority administrative expense claims to the DIP Secured Parties in connection with the DIP Facility;

(f)    authorizing the Debtors to use Prepetition Collateral and Cash Collateral (each as defined below) (together with the DIP Facility, the "<u>Postpetition Financing Arrangement</u>");

(g)    authorizing the Debtors to grant adequate protection to the Prepetition Lenders (as defined below);

(h)    scheduling a hearing (the "<u>Final Hearing</u>"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), to consider entry of the Final Order; and

(i)    granting such other and further relief as this Court deems necessary and just ((a) through (h) collectively, the "<u>Requested Relief</u>");

and the interim hearing on the Motion (the "<u>Interim Hearing</u>") having been held on September __, 2020; and upon all of the pleadings filed with the Court and the evidence proffered or adduced and representations of counsel at the Interim Hearing; and the Court having heard and resolved or overruled any and all objections to the Requested Relief; and it appearing that the

---

[3]    Nothing herein shall constitute a finding or ruling by this Court that any asserted Senior Third-Party Lien is valid, senior, enforceable, prior, perfected or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the Prepetition Agent, the Prepetition Lenders, or a Creditors' Committee (if appointed), to challenge the validity, priority, enforceability, seniority, non-avoidability, perfection or extent of any alleged Senior Third-Party Lien.

- 3 -

Requested Relief is in the best interests of the Debtors, their estates and creditors; and upon the record herein; and after due deliberation thereon, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT**:[4]

A.    <u>Petition Date</u>.  On August 30, 2020 (the "<u>Petition Date</u>"), the Debtors commenced their chapter 11 cases (these "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>").  The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner or official committee of unsecured creditors (a "<u>Creditors' Committee</u>") has been appointed in any of these Chapter 11 Cases.

B.    <u>Jurisdiction; Venue</u>.  The Court has jurisdiction over these Chapter 11 Cases, the parties and the Debtors' property pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delawar*e, dated as of February 21, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(D).  The Court is a proper venue of these Chapter 11 Cases and the Motion under 28 U.S.C. §§ 1408 and 1409.

C.    <u>Notice</u>.  Notice of the Motion, the relief requested therein and the Interim Hearing (the "<u>Notice</u>") has been served by the Debtors pursuant to Bankruptcy Rules 2002 and 4001 and in accordance with the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>") on (i) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis, (ii) counsel to the DIP Agent and the

---

[4]    Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

Prepetition Agent, (iii) any parties that have filed a notice of appearance in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, (iv) all known holders of liens upon the Debtors' assets, (v) the Internal Revenue Service and (vi) the Securities and Exchange Commission, and (vii) the United States Trustee for the District of Delaware (the "U.S. Trustee").  Under the circumstances, the Notice constitutes good and sufficient notice of the Requested Relief, and no further notice of the Requested Relief and the relief granted by this Interim Order is necessary or shall be required.

D.        Debtors' Acknowledgements and Stipulations.  In requesting the Postpetition Financing Arrangement and in exchange for and as a material inducement to, the DIP Secured Parties to agree to provide the Postpetition Financing Arrangement, and to the Prepetition Lenders in exchange for the Diminution (as defined below), the Debtors acknowledge, represent, stipulate and agree, for themselves and their estates, subject to the challenge rights set forth in paragraph 19 herein, as follows (collectively, the "Debtors' Stipulations"):

(i)        the Borrower, certain of the Debtors as guarantors (in such capacity, the "Debtor Guarantors" and collectively with the Borrower, the "Prepetition Obligors"), and Shiloh Holdings Netherlands B.V., *a besloten vennootschap met beperkte aansprakelijkheid* organized under the laws of the Netherlands (the "Dutch Borrower") are parties to the Credit Agreement, dated as of October 25, 2013 (as the same has been amended, restated, supplemented or modified from time to time, the "Prepetition Credit Agreement") with Bank of America, N.A. as administrative agent, swing line lender, Dutch swing line lender and L/C issuer (the "Prepetition Agent") and certain lender parties thereto (collectively with the Prepetition Agent and providers of hedge products and treasury management services secured by the Prepetition Collateral (as defined below), the "Prepetition Lenders");

- 5 -

(ii)      to secure the "Obligations" (as defined in the Prepetition Credit Agreement, the "Prepetition Obligations"), the Prepetition Obligors, but not the Dutch Borrower, granted to the Prepetition Agent, for the benefit of the Prepetition Lenders, liens upon and security interests in (the "Prepetition Liens") all of the Prepetition Obligors' property and assets (other than the "Excluded Property" (as defined in the Prepetition Credit Agreement)), as set forth in certain security documents and instruments including:  (i) the Pledge Agreement, dated as of October 25, 2013, by and among the Borrower, the other Prepetition Obligors and the Prepetition Agent (as the same has been amended, restated, supplemented or modified from time to time, the "Prepetition Pledge Agreement"),  (ii) the Security Agreement, dated as of October 25, 2013, by and among the Borrower, the other Prepetition Obligors, and the Prepetition Agent (together with the Prepetition Credit Agreement, the Prepetition Pledge Agreement and all other agreements, documents, notes, guarantees, subordination agreements, instruments, amendments and any other agreements delivered pursuant thereto or in connection therewith, each as amended, restated, supplemented or otherwise modified from time to time, the "Prepetition Loan Documents"), and, in all instances, the proceeds and products thereof (collectively, the "Prepetition Collateral");

(iii)     as of the Petition Date:  (A) the current outstanding principal balance of the Prepetition Obligations (exclusive of interest, fees, reimbursable expenses and other charges) is not less than $341,300,000, which amount consists of (I) $273,3000,000 under the domestic facility and (II) $68,000,000 under the Dutch facility (for which the Dutch Borrower is primarily obligated); (B) all of the Prepetition Obligations are absolutely and unconditionally owed by the Prepetition Obligors to the Prepetition Lenders; (C) the

- 6 -

Prepetition Obligations constitute legal, valid and binding obligations of the Prepetition Obligors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code to the extent applicable); (D) no recoupments, offsets, defenses or counterclaims exist to the Prepetition Obligations; and (E) no portion of the Prepetition Obligations or any payments or other transfers made to the Prepetition Agent or any other Prepetition Lender or applied to the Prepetition Obligations prior to the Petition Date is subject to avoidance, subordination, recharacterization, recovery, attack, recoupment, offset, counterclaim, defense or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iv)    the Prepetition Liens constitute valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code) and perfected liens with priority over any and all other liens in the Prepetition Collateral (except for any Senior Third-Party Liens (as defined in paragraph 13(d)(ii))) and are not subject to any challenge or defense, including without limitation, respectively, avoidance, subordination, recharacterization, recovery, reduction, set-off, offset, attack, counterclaim, cross-claim or Claim (as defined in the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(v)    the Debtors have waived, discharged and released any right they may have to challenge the Prepetition Obligations and the Prepetition Liens on the Prepetition Collateral and to assert any recoupments, offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against any Prepetition Lender with respect to the

- 7 -

Prepetition Loan Documents, the Prepetition Obligations, the Prepetition Liens or the Prepetition Collateral;

(vi)    any payments made on account of the Prepetition Obligations before the Petition Date were (A) payments out of the Prepetition Collateral and/or (B) made in the ordinary course of business and in exchange for reasonably equivalent value and did not diminish any property otherwise available for distribution to unsecured creditors;

(vii)    all of the Debtors' cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral (as defined below);

(viii)    none of the DIP Secured Parties or the Prepetition Lenders is a control person or insider (as defined in section 101(31) of the Bankruptcy Code) of any Debtor;

(ix)    until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens provided to the DIP Secured Parties by offering subsequent lender or any party-in-interest a superior or *pari passu* lien or claim with respect to the DIP Collateral pursuant to section 364(d) of the Bankruptcy Code or otherwise, except with respect to the Carve-Out;

(x)    until such time as all DIP Obligations are indefeasibly paid in full in cash, the Debtors shall not in any way or at any time seek allowance of any administrative expense claim against the Debtors of any kind or nature whatsoever, including, without limitation, claims for any administrative expenses of the kind specified in, or arising or ordered under sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113 and 1114 of the

- 8 -

Bankruptcy Code that is superior to or *pari passu* with the DIP Superpriority Claim (as defined below) provided herein, except with respect to the Carve-Out; and

(xi)     the Prepetition Lenders are entitled, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date (the "Diminution"), caused by or arising as a result of (A) the incurrence and payment of the DIP Obligations, (B) the use of Prepetition Collateral (including Cash Collateral), (C) the granting of the DIP Liens and the DIP Superpriority Claim, (D) the subordination of the Prepetition Obligations to the Carve-Out, and (E) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

E.     Cash Collateral.  For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the DIP Secured Parties or the Prepetition Lenders have a lien, security interest or any other interest (including, without limitation, any Adequate Protection Liens or security interests), whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise, and shall include, without limitation:

(i)     all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any real or personal property, in or on which the DIP Secured Parties or the Prepetition Lenders have a lien or a replacement lien, whether as part of the DIP Collateral or the Prepetition Collateral, or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of these Chapter 11 Cases, or arose or was generated thereafter;

- 9 -

(ii)　　all of the respective deposits, refund claims and rights in retainers of the Debtors on which the DIP Secured Parties or the Prepetition Lenders hold a lien or replacement lien, whether as part of the DIP Collateral or Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise; and

(iii)　　the proceeds of any sale, transfer or other disposition of DIP Collateral or Prepetition Collateral.

F.　　<u>Adequate Protection</u>.  The Prepetition Lenders are entitled, pursuant to sections 361, 363(e) and 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, to the extent of any Diminution resulting from (i) the incurrence of the DIP Obligations, (ii) the use of Prepetition Collateral (including Cash Collateral), (iii) the granting of the DIP Liens and the DIP Superpriority Claim, (iv) the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out, and (v) imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

G.　　<u>Purpose and Necessity of Financing</u>.  The Debtors require the Postpetition Financing Arrangement to (i) permit the continuation of their businesses and maximize and preserve their going concern value, (ii) satisfy payroll obligations and other working capital and general corporate purposes of the Debtors consistent with the terms set forth in the DIP Documents and the Approved Budget (as defined below), (iii) provide adequate protection to the Prepetition Lenders, (iv) pay fees and expenses related to the DIP Documents and these Chapter 11 Cases and (v) for such other purpose as set forth in, or otherwise permitted by, the DIP Documents (including the Approved Budget).  If the Debtors do not obtain authorization to use the Prepetition Collateral (including Cash Collateral) and borrow under the DIP Agreement, they will suffer immediate and irreparable harm.  The Debtors are unable to obtain adequate unsecured credit allowable only as

- 10 -

an administrative expense under section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or (d) of the Bankruptcy Code, on more favorable terms than those set forth in the DIP Documents.  A loan facility in the amount provided by the DIP Documents is not available to the Debtors without granting the superpriority claims, liens and security interests, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Documents.  After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the Postpetition Financing Arrangement, including without limitation, the DIP Facility, is the best financing available to them at this time.

H.    <u>Good and Sufficient Cause Shown</u>.  Good and sufficient cause has been shown for entry of this Interim Order.  The ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Documents and use of the Prepetition Collateral (including the Cash Collateral) is vital to the Debtors' estates and creditors.  The liquidity to be provided under the DIP Documents and this Interim Order will enable the Debtors to continue to operate their businesses in the ordinary course and preserve the value of the Debtors' businesses pending the sale of substantially all of their assets.  Among other things, entry of this Interim Order is necessary to maximize the value of the Debtors' assets and to avoid immediate and irreparable harm to the Debtors and their estates, and, accordingly, is in the best interests of the Debtors, their estates and their creditors.

I.    <u>Sections 506(c) and 552(b) Waivers</u>.  In light of (i) the DIP Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve-Out, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility and (ii) the Prepetition Lenders' agreement to subordinate their liens and superpriority claims to the DIP

- 11 -

Obligations, the Carve-Out and the DIP Liens, and to permit the use of the Prepetition Collateral (including Cash Collateral for payments made in accordance with the Approved Budget (as defined below) and the terms of this Interim Order), upon entry of the Final Order, each of the DIP Secured Parties and the Prepetition Lenders are entitled to a waiver of the provisions of section 506(c), and the Prepetition Lenders are entitled to a waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code.

J.      <u>Good Faith</u>.   The terms of the DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order, including, without limitation, the interest rates and fees applicable, and intangible factors relevant thereto, are more favorable to the Debtors than those available from alternative sources.   Based upon the record before the Court, the DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order have been negotiated in good faith and at arm's-length among the Debtors, the DIP Secured Parties and the Prepetition Lenders.   Any DIP Loans and other financial accommodations made to the Debtors by the DIP Secured Parties pursuant to the DIP Documents and this Interim Order shall be deemed to have been extended by the DIP Secured Parties in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and each of the DIP Secured Parties shall be entitled to all protections and benefits afforded thereby.

K.      <u>Fair Consideration and Reasonably Equivalent Value</u>.   All of the Debtors have received and will receive fair and reasonable consideration by virtue of their obtaining access to the DIP Loans, the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order and all other financial accommodations provided under the DIP Documents and this Interim Order.   The terms of the DIP Documents and this Interim Order are fair and reasonable,

reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration.

L.    <u>Immediate Entry of Interim Order</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2(b).  The permission granted herein to enter into the DIP Documents, to obtain funds thereunder and to use the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for access to the financing necessary for the continued flow of supplies and services to the Debtors necessary to sustain the operation of the Debtors' existing businesses and further enhance the Debtors' prospects for a successful sale of substantially all of their assets.  Based upon the foregoing findings, acknowledgements and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    <u>Disposition</u>.  The relief requested by the Debtors in the Motion and otherwise on the record at the Interim Hearing is granted on the terms set forth in this Interim Order.  Any objection to the interim relief sought by the Debtors that has not previously been withdrawn or resolved is hereby overruled on its merits.

2.    <u>Authorization For DIP Financing</u>.  The Debtors are hereby authorized, on an interim basis, to incur DIP Obligations immediately during the period prior to entry of the Final Order, subject to the terms of this Interim Order, the Approved Budget and the DIP Documents, in an aggregate principal amount not to exceed $18,100,000.00 ("<u>Interim Borrowings</u>"), with the

- 13 -

maximum principal amount that may be borrowed following entry of the Final Order not to exceed $123,500,000.00 (inclusive of any outstanding Interim Borrowings) (the "Maximum Commitment").[5]  Available financing and advances under the DIP Agreement shall, on an interim basis, be made to fund, in accordance with the DIP Documents and the Approved Budget, working capital and general corporate requirements of the Debtors, adequate protection to the Prepetition Lenders, bankruptcy-related costs and expenses (including interest, fees and expenses in accordance with this Interim Order and the DIP Documents), and any other amounts required or allowed to be paid in accordance with this Interim Order, but only as and to the extent authorized by the Approved Budget and the DIP Documents.  Upon entry of the Final Order and subject to paragraph 19, $100,000,000.00 of the principal amount of the Prepetition Obligations held by DIP Lenders (allocated in accordance with their respective shares of the DIP Loans) shall be converted into DIP Loans, and such portion (once converted into DIP Loans) may not be reborrowed after any repayment (whether full or partial) thereof.

3.    <u>Authorization for Use of Cash Collateral</u>.  The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions and limitations set forth in this Interim Order, the Approved Budget and the DIP Documents, without further approval by the Court.

4.    <u>Approved Budget</u>.

(a)    The Debtors have delivered to the DIP Agent a detailed budget that sets forth projected cash receipts and cash disbursements on a weekly basis for the time period from and including the Petition Date through November 27, 2020 that has been approved by the

---

[5]    For the avoidance of doubt, after the Final Order, borrowings up to the Maximum Commitment are inclusive of the $100,000,000.00 of Prepetition Obligations which are treated as DIP Loans for purposes of the DIP Agreement, the Interim Order and any Final Order.

Required DIP Lenders (defined below), and a copy of which is attached hereto as <u>Exhibit A</u> (as updated, amended, supplemented or otherwise modified in accordance herewith, the "<u>Approved Budget</u>").  The Approved Budget also sets forth, for each week, the amount of DIP Loans anticipated to be advanced or otherwise used for such week after giving effect to any budgeted inflows.  The Debtors shall provide to the DIP Secured Parties financial reporting in accordance with the terms of the DIP Documents.  Funds borrowed under the DIP Agreement and Cash Collateral used under this Interim Order shall be used by the Debtors in accordance with the DIP Documents, including the Approved Budget, and this Interim Order.  The consent of the Required DIP Lenders to the Approved Budget shall not be construed as a commitment of the DIP Lenders to provide DIP Loans or of the DIP Secured Parties or Prepetition Lenders to permit the use of Cash Collateral (subject to the Carve-Out) after the occurrence of a Termination Event (as defined below) under this Interim Order, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(b)    The Approved Budget and Approved Variance Report (as defined below) shall, including any and all updates, amendments, supplements and modifications, at all times be in form and substance reasonably acceptable to the Required DIP Lenders and approved in writing by the DIP Agent prior to the implementation thereof.  Notwithstanding anything herein to the contrary, any updates, amendments, supplements or modifications to the Approved Budget, must be consented to in writing by the DIP Lenders holding more than fifty percent (50%) of the DIP Loan commitments (the "<u>Required DIP Lenders</u>") prior to the implementation thereof and shall not require further notice, hearing, or Court order.

(c)    The DIP Secured Parties (i) may assume the Debtors will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance, and (iii) shall not be

- 15 -

obligated to pay (directly or indirectly from the DIP Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget other than to permit the Debtors' use of Cash Collateral as expressly provided herein prior to the occurrence of a Termination Event. All advances and extensions of credit shall be based upon the terms and conditions of the DIP Documents, as the same may be amended from time to time with the consent of the DIP Lenders or Required DIP Lenders (as applicable in accordance with the DIP Documents).  Subject to the terms and conditions of this Interim Order, the DIP Lenders shall have the right, but not the obligation, to extend credit independent of any Approved Budget restrictions on loan availability set forth in the DIP Documents, and all DIP Loans shall be entitled to the benefits and protections of this Interim Order.  For the avoidance of doubt, no DIP Lender shall be obligated to extend credit outside the terms of the DIP Documents.

(d)    On or before 11:59 p.m. Eastern Time on every Thursday of each week, commencing after the end of the second full week following the Petition Date, the Debtors shall deliver to the DIP Agent a report (each, an "Approved Variance Report") that shows (i) then-current cash balance calculations and (ii) cash flow reconciliations showing actual payments versus budgeted items in the Approved Budget for prior periods ended (with (a) an explanation of any Measurement Item (as defined in the DIP Credit Agreement) variance greater than 20% and $500,000, and (b) an indication of any adverse variance that exceeds the Permitted Variance).  As used herein, "Permitted Variance" means permitted negative variance on the cumulative actual Net Cash Flow (as defined in the DIP Credit Agreement) of 15% of the budgeted amounts with measurement beginning in week two (2) of these Chapter 11 Cases through week five (5) of these Chapter 11 Cases and a permitted negative variance on the

- 16 -

cumulative actual Net Cash Flow of 10% thereafter).  The DIP Agent shall promptly deliver to the DIP Lenders, a copy of each Approved Variance Report upon such agent's receipt.

5.     <u>Reserved.</u>

6.     <u>Authority to Execute and Deliver Necessary Documents</u>.  Each of the Debtors is authorized to negotiate, prepare, enter into and deliver the DIP Documents, in each case including any amendments, supplements and modifications thereto in accordance with the terms thereof. Each of the Debtors is further authorized to negotiate, prepare, enter into and deliver any other UCC financing statements, pledge and security agreements, mortgages or deeds of trust, or similar documents, instruments or agreements encumbering all of the DIP Collateral and securing all of the Debtors' obligations under the DIP Documents, each as may be reasonably requested by the DIP Agent.

7.     <u>Authority to Perform Obligations and Acts</u>.  Each of the Debtors is further authorized to (a) perform all of its obligations and acts contemplated by the DIP Documents and such other agreements as may be required by the DIP Documents to give effect to the terms of the financing provided for therein and in this Interim Order, and (ii) perform all acts required under the DIP Documents and this Interim Order.

8.     <u>Valid and Binding Obligations</u>.  All obligations under the DIP Documents and this Interim Order shall constitute valid and binding obligations of each of the Debtors, enforceable against each of them and each of their successors and assigns, in accordance with their terms and the terms of this Interim Order, and no obligation, payment, transfer or grant of a lien or security interest under the DIP Documents or this Interim Order shall be voidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set-off, offset, recharacterization,

- 17 -

subordination (whether equitable, contractual or otherwise), counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

9.      <u>Termination of DIP Documents</u>.  Notwithstanding anything in this Interim Order to the contrary, the DIP Lenders' commitments under the DIP Documents will terminate and the DIP Obligations will become due and payable (unless such obligations become due and payable earlier pursuant to the terms of the DIP Documents and this Interim Order by way of acceleration or otherwise), and the Debtors' authority to use Cash Collateral in accordance with this Interim Order will terminate, on the date that is the earliest to occur of (in each case, the "<u>Maturity Date</u>"): (i) four (4) months after the commencement of these Chapter 11 Cases; (ii) the date which is thirty (30) days following the entry of this Interim Order if the Court has not entered the Final Order on or prior to such date; (iii) the acceleration of the DIP Obligations upon five (5) business days' prior written notice of an event of default under the DIP Agreement (an "<u>Event of Default</u>") and at the written request of the Required DIP Lenders; (iv) the date upon which any plan of reorganization or liquidation becomes effective in any of these Chapter 11 Cases; (v) entry of an order by the Bankruptcy Court in any these Chapter 11 Cases (a) dismissing any of these Chapter 11 Cases or converting any of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code without the consent of the Required DIP Lenders or (b) appointing a chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Borrower (powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case without the consent of the DIP Agent and the Required DIP Lenders; (vi) the effective date of a sale of all or substantially all of the assets of the Debtors and (vii) the filing or support by any Debtor of a plan of reorganization or liquidation (a "<u>Plan</u>") that is not otherwise reasonably acceptable to the DIP

- 18 -

Agent and the Required DIP Lenders in their sole discretion; provided, that, a Plan that, upon its effective date, pays the DIP Obligations and the obligations under the Prepetition Credit Agreement in full in cash on the effective date of such Plan shall be deemed reasonably acceptable to such parties.

10.     <u>Termination of Authority to Use Cash Collateral.</u>  Subject to paragraph 21(f), the Debtors' ability to use Cash Collateral prior to the Maturity Date will terminate immediately upon the occurrence of any event described below (each a "<u>Termination Event</u>"):

(a)     any Debtor fails to comply in any material respect with any of the terms or conditions of this Interim Order, and such failure is not cured during any applicable Remedies Notice Period;

(b)     any Debtor seeks any modification or extension of this Interim Order, without consent of the Required DIP Lenders;

(c)     an application (other than the application for financing provided by a third party which seeks authority to pay all of the DIP Obligations and the Prepetition Obligations in full upon entry of the order approving such financing) is filed by any Debtor for the approval of (or an order is entered by the Court approving) any claim arising under section 507(b) of the Bankruptcy Code or otherwise, or any lien in any of these Chapter 11 Cases, which is *pari passu* with or senior to the Prepetition Obligations, the Adequate Protection Liens or the Adequate Protection Superpriority Claim, excluding liens arising under this Interim Order or pursuant to any other financing agreement made with the prior written consent of the Required DIP Lenders;

(d)     the commencement or support of any action by any Debtor or any party exercising the authority of the Debtor (other than an action pursuant to paragraph 19) against any of the DIP Lenders or the Prepetition Lenders, or their respective agents and employees, to

- 19 -

subordinate or avoid any liens made in connection with the Prepetition Loan Documents or the DIP Documents or to avoid any obligations incurred in connection with the Prepetition Loan Documents or the DIP Documents;

(e)     any order shall be entered granting relief from the stay arising under section 362 of the Bankruptcy Code to the holder or holders of any security interest, lien or right of setoff to permit foreclosure (or the granting of a deed in lieu of foreclosure or similar instrument), possession, set-off or any similar remedy with respect to any assets of the Debtors with an aggregate value of more than $250,000;

(f)     (i) any Debtor shall assert in any pleading filed in any court that any material provision of this Interim Order is not valid and binding for any reason, or (ii) any material provision of this Interim Order shall for any reason, or any other order of this Court approving the Debtors' use of Cash Collateral, without the prior written consent of the Required DIP Lenders, cease to be valid and binding;

(g)     any Debtor withdraws or modifies the motion to approve the sale of all or substantially all of the Debtors' assets without the consent of the Required DIP Lenders;

(h)     the Debtors fail to comply with any Sale Milestone; or

(i)     the occurrence of the Maturity Date.

11.     <u>Authorization and Direction for Payment of DIP Financing Fees and Expenses</u>. Subject to the provisions of this paragraph 11, all fees paid or payable, and all reasonable costs and expenses reimbursed or reimbursable (including, without limitation, all fees, costs and expenses referred to in the DIP Documents and the DIP Agent's and the DIP Lenders' reasonable attorneys' fees and expenses, including all fees and time charges for attorneys who may be employees (with no profit margin) of the DIP Agent or any DIP Lender, and the invoices of

- 20 -

AlixPartners, LLP in its capacity as the financial advisor to the Prepetition Agent and the DIP Agent ("Alix")), by the Debtors to the DIP Secured Parties are hereby approved, to the extent provided in the DIP Agreement.  The Debtors are hereby authorized and directed to pay all such fees, costs and expenses in accordance with the terms of the DIP Documents and this Interim Order, without any requirement that the Debtors, the DIP Agent, the DIP Lenders or their respective attorneys file any further application or other pleading, notice or document with the Court for approval or payment of such fees, costs or expenses.  To the extent provided in the DIP Agreement, the Debtors shall pay all reasonable prepetition and postpetition out of pocket costs and expenses of the DIP Secured Parties (including all reasonable fees, expenses and disbursements of outside counsel, including local counsel and Alix and all fees and time charges for attorneys who may be employees (with no profit margin) of the DIP Agent or any DIP Lender) in connection with these Chapter 11 Cases and any Successor Case(s) (as defined below), including, without limitation, in connection with (a) the preparation, negotiation, execution and delivery of the DIP Documents, this Interim Order and any Final Order, and the funding of all DIP Loans under the DIP Facility, (b) the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Documents, this Interim Order and any Final Order, (c) the administration of these Chapter 11 Cases and any Successor Case(s), and (d) the enforcement or protection of the DIP Secured Parties' rights and remedies under the DIP Documents, this Interim Order and any Final Order.  Notwithstanding anything to the contrary herein, the payment of all such fees, costs and expenses of the DIP Secured Parties, whether incurred before or after the Petition Date, including, without limitation, all fees referred to in the DIP Documents and all reasonable attorneys' fees and expenses, shall, (i) subject to paragraph 19, be deemed non-refundable and irrevocable, and (ii) not be subject to the Approved Budget.  None of the DIP

- 21 -

Secured Parties' attorneys' fees or disbursements shall be subject to the prior approval of this Court or the guidelines of the Office of the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  Prior to any conversion of these Chapter 11 Cases to chapter 7, any such fees, costs and expenses shall be paid by the Debtors within ten (10) days after delivery of a summary invoice (redacted for privilege) to the Debtors and without the need for application to or order of the Court.  A copy of such summary invoice shall be provided by the DIP Agent to the U.S. Trustee, counsel for the Prepetition Agent and counsel for any Creditors' Committee on the same business day as the Debtors' receipt of such summary invoice.  Notwithstanding the foregoing, if (x) the Debtors, U.S. Trustee or any Creditors' Committee object to the reasonableness of a summary invoice submitted by the DIP Secured Parties and (y) the parties cannot resolve such objection, in each case within the ten (10) day period following receipt of such summary invoice, the Debtors, the U.S. Trustee or such Creditors' Committee, as the case may be, shall file with the Court and serve on the DIP Agent and the DIP Secured Party submitting the fee request a fee objection (a "DIP Secured Party Fee Objection"), which objection shall be limited to the issue of the reasonableness of such fees and expenses.  The Debtors shall promptly pay and/or the DIP Lenders are hereby authorized to make an advance under the DIP Agreement to timely pay, any submitted invoice after the expiration of the ten (10) day period if no DIP Secured Party Fee Objection is filed with the Court and served on the DIP Agent and DIP Lenders in such ten (10) day period.  If a DIP Secured Party Fee Objection is timely filed and served, the Debtors shall promptly pay and/or the DIP Secured Parties are hereby authorized to make an advance under the DIP Agreement to timely pay, the undisputed amount of the summary invoices, and the Court shall have jurisdiction to determine

- 22 -

the disputed portion of such invoice if the parties are unable to resolve the DIP Secured Party Fee Objection.

12.    <u>Amendments, Consents, Waivers and Modifications</u>.  The Debtors, with the express written consent of the Required DIP Lenders in accordance with the terms and conditions of the DIP Documents, may enter into any amendments, consents, waivers or modifications to the DIP Documents without the need for further notice and hearing or any order of this Court, so long as such amendments, consents, waivers or modifications are non-material or not adverse to the Debtors' estates or their creditors (other than the Required DIP Lenders).  A copy of any such amendment, consent, waiver or modification shall be provided by the Debtors to the DIP Lenders, U.S. Trustee and counsel for any Creditors' Committee.  Any material, adverse changes to the DIP Documents, including without limitation changes to the Approved Budget adverse to the Debtors' estates, as well as any increases in the amount of the DIP Loans (except as provided in paragraph 4(c) of this Interim Order), will require the consents of the Required DIP Lenders in addition to any express written consents required by the DIP Documents and Court approval after notice and a hearing, and increases in the amount of the DIP Loans shall require the consent of all DIP Lenders whose commitments are being increased.

13.    <u>DIP Secured Parties' Lien Priority</u>.

(a)    To secure the DIP Obligations, the DIP Secured Parties are hereby granted pursuant to and in accordance with Sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, valid, enforceable and fully perfected liens (the "<u>DIP Liens</u>") in and on all of the property, assets or interests in property or assets of each Debtor, and all "property of the estate" (within the meaning of the Bankruptcy Code) of each Debtor, of any kind or nature whatsoever, real or personal, tangible or intangible or mixed, now existing or hereafter acquired or created, including,

- 23 -

without limitation, all of each Debtor's now owned or hereafter acquired right, title and interest in and to all cash, accounts, accounts receivable, goods, inventory, property, plant and equipment, commercial tort claims, intellectual property, contract rights, tax refunds, prepaid expenses, deposits, general intangibles, real estate, leaseholds (provided, however, with respect to the Debtors' non-residential real property leases, no liens or encumbrances shall be granted or extend to such leases themselves under this Interim Order, except as permitted in the applicable lease or pursuant to applicable law, but rather any liens granted shall extend only to the proceeds realized upon the sale, assignment, termination, or other disposition of such leases, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds), all proceeds or property recovered in connection with actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions") (provided that the lien on Avoidance Actions and proceeds of Avoidance Actions shall be limited to the proceeds and property recovered in connection therewith and shall only attach hereunder to the extent approved in the Final Order), all intercompany claims, all claims and causes of action of each Debtor or its respective estate (including, without limitation, all commercial tort claims of every kind and description, whether described in specificity in the DIP Documents or not) and any and all proceeds and property recovered therefrom, any and all proceeds arising from insurance policies, all intellectual property, and the equity interests of each direct subsidiary of each Debtor, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of each Debtor that constitute Prepetition Collateral, and all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above (collectively, the "DIP Collateral"), subject only to prior payment of the Carve-Out.

- 24 -

(b)    The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date or created thereafter, including under sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than prior payment of the Carve-Out.

(c)    The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements or any other agreements, filings or instruments, such that no additional actions need be taken by the DIP Agent, the DIP Lenders or any other party (including, without limitation, any depository bank or securities intermediary) to perfect such interests.

(d)    At all times prior to indefeasible payment in cash in full of the DIP Obligations, the priority of the DIP Liens will:

(i)    Pursuant to sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, be perfected first priority liens (subject to Senior Third-Party Liens, if any) on all DIP Collateral;

(ii)    Pursuant to section 364(c)(3) of the Bankruptcy Code, be perfected junior liens on all DIP Collateral that was, as of the Petition Date, subject to valid, properly perfected, (before the Petition Date or in accordance with section 546(b) of the Bankruptcy Code), non-avoidable and senior in priority as a matter of law liens in existence at the time of the commencement of these Chapter 11 Cases (other than the liens in favor of the Prepetition Lenders,

- 25 -

which liens are "primed" pursuant to the liens described in subsection (iii) below) ("Senior Third-Party Liens"), with a priority immediately junior to any such Senior Third-Party Liens;

(iii)    Pursuant to section 364(d) of the Bankruptcy Code, be perfected first priority, senior priming liens on all DIP Collateral that is subject to (a) the existing liens that secure the obligations of the applicable Debtors under or in connection with the Prepetition Credit Agreement and, (b) existing liens junior in priority to the liens granted in favor of the Prepetition Lenders, all of which existing liens (the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first priority senior liens granted to the DIP Secured Parties hereunder, which senior priming liens in favor of the DIP Secured Parties shall also prime any liens granted after the commencement of these Chapter 11 Cases to provide adequate protection in respect of any of the Primed Liens; and

(iv)    Pursuant to the terms of this Interim Order, be subject to the Carve-Out and any senior liens, if any, permitted under the DIP Documents.

14.    DIP Secured Parties' Superpriority Claim.  The DIP Secured Parties are hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in each of these Chapter 11 Cases and in any successor case(s) under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, the "Successor Case(s)") for all DIP Obligations, having priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 726, 1113 and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or

claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof including, without limitation, any proceeds or property recovered in connection with the pursuit of Avoidance Actions. The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to prior payment of the Carve-Out. The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in these Chapter 11 Cases including, without limitation, on account of any break-up fee or expense reimbursement that may be granted by the Court in connection with any sale of the Debtors' assets, and the Adequate Protection Superpriority Claim (as defined below).

15.    <u>Survival of DIP Liens, DIP Superpriority Claim, Adequate Protection Liens, and Adequate Protection Superpriority Claim</u>. The DIP Liens, DIP Superpriority Claim, Adequate Protection Liens and Adequate Protection Superpriority Claim and other rights and remedies granted under this Interim Order to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders shall continue in these Chapter 11 Cases and any Successor Case(s), and shall be valid and enforceable against any trustee appointed in any or all of the Debtors' Chapter 11 Cases and upon the dismissal of any or all of the Debtors' Chapter 11 Cases, or in any Successor Case(s), and such liens and security interests shall maintain their first priority as provided in this Interim Order until all the DIP Obligations and the Prepetition Obligations have been indefeasibly paid in full in cash and the DIP Lenders' commitments have been terminated in accordance with the DIP Documents and this Interim Order.

16.    <u>Adequate Protection for Prepetition Lenders</u>. As adequate protection in respect of, and as consideration for any Diminution resulting from any of the incurrence and payment of the DIP Obligations, the use of Cash Collateral, the use of other Prepetition Collateral, the granting of

- 27 -

the DIP Liens and the DIP Superpriority Claim, the subordination of the Prepetition Obligations to the DIP Obligations and the Carve-Out and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Prepetition Lenders are hereby granted (in each case subject only to the DIP Liens, the DIP Superpriority Claim, and prior payment of the Carve-Out) the following adequate protection:

(a)    Adequate Protection Liens.    To secure the Adequate Protection Superpriority Claim (as defined below), the Prepetition Agent, for itself and for the benefit of the other Prepetition Lenders, is hereby granted (effective and perfected by operation of law immediately upon entry of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, account control agreements and other agreements, filings or instruments) valid, perfected, postpetition security interests and liens (the "Adequate Protection Liens") in and on all of the DIP Collateral, with a priority subject and subordinate only to (i) the DIP Liens and (ii) prior payment of the Carve-Out.

(b)    Adequate Protection Superpriority Claim.  As further adequate protection, the Prepetition Agent, for itself and for the benefit of the other Prepetition Lenders, is hereby granted a superpriority claim to the extent of any Diminution, which claim shall have priority over all other administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 546(c) (subject to entry of a Final Order), 546(d), 552, 726, 1113 and 1114 and any other provision of the Bankruptcy Code (the "Adequate Protection Superpriority Claim"), provided however, such Adequate Protection Superpriority Claim shall (i) be subordinate and subject only to the DIP Superpriority

Claim and prior payment of the Carve-Out, and (ii) shall be entitled to all protections and benefits of section 507(b) of the Bankruptcy Code.

(c)     <u>Prepetition Lenders' Fees and Expenses</u>.    Subject to paragraph 19, the Debtors shall pay the reasonable fees, charges and expenses (including attorneys' fees and other professional expenses) of the Prepetition Lenders who are also DIP Lenders, and shall pay all fees and time charges for attorneys who may be employees (with no profit margin) of the Prepetition Lenders who are also DIP Lenders, in connection with these Chapter 11 Cases and any Successor Case(s), including, without limitation, in connection with (i) the preparation, negotiation, execution and delivery of the DIP Documents, this Interim Order and any Final Order, and the funding of all DIP Loans under the DIP Facility, (ii) the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Documents, this Interim Order and any Final Order, (iii) the administration of these Chapter 11 Cases and any Successor Case(s), and (iv) the enforcement or protection of the DIP Secured Parties' or the Prepetition Lenders' rights and remedies under DIP Documents, the Prepetition Credit Agreement, this Interim Order and any Final Order.  The Debtors' obligations to make such payments shall include, in each instance, any of such fees, charges, expenses and other amounts which were incurred or accrued but unpaid as of the date hereof, including amounts incurred prior to the Petition Date.  Prior to any conversion of these Chapter 11 Cases to chapter 7, all such fees, costs and expenses shall be paid by the Debtors within twelve (12) days after delivery of a summary invoice (redacted for privilege) to the Debtors and without the need for further application to or order of the Court.  A copy of such summary invoice shall be provided by the Prepetition Lender to the U.S. Trustee, counsel for the DIP Agent and counsel for any Creditors' Committee at the same time as delivery to the Debtors.  Notwithstanding the foregoing, if (x) the Debtors, the U.S. Trustee or any Creditors' Committee

- 29 -

object to the reasonableness of a summary invoice submitted by the Prepetition Lenders and (y) the parties cannot resolve such objection, in each case within the ten (10) day period following the Debtors' receipt of such summary invoice, the Debtors, the U.S. Trustee or such Creditors' Committee, as the case may be, shall file with the Court and serve on the Prepetition Lenders a fee objection (a "<u>Prepetition Lenders Fee Objection</u>"), which objection shall be limited to the issue of the reasonableness of such fees and expenses.  The Debtors shall promptly pay and/or the DIP Lenders are hereby authorized to make an advance under the DIP Agreement to timely pay, any submitted invoice after the expiration of the ten (10) day period if no Prepetition Lenders Fee Objection has been filed with the Court and served on the DIP Agent in such ten (10) day period. If a Prepetition Lenders Fee Objection is timely filed and served, the Debtors shall promptly pay and/or the DIP Secured Parties are hereby authorized to make an advance under the DIP Agreement to timely pay, the undisputed amount of the summary invoice, and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the Prepetition Lenders Fee Objection.  In all events, the payments pursuant to this subsection (c) shall be subject to the rights reserved to third parties under paragraph 19.

       (d)    <u>Reserved.</u>

       (e)    <u>506(c) and 552(b) Waivers</u>.  Subject to the entry of the Final Order, the Prepetition Lenders' consent to use of Cash Collateral and Prepetition Collateral under this Interim Order and the Debtors' right to use Cash Collateral and Prepetition Collateral: (i) is in lieu of any section 506(c) claim, payment or priority for the costs or expenses of the administration of any of these Chapter 11 Cases; and (ii) is granted as consideration for (among other things) the waiver of the exceptions provided in sections 552(b)(1) and (2) of the Bankruptcy Code, which exceptions are hereby waived.

(f)    <u>Access to Debtors' Management and Investment Banker</u>.  The Debtors shall cause their management team and their investment bankers (the "<u>Investment Bankers</u>") to be made available to provide periodic telephonic updates of such reports to the DIP Agent, the DIP Lenders and the Prepetition Lenders from time to time (but not more than weekly), as reasonably requested by the DIP Agent, at reasonable times to be mutually agreed.

(g)    <u>Reporting</u>.  As and when required under the terms of the DIP Agreement, the Debtors shall provide to the DIP Agent and each DIP Lender all of the financial information, operational information and related reports, documents and analyses required under the terms of the DIP Agreement.

(h)    <u>Credit Bidding Rights</u>.  The Debtors and the DIP Secured Parties agree that in any sale of the DIP Collateral or Prepetition Collateral other than a sale in the ordinary course of business, the DIP Lenders and the Prepetition Lenders shall have the right to credit bid the DIP Obligations and Prepetition Obligations (as applicable) in accordance with section 363(k) of the Bankruptcy Code, provided that any such credit bid of the Prepetition Lenders that does not also contain a credit bid of the DIP Obligation must contain a cash component satisfactory to satisfy in full the DIP Obligations.  The Debtors agree that any motion filed by the Debtors seeking approval of bid procedures will contain a request for approval of the right of the DIP Lenders and the Prepetition Lenders to credit bid the DIP Obligations and Prepetition Obligations (as applicable) and the DIP Lenders consent to the Prepetition Lenders being granted the right to credit bid in accordance with this subsection (h).  Subject to entry of a Final Order, the foregoing agreement shall operate as a finding that the DIP Lenders and the Prepetition Lenders shall have the right to credit bid the DIP Obligations and Prepetition Obligations (as applicable) in accordance with section 363(k) of the Bankruptcy Code (as set forth above) and the right of the DIP Lenders and

- 31 -

Prepetition Lenders to credit bid in accordance with this subsection (h) shall not be modified or altered by any event, including entry of a subsequent order of the Court, without the prior written consent of each of the DIP Lenders and Prepetition Lenders.

(i)    Further Adequate Protection.  Nothing in this Interim Order shall, or shall be deemed to, limit, abridge or otherwise affect the rights of the Prepetition Lenders to request at any time that the Court provide additional or further protection of their interests in the Prepetition Collateral (including the Cash Collateral) or to seek further or additional adequate protection in the event the adequate protection provided herein proves to be inadequate, subject to the Debtors' rights to contest any such request.

17.    Carve-Out.

(a)    The DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens, the Adequate Protection Superpriority Claim and the Prepetition Liens shall be subject and subordinate to the prior payment of:  (i) all fees required to be paid to (A) the clerk of the Bankruptcy Court and (B) the Office of the United States Trustee under section 1930(a) of Title 28 of the United States Code, plus interest required to be paid on any past due amount at the statutory rate (collectively, the "UST Carve-Out"); (ii) all reasonable fees and expenses, up to $50,000, incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve-Out"); (iii) to the extent allowed at any time, all unpaid fees and expenses (the "Allowed Professional Fees") of persons or firms retained by the Debtors pursuant to sections 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") or by the Creditors' Committee pursuant to sections 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") that are incurred or earned at any time before or on the first Business Day following delivery by the DIP Agent of a Carve-Out Trigger Notice

- 32 -

(as defined below), whether allowed prior to or after delivery of a Carve-Out Trigger Notice (the "Professional Fee Carve-Out"); and (iv) Allowed Professional Fees of Professional Persons other than Investment Bankers in an aggregate amount not to exceed $300,000.00, plus Allowed Professional Fees of Investment Bankers, in each case incurred after the first Business Day following delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed at any time (the "Post-Trigger Carve-Out" and with the UST Carve-Out, the Chapter 7 Carve-Out and the Professional Fee Carve-Out, the "Carve-Out")).  "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to lead restructuring counsel to the Debtors, the U.S. Trustee and counsel to the Creditors' Committee, stating that (a) the Post-Trigger Carve-Out has been invoked, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Agreement; (b) the DIP Loans have been accelerated and (c) the DIP Lenders do not intend to fund further advances under the DIP Loans, or consent to further use of Cash Collateral.  Thereafter, if the DIP Lenders fund further advances under the DIP Loans (other than amounts required to be funded in accordance with this Interim Order), or the DIP Lenders or the Prepetition Lenders consent to the use of Cash Collateral for the Debtors to operate in the ordinary course of business as going concerns, the Carve-Out Trigger Notice shall be deemed automatically revoked.  If a Carve-Out Trigger Notice is revoked, the Carve-Out will operate as if the Carve-Out Trigger Notice was never delivered.  While the Carve-Out shall include the fees of any Investment Bankers earned in conjunction with the consummation of a transaction or transactions as set forth in their respective engagement letters with the applicable Debtors, such amounts may be paid out of the collateral of the Prepetition Lenders and the DIP Lenders only to the extent such fees were (a) actually earned pursuant to the terms of the respective engagement letters with the Debtors in effect as of the date of the DIP Loan Documents (or as amended with

- 33 -

the consent of the Required DIP Lenders), (b) approved by the Bankruptcy Court, and (c) earned in connection with transactions consented to by the Required DIP Lenders, or, to the extent such transaction occurs in connection with a Plan, the class of creditors consisting exclusively of the Prepetition Lenders has voted to accept the treatment provided in such Plan (collectively, all such fees are referred to as the "Transaction Payments").

      (b)     Carve-Out Reserve Accounts.

      (i)     On the day on which a Carve-Out Trigger Notice is given by the DIP Agent (the "Termination Declaration Date"), an amount equal to the sum (the "Pre-Trigger Carve-Out Amount") of (A) the UST Carve-Out, plus (B) the Chapter 7 Trustee Carve-Out, plus (C) the then-unpaid amount of the Allowed Professional Fees, will be funded into one or more segregated accounts at the DIP Agent, in trust, exclusively to pay such unpaid Allowed Professional Fees (each such account, a "Pre-Trigger Notice Reserve Account").  The Debtors are hereby authorized and directed to utilize Cash Collateral on hand as of such date, and any Cash Collateral thereafter held by any Debtor, to fund a Pre-Trigger Notice Reserve Account equal to the amount required to be funded.

      (ii)     On the Termination Declaration Date, the Debtors are hereby authorized and directed to utilize all Cash Collateral on hand as of such date, and any available Cash Collateral thereafter held by any Debtor, to fund the Post-Trigger Notice Reserve Account (as defined below) in an amount equal to the amount required to be funded.  The Debtors shall deposit and hold such amounts in one or more segregated accounts at the DIP Agent, in trust, exclusively to pay such Allowed Professional Fees benefiting from the Post-Trigger Carve-Out (each, a "Post-Trigger Notice Reserve Account" and, together with the Pre-Trigger Notice Reserve Account, the "Carve-Out Reserve Accounts").

- 34 -

(iii)     Following the end of the second Business Day after delivery of a Carve-Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserve Accounts have been fully funded.

(iv)     All funds in the Pre-Trigger Notice Reserve Accounts shall be used only to pay the Pre-Trigger Carve-Out Amount until paid in full.  All funds in the Post-Trigger Notice Reserve Accounts shall be used only to pay the obligations constituting the Post-Trigger Carve-Out.

(v)     The Carve-Out shall be effective upon entry of this Interim Order and shall not be rendered ineffective as a result of the occurrence, or non-occurrence, of any event or circumstance thereafter.  In no event shall any Approved Budget, the Carve-Out or any Carve-Out Reserve Account be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.

(vi)     Upon the consummation of a sale of all or substantially all of Debtors' assets consented to by the Required DIP Lenders, the Debtors shall be authorized and directed (without the requirement to have received a Carve-Out Trigger Notice) to transfer from the proceeds of such sale(s) funds equal to the Pre-Trigger Carve-Out Amount into the Pre-Trigger Notice Reserve Account.  The Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders agree that in connection with a sale of all or substantially all of the Debtors' assets approved by the Required DIP Lenders, the Debtors shall also deposit from the proceeds of such sale the sum of $14,100,000 (the "Wind-Down Funds") for the minimum amount of funding expected in wind down expenses incurred after consummation of such sale.  The Wind-Down Funds are not intended to be part of the Carve-Out and will only be required to be funded out of

- 35 -

the proceeds of such sale in connection with a sale approved by the Required DIP Lenders and the Prepetition Lenders constituting the "Required Lenders" under the Prepetition Credit Agreement (the "Required Prepetition Lenders").

18.    Release.    The release, discharge, waivers, settlements, compromises and agreements set forth in this paragraph 18 and the stipulations set forth in paragraph D of this Interim Order shall be deemed effective upon entry of the Interim Order, subject only to the rights set forth in paragraph 19 below.

(a)    The Debtors forever and irrevocably release, discharge and acquit each of the DIP Secured Parties, their affiliates and predecessors in interest, and their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants and attorneys (collectively, the "DIP Lender Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type at any time arising prior to the Petition Date, and all claims and causes of action under chapter 5 of the Bankruptcy Code.

(b)    The Debtors forever and irrevocably release, discharge and acquit each of the Prepetition Lenders and their respective affiliates and predecessors in interest, and their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, advisors, legal advisors, shareholders, managers, consultants, accountants and attorneys (collectively, the "Prepetition Lender Releasees" and collectively with the DIP Lender Releasees, the "Releasees"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type at any time arising

- 36 -

prior to the Petition Date, and all claims and causes of action under chapter 5 of the Bankruptcy Code.

19.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.  The releases set forth in paragraph 18 above and the stipulations set forth in paragraph D of this Interim Order shall be binding upon the Debtors upon entry of this Interim Order.  In addition, such releases and stipulations shall be binding upon each other party in interest, including the Creditors' Committee, if any, unless a party in interest having standing, *first*, commences, (x) within sixty (60) calendar days from date of the formation of a Creditors' Committee for actions brought by a Creditors' Committee, or (y) seventy-five (75) calendar days following the date of entry of this Interim Order for any party other than a Creditors' Committee (such time period established by clauses (x) and (y), shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly and timely file a Challenge and only for the matters specifically set forth in such Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "<u>Challenge Period Termination Date</u>"), (A) a contested matter, adversary proceeding, or other action or claim (as defined in the Bankruptcy Code) challenging or otherwise objecting to the releases set forth in paragraph 18 above or the stipulations set forth in paragraph D of this Interim Order or (B) a contested matter, adversary proceeding, or other action or claim (as defined in the Bankruptcy Code) against any Releasee relating to any pre-Petition Date act, omission or aspect of the relationship between such Releasee and the Debtors ((A) and (B) being, collectively, the "<u>Challenges</u>" and, each individually, a "<u>Challenge</u>"), and, *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed

- 37 -

contested matter, adversary proceeding or other action.  Upon the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Case(s), (i) any and all such Challenges by any party in interest shall be deemed to be forever released, waived and barred and (ii) the releases in paragraph 18 above and the stipulations contained in paragraph D of this Interim Order shall be binding on all parties in interest, including any Creditors' Committee.

20.    <u>Restrictions on Use of Funds</u>.  Notwithstanding anything in this Interim Order or the DIP Documents to the contrary, without the express written consent of the DIP Agent and the Prepetition Agent, no proceeds of the DIP Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay any claims for services rendered by any professionals retained by the Debtors, any creditor or party in interest, any Creditors' Committee, any trustee appointed under these Chapter 11 Cases or any Successor Case(s) or any other party to (a) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364 of the Bankruptcy Code or otherwise, other than from the DIP Secured Parties, unless the proceeds of such loans or accommodations are or will be sufficient, and will be used, to indefeasibly pay in full in cash all DIP Obligations, or (b) investigate (except as set forth in this paragraph below), assert, join, commence, support or prosecute any Challenge or other action or claim, counter-claim, proceeding, application, motion, objection, defense, or other adversary proceeding or contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of the DIP Secured Parties or any other Releasee with respect to any transaction, occurrence, omission or action including, without limitation, (i) any actions under chapter 5 of the Bankruptcy Code, (ii) any action relating to any act, omission or aspect of the relationship between or among any of the Releasees, on the one hand, and any of the Debtors, on the other, (iii) any action with respect to the validity and extent of the

- 38 -

DIP Obligations, the Prepetition Obligations or the validity, extent and priority of the DIP Liens, the Prepetition Liens or the Adequate Protection Liens, (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the Prepetition Obligations, the Prepetition Liens, the Adequate Protection Superpriority Claim or the Adequate Protection Liens or (v) any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) any DIP Secured Party in respect of the enforcement of the DIP Liens, (c) subject to authority provided to the Debtors pursuant to the DIP Documents, pay any claim (as defined in the Bankruptcy Code) of a prepetition creditor (as defined in the Bankruptcy Code) if the Debtors have received a written objection to such payment from the DIP Agent, and/or (d) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby or by the DIP Documents, without the express written consent of the applicable DIP Secured Parties.  Notwithstanding the foregoing, up to $50,000 in the aggregate of the DIP Facility, DIP Collateral, Cash Collateral and Carve-Out may be used by a Creditors' Committee during the Challenge Period to investigate claims against the Releasees.

21.    <u>Remedies and Stay Modification.</u>  The provisions of this paragraph 21 are each subject to the Carve-Out.

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code are, to the extent applicable, vacated and modified without further application or motion to, or order from, the Court, to the extent necessary so as to permit the following, and neither section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies regardless of any change in circumstances (whether or not foreseeable), whether or not an Event of Default (as defined in the DIP Agreement) under the DIP Documents

- 39 -

or a default by any of the Debtors of any of their obligations under this Interim Order has occurred: (i) the right to require all cash, checks or other collections or proceeds from DIP Collateral received by any of the Debtors to be deposited in accordance with the requirements of the DIP Documents or written instructions of the DIP Agent, and to apply any amounts so deposited and other amounts paid to or received by the DIP Secured Parties under the DIP Documents in accordance with any requirements of the DIP Documents; (ii) the right to file or record any financing statements, mortgages or other instruments or other documents to evidence the security interests in and liens upon the DIP Collateral; (iii) the right to charge and collect any interest, fees, costs and other expenses accruing at any time under the DIP Documents as provided therein; and (iv) the right to give the Debtors any notice provided for in any of the DIP Documents or this Interim Order.

(b)     Subject to paragraph 21(d) below, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified without the need for further Court order to permit the DIP Secured Parties, upon the occurrence and during the continuance of an Event of Default under the DIP Agreement or the Debtors' violation of any provision of this Interim Order, and without any interference from the Debtors or any other party in interest, to (i) (A) cease making DIP Loans and/or suspend or terminate the commitments under the DIP Documents, and (B) declare all DIP Obligations immediately due and payable, and (ii) subject to five (5) calendar days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtors, their counsel, counsel to any Creditors' Committee and the U.S. Trustee, to exercise all rights and remedies provided for in the DIP Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (A) take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (B) foreclose or otherwise enforce the DIP Liens on any or all of the

DIP Collateral; (C) set off any amounts held as Cash Collateral (including, without limitation, in any Cash Collateral account held for the benefit of the DIP Secured Parties); and/or (D) exercise any other default-related rights and remedies under the DIP Documents, this Interim Order or applicable law. The Remedies Notice Period shall run concurrently with any notice period provided for under the DIP Documents.

(c)     Notwithstanding anything herein to the contrary, immediately upon the occurrence of a Termination Event or a default by any of the Debtors of any of their obligations under this Interim Order, the DIP Lender may charge interest at the default rate set forth in the DIP Documents, regardless of any notice thereof and without being subject to the Remedies Notice Period.

(d)     The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtors, the Creditors' Committee, if any and/or the U.S. Trustee have not obtained an order providing otherwise from this Court prior to the expiration of the Remedies Notice Period.

(e)     If the DIP Secured Parties are entitled, and have elected in accordance with the provisions hereof, to enforce their liens or security interests or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Secured Parties in connection with such enforcement by, among other things, in accordance with applicable non-bankruptcy law, (A) providing at all reasonable times access to the DIP Collateral and the Debtors' premises to representatives or agents of the DIP Secured Parties (including any collateral liquidator or consultant), (B) providing the DIP Secured Parties and their representatives or agents, at all reasonable times, access to the Debtors' books and records and any

- 41 -

information or documents requested by the DIP Secured Parties or their representatives or agents, (C) performing all other obligations set forth in the DIP Documents and (D) taking reasonable steps to safeguard and protect the DIP Collateral, and the Debtors shall not otherwise interfere with or actively encourage others to interfere with the DIP Secured Parties' enforcement of rights.

(f)    Upon the occurrence and during the continuance of an Event of Default under the DIP Documents, a violation of the terms of this Interim Order or any other Termination Event, and including during the pendency of any applicable Remedies Notice Period, the DIP Secured Parties shall have no further obligation to provide financing under the DIP Documents, except to the extent necessary to allow the Debtors to fund any payroll obligations scheduled to be paid in the five (5) business days after the initiation of a Remedies Notice Period.  Upon (i) initiation of a Remedies Notice Period or (ii) the occurrence of a Maturity Date, the DIP Secured Parties and the Prepetition Lenders shall have no further obligation to permit the continued use of Cash Collateral, except to the extent necessary to allow the Debtors to fund any payroll obligations scheduled to be paid in the five (5) business days after the initiation of a Remedies Notice Period. Once the Debtors' right to use Cash Collateral is no longer permitted by this Interim Order, the Debtors shall be prohibited from using any Cash Collateral under this Interim Order until such time (if any) as the Prepetition Lenders and the DIP Secured Parties have consented to further use of Cash Collateral except to the extent necessary to allow the Debtors to fund any payroll obligations scheduled to be paid in the five (5) business days after the Debtors are no longer permitted to use Cash Collateral pursuant to this Interim Order.

(g)    Upon the occurrence and during the continuance of an Event of Default under the DIP Documents, a violation of the terms of this Interim Order, or any other Termination Event, the DIP Secured Parties may at all times continue to collect and sweep cash as provided

- 42 -

herein or as provided in the DIP Documents, provided that sufficient funds are (or have been) set aside to fund the Carve-Out and payment of all accrued but unpaid expenses set forth in the Approved Budget through the date of the commencement of the Remedies Notice Period.

(h)     This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders pursuant to the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of section 362(a) of the Bankruptcy Code or other injunctive relief requested.

22.     <u>Limitation on Surcharge</u>.  Without limiting the terms of the Carve-Out and subject to the entry of the Final Order, no costs or expenses of administration which have been or may be incurred in these Chapter 11 Cases or any Successor Case(s) at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the DIP Secured Parties, the Carve-Out (other than parties entitled to assert a right to be paid amounts in respect of the Carve-Out), the DIP Collateral or the Prepetition Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Agent and the Prepetition Agent (and the beneficiaries of the Carve-Out in the case of a surcharge in respect of the Carve-Out).  No action, inaction or acquiescence by the DIP Secured Parties or the Prepetition Lenders shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the DIP Secured Parties, the DIP Collateral, the Prepetition Lenders or the Prepetition Collateral.

23.     <u>No Marshaling</u>.  Subject to entry of a Final Order, the DIP Secured Parties (and after payment in full of the DIP Obligations, the Prepetition Lenders) shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral.  Without limiting the generality of the immediately

- 43 -

preceding sentence, from and after the entry of the Final Order, no party (other than the DIP Secured Parties and after payment in full of the DIP Obligations, the Prepetition Lenders) shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral or the Prepetition Collateral (as applicable) after an Event of Default under the DIP Documents.

24.     Additional Perfection Measures.

(a)     If the DIP Agent, in its sole discretion, requests that the Debtors execute additional DIP Loan documentation or chooses to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments, or to otherwise record or perfect such security interests and liens, the DIP Agent is hereby authorized, but not directed to, take such action or to request that Debtors take such action on its behalf (and Debtors are hereby authorized to take such action) and:

(i)     any such documents or instruments shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

(ii)     no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b)     In lieu of obtaining such consents or filing any mortgages, financing statements, notices of lien or similar instruments, each of the DIP Agent and the Prepetition Agent may, in its respective sole discretion, choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of the DIP Collateral, and such filing by the DIP Agent or Prepetition Agent shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

- 44 -

25.    <u>Application of Collateral Proceeds</u>.  To the extent required by this Interim Order and the DIP Documents, after (a) an Event of Default and (b) the receipt by the Debtors of written notice that the DIP Lenders will no longer fund the Debtors through the proceeds of the DIP Loans or by consenting to the Debtors' use of Cash Collateral, the Debtors are hereby authorized to remit to the DIP Agent, subject to the payment of the Carve-Out, one hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral until the DIP Obligations are paid in full, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Lender to retain and apply all collections, remittances and proceeds of the DIP Collateral in accordance with the DIP Documents.  In furtherance of the foregoing, (a) all cash, securities, investment property and other items of any Debtor deposited with any bank or other financial institution shall be subject to a perfected, first priority security interest in favor of the DIP Secured Parties, (b) upon the occurrence and during the continuance of a Termination Event and the expiration of the Remedies Notice Period, each bank or other financial institution with an account of any Debtor is hereby authorized to (i) comply at all times with any instructions originated by the DIP Agent (or its nominee) to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of any Debtor, including, without limitation, any instruction to send to the DIP Agent (or its nominee) by wire transfer (to such account as the DIP Agent (or its nominee) shall specify, or in such other manner as the DIP Agent (or its nominee) shall direct) all such cash, securities, investment property and other items held by it, and, (ii) subject to entry of a Final Order, waive any right of set off, banker's lien or other similar lien, security interest or encumbrance that is or may be invoked against the DIP Agent (or its nominee) and (c) any deposit account or securities account control agreement executed and delivered by any bank or other financial

- 45 -

institution or any Debtor and the Prepetition Agent prior to the Petition Date in connection with the Prepetition Loan Documents shall establish co-control in favor of the DIP Agent of any and all accounts subject thereto and any and all cash, securities, investment property and other items of any Debtor deposited therein to secure the DIP Obligations (provided that primary control rights shall vest in the DIP Agent), and all rights thereunder in favor of the Prepetition Agent shall inure also to the benefit of, and shall be exercisable exclusively by, the DIP Agent, until all of the DIP Obligations have been paid in full in cash, at which time all rights shall automatically revert to the Prepetition Agent, solely to the extent such deposit account or securities account control agreement relates to Cash Collateral.

26.     <u>Lenders Not Responsible Persons</u>.  In (a) making the decision to make the DIP Loans and consent to the use of Cash Collateral, (b) extending other financial accommodations to the Debtors under the DIP Documents, and (c) making the decision to collect the indebtedness and obligations of the Debtors, neither the DIP Agent nor any other DIP Secured Party nor any Prepetition Lender shall be considered to (x) owe any fiduciary obligation to the Debtors or any other party with respect to their exercise of any consent or other rights afforded them under the DIP Documents or this Interim Order or (y) be exercising control over any operations of the Debtors or acting in any way as a responsible person, or as an owner or operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.* and the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute).

27.     <u>Successors and Assigns</u>.  The DIP Documents and the provisions of this Interim Order shall be binding upon the Debtors and the DIP Agent, the other DIP Secured Parties, the

- 46 -

Prepetition Lenders and each of their respective successors and assigns, and shall inure to the benefit of the Debtors, the DIP Agent, the other DIP Secured Parties, the Prepetition Agent and the other Prepetition Lenders and each of their respective successors and assigns including, without limitation, any trustee, examiner with expanded powers, responsible officer, estate administrator or representative, or similar person appointed or elected in a case for any Debtor under any chapter of the Bankruptcy Code, including any Successor Case.  The terms and provisions of this Interim Order shall also be binding on all of the Debtors' creditors, equity holders and all other parties in interest, including, but not limited to a trustee appointed or elected under chapter 7 or chapter 11 of the Bankruptcy Code.

28.     <u>Binding Nature of Agreement</u>.  Each of the DIP Documents to which any of the Debtors are or will become a party shall constitute legal, valid and binding obligations of the Debtors party thereto, enforceable in accordance with their terms.  Unless otherwise consented to in writing by the Required DIP Lenders and the Required Prepetition Lenders (as applicable), the rights, remedies, powers, privileges, liens and priorities of the DIP Agent, the other DIP Secured Parties, the Prepetition Agent and the other Prepetition Lenders provided for in this Interim Order, the DIP Documents, or otherwise, shall not be modified, altered or impaired in any manner by any subsequent order (including a confirmation or sale order), by any plan of reorganization or liquidation in these Chapter 11 Cases, by the dismissal or conversion of these Chapter 11 Cases or in any Successor Case under the Bankruptcy Code unless and until the DIP Obligations have first been indefeasibly paid in full in cash and completely satisfied, the commitments thereunder are terminated in accordance with the DIP Documents and the Prepetition Obligations are indefeasibly paid in full in cash and completely satisfied.  For the avoidance of doubt, any provision of the DIP Agreement or the Prepetition Credit Agreement that requires unanimity among the DIP Lenders

- 47 -

or the Prepetition Lenders, as applicable, with respect to any contemplated action or inaction shall not be overridden by this paragraph.

29.    <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Secured Parties all protections and benefits afforded by section 364(e) of the Bankruptcy Code.

30.    <u>Collateral Rights</u>.  Subject to any order of the Bankruptcy Court entered without the objection of the DIP Agent authorizing the Debtors to make payments to prepetition creditors, and subject to entry of a Final Order, if any party who holds a lien or security interest in DIP Collateral or Prepetition Collateral that is junior or otherwise subordinate to the DIP Liens, the Adequate Protection Liens or the Prepetition Liens in such DIP Collateral receives or is paid the proceeds of such DIP Collateral or Prepetition Collateral, or receives any other payment with respect thereto from any other source prior to the indefeasible payment in full in cash and the complete satisfaction of (a) all DIP Obligations under the DIP Documents and termination of the commitments thereunder in accordance with the DIP Documents and, as applicable (b) the Prepetition Obligations under the Prepetition Loan Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral or Prepetition Collateral, as applicable, in trust for the DIP Secured Parties or Prepetition Lenders, as applicable, and shall immediately turn over such proceeds to the DIP Agent or Prepetition Agent, as applicable, for application to repay the DIP Obligations and, as applicable, the Prepetition Obligations, in accordance with the DIP Documents, the Prepetition Loan Documents and this Interim Order until the DIP Obligations and the Prepetition Obligations, as applicable, are indefeasibly paid in full in cash.

31.     <u>No Waiver</u>.  This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Secured Parties may have to bring or be heard on any matter brought before this Court.

32.     <u>Injunction</u>.  Except as provided in the DIP Documents and this Interim Order, the Debtors shall be enjoined and prohibited from, at any time during these Chapter 11 Cases, seeking or granting liens on DIP Collateral or any portion thereof to any other party, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are senior to or *pari passu* with the liens granted to the DIP Secured Parties and the Prepetition Lenders, except in accordance with the DIP Documents and this Interim Order.

33.     <u>Sales</u>.  The Debtors agree not to seek or support entry of any order that provides for either the sale of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code to any party unless (a) the Required DIP Lenders and the Required Prepetition Lenders consent and (b) the order approving such sale provides that the sale proceeds shall be distributed to pay the DIP Obligations in accordance with the DIP Documents, to pay the Prepetition Obligations in accordance with the Prepetition Loan Documents and in accordance with this Interim Order at the closing of such sale.  The Debtors agree to adhere to the following milestones with respect to the sale of all or substantially all of their assets (collectively, the "<u>Sale Milestones</u>"):

| Timeline | Action/Deadline |
|---|---|
| Three business days following Petition Date | File sale motion and bidding procedures for sale of all of the assets of the Debtors, which motion shall seek approval of a bid of a stalking horse bidder reasonably acceptable to the Required DIP Lenders and Required Prepetition Lenders. |
| September 28, 2020 | Deadline to obtain entry of order approving bidding procedures and the approval of a stalking horse |

- 49 -

| | bidder reasonably acceptable to the Required DIP Lenders and the Required Prepetition Lenders. |
|---|---|
| October 26, 2020 | Deadline for interested parties to submit bids for purchase of assets of the Debtors. |
| October 29, 2020 | Deadline to hold auction. |
| November 10, 2020 | Deadline for hearing to approve sale. |
| December 15, 2020 | Deadline to consummate sale(s) of substantially all of the Debtors' assets |

For the avoidance of doubt, failure to comply with the Sale Milestones or the other provisions of this paragraph 33 shall be a Termination Event for purposes of this Interim Order.

34.     _Dismissal and Conversion_.   If an order dismissing or converting any of these Chapter 11 Cases under sections 305 or 1112 of the Bankruptcy Code or otherwise, or appointing a chapter 11 trustee or a responsible officer or examiner with expanded powers, is at any time entered, such order shall provide that (a) the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim granted hereunder and in the DIP Documents shall continue in full force and effect, remain binding on all parties in interest, and maintain their priorities as provided in this Interim Order and the DIP Documents and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens, the DIP Superpriority Claim, the Adequate Protection Liens and the Adequate Protection Superpriority Claim.   Any motion by the Debtors to dismiss any of these Chapter 11 Cases shall be filed on no less than 21 days' notice absent the consent of the DIP Agent.

35.     _Limits on Lenders' Liability_.   Nothing in this Interim Order or in any of the DIP Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, any other DIP Secured Party,

- 50 -

the Prepetition Agent or any other Prepetition Lender of any liability for any claims arising from any and all activities by the Debtors or any of their subsidiaries or affiliates in the operation of their businesses or in connection with their restructuring efforts.

36.    <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documents, the Motion, the Requested Relief or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Documents (or words of similar import), the terms and provisions of this Interim Order shall govern.

37.    <u>No Third Party Beneficiary</u>.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

38.    <u>Survival</u>.  Except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing any of these Chapter 11 Cases or (ii) converting any of these Chapter 11 Cases to a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim and the Adequate Protection Superpriority Claim shall continue in these Chapter 11 Cases, any such Successor Case(s) or after any such dismissal.  Except as otherwise provided herein, the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claim and the Adequate Protection Superpriority Claim shall maintain their priorities as provided in this Interim Order, the Final Order and the DIP Documents, and not be modified, altered or impaired in any way by any other financing, extension of credit, incurrence of indebtedness (except with respect to any additional financing to be provided by the DIP Secured Parties in accordance

- 51 -

with the DIP Agreement and any Final Order), or any conversion of any of these Chapter 11 Cases into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of these Chapter 11 Cases, or by any other act or omission until: (i) all DIP Obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments under the DIP Documents are terminated in accordance therewith, and (ii) the Prepetition Obligations have been or are deemed to have been satisfied in accordance with the Bankruptcy Code.

39.    <u>Adequate Notice/Scheduling of Final Hearing</u>.  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001 and the Local Rules of this Court.  Such notice was good and sufficient under the particular circumstances and no other or further notice of the request for the relief granted at the Interim Hearing is required.  Any objection to the relief sought at the Final Hearing shall be filed and served on or prior to [    ], 2020 at 4:00 p.m. (prevailing Eastern Time).  The Court shall conduct a Final Hearing on the Requested Relief on September __, 2020, at __:__ _.m. (prevailing Eastern Time).

40.    <u>Immediate Binding Effect; Entry of Interim Order</u>.  This Interim Order shall not be stayed and shall be valid and fully effective immediately upon entry, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062 and 9014, or otherwise, and the Clerk of the Court is hereby directed to enter this Interim Order on the Court's docket in these Chapter 11 Cases.

41.    <u>Proofs of Claim</u>.  Neither the DIP Secured Parties nor the Prepetition Lenders shall be required to file proofs of claim in any of these Chapter 11 Cases or Successor Cases for any claim allowed herein.  The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Prepetition Lenders upon approval of this Interim Order, and the Prepetition Agent shall be treated under section 502(a) of the Bankruptcy Code as if it had filed a proof of claim on behalf of the Prepetition Lenders.  Notwithstanding any order entered by the Court in relation to

- 52 -

the establishment of a bar date in any of these Chapter 11 Cases or Successor Cases to the contrary, the Prepetition Agent is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement as it sees fit) a proof of claim and/or aggregate proofs of claim in each of these Chapter 11 Cases or Successor Cases for any claim allowed herein.

42.    <u>Headings</u>.  The headings of the various paragraphs in this Interim Order are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

43.    <u>Retention of Jurisdiction</u>.  This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation and enforcement of this Interim Order.

RLF1 23936706v.1

**EXHIBIT A**

**APPROVED BUDGET**

**Shiloh Industries Inc., et al**
**DIP Cash Flow Forecast**
*($ in thousands)*

| Week #<br>Week Ending | | 1<br>9/4/20 | 2<br>9/11/20 | 3<br>9/18/20 | 4<br>9/25/20 | 5<br>10/2/20 | 6<br>10/9/20 | 7<br>10/16/20 | 8<br>10/23/20 | 9<br>10/30/20 | 10<br>11/6/20 | 11<br>11/13/20 | 12<br>11/20/20 | 13<br>11/27/20 | 1-13<br>13 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DIP Cash Flow Forecast** | | | | | | | | | | | | | | | |
| **Total Receipts** | $ | 4,906 | 6,697 | 10,624 | 12,419 | 10,958 | 9,697 | 13,485 | 10,118 | 13,067 | 10,022 | 9,441 | 10,075 | 10,189 | $ 131,699 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Materials & Supplies | | (7,487) | (8,274) | (8,147) | (8,439) | (6,616) | (7,374) | (3,185) | (5,639) | (5,660) | (5,410) | (5,694) | (4,964) | (5,297) | (82,187) |
| Wages & Benefits | | (1,245) | (4,984) | (1,213) | (4,114) | (1,258) | (4,691) | (1,134) | (4,287) | (1,134) | (4,287) | (1,134) | (4,287) | (1,134) | (34,900) |
| Other | | (1,282) | (1,200) | (1,183) | (858) | (1,681) | (936) | (1,311) | (1,003) | (2,082) | (1,508) | (1,490) | (1,651) | (1,724) | (17,908) |
| **Total Operating Disbursements** | | (10,013) | (14,458) | (10,543) | (13,410) | (9,555) | (13,002) | (5,630) | (10,929) | (8,876) | (11,205) | (8,318) | (10,902) | (8,155) | (134,995) |
| **Net Operating Cash Flow** | $ | (5,107) | (7,761) | 81 | (991) | 1,403 | (3,305) | 7,855 | (811) | 4,192 | (1,182) | 1,123 | (827) | 2,034 | $ (3,296) |
| **Restructuring Disbursements** | | | | | | | | | | | | | | | |
| DIP Interest and Fees | | (250) | (517) | - | - | - | - | (1,245) | - | - | - | (1,036) | - | (809) | (3,858) |
| Restructuring Professionals and UST Fees | | (1,205) | (1,205) | (1,355) | (1,040) | (1,040) | (1,190) | (985) | (985) | (1,367) | (985) | (1,135) | (985) | (1,572) | (15,043) |
| Adequate Protection Payment | | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (3,645) |
| Utility Deposit | | - | (509) | - | - | - | - | - | - | - | - | - | - | - | (509) |
| **Total Restructuring Disbursements** | | (1,735) | (2,511) | (1,635) | (1,320) | (1,320) | (1,470) | (2,510) | (1,265) | (1,647) | (1,265) | (2,451) | (1,265) | (2,661) | (23,055) |
| **Net Cash Flow** | $ | (6,842) | (10,272) | (1,554) | (2,311) | 83 | (4,775) | 5,344 | (2,076) | 2,544 | (2,447) | (1,328) | (2,092) | (627) | $ (26,352) |
| **Beginning Cash Balance [1]** | $ | 3,919 | 1,077 | 1,005 | 1,051 | 1,040 | 1,123 | 1,049 | 6,393 | 4,317 | 6,861 | 4,414 | 3,086 | 1,094 | $ 3,919 |
| Net Cash Flow | | (6,842) | (10,272) | (1,554) | (2,311) | 83 | (4,775) | 5,344 | (2,076) | 2,544 | (2,447) | (1,328) | (2,092) | (627) | (26,352) |
| Revolver Activity | | 4,000 | 10,200 | 1,600 | 2,300 | - | 4,700 | - | - | - | - | - | 100 | 600 | 23,500 |
| **Ending Cash Balance** | $ | 1,077 | 1,005 | 1,051 | 1,040 | 1,123 | 1,049 | 6,393 | 4,317 | 6,861 | 4,414 | 3,086 | 1,094 | 1,068 | $ 1,068 |
| **DIP Loan** | | | | | | | | | | | | | | | |
| **Beginning Balance** | $ | - | 4,000 | 14,200 | 15,800 | 18,100 | 18,100 | 22,800 | 22,800 | 22,800 | 22,800 | 22,800 | 22,800 | 22,900 | $ - |
| Draw Down / (Repayment) | | 4,000 | 10,200 | 1,600 | 2,300 | - | 4,700 | - | - | - | - | - | 100 | 600 | 23,500 |
| **Ending Balance** | $ | 4,000 | 14,200 | 15,800 | 18,100 | 18,100 | 22,800 | 22,800 | 22,800 | 22,800 | 22,800 | 22,800 | 22,900 | 23,500 | $ 23,500 |

Footnotes:
(1) Preliminary estimate pending confirmation from banks

**<u>Exhibit B</u>**

**DIP Credit Agreement**

**Published Deal CUSIP Number: [_____]**
**Published Revolving CUSIP Number: [_____]**

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of September [__], 2020

among

SHILOH INDUSTRIES, INC.,
as the Borrower,

THE DOMESTIC SUBSIDIARIES OF SHILOH INDUSTRIES, INC.,
as the Guarantors,

BANK OF AMERICA, N.A.,
as Administrative Agent,

and

THE LENDERS PARTY

HERETO

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ................................................................. 1

    1.01    Defined Terms .................................................................. 1
    1.02    Other Interpretive Provisions ...................................... 27
    1.03    Accounting Terms ........................................................ 28
    1.04    [Reserved] .................................................................... 29
    1.05    Times of Day; Rates .................................................... 29

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS ......................................... 29

    2.01    Commitments ................................................................ 30
    2.02    Borrowings, Conversions and Continuations of Loans ....... 30
    2.03    [Reserved] .................................................................... 31
    2.04    [Reserved] .................................................................... 31
    2.05    Prepayments ................................................................. 31
    2.06    Termination or Reduction of Aggregate Revolving Commitments ................................. 33
    2.07    Repayment of Loans .................................................... 33
    2.08    Interest ......................................................................... 33
    2.09    Fees .............................................................................. 34
    2.10    Computation of Interest and Fees ................................ 34
    2.11    Evidence of Debt ......................................................... 35
    2.12    Payments Generally; Administrative Agent's Clawback ......... 35
    2.13    Sharing of Payments by Lenders ................................ 37
    2.14    [Reserved] .................................................................... 37
    2.15    Defaulting Lenders ...................................................... 37
    2.16    Priority and Liens ........................................................ 38

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY .......................................... 41

    3.01    Taxes ............................................................................ 41
    3.02    Illegality ....................................................................... 45
    3.03    Inability to Determine Rates ........................................ 46
    3.04    Increased Costs ............................................................ 49
    3.05    Compensation for Losses ............................................ 50
    3.06    Mitigation Obligations; Replacement of Lenders ....... 50
    3.07    [Reserved] .................................................................... 51
    3.08    Survival ........................................................................ 51

ARTICLE IV GUARANTY .................................................................................................... 51

    4.01    The Guaranty ............................................................... 51
    4.02    Obligations Unconditional .......................................... 52
    4.03    Reinstatement ............................................................... 53
    4.04    Certain Additional Waivers ......................................... 53
    4.05    Remedies ...................................................................... 53
    4.06    Rights of Contribution ................................................. 53
    4.07    Guarantee of Payment; Continuing Guarantee ........... 54
    4.08    [Reserved] .................................................................... 54
    4.09    Appointment of Company ............................................ 54

ARTICLE V CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ................................ 54

i

5.01 Conditions of Initial Credit Extension .......................................................... 54
5.02 Conditions to all Credit Extensions ............................................................. 57

ARTICLE VI REPRESENTATIONS AND WARRANTIES .................................................. 58

6.01 Existence, Qualification and Power ............................................................. 58
6.02 Authorization; No Contravention ................................................................ 58
6.03 Governmental Authorization; Other Consents ............................................ 59
6.04 Binding Effect ............................................................................................. 59
6.05 No Material Adverse Effect ......................................................................... 59
6.06 Litigation ..................................................................................................... 59
6.07 No Default ................................................................................................... 59
6.08 Ownership of Property; Liens ..................................................................... 59
6.09 Environmental Compliance ......................................................................... 59
6.10 Insurance ..................................................................................................... 60
6.11 Taxes ........................................................................................................... 61
6.12 ERISA Compliance ..................................................................................... 61
6.13 Subsidiaries ................................................................................................. 62
6.14 Margin Regulations; Investment Company Act .......................................... 62
6.15 Disclosure ................................................................................................... 62
6.16 Compliance with Laws ................................................................................ 62
6.17 Intellectual Property; Licenses, Etc ............................................................ 63
6.18 Bankruptcy Matters ..................................................................................... 63
6.19 Perfection of Security Interests in the Collateral ....................................... 63
6.20 Business Locations ...................................................................................... 64
6.21 Labor Matters .............................................................................................. 64
6.22 OFAC ........................................................................................................... 64
6.23 [Reserved] ................................................................................................... 64
6.24 [Reserved] ................................................................................................... 64
6.25 No Affected Financial Institution ............................................................... 64
6.26 Anti-Corruption Laws ................................................................................. 64
6.27 Regulation H ............................................................................................... 64
6.28 Use of Proceeds .......................................................................................... 65

ARTICLE VII AFFIRMATIVE COVENANTS ................................................................. 65

7.01 Financial Statements ................................................................................... 65
7.02 Other Information ........................................................................................ 66
7.03 Notices ......................................................................................................... 67
7.04 Payment of Obligations ............................................................................... 67
7.05 Preservation of Existence, Etc .................................................................... 68
7.06 Maintenance of Properties .......................................................................... 68
7.07 Maintenance of Insurance ........................................................................... 68
7.08 Compliance with Laws ................................................................................ 69
7.09 Books and Records ...................................................................................... 69
7.10 Inspection Rights ......................................................................................... 69
7.11 Use of Proceeds .......................................................................................... 69
7.12 [Reserved] ................................................................................................... 70
7.13 ERISA Compliance ..................................................................................... 70
7.14 Pledged Assets ............................................................................................ 70
7.15 [Reserved] ................................................................................................... 71
7.16 Anti-Corruption Laws ................................................................................. 71
7.17 Budget; Conference Calls ........................................................................... 71

ii

| | | |
|---|---|---|
| 7.18 | Milestones | 71 |
| 7.19 | Investment Banker | 71 |
| 7.20 | Postpetition Obligations | 72 |

ARTICLE VIII NEGATIVE COVENANTS ....... 72

| | | |
|---|---|---|
| 8.01 | Liens | 72 |
| 8.02 | Investments | 73 |
| 8.03 | Indebtedness | 74 |
| 8.04 | Fundamental Changes | 75 |
| 8.05 | Dispositions | 75 |
| 8.06 | Restricted Payments | 75 |
| 8.07 | Change in Nature of Business | 75 |
| 8.08 | Transactions with Affiliates and Insiders | 76 |
| 8.09 | Burdensome Agreements | 76 |
| 8.10 | Use of Proceeds | 76 |
| 8.11 | Financial Covenant | 76 |
| 8.12 | Prepayment of Other Indebtedness, Etc | 76 |
| 8.13 | Organization Documents; Fiscal Year; Legal Name, State of Formation and Form of Entity | 77 |
| 8.14 | Ownership of Subsidiaries | 77 |
| 8.15 | Sale Leasebacks | 77 |
| 8.16 | Sanctions | 77 |
| 8.17 | Consolidated Capital Expenditures | 77 |
| 8.18 | Anti-Corruption Laws | 77 |
| 8.19 | Budget | 77 |
| 8.20 | Bankruptcy Matters | 78 |
| 8.21 | Foreign Subsidiaries | 79 |

ARTICLE IX EVENTS OF DEFAULT AND REMEDIES ....... 79

| | | |
|---|---|---|
| 9.01 | Events of Default | 79 |
| 9.02 | Remedies Upon Event of Default | 83 |
| 9.03 | Application of Funds | 84 |

ARTICLE X ADMINISTRATIVE AGENT ....... 84

| | | |
|---|---|---|
| 10.01 | Appointment and Authority | 84 |
| 10.02 | Rights as a Lender | 85 |
| 10.03 | Exculpatory Provisions | 85 |
| 10.04 | Reliance by Administrative Agent | 86 |
| 10.05 | Delegation of Duties | 87 |
| 10.06 | Resignation of Administrative Agent | 87 |
| 10.07 | Non-Reliance on Administrative Agent and Other Lenders | 88 |
| 10.08 | No Other Duties; Etc | 88 |
| 10.09 | Administrative Agent May File Proofs of Claim | 89 |
| 10.10 | Collateral and Guaranty Matters | 90 |
| 10.11 | Treasury Management Banks | 90 |
| 10.12 | ERISA Matters | 91 |

ARTICLE XI MISCELLANEOUS ....... 92

| | | |
|---|---|---|
| 11.01 | Amendments, Etc | 92 |
| 11.02 | Notices and Other Communications; Facsimile Copies | 94 |
| 11.03 | No Waiver; Cumulative Remedies; Enforcement | 96 |

11.04    Expenses; Indemnity; and Damage Waiver ...................................................... 96
11.05    Payments Set Aside ............................................................................................ 98
11.06    Successors and Assigns ...................................................................................... 99
11.07    Treatment of Certain Information; Confidentiality.......................................... 103
11.08    Set-off ............................................................................................................... 103
11.09    Interest Rate Limitation ................................................................................... 104
11.10    Counterparts; Integration; Effectiveness......................................................... 104
11.11    Survival of Representations and Warranties .................................................... 105
11.12    Severability ...................................................................................................... 105
11.13    Replacement of Lenders ................................................................................... 105
11.14    Governing Law; Jurisdiction; Etc ................................................................... 106
11.15    Waiver of Right to Trial by Jury...................................................................... 107
11.16    Electronic Execution; Electronic Records ...................................................... 107
11.17    USA PATRIOT Act........................................................................................... 108
11.18    No Advisory or Fiduciary Relationship ........................................................... 108
11.19    [Reserved].......................................................................................................... 108
11.20    [Reserved].......................................................................................................... 109
11.21    Acknowledgement and Consent to Bail-In of Affected Financial Institutions ............... 109
11.22    Subordination of Intercompany Indebtedness.................................................. 109
11.23    Acknowledgement Regarding Any Supported QFCs ....................................... 109
11.24    Prepetition Dutch Borrower ............................................................................. 110

SCHEDULES

| 2.01 | Commitments and Applicable Percentages |
| 6.10 | Insurance |
| 6.13 | Subsidiaries |
| 6.17 | IP Rights |
| 6.20(a) | Locations of Real Property |
| 6.20(b) | Taxpayer and Organizational Identification Numbers |
| 6.20(c) | Changes in Legal Name, State of Formation and Structure |
| 6.20(d) | Deposit and Securities Accounts |
| 6.21 | Collective Bargaining Agreements |
| 8.01 | Liens Existing on the Closing Date |
| 8.02 | Investments Existing on the Closing Date |
| 8.08 | Transactions with Affiliates Existing or Contemplated on the Closing Date |
| 11.02 | Certain Addresses for Notices |

EXHIBITS

| A | Form of Loan Notice |
| B | Form of Revolving Note |
| C | Form of Interim DIP Order |
| D | Form of Assignment and Assumption |
| E | Forms of U.S. Tax Compliance Certificates |
| F | Form of Secured Party Designation Notice |
| G | Form of Notice of Loan Prepayment |

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT is entered into as of September [__], 2020 among Shiloh Industries, Inc., a Delaware corporation (the "Company" or the "Borrower"), the Guarantors (defined herein), the Lenders (defined herein) and BANK OF AMERICA, N.A., as Administrative Agent.

PRELIMINARY STATEMENTS

On August [__], 2020 (the "Petition Date"), the Company and the other Loan Parties filed voluntary petitions for relief under Title 11 of the United States Code (as now or hereafter in effect, or any successor thereto, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (such cases being jointly administered under Case No. [_____] and are referred to herein as the "Chapter 11 Case"), and such debtor-Loan Parties continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The Company has requested that the Lenders provide a senior secured super priority debtor-in-possession credit facility to the Company in an aggregate principal amount of $23,500,000 (the "DIP Facility") for the purposes set forth herein, and the Lenders are willing to do so on the terms and conditions set forth herein; provided that, (i) $18,100,000 will be made available following the Bankruptcy Court's entry of the Interim DIP Order and (ii) the remainder will be made available following the Bankruptcy Court's entry of the Final DIP Order.

Each of the Loan Parties acknowledges that such Loan Party will receive substantial direct and indirect benefits by reason of making of the loans and other financial accommodations to the Loan Parties as provided in this Agreement.

To provide for the security and repayment of all obligations of any kind of the Loan Parties hereunder and under the other Loan Documents, each of the Loan Parties will provide to the Administrative Agent (for the benefit of the Lenders) the Liens, status and protection set forth in the Interim DIP Order and the Final DIP Order.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I

DEFINITIONS AND ACCOUNTING TERMS

1.01    Defined Terms.

As used in this Agreement, the following terms shall have the meanings set forth below:

"Acquisition" means, with respect to any Person, the acquisition by such Person, in a single transaction or in a series of related transactions, of (a) all or any substantial portion of the property of another Person, or any division, line of business or other business unit of another Person or (b) at least a majority of the Voting Stock of another Person, in each case whether or not involving a merger or consolidation with such other Person and whether for cash, property, services, assumption of Indebtedness, securities or otherwise.

"<u>Administrative Agent</u>" means Bank of America (or any of its designated branch offices or affiliates) in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address and, as appropriate, account as set forth on <u>Schedule 11.02</u>, or such other address or account as the Administrative Agent may from time to time notify the Company and the Lenders.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Affected Financial Institution</u>" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Aggregate Revolving Commitments</u>" means the aggregate amount of the Revolving Commitments of all the Lenders.  The Revolving Commitments of all of the Lenders on the Closing Date are set forth on <u>Schedule 2.01</u>.

"<u>Agreement</u>" means this Superpriority Secured Debtor-in-Possession Credit Agreement, as amended, restated, supplemented or otherwise modified from time to time.

"<u>Applicable Currency</u>" means Dollars.

"<u>Applicable Percentage</u>" means, with respect to a Lender's Revolving Commitment at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Revolving Commitments represented by such Lender's Revolving Commitment at such time, subject to adjustment as provided in <u>Section 2.15</u>; provided that if the commitment of each Lender to make Revolving Loans has been terminated pursuant to <u>Section 9.02</u> or if the Aggregate Revolving Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments.  The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on <u>Schedule 2.01</u> or in the Assignment and Assumption or other documentation pursuant to which such Lender becomes a party hereto, as applicable.

"<u>Applicable Rate</u>" means (a) with respect to Eurocurrency Rate Loans, 10.00% and (c) with respect to Base Rate Loans, 9.00%.

"<u>Applicable Reference Rate</u>" means, for any Eurocurrency Rate Loan, LIBOR.

"<u>Approved Fund</u>" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by <u>Section 11.06(b)</u>), and accepted by the Administrative Agent, in substantially the form of <u>Exhibit G</u> or any other form (including electronic documentation generated by use of an electronic platform) approved by the Administrative Agent.

"<u>Attributable Indebtedness</u>" means, on any date, (a) in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease of any Person, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease were accounted for as a Capital Lease and (c) in respect of any Securitization Transaction of any Person, the outstanding principal amount of such financing, after taking into account reserve accounts and making appropriate adjustments, determined by the Administrative Agent in its reasonable judgment.

"<u>Availability Period</u>" means the period from and including the Closing Date to the earliest of (a) the Maturity Date, (b) the date of termination of the Aggregate Revolving Commitments pursuant to <u>Section 2.06</u>, and (c) the date of termination of the commitment of each Lender to make Revolving Loans pursuant to <u>Section 9.02</u>.

"<u>Avoidance Actions</u>" means actions for preferences, fraudulent conveyances and other avoidance power claims under Sections 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"<u>Bail-In Legislation</u>" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, rule, regulation or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bank of America</u>" means Bank of America, N.A. and its successors.

"<u>Bankruptcy Code</u>" has the meaning specified in the recitals hereto.

"<u>Bankruptcy Court</u>" has the meaning specified in the recitals hereto.

"<u>Base Rate</u>" means for any day a fluctuating rate of interest per annum equal to the highest of (a) the Federal Funds Rate plus one-half percent (0.50%), (b) the rate of interest in effect for such day as publicly announced from time to time by Bank of America as its "prime rate" and (c) the Eurocurrency Rate <u>plus</u> one percent (1.00%); <u>provided</u> that if the Base Rate shall be less than zero such rate shall be deemed zero for purposes of this Agreement.  The "prime rate" is a rate set by Bank of America based upon various factors including Bank of America's costs and desired return, general economic conditions and other factors, and is used as a reference point for pricing some loans, which may be priced at, above, or below such announced rate.  Any change in the "prime rate" announced by Bank of America shall take effect at the opening of business on the day specified in the public announcement of such change.  If the Base Rate is being used as an alternate rate of interest pursuant to <u>Section 3.03</u> hereof, then the Base Rate shall be the greater of <u>clauses (a)</u> and (<u>b</u>) above and shall be determined without reference to <u>clause (c)</u> above.

"<u>Base Rate Loan</u>" means a Loan that bears interest based on the Base Rate.  All Base Rate Loans shall be denominated in Dollars.

"<u>Beneficial Ownership Certification</u>" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Benefit Plan</u>" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Internal Revenue Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Internal Revenue Code) the assets of any such "employee benefit plan" or "plan".

"<u>Borrower</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Borrower Materials</u>" has the meaning specified in <u>Section 7.02</u>.

"<u>Borrowing</u>" means a borrowing consisting of simultaneous Loans of the same Type, and, in the case of Eurocurrency Rate Loans, having the same Interest Period made by each of the Lenders pursuant to <u>Section 2.01</u>.

"<u>Budget</u>" means the detailed weekly budget of projected receipts and expenditures of the Loan Parties for the period commencing on the Petition Date and ending on the date that is thirteen (13) weeks after the Petition Date, delivered to the Administrative Agent on or prior to the Closing Date, which shall set forth forecasted (A) Cash Receipts, (B) Cash Operating Disbursements, (C) Cash Bankruptcy Disbursements and (D) Net Cash Flow, as the same may be updated, amended or modified from time to time after the Closing Date in accordance with <u>Section 7.01</u> or as otherwise agreed by the Administrative Agent and the Required Lenders.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located and, if such day relates to any interest rate settings as to a Eurocurrency Rate Loan denominated in Dollars, any fundings, disbursements, settlements and payments in Dollars in respect of any such Eurocurrency Rate Loan, or any other dealings in Dollars to be carried out pursuant to this Agreement in respect of any such Eurocurrency Rate Loan, means any such day that is also a day on which dealings in Dollar deposits are conducted by and between banks in the London interbank eurodollar market.

"<u>Businesses</u>" means, at any time, a collective reference to the businesses operated by the Company and its Subsidiaries at such time.

"<u>Capital Expenditures</u>" means, with respect to any Person for any period, any expenditure by such Person during such period that is a capital expenditure as determined in accordance with GAAP.

"<u>Capital Lease</u>" means, as applied to any Person, any lease of any property by that Person as lessee which, in accordance with GAAP, is required to be accounted for as a capital lease on the balance sheet of that Person.

"<u>Carve-Out</u>" has the meaning given to such term in the Interim DIP Order and, as applicable, the Final DIP Order.

"<u>Cash Bankruptcy Disbursements</u>" means non-operating, bankruptcy-related cash disbursements of the Loan Parties.

"Cash Equivalents" means, as at any date, (a) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve (12) months from the date of acquisition, (b) Dollar denominated time deposits and certificates of deposit of (i) any Lender, (ii) any domestic commercial bank of recognized standing having capital and surplus in excess of $500,000,000 or (iii) any bank whose short-term commercial paper rating from S&P is at least A-1 or the equivalent thereof or from Moody's is at least P-1 or the equivalent thereof (any such bank being an "Approved Bank"), in each case with maturities of not more than two hundred seventy (270) days from the date of acquisition, (c) commercial paper and variable or fixed rate notes issued by any Approved Bank (or by the parent company thereof) or any variable rate notes issued by, or guaranteed by, any domestic corporation rated A-1 (or the equivalent thereof) or better by S&P or P-1 (or the equivalent thereof) or better by Moody's and maturing within six (6) months of the date of acquisition, (d) repurchase agreements entered into by any Person with a bank or trust company (including any of the Lenders) or recognized securities dealer having capital and surplus in excess of $500,000,000 for direct obligations issued by or fully guaranteed by the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least one hundred percent (100%) of the amount of the repurchase obligations and (e) Investments, classified in accordance with GAAP as current assets, in money market investment programs registered under the Investment Company Act of 1940 which are administered by reputable financial institutions having capital of at least $500,000,000 and the portfolios of which are limited to Investments of the character described in the foregoing subdivisions (a) through (d).

"Cash Management Order" means, collectively, the orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Case authorizing and approving the Loan Parties' cash management arrangements and procedures, and which orders shall be in form and substance reasonably satisfactory to the Administrative Agent.

"Cash Operating Disbursements" means cash operating disbursements of the Loan Parties.

"Cash Receipts" means cash receipts of the Loan Parties.

"Change in Law" means the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any Law, (b) any change in any Law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of Law) by any Governmental Authority; provided, that, notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the occurrence of any of the following events:

(a)    any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire (such right, an "option right"), whether such right is exercisable immediately or only after the

passage of time), directly or indirectly, of thirty percent (30%) or more of the Equity Interests of the Company entitled to vote for members of the board of directors or equivalent governing body of the Company on a fully diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right); provided, that, the acquisition after the Closing Date by MTD Pension Master Trust and MTD Holdings Inc. of not more than twenty percent (20%) of such Equity Interests of the Company in the aggregate shall not result in a "Change of Control" under this clause (a); or

(b)    a majority of the members of the board of directors or other equivalent governing body of the Company cease to be composed of individuals  (i) who were members of that board or equivalent governing body on the Closing Date, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or

(c)    the occurrence of a change of control, or other term of similar import used therein, in any agreement evidencing Indebtedness in excess of the Threshold Amount.

"Chapter 11 Case" has the meaning specified in the recitals hereto.

"Closing Date" means the date hereof.

"Collateral" means a collective reference to all real and personal property with respect to which Liens in favor of the Administrative Agent, for the benefit of itself and the other holders of the Obligations, are purported to be granted pursuant to and in accordance with the terms of the Collateral Documents.

"Collateral Documents" means a collective reference to the Security Agreement, the Pledge Agreement, the Mortgages, and all other security documents as are executed and delivered by the Loan Parties pursuant to the pursuant to the terms of Section 7.14.

"Commitment" means, as to each Lender, the Revolving Commitment of such Lender.

"Commitment Fee" has the meaning specified in Section 2.09(a).

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*) as amended or otherwise modified, and any successor statute.

"Company" has the meaning specified in the introductory paragraph hereto.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Capital Expenditures" means, for any period, for the Company and its Subsidiaries on a consolidated basis, all Capital Expenditures.

"<u>Contractual Obligation</u>" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto. Without limiting the generality of the foregoing, a Person shall be deemed to be Controlled by another Person if such other Person possesses, directly or indirectly, power to vote ten percent (10%) or more of the securities having ordinary voting power for the election of directors, managing general partners or the equivalent.

"<u>Credit Extension</u>" means a Borrowing.

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments, appointment of an administrator or receiver, a winding up, administration, dissolution  or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" means an interest rate equal to (a) the Base Rate <u>plus</u> (b) the Applicable Rate, if any, applicable to Base Rate Loans <u>plus</u> (c) two percent (2%) per annum; <u>provided</u>, <u>however</u>, that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the interest rate (including any Applicable Rate) otherwise applicable to such Loan <u>plus</u> two percent (2%) per annum, in each case to the fullest extent permitted by applicable Laws.

"<u>Defaulting Lender</u>" means, subject to <u>Section 2.15(b)</u>, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Company in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Company or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Company, to confirm in writing to the Administrative Agent and the Company that it will comply with its prospective funding obligations hereunder (<u>provided</u> that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Company), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity or (iii) become the subject of a Bail-In Action; <u>provided</u>, that, a Lender shall not be a Defaulting Lender

solely by virtue of the ownership or acquisition of any Equity Interests in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.15(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Company and each other Lender promptly following such determination.

"Designated Jurisdiction" means any region, country or territory to the extent that such country or territory is the subject of any Sanction (at the time of the Closing Date, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"DIP Orders" means the Interim DIP Order and the Final DIP Order.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any Sale and Leaseback Transaction) of any property by any Loan Party or any Subsidiary (including the Equity Interests of any Subsidiary), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith, but excluding (a) the sale, lease, license, transfer or other disposition of inventory in the ordinary course of business; (b) the sale, lease, license, transfer or other disposition in the ordinary course of business of surplus, obsolete or worn out property no longer used or useful in the conduct of business of any Loan Party and its Subsidiaries; (c) any sale, lease, license, transfer or other disposition of property to any Loan Party or any Subsidiary; provided, (i) that if the transferor of such property is a Loan Party (x) the transferee thereof must be a Loan Party that is a Domestic Subsidiary or (y) to the extent such transaction constitutes an Investment, such transaction is permitted under Section 8.02 and (ii) any such sale, lease, license, transfer or other disposition to a Loan Party shall be subject to Section 8.21, (d) any Involuntary Disposition, (e) any sale by Foreign Subsidiaries of Swedish accounts receivable from a customer pursuant to such customer's supplier financing program to a third party financial institution, so long as the aggregate amount of all such sales of accounts receivable pursuant to this clause (e) shall not exceed $5,000,000 at any time, or (f) Chinese bankers acceptances being drawn at a discount so long as such discounts are at market rates as reasonably determined by the Company in good faith.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the Laws of any state of the United States or the District of Columbia.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 11.06(b) (subject to such consents, if any, as may be required under Section 11.06(b)(iii)).

"Environmental Laws" means any and all federal, state, local, foreign and other applicable statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Company, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests"  means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974 and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Company within the meaning of Section 414(b) or (c) of the Internal Revenue Code (and Sections 414(m) and (o) of the Internal Revenue Code for purposes of provisions relating to Section 412 of the Internal Revenue Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of the Company or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Company or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Sections 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Internal

Revenue Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Company or any ERISA Affiliate.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurocurrency Base Rate" means:

(a)    for any Interest Period with respect to a Eurocurrency Rate Loan, the rate per annum equal to the London Interbank Offered Rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for U.S. Dollars for a period equal in length to such Interest Period) ("LIBOR"), as published on the applicable Bloomberg screen page (or such other commercially available source providing such quotations as may be designated by the Administrative Agent from time to time) (in such case, the "LIBOR Rate') at or about 11:00 a.m., London time, on the Rate Determination Date, for deposits in Dollars with a term equivalent to such Interest Period; and

(b)    for any interest rate calculation with respect to a Base Rate Loan on any date, the rate per annum equal to LIBOR, at approximately 11:00 a.m., London time, determined two (2) Business Days prior to such date for Dollar deposits being delivered in the London interbank market for deposits in Dollars with a term of one (1) month commencing that date;

provided, that, (i) to the extent a comparable or successor rate is approved by the Administrative Agent in connection herewith, the approved rate shall be applied in a manner consistent with market practice; provided, further, that to the extent such market practice is not administratively feasible for the Administrative Agent, such approved rate shall be applied in a manner as otherwise reasonably determined by the Administrative Agent and (ii) if the Eurocurrency Base Rate shall be less than one percent, such rate shall be deemed one percent for purposes of this Agreement.

"Eurocurrency Rate" means (a) for any Interest Period with respect to any Eurocurrency Rate Loan, a rate per annum determined by the Administrative Agent to be equal to the quotient obtained by dividing (i) the Eurocurrency Base Rate for such Eurocurrency Rate Loan for such Interest Period by (ii) one minus the Eurocurrency Reserve Percentage for such Eurocurrency Rate Loan for such Interest Period and (b) for any day with respect to any Base Rate Loan bearing interest at a rate based on the Eurocurrency Rate, a rate per annum determined by the Administrative Agent to be equal to the quotient obtained by dividing (i) the Eurocurrency Base Rate for such Base Rate Loan for such day by (ii) one minus the Eurocurrency Reserve Percentage for such Base Rate Loan for such day.

"Eurocurrency Rate Loan" means a Loan that bears interest at a rate based on clause (a) of the definition of "Eurocurrency Rate".

"Eurocurrency Reserve Percentage" means, for any day, the reserve percentage (expressed as a decimal, carried out to five decimal places) in effect on such day, whether or not applicable to any Lender, under regulations issued from time to time by the FRB for determining the maximum reserve requirement (including any emergency, supplemental or other marginal reserve requirement) with respect to Eurocurrency funding (currently referred to as "Eurocurrency liabilities").  The Eurocurrency Rate for each outstanding Eurocurrency Rate Loan and for each outstanding Base Rate Loan the interest on which is determined by reference to the Eurocurrency Rate, in each case, shall be adjusted automatically as of the effective date of any change in the Eurocurrency Reserve Percentage.

10

"Event of Default" has the meaning specified in Section 9.01.

"Excluded Property" means, with respect to any Loan Party: (a) any non-residential real property leases except to the extent a Lien thereon is permitted in the applicable lease or pursuant to applicable Laws, provided, that the proceeds realized upon the sale, assignment, termination, or other disposition of such leases, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds, shall in each case not constitute Excluded Property; and (b) Avoidance Actions, provided, that subject to entry of the Final DIP Order, all proceeds and property recovered in connection with any Avoidance Action shall not constitute Excluded Property.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the Laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. Federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a Law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Company under Section 11.13) or (ii) such Lender changes its Lending Office, except in each case to the extent that pursuant to Section 3.01(a)(ii), (a)(iii) or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.01(e) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings and proceeds of Involuntary Dispositions), indemnity payments and any purchase price adjustments; provided, however, that an Extraordinary Receipt shall not include cash receipts from proceeds of insurance or indemnity payments to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against such Person and applied to pay (or to reimburse such Person for its prior payment of) such claim and the costs and expenses of such Person with respect thereto.

"Facilities" means, at any time, a collective reference to the facilities and real properties owned, leased or operated by any Loan Party or any Subsidiary.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

"Federal Funds Rate" means, for any day, the rate per annum calculated by the Federal Reserve Bank of New York based on such day's federal funds transactions by depository institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of

New York as the federal funds effective rate; <u>provided</u> that if the Federal Funds Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"<u>Fee Letter</u>" means the letter agreement, dated as of the date hereof among the Company and Bank of America, as amended or otherwise modified.

"<u>Final DIP Order</u>" means, collectively, the final order or orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Case after a hearing under Bankruptcy Rule 4001(c)(2), authorizing and approving the DIP Facility and the terms of this Agreement and the other Loan Documents (including the payment of interest, fees, costs and expenses hereunder and thereunder) and granting the Liens, status and protections set forth in <u>Section 2.16</u> hereof and provided for in the Collateral Documents, which order or judgment is in effect and not stayed, and as to which no appeal, petition for certiorari or other proceeding for re-argument or re-hearing shall then be pending, or, if pending, no stay pending appeal shall have been granted, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and which order shall be in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Final Order Entry Date</u>" means the date on which the Final DIP Order (which, for purposes of this definition, shall be determined without regard to whether or not the time to appeal, petition for certiorari or move for re-argument or re-hearing has expired) shall have been entered on the docket of the Bankruptcy Court in the Chapter 11 Case.

"<u>Flood Hazard Property</u>" means any real property subject to a Mortgage that is in an area designated by the Federal Emergency Management Agency as having special flood or mudslide hazards.

"<u>Flood Insurance Laws</u>" means, collectively, (a) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (b) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (c) the Biggert–Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"<u>Foreign Lender</u>" means a Lender that is not a U.S. Person.

"<u>Foreign Subsidiary</u>" means any Subsidiary that is not a Domestic Subsidiary.

"<u>FRB</u>" means the Board of Governors of the Federal Reserve System of the United States.

"<u>Fund</u>" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"<u>Funded Indebtedness</u>" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

> (a)     all obligations, whether current or long-term, for borrowed money (including the Obligations) and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

> (b)     all purchase money Indebtedness;

(c)    the principal portion of all obligations under conditional sale or other title retention agreements relating to property purchased by such Person or any Subsidiary thereof (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business);

(d)    all obligations arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments (but only to the extent of drawn but unreimbursed amounts);

(e)    all obligations in respect of the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than sixty (60) days after the date on which such trade account payable was created);

(f)    the Attributable Indebtedness of Capital Leases, Securitization Transactions and Synthetic Leases;

(g)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interests in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends;

(h)    all Funded Indebtedness of others secured by (or for which the holder of such Funded Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on, or payable out of the proceeds of production from, property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed;

(i)    all Guarantees with respect to Funded Indebtedness of the types specified in clauses (a) through (h) above of another Person; and

(j)    all Funded Indebtedness of the types referred to in clauses (a) through (i) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, except to the extent that Funded Indebtedness is expressly made non-recourse to such Person.

For purposes hereof, the amount of any direct obligation arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments shall be the maximum amount available to be drawn thereunder.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board, consistently applied and as in effect from time to time.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"<u>Guarantee</u>" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"<u>Guarantors</u>" means (a) each Domestic Subsidiary identified as a "Guarantor" on the signature pages hereto, (b) each other Person that joins as a Guarantor pursuant to <u>Section 7.12</u>, (c) with respect to Obligations under any Secured Treasury Management Agreement, the Company and (d) the successors and permitted assigns of the foregoing.

"<u>Guaranty</u>" means the Guaranty made by the Guarantors in favor of the Administrative Agent, the Lenders and the other holders of the Obligations pursuant to <u>Article IV</u>.

"<u>Hazardous Materials</u>" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"<u>IFRS</u>" means international accounting standards within the meaning of IAS Regulation 1606/2002 to the extent applicable to the relevant financial statements delivered under or referred to herein.

"<u>Impacted Loans</u>" has the meaning specified in <u>Section 3.03</u>.

"<u>Indebtedness</u>" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

      (a)      all Funded Indebtedness;

      (b)      the Swap Termination Value of any Swap Contract;

      (c)      [reserved];

      (d)      all obligations arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(e)        [reserved];

(f)        all Guarantees with respect to outstanding Indebtedness of the types specified in clauses (a), (b), (c) and (d) above of any other Person; and

(g)        all Indebtedness of the types referred to in clauses (a) through (f) above of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person or a Subsidiary thereof is a general partner or joint venturer, unless such Indebtedness is expressly made non-recourse to such Person or such Subsidiary.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitees" has the meaning specified in Section 11.04(b).

"Information" has the meaning specified in Section 11.07.

"Interest Payment Date" means (a) as to any Eurocurrency Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; and (b) as to any Base Rate Loan, the last Business Day of each month and the Maturity Date.

"Interest Period" means as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one (1) month thereafter, subject to availability; provided that:

(a)        any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless, in the case of a Eurocurrency Rate Loan, such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)        any Interest Period pertaining to a Eurocurrency Rate Loan that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)        no Interest Period with respect to any Loan shall extend beyond the Maturity Date.

"Interim DIP Order" means, collectively, the interim order or orders entered by the Bankruptcy Court with respect to the Loan Parties in the Chapter 11 Case on or prior to the date occurring three (3) calendar days after the Petition Date, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to each Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, as applicable, and incur (and guarantee) and secure the Loans and other Obligations in connection therewith, which order shall be in form and substance reasonably satisfactory to the Administrative Agent, and which shall be deemed reasonably satisfactory to the Administrative Agent if such order is substantially in the form of Exhibit E.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Internal Revenue Service" means the United States Internal Revenue Service.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, or (c) an Acquisition.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment.

"Investment Bankers" means the investment banking firms satisfactory to the Administrative Agent (it being understood that Houlihan Lokey are satisfactory) retained by the Loan Parties to market the assets of the Loan Parties and their Subsidiaries for sale.

"Involuntary Disposition" means any loss of, damage to or destruction of, or any condemnation or other taking for public use of, any property of any Loan Party or any of its Subsidiaries.

"IP Rights" has the meaning specified in Section 6.17.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of Law.

"Lenders" means each of the Persons identified as a "Lender" on the signature pages hereto and their successors and assigns.

"Lending Office" means, as to the Administrative Agent or any Lender, the office or offices of such Person described as such in such Lender's Administrative Questionnaire, or such other office or offices as such Person may from time to time notify the Company and the Administrative Agent, which office may include any Affiliate of such Person or any domestic or foreign branch of such Person or such Affiliate.

"LIBOR" has the meaning specified in the definition of "Eurocurrency Base Rate".

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan" means an extension of credit by a Lender to the Borrower under Article II in the form of a Revolving Loan.

"Loan Documents" means this Agreement, each Note, each Collateral Document, the Fee Letter, and any other agreement or document specifically designated as a "Loan Document" (but specifically excluding Secured Treasury Management Agreements).

"<u>Loan Notice</u>" means a notice of (a) a Borrowing of Revolving Loans, (b) [reserved], (c) a conversion of Loans from one Type to the other, or (d) a continuation of Eurocurrency Rate Loans, in each case pursuant to <u>Section 2.02(a)</u>, which shall be substantially in the form of <u>Exhibit A</u> or such other form as may be approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"<u>Loan Parties</u>" means, collectively, the Borrower and each Guarantor.

"<u>Master Agreement</u>" has the meaning specified in the definition of "Swap Contract".

"<u>Material Adverse Effect</u>" means (a) a material adverse change in, or a material adverse effect upon, the business, assets, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of the Company and its Subsidiaries taken as a whole; (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document to which it is a party; (c) a material impairment of the ability of any Loan Party to perform its material obligations under any Loan Document to which it is a party; or (d) a material adverse effect upon the legality, validity, binding effect or enforceability of any Loan Document or of any Loan Party of any Loan Document to which it is a party; <u>provided</u> that changes, events, effects, or circumstances which, directly or indirectly, to the extent they relate to or result from the following, shall be excluded from the determination of a Material Adverse Effect: (i) the filing of the Chapter 11 Case (and any defaults under pre-petition agreements, so long as the exercise of remedies as a result of such defaults are stayed under the Bankruptcy Code or such agreements are voided or invalidated by the Bankruptcy Court); (ii) any litigation or claim threatened or initiated by PBGC or creditors of the Loan Parties against the Loan Parties or any of its officers or directors, in each case, arising out of filing of the Chapter 11 Case or the transactions contemplated thereby; (iii) the existence of any claim or liability from the period prior to the commencement of the Chapter 11 Case, which is unsecured and junior in priority to the Obligations.

"<u>Maturity Date</u>" means the earliest to occur of (a) December [__], 2020[1], (b) the effective date of a sale of all or substantially all assets of the Loan Parties and (c) the date upon which any Plan of Reorganization becomes effective; <u>provided</u>, <u>however</u>, that, in each case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"<u>Measurement Item</u>" means each of Cash Receipts, Cash Operating Disbursements and Cash Bankruptcy Disbursements.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and any successor thereto.

"<u>Mortgages</u>" means the mortgages, deeds of trust or deeds to secure debt that purport to grant to the Administrative Agent, for the benefit of the holders of the Obligations, a security interest in the fee interest and/or leasehold interests of any Loan Party in real property (other than Excluded Property).

"<u>MTD Pension Master Trust</u>" means the MTD Products Inc. Master Retirement Trust which is a qualified benefit plan sponsored by MTD Products Inc., for the benefit of certain of its employees and/or retirees.

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Company or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

---

[1] To be the date that is 4 months after the Petition Date.

"<u>Multiple Employer Plan</u>" means a Plan which has two or more contributing sponsors (including the Company or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"<u>Net Cash Flow</u>" means (a) Cash Receipts <u>minus</u> (b) Cash Operating Disbursements <u>minus</u> (c) Cash Bankruptcy Disbursements.

"<u>Net Cash Proceeds</u>" means the aggregate cash or Cash Equivalents proceeds received by any Loan Party or any Subsidiary in respect of any Disposition or Involuntary Disposition, net of (a) direct costs incurred in connection therewith (including, without limitation, legal, accounting and investment banking fees and sales commissions), (b) taxes paid or payable as a result thereof and (c) the amount necessary to retire any Indebtedness secured by a Permitted Lien (ranking senior to any Lien of the Administrative Agent) on the related property; it being understood that "Net Cash Proceeds" shall include, without limitation, any cash or Cash Equivalents received upon the sale or other disposition of any non-cash consideration received by any Loan Party or any Subsidiary in any Disposition or Involuntary Disposition.

"<u>Non-Consenting Lender</u>" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of (i) all Lenders or (ii) all affected Lenders (and in the case of this clause (a)(ii), such Lender is an affected Lender) in accordance with the terms of <u>Section 11.01</u> and (b) has been approved by the Required Lenders.

"<u>Non-Defaulting Lender</u>" means, at any time, each Lender that is not a Defaulting Lender at such time.

"<u>Note</u>" or "<u>Notes</u>" means the Revolving Notes, individually or collectively, as appropriate.

"<u>Notice of Loan Prepayment</u>" means a notice of prepayment with respect to a Loan, which shall be substantially in the form of <u>Exhibit J</u> or such other form as may be approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be approved by the Administrative Agent), appropriately completed and signed by a Responsible Officer of the Borrower.

"<u>Obligations</u>" means with respect to each Loan Party, (a) all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan and (b) all obligations of any Loan Party owing to a Treasury Management Bank in respect of Secured Treasury Management Agreements, in the case of each of clauses (a) and (b), whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"<u>OFAC</u>" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"<u>Organization Documents</u>" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement (or equivalent or comparable documents with respect to any non-U.S. jurisdiction); and (c) with respect to any

partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization (or equivalent or comparable documents with respect to any non-U.S. jurisdiction) and (d) with respect to all entities, any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization (or equivalent or comparable documents with respect to any non-U.S. jurisdiction).

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.06).

"Outstanding Amount" means, with respect to any Loans on any date, the amount of the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of any Loans occurring on such date.

"Overnight Rate" means, for any day, the greater of (a) the Federal Funds Rate and (b) an overnight rate determined by the Administrative Agent, in accordance with banking industry rules on interbank compensation,.

"Participant" has the meaning specified in Section 11.06(d).

"Participant Register" has the meaning specified in Section 11.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Internal Revenue Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Internal Revenue Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Internal Revenue Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by the Company and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to minimum funding standards under Section 412 of the Internal Revenue Code.

"Permitted Liens" means, at any time, Liens in respect of property of any Loan Party or any of its Subsidiaries permitted to exist at such time pursuant to the terms of Section 8.01.

"Permitted Variances" means (a) Measurement Item variance less than or equal to 20% of the budgeted amounts and $500,000, and (b) a negative variance on the cumulative actual Net Cash Flow of 15% of the budgeted amounts, the measurement of which shall begin in week two of the Chapter 11 Case and continue through week five of the Chapter 11 Case and 10% of the budgeted amounts thereafter.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of the Company or any ERISA Affiliate or any such Plan to which the Company or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Plan of Reorganization" means a plan of reorganization or a plan of liquidation.

"Platform" has the meaning specified in Section 7.02.

"Pledge Agreement" means the postpetition pledge agreement dated as of the Closing Date executed in favor of the Administrative Agent, for the benefit of the holders of the Obligations, by each of the Loan Parties, as amended or modified from time to time in accordance with the terms hereof.

"Postpetition" means the time period beginning immediately upon the filing of the Chapter 11 Case.

"Postpetition Indebtedness" means, the obligations of the Loan Parties arising on or after the Petition Date relating to the Loan Parties' bankruptcy estates, including related to the Postpetition operation of the Loan Parties' business (including the Obligations).

"Prepetition" means the time period prior to filing of the Chapter 11 Case.

"Prepetition Agent" means, the "Administrative Agent" under and as defined in the Prepetition Credit Agreement.

"Prepetition Collateral" means all collateral securing the obligations under the Prepetition Loan Documents.

"Prepetition Credit Agreement" means the Credit Agreement dated as of October 25, 2013 by and among the Company, the Prepetition Dutch Borrower, the guarantors party thereto, the lenders party thereto, and Bank of America, N.A., as administrative agent, swing line lender, Dutch swing line lender and l/c issuer thereunder, as amended, supplemented or otherwise modified from time to time.

"Prepetition Dutch Borrower" means Shiloh Holdings Netherlands B.V., a *besloten vennootschap met beperkte aansprakelijkheid* organized under the laws of the Netherlands.

"Prepetition Facility Obligations" means all obligations from time to time owing by any Loan Party to the Prepetition Agent or any Prepetition Lender under the Prepetition Loan Documents.

"Prepetition Lenders" means the Lenders under the Prepetition Credit Agreement.

"Prepetition Loan Documents" means, the "Loan Documents" under and as defined in the Prepetition Credit Agreement, in each case as amended, supplemented or otherwise modified from time to time.

"Prepetition Payment" means a direct or indirect payment, redemption, purchase, defeasance or acquisition for value (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition (i) Indebtedness (including, without limitation, the Indebtedness under the Prepetition Loan Documents), (ii) "critical vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims), or other Prepetition claims against any Loan Party.

"Primed Liens" has the meaning specified in Section 2.16(a)(iii).

"Priming Lien" has the meaning specified in Section 2.16(a)(iii).

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning specified in Section 7.02.

"Rate Determination Date" means two (2) Business Days prior to the commencement of the applicable Interest Period (or such other day as is generally treated as the rate fixing day by market practice in such interbank market, as determined by the Administrative Agent; provided that to the extent such market practice is not administratively feasible for the Administrative Agent, then "Rate Determination Date" means such other day as otherwise reasonably determined by the Administrative Agent).

"Real Property Security Documents" means with respect to the fee interest and/or leasehold interest of any Loan Party in any real property:

(a)      a fully executed and notarized Mortgage encumbering the fee interest and/or leasehold interest of such Loan Party in such real property;

(b)      if requested by the Administrative Agent in its sole discretion, maps or plats of an as-built survey of the sites of such real property certified to the Administrative Agent and the title insurance company issuing the policies referred to in clause (c) of this definition in a manner satisfactory to each of the Administrative Agent and such title insurance company, dated a date satisfactory to each of the Administrative Agent and such title insurance company by an independent professional licensed land surveyor, which maps or plats and the surveys on which they are based shall be sufficient to delete any standard printed survey exception contained in the applicable title policy and be made in accordance with the Minimum Standard Detail Requirements for Land Title Surveys jointly established and adopted by the American Land Title Association and the American Congress on Surveying and Mapping in 2011 with items 2, 3, 4, 6(b), 7(a), 7(b)(1), 7(c), 8, 9, 10, 11(a), 13, 14, 16,17, 18 and 19 on Table A thereof completed;

(c)      ALTA mortgagee title insurance policies issued by a title insurance company acceptable to the Administrative Agent with respect to such real property, assuring the Administrative Agent that the Mortgage covering such real property creates a valid and enforceable first priority mortgage lien on such real property, free and clear of all defects and encumbrances except Permitted Liens, which title insurance policies shall otherwise be in form and substance satisfactory to the Administrative Agent and shall include such endorsements as are requested by the Administrative Agent;

21

(d)      (i) a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to such real property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by each Loan Party relating thereto) and (ii) if such real property is a Flood Hazard Property, (A) notices to (and confirmations of receipt by) such Loan Party as to the existence of a special flood hazard and, if applicable, the unavailability of flood hazard insurance under the National Flood Insurance Program and (A) evidence of applicable flood insurance, if available, in each case in such form, on such terms and in such amounts as required by The National Flood Insurance Reform Act of 1994 or as otherwise required by the Administrative Agent;

(e)      if requested by the Administrative Agent in its sole discretion, an environmental assessment report, as to such real property, in form and substance and from professional firms acceptable to the Administrative Agent;

(f)      if requested by the Administrative Agent in its sole discretion, evidence reasonably satisfactory to the Administrative Agent that such real property, and the uses of such real property, are in compliance in all material respects with all applicable zoning Laws (the evidence submitted as to which should include the zoning designation made for such real property, the permitted uses of such real property under such zoning designation and, if available, zoning requirements as to parking, lot size, ingress, egress and building setbacks);

(g)      in the case of a leasehold interest of any Loan Party in such real property, (i) such estoppel letters, consents and waivers from the landlords on such real property as may be required by the Administrative Agent, which estoppel letters shall be in the form and substance satisfactory to the Administrative Agent and (ii) evidence that the applicable lease, a memorandum of lease with respect thereto, or other evidence of such lease in form and substance satisfactory to the Administrative Agent, has been or will be recorded in all places to the extent necessary or desirable, in the judgment of the Administrative Agent, so as to enable the Mortgage encumbering such leasehold interest to effectively create a valid and enforceable first priority lien (subject to Permitted Liens) on such leasehold interest in favor of the Administrative Agent (or such other Person as may be required or desired under local Law); and

(h)      if requested by the Administrative Agent in its sole discretion, an opinion of legal counsel to the Loan Party granting the Mortgage on such real property, addressed to the Administrative Agent and each Lender, in form and substance reasonably acceptable to the Administrative Agent.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"Register" has the meaning specified in Section 11.06(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Relevant Governmental Body" means the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York for the purpose of recommending a benchmark rate to replace LIBOR in loan agreements similar to this Agreement.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the thirty-day notice period has been waived.

"Request for Credit Extension" means, with respect to a Borrowing, conversion or continuation of Loans, a Loan Notice.

"Required Lenders" means, at any time, Lenders having Total Credit Exposures representing more than fifty percent (50%) of the Total Credit Exposures of all Lenders. The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means the chief executive officer, president, chief financial officer, vice-president of finance, director of finance, treasurer, assistant treasurer or controller of a Loan Party and, solely for purposes of the delivery of certificates pursuant to Sections 5.01 or 7.12(b), the secretary or any assistant secretary of a Loan Party and, solely for purposes of notices given pursuant to Article II, any other officer or employee of the applicable Loan Party so designated by any of the foregoing officers in a notice to the Administrative Agent or any other officer or employee of the applicable Loan Party designated in or pursuant to an agreement between the applicable Loan Party and the Administrative Agent. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. To the extent requested by the Administrative Agent, each Responsible Officer will provide an incumbency certificate and appropriate authorization documentation, in form and substance reasonably satisfactory to the Administrative Agent.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests of any Loan Party or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or on account of any return of capital to the Company's stockholders, partners or members (or the equivalent Person thereof), or any setting apart of funds or property for any of the foregoing.

"Revolving Commitment" means, as to each Lender, its obligation to make Revolving Loans to the Company pursuant to Section 2.01, in an aggregate principal amount at any one time outstanding not to exceed the Dollar amount set forth opposite such Lender's name on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Credit Exposure" means, as to any Lender at any time, the aggregate principal amount at such time of its outstanding Revolving Loans.

"Revolving Loan" has the meaning specified in Section 2.01.

"Revolving Note" has the meaning specified in Section 2.11(a).

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of The McGraw Hill Companies, Inc. and any successor thereto.

"Sale and Leaseback Transaction" means, with respect to any Loan Party or any Subsidiary, any arrangement, directly or indirectly, with any Person whereby the Loan Party or such Subsidiary shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"Sale Milestones" has the meaning specified in Section 7.18.

"Same Day Funds" means with respect to disbursements and payments in Dollars, immediately available funds.

"Sanctions" means any imposed, sanction administered or enforced by the United States Government (including, without limitation, OFAC), the United Nations Security Council, the European Union, Her Majesty's Treasury ("HMT") or other relevant sanctions authority.

"Scheduled Unavailability Date" has the meaning specified in Section 3.03(c).

"Screen Rate" means the Applicable Reference Rate quote for an Applicable Currency on the applicable screen page the Administrative Agent designates to determine such Applicable Reference Rate for such Applicable Currency (or such other commercially available source providing such quotations for such Applicable Currency as may be designated by the Administrative Agent from time to time).

"Secured Obligations" means all Obligations.

"Secured Parties" means, collectively, the Administrative Agent, the Lenders, the Treasury Management Banks, the Indemnitees and the co-agents or sub-agents appointed by the Administrative Agent from time to time pursuant to Section 10.05.

"Secured Party Designation Notice" means a notice from any Lender or an Affiliate of a Lender substantially in the form of Exhibit I.

"Secured Treasury Management Agreement" means any Treasury Management Agreement between any Loan Party or any Subsidiary and any Treasury Management Bank; provided, that for any of the foregoing to be included as a "Secured Treasury Management Agreement" on any date of determination by the Administrative Agent, the applicable Treasury Management Bank (other than the Administrative Agent or an Affiliate of the Administrative Agent) must have delivered a Secured Party Designation Notice to the Administrative Agent prior to such date of determination.

"Securitization Transaction" means, with respect to any Person, any financing transaction or series of financing transactions (including factoring arrangements) pursuant to which such Person or any Subsidiary of such Person may sell, convey or otherwise transfer, or grant a security interest in, accounts, payments, receivables, rights to future lease payments or residuals or similar rights to payment to a special purpose subsidiary or affiliate of such Person.

"Security Agreement" means the postpetition security agreement dated as of the Closing Date executed in favor of the Administrative Agent, for the benefit of the holders of the Obligations, by each of the Loan Parties, as amended or modified from time to time in accordance with the terms hereof.

"SOFR" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark (or a successor

administrator) on the Federal Reserve Bank of New York's website (or any successor source) and, in each case, that has been selected or recommended by the Relevant Governmental Body.

"<u>SOFR-Based Rate</u>" means SOFR or Term SOFR.

"<u>Subsidiary</u>" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of Voting Stock is at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Company; provided that, Shiloh Industries Italia S.r.l., a limited liability company incorporated under the laws of Italy, with Head offices in Verrès (AO) - Via Glair, 41 ("<u>Verres</u>") shall not shall be considered a Subsidiary of the Company for purposes of this agreement so long as Verres is undergoing or  is  otherwise  a  part  of  a voluntary corporate liquidation and/or voluntary insolvency proceedings under the laws of Italy (such as composition with creditors/"concordato preventivo", "pre-concordato preventivo", or bankruptcy proceeding).

"<u>Successor Rate</u>" has the meaning specified in <u>Section 3.03(c)</u>.

"<u>Successor Rate Conforming Changes</u>" means, with respect to any Successor Rate for an Applicable Currency, any conforming changes to the definition of Base Rate, Interest Period, timing and frequency of determining rates and making payments of interest and other technical, administrative or operational matters as may be appropriate, in the discretion of the Administrative Agent, to reflect the adoption and implementation of such Successor Rate and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice for such Applicable Currency (or, if the Administrative Agent determines that adoption of any portion of such market practice for such Applicable Currency is not administratively feasible or that no market practice for the administration of such Successor Rate for such Applicable Currency exists, in such other manner of administration as the Administrative Agent determines is reasonably necessary in connection with the administration of this Agreement).

"<u>Superpriority Claim</u>" means, a claim against the Company or other Loan Parties in the Chapter 11 Case which is an administrative expense claim having priority over any or all administrative expenses of a Chapter 11 and Chapter 7 trustee, subject and subordinate to the Carve-Out, of the kind specified in Sections 364(c)(1), 503(b), 507(a)(2) and 507(d) of the Bankruptcy Code.

"<u>Swap Contract</u>" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "<u>Master Agreement</u>"), including any such obligations or liabilities under any Master Agreement.

"<u>Swap Termination Value</u>" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"<u>Synthetic Lease</u>" means any synthetic lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing arrangement whereby the arrangement is considered borrowed money indebtedness for tax purposes but is classified as an operating lease or does not otherwise appear on a balance sheet under GAAP.

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term SOFR</u>" means the forward-looking term rate for any period that is approximately (as determined by the Administrative Agent) as long as any of the Interest Period options set forth in the definition of "Interest Period" and that is based on SOFR and that has been selected or recommended by the Relevant Governmental Body, in each case as published on an information service as selected by the Administrative Agent from time to time in its reasonable discretion.

"<u>Threshold Amount</u>" means $1,000,000.

"<u>Total Credit Exposure</u>" means, as to any Lender at any time, the unused Commitments and Revolving Credit Exposure of such Lender at such time.

"<u>Total Revolving Outstandings</u>" means the aggregate Outstanding Amount of all Revolving Loans.

"<u>Transactions</u>" means the execution and delivery by the Loan Parties of this Agreement and the other Loan Documents, the borrowing of the Loans on the Closing Date and the creation and perfection of Liens granted under the Collateral Documents.

"<u>Treasury Management Agreement</u>" means any agreement that is not prohibited by the terms hereof to provide treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards) overdraft, credit or debit card, funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services.

"<u>Treasury Management Bank</u>" means any Person that (a) at the time it enters into a Treasury Management Agreement, is a Lender or the Administrative Agent or an Affiliate of a Lender or the Administrative Agent, (b) in the case of any Treasury Management Agreement in effect on or prior to the Closing Date, is, as of the Closing Date or within thirty (30) days thereafter, a Lender or the Administrative Agent or an Affiliate of a Lender or the Administrative Agent and a party to a Treasury Management Agreement or (c) within thirty (30) days after the time it enters into the applicable Treasury Management Agreement, becomes a Lender, the Administrative Agent or an Affiliate of a Lender or the Administrative Agent, in each case, in its capacity as a party to such Treasury Management Agreement.

26

"Type" means, with respect to any Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"UCC" means the Uniform Commercial Code as in effect in any applicable jurisdiction.

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person subject to IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"United States" and "U.S." mean the United States of America.

"Unsecured Creditors Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Case, as the composition may be amended from time to time.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"U.S. Tax Compliance Certificate" has the meaning specified in Section 3.01(e)(ii)(B)(III).

"Voting Stock" means, with respect to any Person, Equity Interests issued by such Person the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even though the right so to vote has been suspended by the happening of such a contingency.

"Wholly Owned Subsidiary" means any Person one hundred percent (100%) of whose Equity Interests are at the time owned by the Company directly or indirectly through other Persons one hundred percent (100%) of whose Equity Interests are at the time owned, directly or indirectly, by the Company.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

1.02    Other Interpretive Provisions.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the

27

corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including the Loan Documents and any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, modified, extended, restated, replaced or supplemented from time to time (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto, " "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any Law shall include all statutory and regulatory rules, regulations, orders and provisions consolidating, amending, replacing or interpreting such Law and any reference to any Law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified, extended, restated, replaced or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal property and tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Any reference herein to a merger, transfer, consolidation, amalgamation, assignment, sale or disposition, or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, transfer, consolidation, amalgamation, assignment, sale or disposition, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

(e)    In the event of a conflict between, or inconsistency among, the Interim DIP Order or the Final DIP Order, on the one hand, and any Loan Document, on the other hand, the Interim DIP Order or the Final DIP Order, as applicable, shall control.

1.03    Accounting Terms.

(a)    Generally. Except as otherwise specifically prescribed herein, all accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the

Audited Financial Statements, except as otherwise specifically prescribed herein; _provided_, _however_, that calculations of Attributable Indebtedness under any Synthetic Lease or the implied interest component of any Synthetic Lease shall be made by the Company in accordance with accepted financial practice and consistent with the terms of such Synthetic Lease. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Company and its Subsidiaries shall be deemed to be carried at one hundred percent (100%) of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b)　　_Changes in GAAP_.  If at any time any change in GAAP (including the adoption of IFRS) would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Company or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Company shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); _provided that_, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Company shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  Without limiting the foregoing, leases shall continue to be classified and accounted for on a basis consistent with that reflected in the financial statements delivered by the Company under the Prepetition Credit Agreement for all purposes of this Agreement, notwithstanding any change in GAAP relating thereto, unless the parties hereto shall enter into a mutually acceptable amendment addressing such changes, as provided for above.

(c)　　[Reserved].

(d)　　_Consolidation of Variable Interest Entities_.  All references herein to consolidated financial statements of the Company and its Subsidiaries or to the determination of any amount for the Company and its Subsidiaries on a consolidated basis or any similar reference shall, in each case, be deemed to include each variable interest entity that the Company is required to consolidate pursuant to FASB ASC 810 as if such variable interest entity were a Subsidiary as defined herein.

1.04　　[Reserved].

1.05　　Times of Day; Rates

(a)　　_Times of Day_.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

(b)　　_Rates_.  The Administrative Agent does not warrant, nor accept responsibility, nor shall the Administrative Agent have any liability with respect to, the administration, submission or any other matter related to the rates in the definition of "Eurocurrency Base Rate" or with respect to any comparable or successor rate thereto.

ARTICLE II

THE COMMITMENTS AND CREDIT EXTENSIONS

CHAR1\1744985v7

2.01    <u>Commitments</u>.

(a)    Subject to the terms and conditions set forth herein, each Lender severally agrees to make loans (each such loan, a "<u>Revolving Loan</u>") to the Company in Dollars from time to time on any Business Day during the Availability Period in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Revolving Commitment; <u>provided</u>, <u>however</u>, that after giving effect to any Borrowing of Revolving Loans, (i) the Total Revolving Outstandings shall not exceed the Aggregate Revolving Commitments, and (ii) the Revolving Credit Exposure of any Lender shall not exceed such Lender's Revolving Commitment. Within the limits of each Lender's Revolving Commitment, and subject to the other terms and conditions hereof, the Company may borrow under this <u>Section 2.01</u>, prepay under <u>Section 2.05</u>, and reborrow under this <u>Section 2.01</u> any portion of the Revolving Loans made pursuant to the "DIP Commitment" as such term is used in and as set forth on <u>Schedule 2.01</u>. Revolving Loans may be Base Rate Loans or Eurocurrency Rate Loans, or a combination thereof, as further provided herein.

(b)    Subject to the DIP Orders, following entry of the Final DIP Order and approval set forth therein, $100,000,000 of the principal amount of loans under the Prepetition Credit Agreement shall be deemed automatically refunded, refinanced, replaced and made as Loan hereunder in the amounts for each Lender set forth under "Pre-Petition Rollup Commitments" set forth on <u>Schedule 2.01</u>; <u>provided</u>, <u>that</u>, notwithstanding anything in this Agreement to the contrary, any portion of the Revolving Loans made pursuant to the "Pre-Petition Rollup Commitment" shall not be reborrowed under this <u>Section 2.01</u> after repayment thereof.

2.02    <u>Borrowings, Conversions and Continuations of Loans</u>.

(a)    Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which may be given by: (A) telephone or (B) a Loan Notice; <u>provided</u> that any telephonic notice must be confirmed immediately by delivery to the Administrative Agent of a Loan Notice. Each such notice must be received by the Administrative Agent not later than 11:00 a.m. (i) three (3) Business Days prior to the requested date of any Borrowing of, conversion to or continuation of Eurocurrency Rate Loans denominated in Dollars or of any conversion of Eurocurrency Rate Loans denominated in Dollars to Base Rate Loans, and (ii) on the requested date of any Borrowing of Base Rate Loans. Each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof. Each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $250,000 or a whole multiple of $250,000 in excess thereof. Each Loan Notice shall specify (i) whether the Borrower is requesting a Borrowing of Revolving Loans, a conversion of Revolving Loans from one Type to the other, or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of a Loan in a Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Loans shall be made as, or converted to, Base Rate Loans. Any automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of Eurocurrency Rate Loans in any Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month.

(b)      Following receipt of a Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the applicable Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans as described in the preceding subsection.  In the case of a Borrowing, each Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office later than 1:00 p.m. on the Business Day specified in the applicable Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 5.02 (and, if such Borrowing is the initial Credit Extension, Section 5.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by (i) crediting the account of the Borrower on the books of Bank of America with the amount of such funds or (ii) wire transfer of such funds, in each case in accordance with instructions provided to (and acceptable to) the Administrative Agent by the Borrower.

(c)      Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of the Interest Period for such Eurocurrency Rate Loan.  During the existence of a Default, no Loans may be requested as, converted to or continued as Eurocurrency Rate Loans without the consent of the Required Lenders, and the Required Lenders may demand that any or all of the then outstanding Eurocurrency Rate Loans denominated in Dollars be converted immediately to Base Rate Loans.

(d)      Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.

(e)      After giving effect to all Borrowings, all conversions of Loans from one Type to the other, and all continuations of Loans as the same Type, there shall not be more than five (5) Interest Periods in effect with respect to all Loans.

(f)      [Reserved].

(g)      Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower, the Administrative Agent and such Lender.

2.03      [Reserved].

2.04      [Reserved].

2.05      Prepayments.

(a)      Voluntary Prepayments.

(i)      Revolving Loans.    In the sole discretion of the Loan Parties, the Borrower may, upon notice from the Borrower to the Administrative Agent pursuant to delivery to the Administrative Agent of a Notice of Loan Prepayment, at any time or from time to time voluntarily prepay Revolving Loans in whole or in part without premium or penalty; provided that, unless otherwise agreed by the Administrative Agent,

31

(A) such notice must be received by the Administrative Agent not later than 12:00 noon (1) three (3) Business Days prior to any date of prepayment of Eurocurrency Rate Loans denominated in Dollars, and (2) on the date of prepayment of Base Rate Loans; (B) any such prepayment of Eurocurrency Rate Loans shall be in a principal amount of $250,000 or a whole multiple of $250,000 in excess thereof (or, if less, the entire principal amount thereof then outstanding); (C) any prepayment of Base Rate Loans shall be in a principal amount of $250,000 or a whole multiple of $250,000 in excess thereof (or, if less, the entire principal amount thereof then outstanding); and (D) any prepayment of the Revolving Loans shall be applied as directed by the Borrower among the portion of the Revolving Loans made pursuant to the "DIP Commitment" (as such term is used in and as set forth on Schedule 2.01) and the portion of the Revolving Loans made pursuant to the "Pre-Petition Rollup Commitment" (as such term is used in and as set forth on Schedule 2.01); provided, that, if the Borrower does not specify how such prepayment shall be applied, such prepayment shall be applied first to the portion of the Revolving Loans made pursuant to the "DIP Commitment" (as such term is used in and as set forth on Schedule 2.01). Each such notice shall specify the date and amount of such prepayment, the Type(s) of Loans to be prepaid and, if Eurocurrency Rate Loans are to be prepaid, the Interest Period(s) of such Loans. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Eurocurrency Rate Loan shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to Section 3.05. Subject to Section 2.15, each such prepayment shall be applied to the Loans of the Lenders in accordance with their respective Applicable Percentages.

(ii)     [Reserved].

(b)     Mandatory Prepayments of Loans.

(i)     Revolving Commitments. If for any reason (1) at any time prior to the entry of the Final DIP Order the Total Revolving Outstandings at any time exceed $18,100,000 or (2) at any time after entry of the Final DIP Order, the Total Revolving Outstandings exceed the Aggregate Revolving Commitments then in effect, the Company shall immediately prepay Revolving Loans in an aggregate amount equal to such excess.

(ii)     Dispositions and Involuntary Dispositions. The Borrower shall prepay the Revolving Loans as hereinafter provided in an aggregate amount equal to one hundred percent (100%) of the Net Cash Proceeds received by any Loan Party or any Subsidiary from all Dispositions and Involuntary Dispositions within three (3) days of the date of such Disposition or Involuntary Disposition.

(iii)     Extraordinary Receipts. Immediately upon receipt by any Loan Party or any Subsidiary of any Extraordinary Receipt received by or paid to or for the account of any Loan Party or any of its Subsidiaries, and not otherwise included in clause (ii) of this Section 2.05(b), the Borrower shall prepay the Revolving Loans as hereinafter provided in an aggregate principal amount equal to one hundred percent (100%) of all Net Cash Proceeds received therefrom.

CHAR1\1744985v7

(iv)    Application of Mandatory Prepayments.    Each payment required pursuant to Section 2.05(b) shall be applied, first, to the payment of any fees or expenses owing to the Administrative Agent, second, to the payment of any fees or expenses owing to any Lender, third, to accrued and unpaid interest of the Revolving Loans, and fourth, to the principal of the Revolving Loans (with a corresponding reduction in the Aggregate Revolving Commitments in the cases of clauses (b)(ii) and (b)(iii)), as directed by the Administrative Agent among the portion of the Revolving Loans made pursuant to the "DIP Commitment" (as such term is used in and as set forth on Schedule 2.01) and the portion of the Revolving Loans made pursuant to the "Pre-Petition Rollup Commitment" (as such term is used in and as set forth on Schedule 2.01).

(v)    Within the parameters of the applications set forth above, prepayments shall be applied first to Base Rate Loans and then to Eurocurrency Rate Loans in direct order of Interest Period maturities.  All prepayments under this Section 2.05(b) shall be subject to Section 3.05, but otherwise without premium or penalty, and shall be accompanied by interest on the principal amount prepaid through the date of prepayment.

2.06    Termination or Reduction of Aggregate Revolving Commitments.

(a)    Optional Reductions.  The Company may, upon notice to the Administrative Agent, terminate the Aggregate Revolving Commitments, or from time to time permanently reduce the Aggregate Revolving Commitments to an amount not less than the Outstanding Amount of Revolving Loans; provided that (i) any such notice shall be received by the Administrative Agent not later than 12:00 noon five (5) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $250,000 or any whole multiple of $250,000 in excess thereof and (iii) the Company shall not terminate or reduce the Aggregate Revolving Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Outstandings would exceed the Aggregate Revolving Commitments.

(b)    Mandatory Reductions.  Notwithstanding anything to the contrary herein, all Commitments shall terminate on the Maturity Date.

(c)    Notice.  The Administrative Agent will promptly notify the Lenders of any termination or reduction of the Aggregate Revolving Commitments under this Section 2.06. Upon any reduction of the Aggregate Revolving Commitments, the Revolving Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. All fees in respect of the Aggregate Revolving Commitments accrued until the effective date of any termination of the Aggregate Revolving Commitments shall be paid on the effective date of such termination.

2.07    Repayment of Loans.  The Company shall repay to the Lenders the aggregate principal amount of all Revolving Loans outstanding on such date, together with all interest, fees and other amounts payable hereunder, on the earlier of (a) the date that is 30 days after the entry of the Interim DIP Order or (b) if the Final DIP Order is entered as and when required hereunder, the Maturity Date.

2.08    Interest.

(a)    Interest.  Subject to the provisions of subsection (b) below, (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the sum of the Eurocurrency Rate for such Interest Period plus the

Applicable Rate, and (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the sum of the Base Rate <u>plus</u> the Applicable Rate.  To the extent that any calculation of interest or any fee required to be paid under this Agreement shall be based on (or result in) a calculation that is less than zero, such calculation shall be deemed zero for purposes of this Agreement.

(b)    <u>Default Rate</u>.  Upon the occurrence and during the continuance of any Event of Default, at the election of the Administrative Agent with the written consent of the Required Lenders or at the written instruction of the Required Lenders, all outstanding Obligations shall bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.  Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable on demand.

(c)    <u>Interest Payments</u>.  Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

2.09    <u>Fees</u>.

(a)    <u>Commitment Fee</u>.  The Company shall pay to the Administrative Agent, for the account of each Lender in accordance with its Applicable Percentage, a commitment fee in Dollars (the "<u>Commitment Fee</u>") at a rate per annum equal to the product of (i) one half of one percent (0.50%) per annum <u>times</u> (ii) the actual daily amount by which the Aggregate Revolving Commitments exceed the Outstanding Amount of Revolving Loans, subject to adjustment as provided in <u>Section 2.15</u>.  For the avoidance of doubt, for purposes of determining the Commitment Fee, and the Commitment Fee shall be determined based on the full $23,500,000 of Revolving Commitments prior to entry of the Final DIP Order and thereafter.  The Commitment Fee shall accrue at all times during the Availability Period, including at any time during which one or more of the conditions in <u>Article V</u> is not met, and shall be due and payable monthly in arrears on the first Business Day of each month, commencing with the first such date to occur after the Closing Date, and on the Maturity Date; <u>provided</u>, <u>that</u> (A) no Commitment Fee shall accrue on the Revolving Commitment of a Defaulting Lender so long as such Lender shall be a Defaulting Lender and (B) any Commitment Fee accrued with respect to the Revolving Commitment of a Defaulting Lender during the period prior to the time such Lender became a Defaulting Lender and unpaid at such time shall not be payable by the Company so long as such Lender shall be a Defaulting Lender.  The Commitment Fee shall be calculated monthly in arrears.

(b)    <u>Fee Letter</u>.  The Company shall pay to the Administrative Agent for its own account, in Dollars, fees in the amounts and at the times specified in the Fee Letter.  Such fees shall be fully earned when paid and shall be non-refundable for any reason whatsoever.

2.10    <u>Computation of Interest and Fees</u>.  All computations of interest for Base Rate Loans (including Base Rate Loans determined by reference to the Eurocurrency Rate) shall be made on the basis of a year of three hundred sixty-five (365) or three hundred sixty-six (366) days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred sixty-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a three hundred sixty-five-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof,

for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.11    Evidence of Debt.

(a)    The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon.  Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a promissory note, which shall evidence such Lender's Loans in addition to such accounts or records.  Each such promissory note shall in the case of Revolving Loans, be in the form of Exhibit C (a "Revolving Note").  Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)    [Reserved]

2.12    Payments Generally; Administrative Agent's Clawback.

(a)    General.  All payments to be made by the Borrower shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  Subject to the definition of "Interest Period", if any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    (i)    Funding by Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Eurocurrency Rate Loans (or, in the case of any Borrowing of Base Rate Loans, prior to 12:00 noon on the date of such Borrowing) that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.02 (or, in the case of any Borrowing of Base Rate Loans, that such Lender has made such share available in accordance with and at the time required by Section 2.02) and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a

Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in Same Day Funds with interest thereon, for each day from and including the date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the Overnight Rate, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to Base Rate Loans. If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    Payments by Borrower; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in Same Day Funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Overnight Rate.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article V are not satisfied or waived in accordance with the terms hereof, the Administrative Agent promptly shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligations of Lenders Several. The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 11.04(c) are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 11.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 11.04(c).

(e)    Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

36

2.13    <u>Sharing of Payments by Lenders</u>.

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of, interest on or fee in respect of any of the Loans made by it, resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans or participations and accrued interest and fees thereon greater than its <u>pro rata</u> share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest and fees on their respective Loans and other amounts owing them, <u>provided</u> that:

(i)    if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)    the provisions of this Section shall not be construed to apply to (x) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to the Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

2.14    [Reserved].

2.15    <u>Defaulting Lenders</u>.

(a)    <u>Adjustments</u>.    Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    <u>Waivers and Amendments</u>.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and <u>Section 11.01</u>.

(ii)    <u>Defaulting Lender Waterfall</u>.  Any payment of principal, interest, fees or other amount received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article IX</u> or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to <u>Section 11.08</u>, shall be applied at such time or times as may be determined by the Administrative Agent as follows: <u>first</u>, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; <u>second</u>, [reserved]; <u>third</u>, [reserved]; <u>fourth</u>, as the Company may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender

has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; <u>fifth</u>, if so determined by the Administrative Agent and the Company, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; <u>sixth</u>, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>seventh</u>, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and <u>eighth</u>, to such Defaulting Lender or as otherwise may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; <u>provided</u>, <u>that</u>, if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in <u>Section 5.02</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a <u>pro rata</u> basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to <u>Section 2.15(a)(iv)</u>.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this <u>Section 2.15(a)(ii)</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii)    <u>Certain Fees</u>.  No Defaulting Lender shall be entitled to receive any fee payable under <u>Section 2.09(a)</u> for any period during which that Lender is a Defaulting Lender (and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender).

(b)    <u>Defaulting Lender Cure</u>.  If the Company and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a <u>pro rata</u> basis by the Lenders in accordance with their Applicable Percentages (without giving effect to <u>Section 2.15(a)(iv)</u>), whereupon such Lender will cease to be a Defaulting Lender; <u>provided</u>, <u>that</u>, no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; <u>provided</u>, <u>further</u>, <u>that</u>, except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

2.16    <u>Priority and Liens</u>.

(a)    <u>Superpriority Claims and Liens</u>. Each of the Loan Parties hereby covenants, represents and warrants that, upon entry of the Interim DIP Order, subject in all respects to the terms of the DIP Orders, the Obligations authorized by the DIP Orders of the Company and the Guarantors under the Loan Documents:

(i)       pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code, constitute joint and several allowed administrative expense claims in the Chapter 11 Case having superpriority over all administrative expenses of the kind specified in Section 364(c)(1), 503(b), 507(a)(2), 507(b) or 507(d) of the Bankruptcy Code;

(ii)      pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority (subject to Existing Liens, if any) Lien on all presently owned and hereafter acquired unencumbered tangible and intangible property and assets of the Company, the Guarantors and their respective estates (subject to Permitted Liens) wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action, investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds);

(iii)     pursuant to Section 364(d)(1) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority, senior priming Lien (the "Priming Lien") on the Prepetition Collateral, which Priming Lien shall prime all Liens securing the Prepetition Facility Obligations and any Liens that are junior thereto, and shall also be senior to any Liens arising after the Petition Date to provide adequate protection in respect of any Liens to which the Priming Lien is senior (collectively, the "Primed Liens"); and

(iv)     pursuant to Section 364(c)(3) of the Bankruptcy Code and the Collateral Documents, shall be secured by, and each Loan Party shall have granted to the Administrative Agent, for the benefit of the Secured Parties, a perfected junior priority Lien on all presently owned and hereafter acquired tangible and intangible property and assets of the Company, the Guarantors and their respective estates wherever located, and any proceeds and products thereof, including, without limitation, accounts, deposit accounts, cash, chattel paper, investment property, letter-of-credit rights, securities accounts, commercial tort claims, causes of action, investments, instruments, documents, inventory, contract rights, general intangibles, intellectual property, real property, fixtures, goods, equipment, vessels and other fixed assets and proceeds and products of all of the foregoing (including earnings and insurance proceeds) that are subject to Liens that are valid, properly perfected (before the Petition Date or in accordance with Section 546(b) of the Bankruptcy Code), non-avoidable and senior in priority as a matter of law (the "Existing Liens"); provided, that the Liens in favor of the Administrative Agent, for the benefit of the Secured Parties, shall not encumber any Excluded Property.

Each of the Loan Parties further covenants, represents and warrants that, subject to entry of the Final DIP Order and immediately and automatically upon Bankruptcy Court authorization of such grant pursuant to the Final DIP Order or otherwise, each Loan Party shall be deemed to have automatically granted to the Administrative Agent for the benefit of the holders of Obligations, as security for the Obligations, a first priority Lien on all proceeds and other property recovered in any Avoidance Action of the Loan Parties.  The Liens in favor of the Administrative Agent, for the benefit of the Secured Parties, described in this Section 2.16(a) shall be subject to the Carve-

Out, any senior Liens, if any, permitted under this Agreement and the other Loan Documents, and the rights of the cash management banks as set forth in the Cash Management Order.

(b)    <u>Collateral Security Perfection</u>. Each of the Loan Parties agrees to take all action that the Administrative Agent or the Required Lenders may reasonably request as a matter of nonbankruptcy law to perfect and protect the Administrative Agent's Liens for the benefit of the Secured Parties, and upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents and instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental authorizations and providing such other instruments and documents in recordable form as the Administrative Agent or any Lender may reasonably request. Each Loan Party hereby irrevocably authorizes the Administrative Agent at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (i) indicate the Collateral (x) as all assets of such Loan Party or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC, or (y) as being of an equal or lesser scope or with greater detail, and (ii) provide any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including (x) whether such Loan Party is an organization, the type of organization and any organization identification number issued to such Loan Party and, (y) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates. Such Loan Party agrees to use commercially reasonable efforts to furnish any such information to the Administrative Agent promptly upon request. Notwithstanding the provisions of this <u>Section 2.16(b)</u>, the Administrative Agent and the Lenders shall have the benefits of the Interim DIP Order and the Final DIP Order.

(c)    <u>Real Property</u>. Subject in all respects to the priorities set forth in <u>Section 2.16(a)</u> above and to the Carve-Out, the Company and the Guarantors shall grant to the Administrative Agent on behalf of the Secured Parties a security interest in, and mortgage on, all of the right, title and interest of the Company and the Guarantors in all real property, if any, owned or leased by the Company or any of the Guarantors, together in each case with all of the right, title and interest of the Company and such Guarantor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof, except to the extent constituting Excluded Property. The Company and the Guarantors shall acknowledge that, pursuant to the DIP Orders, the Liens in favor of the Administrative Agent on behalf of the Secured Parties in all of such real property and leasehold interests shall be perfected without the recordation of any instruments of mortgage or assignment and the Administrative Agent and the Lenders shall have the benefits of the DIP Orders.  For the avoidance of doubt, the Loan Parties will not enter into any fee mortgages or provide any additional Real Property Security Documents with respect to any real property owned or leased as of the Closing Date.

(d)    Except as otherwise agreed to by the Lenders, the Liens, Lien priorities, Superpriority Claims and other rights and remedies granted to the Secured Parties pursuant to the DIP Orders, this Agreement or the other Loan Documents (specifically including, but not limited to, the existence, perfection, enforceability and priority of the Liens provided for herein and therein, and the DIP Superpriority Claims provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Company or any other Loan Party (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by dismissal or conversion of the Chapter 11 Case, or by any other act or omission whatsoever.

(e)    In connection with any sale or Disposition of all or any portion of the Collateral, including in each case pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or as part of restructuring plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, or at any sale or foreclosure conducted by the Administrative Agent, in accordance with applicable law and, with respect to any credit bid, Section 363(k) of the Bankruptcy Code, the Company and each other Loan Party hereby gives the Administrative Agent (at the direction of the Required Lenders) the power and right, without assent by such Loan Party, to "credit bid" up to the full amount of all Obligations in order to purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral.

ARTICLE III

TAXES, YIELD PROTECTION AND ILLEGALITY

3.01    <u>Taxes</u>.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws.  If any applicable Laws (as determined in the good faith discretion of the Administrative Agent) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or a Loan Party, then the Administrative Agent or such Loan Party shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to <u>subsection (e)</u> below.

(ii)    If any Loan Party or the Administrative Agent shall be required by the Internal Revenue Code to withhold or deduct any Taxes, including both United States Federal backup withholding and withholding taxes, from any payment, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to <u>subsection (e)</u> below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Internal Revenue Code, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this <u>Section 3.01</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)    If any Loan Party or the Administrative Agent shall be required by any applicable Laws other than the Internal Revenue Code to withhold or deduct any Taxes from any payment, then (A) such Loan Party or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to <u>subsection (e)</u> below, (B) such Loan Party or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the

41

withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this <u>Section 3.01</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)    <u>Payment of Other Taxes by the Loan Parties</u>.  Without limiting the provisions of <u>subsection (a)</u> above, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Laws, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)    <u>Tax Indemnifications</u>.  (i) Each of the Loan Parties shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 3.01</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Company by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.  Each of the Loan Parties shall, and does hereby, jointly and severally indemnify the Administrative Agent, and shall make payment in respect thereof within ten (10) days after demand therefor, for any amount which a Lender for any reason fails to pay indefeasibly to the Administrative Agent as required pursuant to <u>Section 3.01(c)(ii)</u> below.

(i)    Each Lender shall, and does hereby, severally indemnify, and shall make payment in respect thereof within ten (10) days after demand therefor, (x) the Administrative Agent against any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (y) the Administrative Agent and the Loan Parties, as applicable, against any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 11.06(d)</u> relating to the maintenance of a Participant Register and (z) the Administrative Agent and the Loan Parties, as applicable, against any Excluded Taxes attributable to such Lender that are payable or paid by the Administrative Agent or a Loan Party in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this <u>clause (ii)</u>.

(d)    <u>Evidence of Payments</u>.  As soon as practicable, after any payment of Taxes by any Loan Party to a Governmental Authority as provided in this <u>Section 3.01</u>, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Status of Lenders; Tax Documentation.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Company and the Administrative Agent, at the time or times reasonably requested by the Company or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Company or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Company or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Company or the Administrative Agent as will enable the Company or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.01(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)    Without limiting the generality of the foregoing, in the event that the Company is a U.S. Person,

(A)    any Lender that is a U.S. Person shall deliver to the Company and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Administrative Agent), whichever of the following is applicable:

(I)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(II)    executed copies of Internal Revenue Service Form W-8ECI,

(III)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of Exhibit H-1

to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Company within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

(IV)   to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or Exhibit H-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of each such direct and indirect partner;

(C)   any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Company or the Administrative Agent), executed copies (or originals, as required) of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Company or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)   if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Company and the Administrative Agent at the time or times prescribed by Law and at such time or times reasonably requested by the Company or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Company or the Administrative Agent as may be necessary for the Company and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(ii)   Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 3.01 expires or becomes obsolete or inaccurate in any

respect, it shall update such form or certification or promptly notify the Company and the Administrative Agent in writing of its legal inability to do so.

(f)    <u>Treatment of Certain Refunds</u>.  Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified by any Loan Party or with respect to which any Loan Party has paid additional amounts pursuant to this <u>Section 3.01</u>, it shall pay to the Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by a Loan Party under this <u>Section 3.01</u> with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that the Loan Party, upon the request of the Recipient, agrees to repay the amount paid over to the Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Loan Party pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Loan Party or any other Person.

(g)    <u>Survival</u>.  Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

3.02    <u>Illegality</u>.

(a)    If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to perform any of its obligations hereunder or to make, maintain or fund or charge interest with respect to any Credit Extension or to determine or charge interest rates based upon the Eurocurrency Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the applicable interbank market, then, on notice thereof by such Lender to the Company through the Administrative Agent, (i) any obligation of such Lender to issue, make, maintain, fund or charge interest with respect to any such Credit Extension or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans, shall be suspended and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Eurocurrency Rate component of the Base Rate, the interest rate on which Base Rate Loans of such Lender, shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Company that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Company shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable and such Loans are denominated in Dollars,

convert all Eurocurrency Rate Loans of such Lender to Base Rate Loans (the interest rate on which Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Eurocurrency Rate component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon the Eurocurrency Rate, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Eurocurrency Rate component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon the Eurocurrency Rate.  Upon any such prepayment or conversion, the Company shall also pay accrued interest on the amount so prepaid or converted.

(b)     If, in any applicable jurisdiction, the Administrative Agent or any Lender or any domestic or foreign branch or Affiliate of such Lender (each a "Designated Lender") determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for the Administrative Agent or any Lender or its applicable Designated Lender to (i) perform any of its obligations hereunder or under any other Loan Document or (ii) fund or maintain its participation in any Loan, such Person shall promptly notify the Administrative Agent, then, upon the Administrative Agent notifying the Company, and until such notice by such Person is revoked, any obligation of such Person to issue, make, maintain, fund or charge interest or fees with respect to any such Credit Extension shall be suspended, and to the extent required by applicable Law, cancelled.  Upon receipt of such notice, the Loan Parties shall, (A) repay that Person's participation in the Loans or other applicable Obligations on the last day of the Interest Period for each Loan or other Obligation occurring after the Administrative Agent has notified the Company or, if earlier, the date specified by such Person in the notice delivered to the Administrative Agent (being no earlier than the last day of any applicable grace period permitted by applicable Law), (B) [reserved] and (C) take all reasonable actions requested by such Person to mitigate or avoid such illegality.

3.03     Inability to Determine Rates.

(a)     If in connection with any request for a Eurocurrency Rate Loan or a conversion to or continuation thereof, (a) the Administrative Agent determines that (A) deposits in Dollars are not being offered to banks in the applicable offshore interbank eurodollar market for Dollars for the applicable amount and Interest Period of such Eurocurrency Rate Loan, or (B) (1) adequate and reasonable means do not exist for determining the Eurocurrency Base Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan or in connection with an existing or proposed Base Rate Loan and (2) the circumstances described in Section 3.03(c)(i) do not apply (in each case with respect to this clause (i), "Impacted Loans"), or (ii) the Administrative Agent or the Required Lenders determine that for any reason the Eurocurrency Base Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Eurocurrency Rate Loan, the Administrative Agent will promptly notify the Company and all Lenders.  Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans shall be suspended (to the extent of the affected Eurocurrency Rate Loans or Interest Periods) and (y) in the event of a determination described in the preceding sentence with respect to the Eurocurrency Rate component of the Base Rate, the utilization of the Eurocurrency Rate component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (or, in the case of a determination by the Required Lenders described in clause (ii) of Section 3.03(a),

until the Administrative Agent upon instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans (to the extent of the affected Eurocurrency Rate Loans or Interest Periods) or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans of the amount specified therein and (ii) any outstanding affected Eurocurrency Rate Loans will be deemed to have been converted into Base Rate Loans at the end of the applicable Interest Period.

(b)    Notwithstanding the foregoing, if the Administrative Agent has made the determination described in clause (a)(i) of this Section 3.03, the Administrative Agent, in consultation with the Company and the Required Lenders, may establish an alternative interest rate for the applicable Impacted Loans, in which case, such alternative interest rate shall apply with respect to such Impacted Loans until (1) the Administrative Agent revokes the notice delivered with respect to the applicable Impacted Loans under clause (a)(i) of this Section 3.03, (2) the Administrative Agent or the Required Lenders notify the Administrative Agent and the Company that such alternative interest rate does not adequately and fairly reflect the cost to such Lenders of funding the applicable Impacted Loans, or (3) any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for such Lender or its applicable Lending Office to make, maintain or fund Loans whose interest is determined by reference to such alternative interest rate or to determine or charge interest rates based upon such rate or any Governmental Authority has imposed material restrictions on the authority of such Lender to do any of the foregoing and provides the Administrative Agent and the Company written notice thereof.

(c)    Notwithstanding anything to the contrary in this Agreement or any other Loan Documents, if the Administrative Agent determines (which determination shall be conclusive absent manifest error), or the Company or Required Lenders notify the Administrative Agent (with, in the case of the Required Lenders, a copy to the Company) that the Company or Required Lenders (as applicable) have determined, that:

(i)    adequate and reasonable means do not exist for ascertaining the Applicable Reference Rate for an Applicable Currency for any requested Interest Period, including, without limitation, because the Screen Rate for such Applicable Currency is not available or published on a current basis and such circumstances are unlikely to be temporary; or

(ii)    the administrator of the Screen Rate for an Applicable Currency or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Applicable Reference Rate for an Applicable Currency or the Screen Rate for an Applicable Currency shall no longer be made available, or used for determining the interest rate of loans denominated in such Applicable Currency, provided that, in each case, at the time of such statement, there is no successor administrator that is satisfactory to the Administrative Agent, that will continue to provide the Applicable Reference Rate for such Applicable Currency after such specific date (such specific date, the "Scheduled Unavailability Date"); or

(iii)    loans currently being executed, or that include language similar to that contained in this Section 3.03, are being executed or amended (as applicable) to incorporate or adopt a new benchmark interest rate to replace the Applicable Reference Rate for an Applicable Currency,

47

then, reasonably promptly after such determination by the Administrative Agent or receipt by the Administrative Agent of such notice, as applicable, the Administrative Agent and the Company may amend this Agreement solely for the purpose of replacing the Applicable Reference Rate for the Applicable Currency in accordance with this <u>Section 3.03</u> with (x) in the case of Dollars, one or more SOFR-Based Rates or (y) another alternate benchmark rate giving due consideration to any evolving or then existing convention for similar syndicated credit facilities syndicated in the U.S. and denominated in the Applicable Currency for such alternative benchmarks and, in each case, including any mathematical or other adjustments to such benchmark giving due consideration to any evolving or then existing convention for similar syndicated credit facilities syndicated in the U.S. and denominated in the Applicable Currency for such benchmarks, each of which adjustments or methods for calculating such adjustments shall be published on one or more information services as selected by the Administrative Agent from time to time in its reasonable discretion and may be periodically updated (each, an "<u>Adjustment</u>;" and any such proposed rate, a "<u>Successor Rate</u>"), and any such amendment shall become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent shall have posted such proposed amendment to all Lenders and the Company unless, prior to such time, Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders (A) in the case of an amendment to replace the Applicable Reference Rate with respect to Eurocurrency Rate Loans denominated in Dollars with a rate described in clause (x), object to any Adjustment; or (B) in the case of an amendment to replace the Applicable Reference Rate with respect to Eurocurrency Rate Loans denominated in the Applicable Currency with a rate described in clause (y), object to such amendment; <u>provided</u> that for the avoidance of doubt, in the case of clause (A), the Required Lenders shall not be entitled to object to any SOFR-Based Rate contained in any such amendment. Such Successor Rate for the Applicable Currency shall be applied in a manner consistent with market practice; <u>provided</u> that to the extent such market practice is not administratively feasible for the Administrative Agent, such Successor Rate for such Applicable Currency shall be applied in a manner as otherwise reasonably determined by the Administrative Agent.

If no Successor Rate has been determined for the Applicable Currency and the circumstances under clause (i) above exist or the Scheduled Unavailability Date has occurred (as applicable), the Administrative Agent will promptly so notify the Company and each Lender. Thereafter, (x) the obligation of the Lenders to make or maintain Eurocurrency Rate Loans in each such Applicable Currency shall be suspended, (to the extent of the affected Eurocurrency Rate Loans or Interest Periods), and (y) the Eurocurrency Rate component shall no longer be utilized in determining the Base Rate. Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans in each such affected Applicable Currency (to the extent of the affected Eurocurrency Rate Loans or Interest Periods) or, failing that, will be deemed to have converted each such request into a request for a Borrowing of Base Rate Loans denominated in Dollars in the Dollar Equivalent of the amount specified therein and (ii) any outstanding affected Eurocurrency Rate Loans will be deemed to have been converted into Base Rate Loans at the end of the applicable Interest Period.

Notwithstanding anything else herein, any definition of a Successor Rate for any currency shall provide that in no event shall such Successor Rate be less than one percent for purposes of this Agreement.

In connection with the implementation of a Successor Rate for Dollars, the Administrative Agent will have the right to make Successor Rate Conforming Changes with respect to Dollars from time to time and, notwithstanding anything to the contrary herein or in

CHAR1\1744985v7

any other Loan Document, any amendments implementing such Successor Rate Conforming Changes will become effective without any further action or consent of any other party to this Agreement; provided that, with respect to any such amendment effected, the Administrative Agent shall post each such amendment implementing such Successor Rate Conforming Changes for the Applicable Currency to the Lenders reasonably promptly after such amendment becomes effective.

3.04    Increased Costs.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by Section 3.04(e));

(ii)    subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurocurrency Rate Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making, converting to, continuing or maintaining any Loan (or of maintaining its obligation to make any such Loan), or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Company will, upon demand, pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered; provided, however, a Lender shall not be entitled to any compensation pursuant to this clause (a) to the extent such Lender is not imposing such charges or requesting such compensation from borrowers (similarly situated to the Borrower hereunder) under comparable syndicated credit facilities.

(b)    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then from time to time the Company will, upon demand, pay to such Lender, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; provided, however, a Lender shall not be entitled to any compensation pursuant to this clause (b) to the extent such Lender is not imposing such charges or requesting such compensation from borrowers (similarly situated to the Borrower hereunder) under comparable syndicated credit facilities.

(c)    [Reserved].

(d)    <u>Certificates for Reimbursement</u>.    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a), (b) or (c) of this Section and delivered to the Company shall be conclusive absent manifest error.  The Company shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(e)    <u>Delay in Requests</u>.    Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, <u>provided</u> that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Company of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) - month period referred to above shall be extended to include the period of retroactive effect thereof).

3.05    <u>Compensation for Losses</u>.

Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Company shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)    any continuation, conversion, payment or prepayment of any Eurocurrency Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)    any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Eurocurrency Rate Loan on the date or in the amount notified by the Borrower;

(c)    [reserved]; or

(d)    any assignment of a Eurocurrency Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Company pursuant to <u>Section 11.13</u>;

excluding any loss of anticipated profits but including any foreign exchange losses and any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained or from the performance of any foreign exchange contract.  The Company shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

For purposes of calculating amounts payable by the Company to the Lenders under this <u>Section 3.05</u>, each Lender shall be deemed to have funded each Eurocurrency Rate Loan made by it at the Eurocurrency Base Rate used in determining the Eurocurrency Rate for such Loan by a matching deposit or other borrowing in the offshore interbank market for Dollars for a comparable amount and for a comparable period, whether or not such Eurocurrency Rate Loan was in fact so funded.

3.06    <u>Mitigation Obligations; Replacement of Lenders</u>.

CHAR1\1744985v7

(a)    <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, or if any Lender gives a notice pursuant to <u>Section 3.02</u>, then at the request of the Company such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Section 3.01</u> or <u>3.04</u>, as the case may be, in the future, or eliminate the need for the notice pursuant to <u>Section 3.02</u>, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Company hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u> and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with <u>Section 3.06(a)</u>, the Company may replace such Lender in accordance with <u>Section 11.13</u>.

3.07    <u>[Reserved]</u>.

3.08    <u>Survival</u>.

All of the Borrower's obligations under this <u>Article III</u> shall survive termination of the Aggregate Revolving Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

ARTICLE IV

GUARANTY

4.01    <u>The Guaranty</u>.

Each of the Guarantors hereby jointly and severally guarantees to each Lender, each Treasury Management Bank and the Administrative Agent as hereinafter provided, as primary obligor and not as surety, the prompt payment of all Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof.  The Guarantors hereby further agree that if any of the Obligations are not paid in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), the Guarantors will, jointly and severally, promptly pay the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

Notwithstanding any provision to the contrary contained herein or in any other of the Loan Documents or Secured Treasury Management Agreements, the obligations of each Guarantor under this Agreement and the other Loan Documents shall be limited to an aggregate amount equal to the largest amount that would not render such obligations subject to avoidance under the Debtor Relief Laws or any comparable provisions of any applicable state Law.

51

4.02    Obligations Unconditional.

The obligations of the Guarantors under Section 4.01 are joint and several, absolute and unconditional, irrespective of the value, genuineness, validity, regularity or enforceability of any of the Loan Documents or Secured Treasury Management Agreements, or any other agreement or instrument referred to therein, or any substitution, release, impairment or exchange of any other guarantee of or security for any of the Obligations, and, to the fullest extent permitted by applicable Law, irrespective of any Law or regulation or other circumstance whatsoever which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, it being the intent of this Section 4.02 that the obligations of the Guarantors hereunder shall be absolute and unconditional under any and all circumstances.  Each Guarantor agrees that such Guarantor shall have no right of subrogation, indemnity, reimbursement or contribution against the Borrower or any other Guarantor for amounts paid under this Article IV until such time as the Obligations have been paid in full and the Commitments have expired or terminated.  Without limiting the generality of the foregoing, it is agreed that, to the fullest extent permitted by Law, the occurrence of any one or more of the following shall not alter or impair the liability of any Guarantor hereunder, which shall remain absolute and unconditional as described above:

(a)    at any time or from time to time, without notice to any Guarantor, the time for any performance of or compliance with any of the Obligations shall be extended, or such performance or compliance shall be waived;

(b)    any of the acts mentioned in any of the provisions of any of the Loan Documents, any Secured Treasury Management Agreement or any other agreement or instrument referred to in the Loan Documents or such Secured Treasury Management Agreements shall be done or omitted;

(c)    the maturity of any of the Obligations shall be accelerated, or any of the Obligations shall be modified, supplemented or amended in any respect, or any right under any of the Loan Documents or any Secured Treasury Management Agreement, or any other agreement or instrument referred to in the Loan Documents or such Secured Treasury Management Agreements shall be waived or any other guarantee of any of the Obligations or any security therefor shall be released, impaired or exchanged in whole or in part or otherwise dealt with;

(d)    any Lien granted to, or in favor of, the Administrative Agent or any Lender or Lenders as security for any of the Obligations shall fail to attach or be perfected; or

(e)    any of the Obligations shall be determined to be void or voidable (including, without limitation, for the benefit of any creditor of any Guarantor) or shall be subordinated to the claims of any Person (including, without limitation, any creditor of any Guarantor).

With respect to its obligations hereunder, each Guarantor hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the Administrative Agent or any Lender exhaust any right, power or remedy or proceed against any Person under any of the Loan Documents or any Secured Treasury Management Agreement, or any other agreement or instrument referred to in the Loan Documents or such Secured Treasury Management Agreements, or against any other Person under any other guarantee of, or security for, any of the Obligations.

CHAR1\1744985v7

4.03     Reinstatement.

The obligations of the Guarantors under this Article IV shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Person in respect of the Obligations is rescinded or must be otherwise restored by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise, and each Guarantor agrees that it will indemnify the Administrative Agent and each Lender on demand for all reasonable costs and expenses (including, without limitation, the fees, charges and disbursements of counsel) incurred by the Administrative Agent or such Lender in connection with such rescission or restoration, including any such costs and expenses incurred in defending against any claim alleging that such payment constituted a preference, fraudulent transfer or similar payment under any bankruptcy, insolvency or similar Law.

4.04     Certain Additional Waivers.

Each Guarantor agrees that such Guarantor shall have no right of recourse to security for the Obligations, except through the exercise of rights of subrogation pursuant to Section 4.02 and through the exercise of rights of contribution pursuant to Section 4.06.

4.05     Remedies.

The Guarantors agree that, to the fullest extent permitted by Law, as between the Guarantors, on the one hand, and the Administrative Agent and the Lenders, on the other hand, the Obligations may be declared to be forthwith due and payable as provided in Section 9.02 (and shall be deemed to have become automatically due and payable in the circumstances provided in said Section 9.02) for purposes of Section 4.01 notwithstanding any stay, injunction or other prohibition preventing such declaration (or preventing the Obligations from becoming automatically due and payable) as against any other Person and that, in the event of such declaration (or the Obligations being deemed to have become automatically due and payable), the Obligations (whether or not due and payable by any other Person) shall forthwith become due and payable by the Guarantors for purposes of Section 4.01. The Guarantors acknowledge and agree that their obligations hereunder are secured in accordance with the terms of the Collateral Documents and that the Lenders may exercise their remedies thereunder in accordance with the terms thereof.

4.06     Rights of Contribution.

The Guarantors hereby agree as among themselves that, if any Guarantor shall make an Excess Payment (as defined below), such Guarantor shall have a right of contribution from each other Guarantor in an amount equal to such other Guarantor's Contribution Share (as defined below) of such Excess Payment. The payment obligations of any Guarantor under this Section 4.06 shall be subordinate and subject in right of payment to the Obligations until such time as the Obligations have been paid-in-full and the Commitments have terminated, and none of the Guarantors shall exercise any right or remedy under this Section 4.06 against any other Guarantor until such Obligations have been paid-in-full and the Commitments have terminated. For purposes of this Section 4.06, (a) "Excess Payment" shall mean the amount paid by any Guarantor in excess of its Ratable Share of any Obligations; (b) "Ratable Share" shall mean, for any Guarantor in respect of any payment of Obligations, the ratio (expressed as a percentage) as of the date of such payment of Obligations of (i) the amount by which the aggregate present fair salable value of all of its assets and properties exceeds the amount of all debts and liabilities of such Guarantor (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of such Guarantor hereunder) to (ii) the amount by which the aggregate present fair salable value of all assets and other properties of all of the Loan Parties exceeds the amount of all of the debts and liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations

53

of the Loan Parties hereunder) of the Loan Parties; provided, however, that, for purposes of calculating the Ratable Shares of the Guarantors in respect of any payment of Obligations, any Guarantor that became a Guarantor subsequent to the date of any such payment shall be deemed to have been a Guarantor on the date of such payment and the financial information for such Guarantor as of the date such Guarantor became a Guarantor shall be utilized for such Guarantor in connection with such payment; and (c) "Contribution Share" shall mean, for any Guarantor in respect of any Excess Payment made by any other Guarantor, the ratio (expressed as a percentage) as of the date of such Excess Payment of (i) the amount by which the aggregate present fair salable value of all of its assets and properties exceeds the amount of all debts and liabilities of such Guarantor (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of such Guarantor hereunder) to (ii) the amount by which the aggregate present fair salable value of all assets and other properties of the Loan Parties other than the maker of such Excess Payment exceeds the amount of all of the debts and liabilities (including contingent, subordinated, unmatured, and unliquidated liabilities, but excluding the obligations of the Loan Parties) of the Loan Parties other than the maker of such Excess Payment; provided, however, that, for purposes of calculating the Contribution Shares of the Guarantors in respect of any Excess Payment, any Guarantor that became a Guarantor subsequent to the date of any such Excess Payment shall be deemed to have been a Guarantor on the date of such Excess Payment and the financial information for such Guarantor as of the date such Guarantor became a Guarantor shall be utilized for such Guarantor in connection with such Excess Payment.  This Section 4.06 shall not be deemed to affect any right of subrogation, indemnity, reimbursement or contribution that any Guarantor may have under Law against the Borrower in respect of any payment of Obligations.

4.07    Guarantee of Payment; Continuing Guarantee.

The guarantee in this Article IV is a guaranty of payment and not of collection, is a continuing guarantee, and shall apply to all Obligations whenever arising.

4.08    [Reserved].

4.09    Appointment of Company.

Each of the Loan Parties hereby appoints the Company to act as its agent for all purposes of this Agreement, the other Loan Documents and all other documents and electronic platforms entered into in connection herewith and agrees that (a) the Company may execute such documents and provide such authorizations on behalf of such Loan Parties as the Company deems appropriate in its sole discretion and each Loan Party shall be obligated by all of the terms of any such document and/or authorization executed on its behalf, (b) any notice or communication delivered by the Administrative Agent or a Lender to the Company shall be deemed delivered to each Loan Party and (c) the Administrative Agent or the Lenders may accept, and be permitted to rely on, any document, authorization, instrument or agreement executed by the Company on behalf of each of the Loan Parties.

ARTICLE V

CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

5.01    Conditions of Initial Credit Extension.

This Agreement shall become effective upon and the obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a)    <u>Loan Documents</u>.  Receipt by the Administrative Agent of executed counterparts of this Agreement and the other Loan Documents, each properly executed by a Responsible Officer of the signing Loan Party and, in the case of this Agreement, by each Lender.

(b)    <u>Opinions of Counsel</u>. Receipt by the Administrative Agent of favorable opinions of legal counsel to the Loan Parties, addressed to the Administrative Agent and each Lender, dated as of the Closing Date, and in form and substance reasonably satisfactory to the Administrative Agent.

(c)    <u>Organization Documents, Resolutions, Etc</u>.  Receipt by the Administrative Agent of the following, in form and substance satisfactory to the Administrative Agent and its legal counsel:

(i)    copies of the Organization Documents of each Loan Party certified to be true and complete as of a recent date by the appropriate Governmental Authority of the state or other jurisdiction of its incorporation or organization, where applicable, and certified by a secretary or assistant secretary of such Loan Party to be true and correct as of the Closing Date;

(ii)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party; and

(iii)    such documents and certifications as the Administrative Agent may require to evidence that each Loan Party is duly organized or formed, and is validly existing, in good standing and qualified to engage in business in its state of organization or formation.

(d)    <u>Perfection and Priority of Liens</u>.  Receipt by the Administrative Agent of the following:

(i)    searches of Uniform Commercial Code filings in the jurisdiction of formation of each Loan Party or where a filing would need to be made in order to perfect the Administrative Agent's security interest in the Collateral, copies of the financing statements on file in such jurisdictions and evidence that no Liens exist other than Permitted Liens;

(ii)    UCC financing statements for each appropriate jurisdiction as is necessary, in the Administrative Agent's sole discretion, to perfect the Administrative Agent's security interest in the Collateral;

(iii)    subject to Section 4(a) of the Pledge Agreement, all certificates evidencing any certificated Equity Interests pledged to the Administrative Agent pursuant to the Pledge Agreement, together with duly executed in blank and undated stock powers attached thereto;

(iv)    searches of ownership of, and Liens on, intellectual property of each Loan Party in the appropriate governmental offices; and

(v)    duly executed notices of grant of security interest in the form required by the Security Agreement as are necessary, in the Administrative Agent's sole discretion, to perfect the Administrative Agent's security interest in the intellectual property of the Loan Parties.

(e)    Closing Certificate.  Receipt by the Administrative Agent of a certificate signed by a Responsible Officer of the Company certifying that the conditions specified in Sections 5.02(a) and (b) have been satisfied.

(f)    Fees.  Receipt by the Administrative Agent and the Lenders of any fees required to be paid on or before the Closing Date, to the extent invoiced prior to the Closing Date.

(g)    Attorney Costs.  Unless waived by the Administrative Agent, the Company shall have paid all fees, charges and disbursements of counsel to the Administrative Agent to the extent invoiced prior to the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Company and the Administrative Agent).

(h)    Request for Credit Extension.  Receipt by the Administrative Agent of a Request for Credit Extension in accordance with the requirements hereof with respect to the Loans to be made on the Closing Date.

(i)    Due Diligence; PATRIOT ACT; Beneficial Ownership Certification.  The Administrative Agent and the Lenders shall have received all documentation and other information required under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act, at least three Business Days prior to the requested Borrowing.  If the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, it shall deliver a certification regarding beneficial ownership required by the Beneficial Ownership Regulation to each Lender that so requests.

(j)    Collateral Requirement.  On or prior to the Closing Date, the Security Agreement, the Pledge Agreement and the Interim DIP Order, upon entry of the Interim DIP Order, shall be effective to create in favor of the Administrative Agent, for the benefit of the holders of the Obligations, a legal, valid and enforceable: (i) first priority (except for Existing Liens entitled to priority under applicable Laws) perfected (to the extent required by the Security Agreement, the Pledge Agreement or the DIP Orders) security interest in and Lien on the Collateral, subject to the Carve-Out; and (ii) with respect to the Collateral subject to Existing Liens entitled to priority under applicable Laws, junior perfected (to the extent required by the Security Agreement, the Pledge Agreement or the DIP Orders) security interest in and Lien on such Collateral, subject to such applicable Existing Lien and the Carve-Out.

(k)    Interim DIP Order. Prior to the Closing Date, the Bankruptcy Court shall have entered the Interim DIP Order, which Interim DIP Order shall be in full force and effect and shall not have been amended, modified, stayed or reversed. If the Interim DIP Order is the subject of a pending appeal in any respect, neither the Interim DIP Order nor the making of the Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(l)    First Day Orders. On the Closing Date, all of the "first day orders" entered reasonably soon after the commencement of the Chapter 11 Case by the Bankruptcy Court in the Chapter 11 Case and all adequate protection payments and critical vendor payments approved by the Bankruptcy Court in the Interim DIP Order or otherwise shall be reasonably satisfactory in form and substance to the Administrative Agent and the Lenders in all material respects.

(m)    Other Orders. On the Closing Date, all orders (if any) providing for payment of Prepetition indebtedness of the Loan Parties or affecting in any way the Obligations or Collateral submitted for entry in the Chapter 11 Case shall be reasonably satisfactory in form and substance to the Administrative Agent, as entered, and shall not deviate from the form thereof approved by the Administrative Agent in any material respect which is adverse to the interests of the Lenders or the Prepetition Lenders.

(n)    Budget. On the Closing Date, the Lenders shall have received and be satisfied with the initial Budget.

(o)    Chapter 11 Case Jurisdiction. The Loan Parties shall have commenced the Chapter 11 Case in the Bankruptcy Court.

Without limiting the generality of the provisions of the last paragraph of Section 10.03, for purposes of determining compliance with the conditions specified in this Section 5.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

5.02    Conditions to all Credit Extensions.

The obligation of each Lender to honor any Request for Credit Extension is subject to the following conditions precedent:

(a)    Representations and Warranties.  The representations and warranties of the Company and each other Loan Party contained in Article VI or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (or, if any such representation or warranty is qualified by materiality or Material Adverse Effect, it shall be true and correct in all respects) on and as of the date of such Credit Extension, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality or reference to Material Adverse Effect) as of such earlier date.

(b)    Default.  No Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds thereof.

(c)    Request for Credit Extension.  The Administrative Agent and shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)    Orders. At the time of each Borrowing, and also after giving effect thereto, (i) if an extension of credit has been requested before the Final DIP Order has been entered by the Bankruptcy Court, the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified, rescinded or amended in any respect without the prior written

consent of the Administrative Agent other than in respect of immaterial modifications (with the prior written consent of the Administrative Agent not to be unreasonably withheld for such modifications), and (ii) if an extension of credit is requested after the Final DIP Order has been entered by the Bankruptcy Court, the Administrative Agent and the Lenders shall have received a copy of the Final DIP Order and the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, stayed, modified or amended in any respect without the prior written consent of the Administrative Agent (with the prior written consent of the Administrative Agent not to be unreasonably withheld for such modifications). If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such DIP Order, the making of the Loans or the performance by any Loan Party of any of its obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal. The Loan Parties, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

Each Request for Credit Extension submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in <u>Sections 5.02(a)</u>, <u>(b)</u>, and <u>(d)</u> have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

The Loan Parties represent and warrant to the Administrative Agent and the Lenders that:

6.01    <u>Existence, Qualification and Power</u>.

Each Loan Party (a) is duly organized or formed, validly existing and in good standing (if applicable in such jurisdiction) under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, and (c) is duly qualified and is licensed and in good standing (if applicable in such jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.02    <u>Authorization; No Contravention</u>.

Subject to the entry of the Interim DIP Order and, as applicable, the Final DIP Order, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is party have been duly authorized by all necessary corporate or other organizational action, and do not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than any Liens created under the Interim DIP Order and, as applicable, the Final DIP Order in favor of the Administrative Agent, on behalf of the holders of the Obligations, and the Prepetition Lenders), or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law (including, without limitation, Regulation U or Regulation X issued by the FRB), except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (b) to the

extent that such conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

6.03    Governmental Authorization; Other Consents.

Subject to the entry of the Interim DIP Order and, as applicable, the Final DIP Order, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document other than (a) those that have already been obtained and are in full force and effect and (b) filings to perfect the Liens created by the Collateral Documents.

6.04    Binding Effect.

Each Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  Each Loan Document constitutes a legal, valid and binding obligation of each Loan Party that is party thereto, enforceable against each such Loan Party in accordance with its terms.

6.05    No Material Adverse Effect.

Since the Petition Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

6.06    Litigation.

Except for the Chapter 11 Case, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of its Subsidiaries or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby or (b) if determined adversely, could reasonably be expected to have a Material Adverse Effect.

6.07    No Default.

(a)    Neither any Loan Party nor any Subsidiary is in default under or with respect to any Contractual Obligation that could reasonably be expected to have a Material Adverse Effect (excluding any default arising solely as a result of the commencement of the Chapter 11 Case and the effects therefore or arising under any agreement that the applicable Loan Party has rejected under Section 365 of the Bankruptcy Code not in prohibition of this Agreement).

(b)    No Default has occurred and is continuing.

6.08    Ownership of Property; Liens.

Each Loan Party and its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The property of each Loan Party and its Subsidiaries is subject to no Liens, other than Permitted Liens.

6.09    Environmental Compliance.

59

Except as could not reasonably be expected to have a Material Adverse Effect:

(a)    Each of the Facilities and all operations at the Facilities are in compliance with all applicable Environmental Laws, and there is no violation of any Environmental Law with respect to the Facilities or the Businesses, and there are no conditions relating to the Facilities or the Businesses that could give rise to liability under any applicable Environmental Laws.

(b)    None of the Facilities contains, or has previously contained, any Hazardous Materials at, on or under the Facilities in amounts or concentrations that constitute or constituted a violation of, or could give rise to liability under, Environmental Laws.

(c)    Neither any Loan Party nor any Subsidiary has received any written notice of, or inquiry from any Governmental Authority regarding, any violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Facilities or the Businesses, nor does any Responsible Officer of any Loan Party have knowledge or reason to believe that any such notice will be received or is being threatened.

(d)    Hazardous Materials have not been transported or disposed of from the Facilities, or generated, treated, stored or disposed of at, on or under any of the Facilities or any other location, in each case by or on behalf of any Loan Party or any Subsidiary in violation of, or in a manner that would be reasonably likely to give rise to liability under, any applicable Environmental Law.

(e)    No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Loan Parties, threatened, under any Environmental Law to which any Loan Party or any Subsidiary is or will be named as a party, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to any Loan Party, any Subsidiary, the Facilities or the Businesses.

(f)    There has been no release or threat of release of Hazardous Materials at or from the Facilities, or arising from or related to the operations (including, without limitation, disposal) of any Loan Party or any Subsidiary in connection with the Facilities or otherwise in connection with the Businesses, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws.

6.10    <u>Insurance</u>.

(a)    The properties of the Loan Parties and their Subsidiaries are insured with financially sound and reputable insurance companies not Affiliates of such Persons, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the applicable Loan Party or the applicable Subsidiary operates. The insurance coverage of the Loan Parties and their Subsidiaries as in effect on the Closing Date is outlined as to carrier, policy number, expiration date, type, amount and deductibles on <u>Schedule 6.10</u>.

(b)    The Company and its Subsidiaries maintain, if available, fully paid flood hazard insurance on all real property that is located in a special flood hazard area and that constitutes Collateral, on such terms and in such amounts as required by The National Flood Insurance Reform Act of 1994 or as otherwise required by the Administrative Agent.

60

6.11   <u>Taxes</u>.

The Loan Parties and their Subsidiaries have filed all federal, state and other tax returns and reports required to be filed, and have paid all federal, state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except (i) those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP, (ii) those excused or prohibited from being paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code or (iii) to the extent that failure to so file or pay could not reasonably be expected to result in a Material Adverse Effect.  There is no proposed tax assessment against any Loan Party or any Subsidiary that would, if made, have a Material Adverse Effect.  Neither any Loan Party nor any Subsidiary thereof is party to any tax sharing agreement.

6.12   <u>ERISA Compliance</u>.

(a)   Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (i) each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other federal or state Laws; and (ii) each Pension Plan that is intended to be a qualified plan under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Internal Revenue Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Internal Revenue Code or an application for such a letter is currently being processed by the Internal Revenue Service, and to the best knowledge of the Loan Parties, nothing has occurred that would prevent, or cause the loss of, such tax-qualified status.

(b)   There are no pending or, to the best knowledge of the Loan Parties, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  To the knowledge of the Loan Parties, there has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)   Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (i) no ERISA Event has occurred and neither the Company nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan; (ii) the Company and each ERISA Affiliate has met all material applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained; (iii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Internal Revenue Code) is sixty percent (60%) or higher and neither the Company nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below sixty percent (60%) as of the most recent valuation date; (iv) neither the Company nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid; (v) neither the Company nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA; and (vi) no Pension Plan has been terminated by the plan administrator thereof.

(d)    The Company represents and warrants as of the Closing Date that the Company is not and will not be using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Commitments.

6.13    Subsidiaries.

Set forth on Schedule 6.13 is a complete and accurate list as of the Closing Date of each Subsidiary of any Loan Party, together with (a) jurisdiction of formation, (b) number of shares of each class of Equity Interests outstanding, (c) number and percentage of outstanding shares of each class owned (directly or indirectly) by any Loan Party or any Subsidiary and (d) number and effect, if exercised, of all outstanding options, warrants, rights of conversion or purchase and all other similar rights with respect thereto.  The outstanding Equity Interests of each Subsidiary of any Loan Party are validly issued, fully paid and non-assessable.

6.14    Margin Regulations; Investment Company Act.

(a)    The Borrower is not engaged nor will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.  Following the application of the proceeds of each Borrowing, not more than twenty-five percent (25%) of the value of the assets (either of the Borrower only or of the Company and its Subsidiaries on a consolidated basis) subject to the provisions of Section 8.01 or Section 8.05 or subject to any restriction contained in any agreement or instrument between the Borrower and any Lender or any Affiliate of any Lender relating to Indebtedness and within the scope of Section 9.01(e) will be margin stock.

(b)    None of any Loan Party, any Person Controlling any Loan Party, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

6.15    Disclosure.

Each Loan Party has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.  The information included in any Beneficial Ownership Certification, if applicable, is true and correct in all respects.

6.16    Compliance with Laws.

Each Loan Party and each Subsidiary is in compliance with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which

(a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

6.17    Intellectual Property; Licenses, Etc.

Each Loan Party and its Subsidiaries own, or possess the legal right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses.  Set forth on Schedule 6.17 is a list of all IP Rights registered or pending registration with the United States Copyright Office or the United States Patent and Trademark Office and owned by each Loan Party as of the Closing Date.  Except for such claims and infringements that could not reasonably be expected to have a Material Adverse Effect, no claim has been asserted and is pending by any Person challenging or questioning the use of any IP Rights or the validity or effectiveness of any IP Rights, nor does any Loan Party know of any such claim, and, to the knowledge of the Loan Parties, the use of any IP Rights by any Loan Party or any of its Subsidiaries or the granting of a right or a license in respect of any IP Rights from any Loan Party or any of its Subsidiaries does not infringe on the rights of any Person.  As of the Closing Date, none of the IP Rights owned by any of the Loan Parties or any of its Subsidiaries is subject to any licensing agreement or similar arrangement except as set forth on Schedule 6.17.

6.18    Bankruptcy Matters.

(a)    The Interim DIP Order and, at all times after its entry by the Bankruptcy Court, the Final DIP Order, is in full force and effect, and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Administrative Agent.

(b)    Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lenders shall, subject to the provisions of the Interim DIP Order or Final DIP Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder in accordance with the terms hereof, without further application to or order by the Bankruptcy Court.

(c)    If either the Interim DIP Order or the Final DIP Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by the Loan Parties of any of their obligations under any of the Loan Documents is or shall be the subject of a presently effective stay pending appeal. The Loan Parties, the Administrative Agent and the Lenders shall be entitled to rely in good faith upon the DIP Orders, notwithstanding objection thereto or appeal therefrom by any interested party. The Loan Parties, the Administrative Agent and the Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

(d)    The Loan Parties are in compliance with all material agreements entered into and all orders entered by the Bankruptcy Court from and after the Petition Date.

6.19    Perfection of Security Interests in the Collateral.

The Collateral Documents, together with the entry of the Interim DIP Order and, as applicable, the Final DIP Order, create valid security interests in, and Liens on, the Collateral purported to be covered thereby, which security interests and Liens are currently perfected (to the extent required by the Security

Agreement, the Pledge Agreement or the DIP Orders) security interests and Liens, prior to all other Liens other than Permitted Liens.

6.20    Business Locations.

Set forth on Schedule 6.20(a) is a list of all real property located in the United States that is owned or leased by the Loan Parties as of the Closing Date.  Set forth on Schedule 6.20(b) is the tax payer identification number and organizational identification number of each Loan Party as of the Closing Date. The exact legal name and state of organization of (a) the Company is as set forth on the signature pages hereto and (b) each Guarantor is (i) as set forth on the signature pages hereto or (ii) as may be otherwise disclosed by the Loan Parties to the Administrative Agent in accordance with Section 8.13(c).  Except as set forth on Schedule 6.20(c), no Loan Party has during the five years preceding the Closing Date (i) changed its legal name, (ii) changed its state of formation, or (iii) been party to a merger, consolidation or other change in structure.  Except as set forth on Schedule 6.20(d), no Loan Party that is a Domestic Subsidiary has opened or maintained or otherwise has deposit or other accounts where money or securities are or may be deposited or maintained with any Person as of the Closing Date.

6.21    Labor Matters.

There are no collective bargaining agreements (except as set forth on Schedule 6.21) or Multiemployer Plans covering the employees of any Loan Party or any Subsidiary as of the Closing Date and neither any Loan Party nor any Subsidiary has suffered any strikes, walkouts, work stoppages or other material labor difficulty within the last five years.

6.22    OFAC.

Neither the Company, nor any of its Subsidiaries, nor, to the knowledge of the Company and its Subsidiaries, any director, officer, employee, agent, affiliate or representative thereof, is an individual or entity that is, or is owned or controlled by any individual or entity that is (i) currently the subject or target of any Sanctions, (ii) included on OFAC's List of Specially Designated Nationals, HMT's Consolidated List of Financial Sanctions Targets and the Investment Ban List, or any similar list enforced by any other relevant sanctions authority or (iii) located, organized or resident in a Designated Jurisdiction.

6.23    [Reserved].

6.24    [Reserved].

6.25    No Affected Financial Institution.

No Loan Party is an Affected Financial Institution.

6.26    Anti-Corruption Laws.

The Loan Parties and their Subsidiaries have conducted their businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010, and other similar anti-corruption legislation in other jurisdictions and have instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

6.27    Regulation H.

CHAR1\1744985v7

No real property subject to a Mortgage is a Flood Hazard Property unless the Administrative Agent shall have received the following: (a) the applicable Loan Party's written acknowledgment of receipt of written notification from the Administrative Agent (i) as to the fact that such real property subject to a Mortgage is a Flood Hazard Property, (ii) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program and (iii) such other flood hazard determination forms, notices and confirmations thereof as requested by the Administrative Agent and (b) copies of insurance policies or certificates of insurance of the applicable Loan Party evidencing flood insurance on such terms and in such amounts as required by The National Flood Insurance Reform Act of 1994 or as otherwise required by the Administrative Agent and naming the Administrative Agent as loss payee on behalf of the Lenders. All flood hazard insurance policies required hereunder have been obtained and remain in full force and effect, and the premiums thereon have been paid in full.

6.28    Use of Proceeds.

After giving effect to each Credit Extension and the use of proceeds thereof, the Company shall be in compliance with Section 7.11 hereof.

ARTICLE VII

AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, the Loan Parties shall and shall cause each Subsidiary to:

7.01    Financial Statements.

(a)    Deliver to the Administrative Agent for distribution to the Lenders by 11:59 p.m. on Thursday of each week commencing after completion of the first two calendar weeks after the Petition Date: (i) then current cash balance calculations; (ii) cash flow reconciliations showing actual payments versus budgeted items in the Budget for prior periods ended (with (x) explanation of any Measurement Item variance greater than 20% of the budgeted amounts and $500,000, and (y) a permitted negative variance on the cumulative actual Net Cash Flow of 15% of the budgeted amounts, the measurement of which shall begin in week two of the Chapter 11 Case and continue through week five of the Chapter 11 Case and 10% of the budgeted amounts thereafter); and (iii) an updated budget (the "Updated Budget") of projected receipts and expenditures for the following 13-week period, which Updated Budget shall be in the form and contain the detail set forth in the initial Budget (for clarification, the initial Budget shall serve as the "Budget" for purposes of this Agreement until the Company has obtained approval of the expenditures in the periods covered in the Updated Budgets from the Administrative Agent (such approval not to be unreasonably withheld) on behalf of the Required Lenders in writing (including via email), in the Administrative Agent's reasonable discretion, and at the time of such approval and thereafter (until the receipt of approval from the Administrative Agent of a subsequent Updated Budget) the Updated Budget shall become the "Budget" for purposes of this Agreement, with approval for Updated Budgets being sought not more often than every four (4) weeks).

(b)    Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Administrative Agent and the Required Lenders, within thirty (30) days of the end of each calendar month of the Company, a consolidated balance sheet of the Company and its Subsidiaries as at the end of such calendar month, and the related consolidated statements of

income or operations, and cash flows for such calendar month, all in reasonable detail and certified by a Responsible Officer of the Company as fairly presenting the financial condition, results of operations, and cash flows of the Company and its Subsidiaries on a consolidated basis in accordance with GAAP, subject only to the absence of footnotes.

7.02    <u>Other Information</u>.

Deliver to the Administrative Agent and each Lender:

(a)    promptly upon providing such information or documents to an Unsecured Creditors Committee, copies of all financial information and related documents provided by or on behalf of the Loan Parties in the Chapter 11 Case;

(b)    a weekly report from the Investment Bankers and the management team of the Loan Parties (with any written reports being in form and substance reasonably satisfactory to Administrative Agent), which report will address such items as are reasonably requested by the Administrative Agent, including addressing the status of the marketing and sale process of the Loan Parties;

(c)    promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act, the Beneficial Ownership Regulation or other applicable anti-money laundering laws; and

(d)    to the extent any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, an updated Beneficial Ownership Certification promptly following any change in the information provided in the Beneficial Ownership Certification delivered to any Lender in relation to such Loan Party that would result in a change to the list of beneficial owners identified in such certification.

Documents required to be delivered pursuant to <u>Section 7.01(b)</u> (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Company posts such documents, or provides a link thereto on the Company's website on the Internet at the website address listed on <u>Schedule 11.02</u>; or (ii) on which such documents are posted on the Company's behalf on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); <u>provided</u>, <u>that</u>: (i) the Company shall deliver paper copies of such documents to the Administrative Agent or any Lender upon its request to the Company to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Company shall notify the Administrative Agent and each Lender (by facsimile or e-mail) of the posting of any such documents and provide to the Administrative Agent by e-mail electronic versions (<u>i.e.</u>, soft copies) of such documents.  The Administrative Agent shall have no obligation to request the delivery of or to maintain paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Company with any such request for delivery by a Lender, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

The Company hereby acknowledges that (a) the Administrative Agent may, but shall not be obligated to, make available to the Lenders materials and/or information provided by or on behalf of the Company hereunder (collectively, the "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks, Syndtrak, ClearPar or a substantially similar electronic transmission system (the "<u>Platform</u>")

and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive material non-public information with respect to the Company or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Person's securities.  The Company hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Company shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Company or its securities for purposes of United States federal and state securities Laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 11.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Side Information;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform that is not designated as "Public Side Information."   Notwithstanding the foregoing, the Borrower shall be under no obligation to mark any Borrower Materials "PUBLIC."

7.03    Notices.

(a)    Promptly (and in any event, within two (2) Business Days) notify the Administrative Agent and each Lender of the occurrence of any Default.

(b)    Promptly (and in any event, within five (5) Business Days) notify the Administrative Agent and each Lender of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)    [Reserved].

(d)    Promptly (and in any event, within five (5) Business Days) notify the Administrative Agent and each Lender of any material change in accounting policies or financial reporting practices by the Company or any Subsidiary.

(e)    Commencing on the Closing Date, promptly (and in any event, within three (3) Business Days) deliver to the Administrative Agent notice of entering into, or amending, any customer supplier financing program and a copy of all agreements entered into by the Company or any Subsidiary in connection therewith.

Each notice pursuant to this Section 7.03(a) through (e) shall be accompanied by a statement of a Responsible Officer of the Company setting forth details of the occurrence referred to therein and stating what action the applicable Loan Party has taken and proposes to take with respect thereto.  Each notice pursuant to Section 7.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

7.04    Payment of Obligations.

Pay and discharge, as the same shall become due and payable, all its obligations and liabilities, including (a) all Postpetition tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, except to the extent (i) the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Loan Party Subsidiary, (ii) such liabilities, assessments and governmental charges or levies are

67

excused or prohibited from being paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code or (iii) to the extent that failure to pay taxes could not reasonably be expected to result in a Material Adverse Effect; and (b) all lawful Postpetition claims which, if unpaid, would by law become a Lien upon its property.

7.05    <u>Preservation of Existence, Etc</u>.

(a)    Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by <u>Section 8.04</u> or <u>8.05</u>.

(b)    Preserve, renew and maintain in full force and effect its good standing (if applicable in such jurisdiction) under the Laws of the jurisdiction of its organization, except to the extent the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(c)    Take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(d)    Preserve or renew all of its material registered patents, copyrights, trademarks, trade names and service marks, the non-preservation or non-renewal of which could reasonably be expected to have a Material Adverse Effect.

7.06    <u>Maintenance of Properties</u>.

(a)    Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted.

(b)    Make all necessary repairs thereto and renewals and replacements thereof, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(c)    Use the standard of care typical in the industry in the operation and maintenance of its facilities.

7.07    <u>Maintenance of Insurance</u>.

(a)    Maintain with financially sound and reputable insurance companies not Affiliates of the Company, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other Persons.

(b)    Without limiting the foregoing, if any portion of any real property subject to a Mortgage is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Company shall, or shall cause each Loan Party to (v) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the

Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent. The Company shall promptly notify the Administrative Agent of any real property subject to a Mortgage that is, or becomes, a Flood Hazard Property.

(c)    By the earlier of (i) the date that is thirty (30) days after the Closing Date (or such longer period as may be approved by the Administrative Agent in its sole discretion) and (ii) the date on which the Final Order is entered, cause the Administrative Agent and its successors and/or assigns to be named as lender's loss payee or mortgagee as its interest may appear, and/or additional insured with respect to any such insurance providing liability coverage or coverage in respect of any Collateral, and cause each provider of any such insurance to agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to the Administrative Agent, that it will give the Administrative Agent thirty days (or such lesser amount as the Administrative Agent may agree) prior written notice before any such policy or policies shall be altered or canceled.

7.08    <u>Compliance with Laws</u>.

Comply with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

7.09    <u>Books and Records</u>.

(a)    Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Loan Party or such Subsidiary, as the case may be.

(b)    Maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over such Loan Party or such Subsidiary, as the case may be.

7.10    <u>Inspection Rights</u>.

Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Company and at such reasonable times during normal business hours and as often as may be desired, upon reasonable advance notice to the Company; <u>provided</u>, that any Lender and its agents may only undertake such actions when accompanying the Administrative Agent and all such actions shall be subject to public health and safety limitations.

7.11    <u>Use of Proceeds</u>.

Each Loan Party shall, and shall cause each of its Subsidiaries to, use the proceeds of the Credit Extensions, subject to the Interim DIP Order and the Final DIP Order: (a) for working capital and other general purposes of the Loan Parties, including the payment of professional fees and expenses; (b) as provided in the DIP Orders to pay the reasonable fees and expenses of the Administrative Agent and the

Lenders (including the reasonable fees and expenses of counsel and financial advisors); (c) to pay claims in respect of certain Prepetition creditors, which may include, without limitation, employees, customers, lienholders, insurers, vendors and taxing authorities in the ordinary course, in each case to the extent authorized by the Interim DIP Order or the Final DIP Order, as applicable; and (d) to make adequate protection payments to the Prepetition Agent and the Prepetition Lenders to the extent authorized by orders of the Bankruptcy Court, in each case in accordance with the Budget; provided, that in no event shall the proceeds of any Credit Extension be used (i) in contravention of any Law or of any Loan Documents; or (ii) for the payment of professional fees and disbursements incurred in connection with any challenge to (A) the amount, extent, priority, validity or enforcement of the indebtedness of the Loan Parties owing to the Administrative Agent, the Lenders, the Prepetition Agent or the Prepetition Lenders or (B) the collateral securing such indebtedness or the amount, extent, perfection, priority, enforcement or validity of the Liens granted in favor of the Administrative Agent, the Lenders, the Prepetition Agent or the Prepetition Lenders with respect thereto; provided, notwithstanding anything to the contrary herein, no more than an aggregate of $50,000 of the Carve-Out may be used by the Unsecured Creditors Committee to investigate the matters in the foregoing clauses (A) and (B).

7.12    [Reserved].

7.13    ERISA Compliance.

Do, and cause each of its ERISA Affiliates to do, each of the following: (a) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other federal or state Law; (b) cause each Plan that is qualified under Section 401(a) of the Internal Revenue Code to maintain such qualification; and (c) make all required contributions to any Plan subject to Section 412, Section 430 or Section 431 of the Internal Revenue Code, unless the failure to take any such actions in subsections (a), (b), or (c) would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

7.14    Pledged Assets.

(a)    Equity Interests.    Cause one hundred percent (100%) of the issued and outstanding Equity Interests of each Subsidiary directly owned by a Loan Party to be subject at all times to a first priority, perfected Lien in favor of the Administrative Agent, for the benefit of the holders of the Obligations, pursuant to the terms and conditions of the Collateral Documents, together with opinions of counsel and any filings and deliveries necessary in connection therewith to perfect the security interests therein, all in form and substance satisfactory to the Administrative Agent; provided, however, that, if any such pledge with respect to the Equity Interests of any Foreign Subsidiary of a Loan Party (a) would reasonably be expected to cause the undistributed earnings of such Foreign Subsidiary as determined for United States federal income tax purposes to be treated as a deemed dividend to such Foreign Subsidiary's United States parent or (b) would reasonably be expected to cause any material adverse tax consequences for the Loan Parties or any of their Subsidiaries, then the foregoing pledge requirement shall be limited to the pledge of the maximum amount of voting and/or non-voting Equity Interests (if any) that would reasonably be expected to not result in or cause such deemed dividend and/or other material adverse tax consequences.   For the avoidance of doubt, no foreign law governed pledge agreements shall be required.

(b)    Account Control Agreements.   The Loan Parties (other than Loan Parties that are Foreign Subsidiaries) shall not open, maintain or otherwise have any deposit or other account where money or securities are or may be deposited or maintained with any Person, other than (i) foreign accounts, (ii) deposit accounts or securities accounts that are maintained at all times with

depositary institutions or financial institutions, as applicable, as to which the Administrative Agent shall have received an agreement, among a Loan Party, a depository institution or securities intermediary and the Administrative Agent, which agreement is in form and substance acceptable to the Administrative Agent and which provides the Administrative Agent with "control" (as such term is used in Article 9 of the Uniform Commercial Code) over the deposit account(s) or securities account(s) described therein (provided that, to the extent the Prepetition Agent has "control" over such Accounts, the Prepetition Agent shall be deemed to maintain such "control" on behalf of the Administrative Agent and no other action shall be required hereunder), (iii) deposit accounts established solely as payroll, tax or escrow accounts, (iv) zero balance accounts and (v) other deposit accounts, so long as at any time the balance in any such account does not exceed $100,000 and the aggregate balance in all such accounts does not exceed $300,000.

(c)     Other Property.  Cause all property (other than Excluded Property) of each Loan Party to be subject at all times to first priority, perfected (to the extent required by the Security Agreement, the Pledge Agreement or the DIP Orders) and, in the case of real property (whether leased or owned), title insured Liens in favor of the Administrative Agent to secure the Obligations pursuant to the Collateral Documents or, with respect to any such property acquired subsequent to the Closing Date, such other additional security documents as the Administrative Agent shall reasonably request (subject to Permitted Liens) and, in connection with the foregoing, deliver to the Administrative Agent such other documentation as the Administrative Agent may request including filings and deliveries necessary to perfect such Liens, Organization Documents, resolutions, Real Property Security Documents, landlord's waivers and favorable opinions of counsel to such Person, all in form, content and scope reasonably satisfactory to the Administrative Agent.  With respect to real property (other than Excluded Property) acquired after the Closing Date, the Loan Parties shall have sixty days (or such later time as agreed by the Administrative Agent) to deliver Real Property Security Documents with respect thereto.

7.15    [Reserved].

7.16    Anti-Corruption Laws.

Conduct its businesses in compliance with the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 and other similar anti-corruption legislation in other jurisdictions and maintain policies and procedures designed to promote and achieve compliance with such laws.

7.17    Budget; Conference Calls.

Cause appropriate members of the Loan Parties' management and the Investment Banker to be available to discuss (telephonically) the Budget, the reports delivered pursuant to Sections 7.02(a), 7.02(c) or 7.19(a) and such other information relating to the Chapter 11 Case and the financial results and condition of the Loan Parties and their Subsidiaries, from time to time (but not more than weekly), with the Administrative Agent and the Lenders, as and when reasonably requested by the Administrative Agent.

7.18    Milestones.

The Loan Parties and their Subsidiaries shall comply with the sale milestones set forth in the Interim DIP Order and the Final DIP Order (the "Sale Milestones").

7.19    Investment Banker.

The Loan Parties shall (i) retain and continue to retain the Investment Bankers with the terms of such engagement satisfactory to the Administrative Agent, (ii) seek court approval of the retention Investment Bankers within three (3) days of the Petition Date *nunc pro tunc* to the Petition Date and (iii) obtain court approval of the Investment Bankers and on a final basis within thirty (30) days of the Petition Date.

7.20    Postpetition Obligations.

Except as otherwise permitted by the Bankruptcy Code, each of the Loan Parties shall perform and comply with all of their material Postpetition obligations, including, without limitation, compliance in all respects with the Interim DIP Order and the Final DIP Order (as applicable) and payment of all Postpetition taxes, in each case except to the extent that any such obligation is being contested in good faith by appropriate proceedings with adequate reserves set aside therefor.

ARTICLE VIII

NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, no Loan Party shall, nor shall it permit any Subsidiary to, directly or indirectly:

8.01    Liens.

Create, incur, assume or suffer to exist any Postpetition Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens pursuant to any Loan Document;

(b)    Liens existing on the Closing Date and listed on Schedule 8.01 and any renewals or extensions thereof, provided that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased and (iii) the direct or any contingent obligor with respect thereto is not changed;

(c)    Liens (other than Liens imposed under ERISA) for taxes, assessments or governmental charges or levies not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen and suppliers and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the ordinary course of business, provided that such Liens secure only amounts not yet due and payable or, if due and payable, are unfiled and no other action has been taken to enforce the same or are being contested in good faith by appropriate proceedings for which adequate reserves determined in accordance with GAAP have been established;

(e)    pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)    deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business, in an aggregate amount not to exceed $1,000,000;

(g)    easements, rights-of-way, restrictions and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h)    [reserved];

(i)    leases or subleases granted to others not interfering in any material respect with the business of any Loan Party or any of its Subsidiaries;

(j)    any interest of title of a lessor under, and Liens arising from UCC financing statements (or equivalent filings, registrations or agreements in foreign jurisdictions) relating to, leases permitted by this Agreement;

(k)    Liens of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection;

(l)    Liens of sellers of goods to the Company and any of its Subsidiaries arising under Article 2 of the Uniform Commercial Code or similar provisions of applicable law in the ordinary course of business, covering only the goods sold and securing only the unpaid purchase price for such goods and related expenses;

(m)    Liens securing the Prepetition Facility Obligations and any obligation of the Prepetition Dutch Borrower under the Prepetition Credit Agreement;

(n)    Liens on deposits made with utilities pursuant to any order of the Bankruptcy Court in an aggregate principal amount not to exceed $1,000,000;

(o)    Liens in existence as of the Petition Date;

(p)    Liens junior to the senior Liens contemplated in Section 2.16 that are granted by the Interim DIP Order or the Final DIP Order pursuant to section 364(d)(1) of the Bankruptcy Code as adequate protection in respect of any Liens to which the Priming Lien is senior; provided, that the Interim DIP Order and the Final DIP Order shall provide that the holders of such junior adequate protection Liens shall not be permitted to take any action to foreclose their rights with respect to such junior Liens as long as any amounts are outstanding under the Loan Documents or the Lenders have any Commitments hereunder; and

(q)    Liens pursuant to the Carve-Out.

8.02    Investments.

Make any Investments, except:

(a)    Investments held by the Company or such Subsidiary in the form of cash or Cash Equivalents;

73

(b)      the Company and its Subsidiaries may continue to own the Investments owned by them as of the Closing Date and described in <u>Schedule 8.02</u>;

(c)      (i) subject to <u>Section 8.21</u>, Investments by the Company and its Subsidiaries in Loan Parties, (ii) Investments by the Company and its Subsidiaries in their respective Subsidiaries outstanding on the Closing Date, and (iii) Investments by the Loan Parties in any Subsidiary domiciled in Mexico in an aggregate amount not to exceed $1,000,000;

(d)      Investments by any Subsidiary of the Company that is not a Loan Party in any other Subsidiary of the Company that is not a Loan Party;

(e)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(f)      Guarantees permitted by <u>Section 8.03</u>;

(g)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, or upon foreclosure or other transfer of title with respect to any secured investment, loan or advance permitted hereunder, in each case in the ordinary course of business;

(h)      Investments made pursuant to the Cash Management Order; and

(i)      Investments consisting of Chinese bankers acceptances in an aggregate amount not to exceed $4,000,000.

8.03    <u>Indebtedness</u>.

Create, incur, assume or suffer to exist any Postpetition Indebtedness, except:

(a)      Indebtedness under the Loan Documents and the Prepetition Loan Documents;

(b)      intercompany Indebtedness between Loan Parties and any other intercompany Indebtedness permitted under <u>Section 8.02</u>;

(c)      Indebtedness existing or arising under any Secured Treasury Management Agreement entered into in the ordinary course of business;

(d)      Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit, securities, and commodities accounts arising in the ordinary course of business;

(e)      to the extent constituting Indebtedness, the Carve-Out;

(f)      to the extent constituting Indebtedness, any adequate protection provided to the Administrative Agent, the Lenders, the Treasury Management Banks, and the Prepetition Lenders (as defined in the Interim DIP Order) under the DIP Orders, as amended pursuant to the terms of this Agreement;

(g)        Guarantees with respect to (i) recourse obligations resulting from endorsement of negotiable instruments for collection in the ordinary course of business, (ii) surety, appeal and performance bonds obtained in the ordinary course of business, and (iii) workers' compensation and similar obligations of the Company and its Subsidiaries incurred in the ordinary course of business;

(h)        other unsecured Indebtedness incurred in the ordinary course of business, which Indebtedness shall not constitute a Superpriority Claim that is senior to or *pari passu* with the Secured Obligations;

(i)        Indebtedness consisting of the financing of insurance premiums (with an insurance premium financing company) in the ordinary course of business; and

(j)        Indebtedness of any Foreign Subsidiary resulting from the sale of Swedish accounts receivable from a customer pursuant to such customer's supplier financing program to a third party financial institution; <u>provided</u>, that the aggregate principal amount of such Indebtedness shall not exceed $5,000,000 at any time.

8.04        Fundamental Changes.

Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person; provided that, notwithstanding the foregoing provisions of this Section 8.04, the Company may liquidate, wind-up, or dissolve any Subsidiary of the Company after a Disposition that (a) results in the sale of substantially all of the assets of such Subsidiary and (b) is in compliance with the provisions of this Agreement and the DIP Orders.

8.05        Dispositions.

Make any Disposition, except the Company may liquidate, wind-up or dissolve any Subsidiary of the Company after a Disposition that (a) results in the sale of substantially all of the assets of such Subsidiary and (ii) is in compliance with the provisions of this Agreement and the DIP Orders.

8.06        Restricted Payments.

Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that, so long as such Restricted Payments are not inconsistent with the Budget, subject to Permitted Variances:

(a)        subject to Section 8.21, each Subsidiary may make Restricted Payments to the Company or any  Guarantor; and

(b)        the Company and each Subsidiary may make Restricted Payments for the payment of Taxes.

8.07        Change in Nature of Business.

Engage in any material line of business substantially different from those lines of business conducted by the Company and its Subsidiaries on the Closing Date or any business substantially related or incidental thereto in a manner that would be materially adverse to the Administrative Agent or the Lenders, except for (a) changes resulting from asset sales permitted under the Loan Documents, (b)

changes made in connection with the Loan Parties' long-term business plans as contemplated by the Budget and (c) as required by the Bankruptcy Court or the Bankruptcy Code.

       8.08     Transactions with Affiliates and Insiders.

       Enter into or permit to exist any transaction or series of transactions with any officer, director or Affiliate of such Person other than (a) those transactions that exist or are contemplated on the Closing Date and set forth in Schedule 8.08 hereto, (b) advances of working capital to any Loan Party, (c) transfers of cash and assets to any Loan Party, (d) intercompany transactions expressly permitted by Section 8.02, Section 8.03, Section 8.04, Section 8.05 or Section 8.06, (e) normal and reasonable compensation and reimbursement of expenses of officers and directors in the ordinary course of business and (f) except as otherwise specifically limited in this Agreement, other transactions which are entered into in the ordinary course of such Person's business on terms and conditions substantially as favorable to such Person as would be obtainable by it in a comparable arms-length transaction with a Person other than an officer, director or Affiliate.

       8.09     Burdensome Agreements.

       Enter into, or permit to exist, any Contractual Obligation that (a) encumbers or restricts the ability of any such Person to (i) make Restricted Payments to any Loan Party, (ii) pay any Indebtedness or other obligations owed to any Loan Party, (iii) make loans or advances to any Loan Party, (iv) transfer any of its property to any Loan Party, (v) pledge its property pursuant to the Loan Documents or any renewals, refinancings, exchanges, refundings or extension thereof or (vi) act as a Loan Party pursuant to the Loan Documents or any renewals, refinancings, exchanges, refundings or extension thereof, except (in respect of any of the matters referred to in clauses (i)-(v) above) for (1) this Agreement and the other Loan Documents, (2) any document or instrument governing Indebtedness incurred pursuant to Section 8.03(e), provided that any such restriction contained therein relates only to the asset or assets constructed or acquired in connection therewith, (3) any Permitted Lien or any document or instrument governing any Permitted Lien, provided that any such restriction contained therein relates only to the asset or assets subject to such Permitted Lien or (4) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 8.05 pending the consummation of such sale, or (b) requires the grant of any security for any obligation if such property is given as security for the Obligations.

       8.10     Use of Proceeds.

       Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the FRB) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

       8.11     Financial Covenant.

       Fail to comply with the Budget, subject to Permitted Variances.

       8.12     Prepayment of Other Indebtedness, Etc.

       Make (or give any notice with respect thereto) any voluntary or optional payment or prepayment or redemption or acquisition for value of (including without limitation, by way of depositing money or securities with the trustee with respect thereto before due for the purpose of paying when due), refund,

refinance or exchange of any Indebtedness of any Loan Party or any Subsidiary (other than Indebtedness arising under the Loan Documents).

8.13    Organization Documents; Fiscal Year; Legal Name, State of Formation and Form of Entity.

(a)    Amend, modify or change its Organization Documents in a manner adverse to the Lenders.

(b)    Change its fiscal year.

(c)    Without providing ten (10) days prior written notice to the Administrative Agent, change its name, state of formation or form of organization.

8.14    Ownership of Subsidiaries.

Notwithstanding any other provisions of this Agreement to the contrary, (a) permit any Person (other than any Loan Party or any Wholly Owned Subsidiary of the Company) to own any Equity Interests of any Subsidiary of any Loan Party, except to qualify directors where required by applicable Law or to satisfy other requirements of applicable Law with respect to the ownership of Equity Interests of Foreign Subsidiaries, (b) permit any Loan Party or any Subsidiary of any Loan Party to issue or have outstanding any shares of preferred Equity Interests, (c) create, incur, assume or suffer to exist any Lien on any Equity Interests of any Subsidiary of any Loan Party, except for Permitted Liens or (d) have any Subsidiary other than the Subsidiaries identified on Schedule 6.13.

8.15    Sale Leasebacks.

Enter into any Sale and Leaseback Transaction.

8.16    Sanctions.

Directly or indirectly, use the proceeds or any Credit Extension, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity, to fund any activities or business with any individual or entity, or in any Designated Jurisdiction that, at the time of such funding, is the subject of any Sanctions, or in any other manner that will result in a violation by any individual or entity (including any individual or entity participating in the transaction, whether as Lender, Administrative Agent, or otherwise) of Sanctions.

8.17    Consolidated Capital Expenditures.

Permit Consolidated Capital Expenditures; provided that the Loan Parties and their Subsidiaries may make Consolidated Capital Expenditures during the Chapter 11 Case in an amount not to exceed $5,500,000.

8.18    Anti-Corruption Laws.

Directly or indirectly use any Credit Extension or the proceeds of any Credit Extension for any purpose which would breach the United States Foreign Corrupt Practices Act of 1977, the UK Bribery Act 2010 or other similar anti-corruption legislation in other jurisdictions.

8.19    Budget.

CHAR1\1744985v7

Make any expenditures outside of the ordinary course of business unless consistent with the Budget and approved by the Bankruptcy Court to the extent required.

8.20    <u>Bankruptcy Matters</u>.

(a)    Unless consented to by the Administrative Agent, at any time, seek or consent to any reversal, modification, amendment, stay or vacation of (i) any "first day order" entered by the Bankruptcy Court in the Chapter 11 Case, if such reversal, modification, amendment, stay or vacation could have an adverse effect on the rights of the Lenders under this Agreement, (ii) the Interim DIP Order or (iii) the Final DIP Order;

(b)    unless consented to by the Administrative Agent, at any time, seek or consent to a priority for any administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising) of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code equal or superior to the priority of the Secured Parties in respect of the Obligations, other than for the Carve-Out and as otherwise expressly permitted by this Agreement or the DIP Orders;

(c)    unless consented to by the Administrative Agent, permit the incurrence of any administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising) of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105(a), 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code equal or superior to the priority of the superpriority adequate protection claims of the Prepetition Lenders granted under the DIP Orders, other than for the Carve-Out, the Obligations under this Agreement and as expressly permitted by this Agreement or the DIP Orders;

(d)    file or permit to be filed with the Bankruptcy Court any of the following unless such motion, pleading, proposed order or other document is in form and substance: (1) satisfactory to the Administrative Agent in its sole discretion in the case of (i) any motion seeking approval of any DIP Order, and any proposed order relating thereto or (ii) any pleading or proposed order relating to the Loan Documents; and (2) reasonably satisfactory to the Administrative Agent and the Required Lenders in the case of (i) any motion to extend or otherwise modify the Loan Parties' exclusive periods set forth in Section 1121 of the Bankruptcy Code, and any proposed order relating thereto, (ii) any motion seeking approval of bidding procedures or any sale or other disposition of any Loan Party's assets, and any proposed order relating thereto, including, without limitation, any proposed form of bidding procedures or proposed sale order, or (iii) any motion or proposed form of order relating to any management equity plan, incentive, retention or severance plan;

(e)    file or permit to be filed with the Bankruptcy Court any Plan of Reorganization, related disclosure statement, motion to approve any Plan of Reorganization or related disclosure statement or any form of order relating to the foregoing, in each case unless such filing is in form and substance satisfactory to the Administrative Agent and the Required Lenders in their sole discretion; or

(f)    unless consented to by the Administrative Agent, prior to the date on which the Obligations have been paid in cash in full and the Commitments have been cancelled and terminated, (i) pay any administrative expense claims of the Loan Parties except (A) the Obligations then due and payable hereunder or (B) other administrative expense set forth in the

Budget and professional claims set forth in the Budget, in each case to the extent and having the order of priority set forth in the DIP Orders or (ii) file with the Bankruptcy Court any alternative debtor-in-possession financing proposal that does not provide for the Obligations and the Prepetition Facility Obligations to be paid in cash in full and for the Commitments to be cancelled and terminated.

8.21    Foreign Subsidiaries.

Notwithstanding anything to the contrary contained herein or in any other Loan Document:

(a)    no Loan Party shall repatriate any cash or Cash Equivalents from a Foreign Subsidiary other than in the ordinary course and consistent with past business practices between such Loan Party and such Subsidiary; and

(b)    no Foreign Subsidiary, including without limitation, the Prepetition Dutch Borrower, shall be permitted to make or declare any Restricted Payment to a  Loan Party without the prior written consent of the Administrative Agent.

ARTICLE IX

EVENTS OF DEFAULT AND REMEDIES

9.01    Events of Default.

Any of the following shall constitute an Event of Default:

(a)    Non-Payment.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within three (3) Business Days after the same becomes due, any interest on any Loan, or any fee due hereunder, or (iii) within five (5) Business Days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)    Specific Covenants.  Any Loan Party fails to perform or observe any term, covenant or agreement contained in any of Section 7.01, 7.02, 7.03, 7.05, 7.10, 7.11, 7.12 or 7.14 or Article VIII; or

(c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for ten (10) days; or

(d)    Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading when made or deemed made; or

(e)    Cross-Default.  (i) Any Loan Party or any Subsidiary (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to

79

observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; provided that, with respect to any such failure that occurred prior to the Petition Date or with respect to the Prepetition Credit Agreement, such failure or event shall be an Event of Default solely to the extent not subject to the automatic stay by the Bankruptcy Court or (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which the Company or any Subsidiary is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which the Company or any Subsidiary is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by the Company or such Subsidiary as a result thereof is greater than the Threshold Amount; provided that, with respect to any such occurrence prior to the Petition Date or with respect to the Prepetition Credit Agreement, such occurrence shall be an Event of Default solely to the extent not subject to the automatic stay by the Bankruptcy Court; or

(f)    Bankruptcy Matters.  Any of the following shall occur:

(i)    any Chapter 11 Case shall be dismissed (which dismissal does not require as a condition to such dismissal the termination of the Lenders' Commitments and the payment in full in cash of all Secured Obligations and the Prepetition Facility Obligations) or converted to a case under Chapter 7 of the Bankruptcy Code or the Loan Parties (or any of them) shall file a motion or other pleading seeking the dismissal or conversion of any Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Required Lenders; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any Chapter 11 Case, provided that the appointment of a Chapter 11 trustee or officer or examiner with enlarged powers shall not be an Event of Default hereunder if (A) such relief is sought by the Administrative Agent or (B) the Required Lenders waive such Event of Default in connection with such appointment; the Board of Directors of one or more of the Loan Parties shall authorize a liquidation of any Loan Party's business, except with the prior written consent of the Administrative Agent; an application shall be filed by the Loan Parties for the approval of any other Superpriority Claim (other than the Carve-Out, which shall have a Superpriority Claim ranking senior to the Secured Obligations, and which shall be paid by the Loan Parties at the times and in the amounts permitted by an order of the Bankruptcy Court) or any Primed Liens in any Chapter 11 Case which is equal to or senior to the claims of the Lenders against the Loan Parties hereunder or under any of the other Loan Documents if it is not used to repay the Secured Obligations in full in cash, or there shall arise or be granted any such senior or pari passu Superpriority Claim; or the Loan Parties shall file an application or motion for the approval of any Lien in any Chapter 11 Case that is *pari passu* with or senior to the Liens of the Secured Parties or the Liens of the Prepetition Agent and the Prepetition Lenders granted or created

hereunder, under any of the other Loan Documents or either of the Orders (other than Liens of third parties securing the Carve-Out and any other Liens permitted by this Agreement and the other Loan Documents, which shall have the respective priorities set forth in the Interim DIP Order, the Final DIP Order or this Agreement, as applicable);

(ii)    the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code pertaining to the Collateral to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Loan Parties in an amount in excess of $250,000, individually or in the aggregate (except as otherwise permitted in writing by the Administrative Agent) or (ii) permit other actions that would have a Material Adverse Effect;

(iii)    (1) the Final Order Entry Date shall not have occurred on or prior to the date occurring thirty (30) calendar days after the entry of the Interim DIP Order, (2) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, vacating or otherwise amending, supplementing or modifying the Interim DIP Order and/or the Final DIP Order without the prior written consent of the Administrative Agent, or any Loan Party shall apply for authority to do so, without the prior written consent of the Administrative Agent, (3) an order with respect to the Chapter 11 Case shall be entered by the Bankruptcy Court without the express prior written consent of the Required Lenders to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Loan Parties equal or superior to the priority of the Secured Parties in respect of the Secured Obligations except as otherwise provided in this Agreement, (4) [reserved], (5) the Interim DIP Order and/or the Final DIP Order shall cease to create a valid and perfected first priority Lien on the Collateral or otherwise cease to be valid and binding and in full force and effect, (6) [reserved], (7) any Loan Party shall seek any modification of the Interim DIP Order and/or the Final DIP Order or assert in any pleading filed in any court that any material provision of the Interim DIP Order and/or the Final DIP Order is not valid and binding for any reason or otherwise modifying the Interim DIP Order and/or the Final DIP Order in a manner adverse to the Secured Parties, or (8) if any Loan Party is enjoined, restrained or in any way prevented by court order from continuing or conducting all or any material part of its business or affairs;

(iv)    except as permitted by this Agreement, the DIP Orders, the Budget or as otherwise agreed to by the Administrative Agent and the Required Lenders, the Loan Parties shall make (or shall have made) any Prepetition Payment other than Prepetition Payments authorized by the Bankruptcy Court in accordance with orders of the Bankruptcy Court entered without objection by the Administrative Agent;

(v)    the Bankruptcy Court shall enter an order avoiding or requiring disgorgement by the Secured Parties of any material amounts received in respect of the Secured Obligations;

(vi)    the Bankruptcy Court shall enter an order or orders to sell, transfer, lease, exchange, alienate or otherwise dispose of any assets, properties or equity of any Loan Party pursuant to Section 363 of the Bankruptcy Code without the consent of the Administrative Agent and Required Lenders unless such order or orders contemplate the repayment in full in cash of the Secured Obligations and the termination in full of all Commitments under this Agreement;

(vii)     any of the Loan Parties shall take any action in support of any matter set forth in clauses (i)-(vi) above or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

(viii)    any Loan Party shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment;

(ix)     any Loan Party shall file a motion in the Chapter 11 Case (A) to use cash collateral under Section 363(c) of the Bankruptcy Code without the consent of the Lenders, (B) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement or (C) to take any other action or actions materially adverse to Administrative Agent or the Lenders, or their rights and remedies hereunder or under any of the other Loan Documents, or the DIP Orders, or Administrative Agent's interest in any of the Collateral;

(x)      the filing or support by any Loan Party of any plan of reorganization or liquidation that is not reasonably approved by the Administrative Agent and the Required Lenders unless such plan of reorganization or liquidation provides for the repayment in full in cash of and termination in full of all Commitments and Secured Obligations upon its effective date;

(xi)     any Loan Party shall take (or support any Person in taking) any action in order to restrict or prohibit the Administrative Agent, any Lender, the Prepetition Agent or any Prepetition Lender from submitting a "credit bid" for any assets of the Loan Parties;

(xii)    subject to any requirements to the contrary in the DIP Orders, the Loan Parties fail to disburse the sale proceeds to the Administrative Agent contemporaneously with the closing of a sale of substantially all of the Loan Parties' assets, subject to payment of the Carve-Out and any wind-down fund provided for in the DIP Orders;

(xiii)   the grant of a change of venue with respect to the Chapter 11 Case without the consent of the Administrative Agent and the Required Lenders (such consent not to be unreasonably withheld);

(xiv)    other than with respect to the Carve-out, entry of a final non-appealable order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral;

(xv)     the filing of a challenge by any Loan Party to the Liens or claims of the Prepetition Agent or the Prepetition Lenders based on upon the Prepetition Agent's or any of the Prepetition Lender's conduct; or

(xvi)    except as otherwise permitted in this Agreement, the failure of any Loan Party to comply in any material respect with the terms of the Interim DIP Order or the Final DIP Order (after giving effect to any applicable grace period or periods in the Interim DIP Order or Final DIP Order, as applicable); or

(g)    Attachment.  Any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within thirty (30) days after its issue or levy; or

(h)    Judgments.  There is entered against any Loan Party or any Subsidiary (i) one or more final judgments or orders for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of thirty (30) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)    ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted in liability of any Loan Party under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount and such ERISA Event would result in a Material Adverse Effect, or (ii) the Company or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount and such failure would result in a Material Adverse Effect; provided that, with respect to any such events that occurred prior to the Petition Date or with respect to the Prepetition Credit Agreement, such failure or event shall be an Event of Default solely to the extent not subject to the automatic stay of the Bankruptcy Court; or

(j)    Invalidity of Loan Documents.  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect or ceases to give the Administrative Agent any material part of the Liens purported to be created thereby; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(k)    Change of Control.  There occurs any Change of Control without the consent of the Administrative Agent.

9.02    Remedies Upon Event of Default.

If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)    declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

83

(c)        [reserved]; and

(d)        exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents.

9.03    <u>Application of Funds</u>.

After the exercise of remedies provided for in <u>Section 9.02</u>, any amounts received on account of the Obligations shall, subject to the provisions of <u>Section 2.15</u>, be applied by the Administrative Agent in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under <u>Article III</u>) payable to the Administrative Agent in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders) arising under the Loan Documents and amounts payable under <u>Article III</u>, ratably among them in proportion to the respective amounts described in this clause <u>Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause <u>Third</u> held by them;

<u>Fourth</u>, to (a) payment of that portion of the Obligations constituting accrued and unpaid principal of the Loans, and (b) payments of amounts due under any Secured Treasury Management Agreement, ratably among the Lenders and Treasury Management Banks in proportion to the respective amounts described in this clause <u>Fourth</u> held by them; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

Notwithstanding the foregoing, Obligations arising under Secured Treasury Management Agreements shall be excluded from the application described above if the Administrative Agent has not received a Secured Party Designation Notice, together with such supporting documentation as the Administrative Agent may request, from the applicable Treasury Management Bank, as the case may be (unless such Treasury Management Bank is the Administrative Agent or an Affiliate thereof).  Each Treasury Management Bank not a party to this Agreement that has given the notice contemplated by the preceding sentence shall, by such notice, be deemed to have acknowledged and accepted the appointment of the Administrative Agent pursuant to the terms of <u>Article X</u> for itself and its Affiliates as if a "Lender" party hereto.

ARTICLE X

ADMINISTRATIVE AGENT

10.01    <u>Appointment and Authority</u>.

84

(a)        Each of the Lenders hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Lenders, and neither the Company nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b)        The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacities as a Lender and potential Treasury Management Banks) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to <u>Section 10.05</u> for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this <u>Article X</u> and <u>Article XI</u> (including <u>Section 11.04(c)</u>, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

10.02    <u>Rights as a Lender</u>.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders or to provide notice to or consent of the Lenders with respect thereto.

10.03    <u>Exculpatory Provisions</u>.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Administrative Agent and its Related Parties:

(a)        shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)        shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in

CHAR1\1744985v7

writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may affect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)      shall not, except as expressly set forth herein and in the other Loan Documents, have any duty or responsibility to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

Neither the Administrative Agent nor any of its Related Parties shall be liable for any action taken or not taken by the Administrative Agent under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby or thereby (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 11.01 and 9.02) or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.    The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given in writing to the Administrative Agent by the Company or a Lender.

Neither the Administrative Agent nor any of its Related Parties have any duty or obligation to any Lender or participant or any other Person to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article V or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

10.04    Reliance by Administrative Agent.

The Administrative Agent shall be entitled to rely upon, and shall be fully protected in relying and shall not incur any liability for relying upon, any notice, request, certificate, communication, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.    The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall be fully protected in relying and shall not incur any liability for relying thereon.    In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.    The Administrative Agent may consult with legal counsel (who may be counsel for the Loan Parties), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

10.05    <u>Delegation of Duties</u>.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

10.06    <u>Resignation of Administrative Agent</u>.

(a)    The Administrative Agent may at any time give notice of its resignation to the Lenders and the Company. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Company, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "<u>Resignation Effective Date</u>"), then the retiring Administrative Agent may (but shall not be obligated to) on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above, <u>provided</u> that in no event shall any such successor Administrative Agent be a Defaulting Lender. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable Law by notice in writing to the Company and such Person remove such Person as the Administrative Agent and, in consultation with the Company, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within thirty (30) days (or such earlier day as shall be agreed by the Required Lenders) (the "<u>Removal Effective Date</u>"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)    With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (1) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and

duties of the retiring or removed Administrative Agent (other than as provided in Section 3.01(g) and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Company to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Company and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 11.04 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them (i) while the retiring or removed Administrative Agent was acting as Administrative Agent and (ii) after such resignation or removal for as long as any of them continues to act in any capacity hereunder or under the other Loan Documents, including (A) acting as collateral agent or otherwise holding any collateral security on behalf of any of the Lenders and (B) in respect of any actions taken in connection with transferring the agency to any successor Administrative Agent.

10.07    Non-Reliance on Administrative Agent and Other Lenders.

Each Lender expressly acknowledges that the Administrative Agent has not made any representation or warranty to it, and that no act by the Administrative Agent hereafter taken, including any consent to, and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender as to any matter, including whether the Administrative Agent has disclosed material information in its (or its Related Parties') possession.  Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent, any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis of, appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower hereunder. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent, any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties.  Each Lender represents and warrants that (i) the Loan Documents set forth the terms of a commercial lending facility and (ii) it is engaged in making, acquiring or holding commercial loans in the ordinary course and is entering into this Agreement as a Lender for the purpose of making, acquiring or holding commercial loans and providing other facilities set forth herein as may be applicable to such Lender, and not for the purpose of purchasing, acquiring or holding any other type of financial instrument, and each Lender agrees not to assert a claim in contravention of the foregoing.  Each Lender represents and warrants that it is sophisticated with respect to decisions to make, acquire and/or hold commercial loans and to provide other facilities set forth herein, as may be applicable to such Lender, and either it, or the Person exercising discretion in making its decision to make, acquire and/or hold such commercial loans or to provide such other facilities, is experienced in making, acquiring or holding such commercial loans or providing such other facilities.

10.08    No Other Duties; Etc.

Anything herein to the contrary notwithstanding, none of the bookrunners, arrangers, syndication agents, documentation agents or co-agents shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, a Lender hereunder.

10.09    <u>Administrative Agent May File Proofs of Claim</u>.

In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

      (a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations (other than obligations under Treasury Management Agreements to which the Administrative Agent is not a party) that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Sections 2.09</u> and <u>11.04</u>) allowed in such judicial proceeding; and

      (b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Sections 2.09</u> and <u>11.04</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

The holders of the Obligations hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law.  In connection with any such credit bid and purchase, the Obligations owed to the holders thereof shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the

acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in clauses (a)(i) through (a)(viii) of Section 11.01, and (ii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Lender or any acquisition vehicle to take any further action.

10.10    Collateral and Guaranty Matters.

Without limiting the provisions of Section 10.09, each Lender (including in its capacity as a potential Treasury Management Bank) irrevocably authorize the Administrative Agent, at its option and in its discretion,

(a)    to release any Lien on any Collateral granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Revolving Commitments and payment in full of all Obligations (other than contingent indemnification obligations), (ii) that is sold or otherwise disposed of or to be sold or otherwise disposed of as part of or in connection with any sale or other Disposition permitted hereunder or under any other Loan Document or any Involuntary Disposition, or (iii) as approved in accordance with Section 11.01; and

(b)    to release any Guarantor from its obligations under the Guaranty if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty, pursuant to this Section 10.10.

The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

10.11    Treasury Management Banks.

No Treasury Management Bank that obtains the benefit of Section 9.03, the Guaranty or any Collateral by virtue of the provisions hereof or any Collateral Document shall have any right to notice of any action or to consent to, direct or object to any action hereunder or under any other Loan Document or

CHAR1\1744985v7

otherwise in respect of the Collateral (including the release or impairment of any Collateral) (or to notice of or to consent to any amendment, waiver or modification of the provisions hereof or of the Guaranty or any Collateral Document) other than in its capacity as a Lender and, in such case, only to the extent expressly provided in the Loan Documents.  Notwithstanding any other provision of this <u>Article X</u> to the contrary, the Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Treasury Management Agreements except to the extent expressly provided herein and unless the Administrative Agent has received a Secured Party Designation Notice of such Obligations, together with such supporting documentation as the Administrative Agent may request, from the applicable Lender or Treasury Management Bank, as the case may be.  The Administrative Agent shall not be required to verify the payment of, or that other satisfactory arrangements have been made with respect to, Obligations arising under Secured Treasury Management Agreements.

10.12   <u>ERISA Matters</u>.

(a)   Each Lender (x) represents and warrants, as of the Closing Date or the later date such Person became a Lender party hereto, as applicable, to, and (y) covenants, from the Closing Date or the later date such Person became a Lender party hereto, as applicable, to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)   such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement,

(ii)   the transaction exemption set forth in one or more PTEs, such as PTE 84–14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95–60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90–1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91–38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96–23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement,

(iii)   (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84–14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84–14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84–14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, or

(iv)   such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless either (1) clause (i) in the immediately preceding clause (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the Closing Date or the later date such Person became a Lender party hereto, as applicable, to, and (y) covenants, from the Closing Date or the later date such Person became a Lender party hereto, as applicable, to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of the Company or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

ARTICLE XI

MISCELLANEOUS

11.01    <u>Amendments, Etc</u>.

Subject to <u>Section 3.03(c)</u>, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Company or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) and the Company or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>further</u>, that

(a)    no such amendment, waiver or consent shall:

(i)    extend or increase the Commitment of a Lender (or reinstate any Commitment terminated pursuant to <u>Section 9.02</u>) without the written consent of such Lender whose Commitment is being extended or increased (it being understood and agreed that a waiver of any condition precedent set forth in <u>Section 5.02</u> or of any Default or a mandatory reduction in Commitments is not considered an extension or increase in Commitments of any Lender);

(ii)    postpone any date fixed by this Agreement or any other Loan Document for any payment of principal (excluding mandatory prepayments), interest, fees or other amounts due to the Lenders (or any of them) or any scheduled or mandatory reduction of the Commitments hereunder or under any other Loan Document without the written consent of each Lender entitled to receive such payment or whose Commitments are to be reduced;

(iii)    reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (i) of the final proviso to this <u>Section 11.01</u>) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender entitled to receive such payment of principal, interest, fees or other amounts; <u>provided</u>, <u>however</u>, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

92

(iv)    change Section 2.13 or Section 9.03 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender directly affected thereby;

(v)    change any provision of this Section 11.01(a) or the definition of "Required Lenders" without the written consent of each Lender directly affected thereby;

(vi)    except in connection with a Disposition permitted under Section 8.05, release all or substantially all of the Collateral without the written consent of each Lender directly affected thereby; or

(vii)    release the Borrower or, except in connection with a merger or consolidation permitted under Section 8.04 or a Disposition permitted under Section 8.05, all or substantially all of the Guarantors without the written consent of each Lender directly affected thereby, except to the extent the release of any Guarantor is permitted pursuant to Section 10.10 (in which case such release may be made by the Administrative Agent acting alone);

(b)    [reserved];

(c)    [reserved]; and

(d)    unless also signed by the Administrative Agent, no amendment, waiver or consent shall affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document;

provided, however, that notwithstanding anything to the contrary herein, (i) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto, (ii) no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender, (iii) [reserved], (iv) each Lender is entitled to vote as such Lender sees fit on any bankruptcy reorganization or liquidation plan that affects the Loans, and each Lender acknowledges that the provisions of Section 1126(c) of the Bankruptcy Code supersedes the unanimous consent provisions set forth herein and (v) the Required Lenders shall determine whether or not to allow a Loan Party to use cash collateral in the context of a bankruptcy or insolvency proceeding and such determination shall be binding on all of the Lenders.

(e)    [Reserved].

(f)    [Reserved].

(g)    Notwithstanding anything to the contrary herein, if following the Closing Date, the Administrative Agent and the Company shall have jointly identified an inconsistency, obvious error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Loan Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of

CHAR1\1744985v7

any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within ten (10) Business Days following receipt of notice thereof.

(h)     Notwithstanding anything herein to the contrary, as to any amendment, amendment and restatement or other modifications otherwise approved in accordance with this Section, it shall not be necessary to obtain the consent or approval of any Lender that, upon giving effect to such amendment, amendment and restatement or other modification, would have no Commitment or outstanding Loans so long as such Lender receives payment in full of the principal of an interest accrued on each Loan made by, and all other amounts owing to, such Lender or accrued for the account of such Lender under this Agreement and the other Loan Documents at the time such amendment, amendment and restatement or other modification becomes effective.

Notwithstanding anything to the contrary herein, this Agreement may be amended and restated without the consent of any Lender (but with the consent of the Borrower and the Administrative Agent) if, upon giving effect to such amendment and restatement, such Lender shall no longer be a party to this Agreement (as so amended and restated), the Commitments of such Lender shall have terminated, such Lender shall have no other commitment or other obligation hereunder and shall have been paid in full all principal, interest and other amounts owing to it or accrued for its account under this Agreement.

11.02   Notices and Other Communications; Facsimile Copies.

(a)     Notices Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)     if to the Company or any other Loan Party or the Administrative Agent, to the address, facsimile number, e-mail address or telephone number specified for such Person on Schedule 11.02; and

(ii)     if to any other Lender, to the address, facsimile number, e-mail address or telephone number specified in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Company).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).  Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)     Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e mail, FpML messaging, and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender

pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Company may each, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii), if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    The Platform.    THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's, any Loan Party's or the Administrative Agent's transmission of Borrower Materials or notices through the Platform, any other electronic platform or electronic messaging service, or through the Internet.

(d)    Change of Address, Etc.  Each of the Company and the Administrative Agent may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, facsimile or telephone number or e-mail address for notices and other communications hereunder by notice to the Company and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, facsimile number and e-mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Company or its securities for purposes of United States federal or state securities Laws.

(e)    <u>Reliance by Administrative Agent and Lenders</u>.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic or electronic notices, Loan Notices and Notices of Loan Prepayment) purportedly given by or on behalf of any Loan Party even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Loan Parties shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of a Loan Party; <u>provided</u> that such indemnity shall not, as to any such Person, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Person, if the Company or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

11.03    <u>No Waiver; Cumulative Remedies; Enforcement</u>.

No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder or under any other Loan Document (including the imposition of the Default Rate) preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with <u>Section 10.01</u> for the benefit of all the Lenders; <u>provided</u>, <u>however</u>, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) [reserved], (c) any Lender from exercising setoff rights in accordance with <u>Section 11.08</u> (subject to the terms of <u>Section 2.13</u>), or (d) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and <u>provided</u>, <u>further</u>, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to <u>Section 10.01</u> and (ii) in addition to the matters set forth in clauses (b), (c) and (d) of the preceding proviso and subject to <u>Section 2.13</u>, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

11.04    <u>Expenses; Indemnity; and Damage Waiver</u>.

(a)    <u>Costs and Expenses</u>.  The Loan Parties shall pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, and any Lender (including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent, any Lender and Alix Partners (as financial advisors to the Administrative

Agent)), and shall pay all fees and time charges for attorneys who may be employees (with no profit margin) of the Administrative Agent or any Lender, in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, the Interim DIP Order, the Final DIP Order or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) [reserved], (iii) [reserved] and (iv) all out-of-pocket expenses incurred by the Administrative Agent, any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent, any Lender, and Alix Partners (as financial advisors to the Administrative Agent)), and shall pay all fees and time charges for attorneys who may be employees (with no profit margin) of the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights (A) in connection with this Agreement or the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans, in each case subject to receipt by the Loan Parties of an invoice.  The Loan Parties will be invoiced on a monthly basis for the foregoing fees and expenses.  All such fees and expenses shall be paid by the Loan Parties on the twelfth (12th) Business Day following delivery of the applicable invoice; provided, that the Administrative Agent or any Lender, as applicable, shall provide copies of each invoice to the United States Trustee and the Unsecured Creditors Committee in the Chapter 11 Case and allow such parties at least (10) Business Days to review and object to any such invoice.  In the event that an objection is asserted, the Loan Parties shall: (A) pay the undisputed portion of the applicable fees and expenses pursuant to the terms of this section; and (B) not be required to pay the disputed portion of the applicable fees and expenses until such time as the Bankruptcy Court has made a determination regarding such objection.  For the avoidance of doubt, the reasonable fees and expenses of the Administrative Agent and the Lenders shall not be subject to the limitations set forth in the Budget.

(b)     Indemnification by the Loan Parties.  The Loan Parties shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the reasonable and documented out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all reasonable and documented fees and time charges for attorneys who may be employees (with no profit margin) of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Company or any other Loan Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in Section 3.01), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by a Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to a Loan Party or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Company or any other Loan Party, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such

indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  Without limiting the provisions of Section 3.01(c), this Section 11.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    Reimbursement by Lenders.  To the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by them to the Administrative Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposure at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender), such payment to be made severally among them based on such Lenders' Applicable Percentages (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), provided, further that, the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.12(d).

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Law, no Loan Party shall assert, and each Loan Party hereby waives, and acknowledges that no other Person shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)    Payments.  All amounts due under this Section shall be payable not later than ten (10) Business Days after demand therefor.

(f)    Survival.  The agreements in this Section and the indemnity provisions of Section 11.02(e) shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all the other Obligations.

11.05    Payments Set Aside.

To the extent that any payment by or on behalf of any Loan Party is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent

of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect, in Dollars.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

11.06   Successors and Assigns.

(a)     Successors and Assigns Generally.  The provisions of this Agreement and the other Loan Documents shall be binding upon and inure to the benefit of the parties hereto and thereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder or thereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (e) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including all or a portion of its Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)     Minimum Amounts.

(A)     in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignment) that equal at least the amount specified in paragraph (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)     in any case not described in subsection (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $500,000 unless each of the Administrative Agent and, so long as

no Event of Default has occurred and is continuing, the Company otherwise consents (each such consent not to be unreasonably withheld or delayed);

(ii)     Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's Loans and Commitments, and rights and obligations with respect thereto assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations in respect of its Revolving Commitment (and the related Revolving Loans thereunder) on a non-pro rata basis;

(iii)    Required Consents.  No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)     the consent of the Company (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided, that, the Company shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five (5) Business Days after having received notice thereof;

(B)     the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender; and

(C)     [reserved].

(iv)    Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)     No Assignment to Certain Persons.  No such assignment shall be made (A) to the Company or any of the Company's Affiliates or Subsidiaries, (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B) or (C) to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural Person).

(vi)    Certain Additional Payments.  In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Company and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the

applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u>, <u>3.05</u> and <u>11.04</u> with respect to facts and circumstances occurring prior to the effective date of such assignment; provided, that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)    <u>Register</u>.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Company (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  The entries in the Register shall be conclusive absent manifest error, and the Company, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by the Company and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    <u>Participations</u>.  Any Lender may at any time, without the consent of, or notice to, the Company or the Administrative Agent, sell participations to any Person (other than a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of a natural Person), a Defaulting Lender or the Company or any of the Company's Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Company, the Administrative Agent, the Lenders shall continue to deal solely and directly with such Lender in connection with such

Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 11.04(c) without regard to the existence of any participation.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (i) through (vii) of Section 11.01(a) that affects such Participant. The Company agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section (it being understood that the documentation required under Section 3.01(e) shall be delivered to the Lender who sells the participation) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Sections 3.06 and 11.13 as if it were an assignee under paragraph (b) of this Section and (B) shall not be entitled to receive any greater payment under Sections 3.01 or 3.04, with respect to any participation, than the Lender from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Company's request and expense, to use reasonable efforts to cooperate with the Company to effectuate the provisions of Section 3.06 with respect to any Participant. To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 11.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(f)    [Reserved].

11.07    Treatment of Certain Information; Confidentiality.

(a)    Treatment of Confidential Information.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, its auditors and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to a Loan Party and its obligations, this Agreement or payments hereunder, (g) on a confidential basis to (i) any rating agency in connection with rating the Company or its Subsidiaries or the credit facilities provided hereunder or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder, (h) with the consent of the Company or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Company.  In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents and the Lenders in connection with the administration of this Agreement, the other Loan Documents, and the Commitments.  For purposes of this Section, "Information" means all information received from a Loan Party or any Subsidiary relating to the Loan Parties or any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent, any Lender on a nonconfidential basis prior to disclosure by such Loan Party or any Subsidiary, provided that, in the case of information received from a Loan Party or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b)    Non-Public Information.  Each of the Administrative Agent, the Lenders acknowledges that (a) the Information may include material non-public information concerning the Company or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

11.08    Set-off.

If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior

written consent of the Administrative Agent, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Company or any other Loan Party against any and all of the obligations of the Company or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or their respective Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Company or such Loan Party may be contingent or unmatured or are owed to a branch office or Affiliate of such Lender different from the branch office or Affiliate holding such deposit or obligated on such indebtedness; provided, that, in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.15 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify the Company and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

      11.09    Interest Rate Limitation.

      Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

      11.10    Counterparts; Integration; Effectiveness.

      This Agreement and each of the other Loan Documents may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 5.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement or any other Loan Document, or any certificate delivered thereunder, by fax transmission or e-mail transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement or such other Loan Document or certificate.  Without limiting the foregoing, to the extent a manually executed counterpart is not specifically required to be delivered under the terms of any Loan Document, upon the request of any

party, such fax transmission or e-mail transmission shall be promptly followed by such manually executed counterpart.

11.11   <u>Survival of Representations and Warranties</u>.

All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

11.12   <u>Severability</u>.

If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this <u>Section 11.12</u>, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

11.13   <u>Replacement of Lenders</u>.

If the Company is entitled to replace a Lender pursuant to the provisions of <u>Section 3.06</u>, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Company may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 11.06</u>), all of its interests, rights (other than its existing rights to payments pursuant to <u>Sections 3.01</u> and <u>3.04</u>) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), <u>provided</u> that:

(a)   the Company shall have paid to the Administrative Agent the assignment fee (if any) specified in <u>Section 11.06(b)</u>;

(b)   such Lender shall have received payment of an amount equal to one hundred percent (100%) of the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 3.05</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Company (in the case of all other amounts);

(c)   in the case of any such assignment resulting from a claim for compensation under <u>Section 3.04</u> or payments required to be made pursuant to <u>Section 3.01</u>, such assignment will result in a reduction in such compensation or payments thereafter;

(d)        such assignment does not conflict with applicable Laws; and

(e)        in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Company to require such assignment and delegation cease to apply.

11.14    Governing Law; Jurisdiction; Etc.

(a)        GOVERNING LAW.    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND ANY CLAIMS, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT OR TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT (EXCEPT, AS TO ANY OTHER LOAN DOCUMENT, AS EXPRESSLY SET FORTH THEREIN) AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)        SUBMISSION TO JURISDICTION.    THE COMPANY AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT IT WILL NOT COMMENCE ANY ACTION, LITIGATION OR PROCEEDING OF ANY KIND OR DESCRIPTION, WHETHER IN LAW OR EQUITY, WHETHER IN CONTRACT OR IN TORT OR OTHERWISE, AGAINST THE ADMINISTRATIVE AGENT, ANY LENDER, OR ANY RELATED PARTY OF THE FOREGOING IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS RELATING HERETO OR THERETO, IN ANY FORUM OTHER THAN THE BANKRUPTCY COURT AND IF THE BANKRUPTCY COURT DOES NOT HAVE OR ABSTAINS FROM EXERCISING SUCH JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE JURISDICTION OF SUCH COURTS AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION, LITIGATION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.    EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION, LITIGATION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.    NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE COMPANY OR ANY OTHER LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

(c)        WAIVER OF VENUE. THE COMPANY AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT

PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)      SERVICE OF PROCESS.      EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 11.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

11.15   Waiver of Right to Trial by Jury.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

11.16   Electronic Execution; Electronic Records.

(a)      The words "delivery," "execute," "execution," "signed," "signature," and words of like import in any Loan Document or any other document executed in connection herewith and the transactions contemplated hereby shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; ***provided*** *that notwithstanding anything contained herein to the contrary neither the Administrative Agent nor any Lender is under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent or such Lender pursuant to procedures approved by it and **provided further** without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart*.  For the avoidance of doubt, the authorization under this paragraph may include, without limitation, use or acceptance by the Administrative Agent and each of the holders of the Obligations of a manually signed paper document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure or

authorization related to this Agreement (each a "<u>Communication</u>") which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery and/or retention.

(b)    The Borrower hereby acknowledges the receipt of a copy of this Agreement and all other Loan Documents. The Administrative Agent and each Lender may, on behalf of the Borrower, create a microfilm or optical disk or other electronic image of this Agreement and any or all of the other Loan Documents. The Administrative Agent and each Lender may store the electronic image of this Agreement and the other Loan Documents in its electronic form and then destroy the paper original as part of the Administrative Agent's and each Lender's normal business practices, with the electronic image deemed to be an original and of the same legal effect, validity and enforceability as the paper originals.

11.17    <u>USA PATRIOT Act</u>.

Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Company that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "<u>Act</u>"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Act. The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

11.18    <u>No Advisory or Fiduciary Relationship</u>.

In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (a)(i) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders on the other hand, (ii) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (iii) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b)(i) the Administrative Agent and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary, for the Loan Parties or any of their respective Affiliates or any other Person and (ii) neither the Administrative Agent,  nor any Lender has any obligation to the Loan Parties or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Administrative Agent and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent or Lender has any obligation to disclose any of such interests to the Loan Parties or their respective Affiliates.  To the fullest extent permitted by Law, each Loan Party hereby waives and releases, any claims that it may have against the Administrative Agent or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

11.19    <u>[Reserved]</u>.

11.20    [Reserved].

11.21    <u>Acknowledgement and Consent to Bail-In of Affected Financial Institutions</u>.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender that is an Affected Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

11.22    <u>Subordination of Intercompany Indebtedness</u>.

Each Loan Party (a "<u>Subordinating Loan Party</u>") agrees that the payment of all obligations and indebtedness, whether principal, interest, fees and other amounts and whether now owing or hereafter arising, owing to such Subordinating Loan Party by any other Loan Party is expressly subordinated to the payment in full in cash of the Obligations. If the Administrative Agent so requests, any such obligation or indebtedness shall be enforced and performance received by the Subordinating Loan Party as trustee for the holders of the Obligations and the proceeds thereof shall be paid over to the holders of the Obligations on account of the Obligations, but without reducing or affecting in any manner the liability of the Subordinating Loan Party under this Agreement or any other Loan Document. Without limitation of the foregoing, so long as no Default has occurred and is continuing, the Loan Parties may make and receive payments with respect to any such obligations and indebtedness, <u>provided</u>, that in the event that any Loan Party receives any payment of any such obligations and indebtedness at a time when such payment is prohibited by this Section, such payment shall be held by such Loan Party, in trust for the benefit of, and shall be paid forthwith over and delivered, upon written request, to the Administrative Agent.

11.23    <u>Acknowledgement Regarding Any Supported QFCs</u>.

To the extent that the Loan Documents provide support, through a guarantee or otherwise, for any Swap Contract or any other agreement or instrument that is a QFC (such support, "<u>QFC Credit Support</u>", and each such QFC, a "<u>Supported QFC</u>"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the

regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)    As used in this Section 11.23, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:  (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

11.24   Prepetition Dutch Borrower.

As of the Closing Date, the Lenders constitute all of the Prepetition Lenders.  Each Lender agrees, in its capacity as a Prepetition Lender, and hereby directs the Prepetition Administrative Agent, to release the Prepetition Dutch Borrower from all of its obligations under the Prepetition Credit Agreement upon the consummation of a sale of Shiloh Netherlands pursuant to a purchase agreement that is reasonably satisfactory to the Lenders and the Prepetition Lenders; provided that, it is agreed that the purchase agreement filed with the Bankruptcy Court with the approval of the Required Lenders and the Required Lenders (as defined in the Prepetition Credit Agreement) to satisfy the Sale Milestones in connection with the Interim Order at the time of (or within three (3) days of) the consummation of the Chapter 11 Case, and the sale process indicated in the pleadings filed in connection with the motion seeking approval of such

purchase agreement, is reasonably satisfactory to the Prepetition Lenders so long as the proceeds of such sale are distributed in accordance with the Interim Order and the Final Order.  Upon such sale, the Prepetition Administrative Agent agrees, and the Lenders, in their capacities as Prepetition Lenders, hereby direct the Prepetition Administrative Agent, to enter into such documents and file such releases as are reasonably necessary to effectuate the full release of any claims of the Prepetition Lenders against the Prepetition Dutch Borrower.

[SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**BORROWER:**                         **SHILOH INDUSTRIES, INC.,**
                                      a Delaware corporation


                                      By:_____
                                      Name:
                                      Title:


**GUARANTORS:**                       **SHILOH CORPORATION,**
                                      an Ohio corporation

                                      By:_____
                                      Name:
                                      Title:


                                      **GREENFIELD DIE & MANUFACTURING CORP.,**
                                      a Michigan corporation

                                      By:_____
                                      Name:
                                      Title:


                                      **JEFFERSON BLANKING INC.,**
                                      a Georgia corporation

                                      By:_____
                                      Name:
                                      Title:


                                      **SHILOH AUTOMOTIVE, INC.,**
                                      an Ohio corporation

                                      By:_____
                                      Name:
                                      Title:


                                      **SHILOH INDUSTRIES, INC. DICKSON MANUFACTURING DIVISION,**
                                      a Tennessee corporation

                                      By:_____
                                      Name:
                                      Title:

**LIVERPOOL COIL PROCESSING, INCORPORATED,**
an Ohio corporation

By: _____
Name:
Title:


**MEDINA BLANKING, INC.,**
an Ohio corporation

By: _____
Name:
Title:


**THE SECTIONAL DIE COMPANY,**
an Ohio corporation

By: _____
Name:
Title:


**SECTIONAL STAMPING, INC.,**
an Ohio corporation

By: _____
Name:
Title:


**SHILOH DIE CAST LLC,**
an Ohio limited liability company

By: _____
Name:
Title:


**ALBANY-CHICAGO COMPANY LLC,**
a Wisconsin limited liability company

By: _____
Name:
Title:

CHAR1\1744985v7

**SHILOH DIE CAST MIDWEST LLC,**
an Ohio limited liability company


By:_____
Name:
Title:


**SHILOH HOLDINGS INTERNATIONAL, INC.,**
a Michigan corporation


By:_____
Name:
Title:


**FMS MAGNUM HOLDINGS LLC,**
an Ohio limited liability company


By:_____
Name:
Title:


**SHILOH MANUFACTURING LLC,**
a Michigan limited liability company


By:_____
Name:
Title:


**SHILOH MANUFACTURING HOLDINGS LLC,**
an Ohio limited liability company


By:_____
Name:
Title:


**C&H DESIGN COMPANY,**
a Michigan corporation


By:_____
Name:
Title:

**VCS PROPERTIES, LLC,**
an Ohio limited liability company

By:_____
Name:
Title:

4

**ADMINISTRATIVE AGENT:**          **BANK OF AMERICA, N.A.,**
as Administrative Agent


By:_____
Name:
Title:

**LENDERS:**                           **BANK OF AMERICA, N.A.,**
as a Lender

By:_____
Name:
Title:

CHAR1\1744985v7

[_____],
as a Lender


By:_____
Name:
Title:

7

**<u>Exhibit C</u>**

**Lewis Declaration**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

```
-------------------------------------------------------  x
                                                         :
In re:                                                   :
                                                         :
SHILOH INDUSTRIES, INC.,¹                                :       Chapter 11
  et al.,                                                :
                                                         :       Case No. 20-____ (____)
           Debtors.                                      :
                                                         :       (Joint Administration Requested)
                                                         :
                                                         :
-------------------------------------------------------  x
```

**DECLARATION OF**
**JEFFREY LEWIS IN SUPPORT**
**OF MOTION OF THE DEBTORS, PURSUANT**
**TO SECTIONS 105, 361, 362, 363, 364 AND 507 OF THE**
**BANKRUPTCY CODE, BANKRUPTCY RULE 4001 AND**
**LOCAL RULE 4001-2, FOR INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION**
**FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING**
**ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES,**
**(III) SCHEDULING FINAL HEARING AND (IV) GRANTING RELATED RELIEF**

I, Jeffrey Lewis, hereby declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury:

1.     I am a Director in the Financial Restructuring Group at Houlihan Lokey Capital, Inc. ("Houlihan"), a publicly traded, global financial advisory and investment banking firm.  I am authorized to execute this declaration on behalf of Houlihan.

---

¹     The Debtors are the following nineteen entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses):  Shiloh Industries, Inc. (7683), Greenfield Die & Manufacturing Corp. (8114), Jefferson Blanking Inc. (7850), Shiloh Automotive, Inc. (1339), Shiloh Corporation (5101), Shiloh Industries, Inc. Dickson Manufacturing Division (5835), Shiloh Holdings International, Inc. (1446), C&H Design Company (9432), Liverpool Coil Processing, Incorporated (0571), Medina Blanking, Inc. (0707), The Sectional Die Company (3562), VCS Properties, LLC (1094), Shiloh Die Cast LLC (5814), Shiloh Manufacturing Holdings LLC (0853), FMS Magnum Holdings LLC (6471), Sectional Stamping, Inc. (8967), Albany-Chicago Company LLC (4687), Shiloh Die Cast Midwest LLC (4114), and Shiloh Manufacturing LLC (1628).  The Debtors' noticing address in these chapter 11 cases is 880 Steel Drive, Valley City, Ohio 44280.

2.      I submit this declaration (the "Declaration") in support of the *Motion of the Debtors, Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling Final Hearing and (IV) Granting Related Relief* (including all exhibits thereto, the "Motion").[2]

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon:  (a) my personal knowledge; (b) information provided to me by the Debtors' management team, other members of the Houlihan team, and the Debtors' other advisors; (c)  my review of relevant documents; and/or (d) my opinion based upon my experience.  I have been involved in the Debtors' restructuring and the development of the DIP Facility.  I have reviewed and am familiar with the terms and provisions of the DIP Credit Agreement.  I am not being compensated specifically for this testimony other than through payments that Houlihan will receive in accordance with the terms of the Debtors' prepetition engagement of Houlihan for work performed prepetition and in accordance with the terms of any postpetition engagement of Houlihan approved by the Court.  I am authorized to submit this declaration in support of the Debtors.  If called upon to testify, I could and would competently testify to the facts and opinions set forth herein.

### Houlihan's Qualifications

4.      Houlihan is a publicly traded, internationally recognized investment banking and financial advisory firm with expertise in mergers and acquisitions, capital markets, financial restructuring, valuation and strategic consulting.  The firm serves corporations,

---

[2]      Capitalized but undefined terms herein shall be given the meaning provided in the Motion.

institutions and governments worldwide from twenty-three offices located in the United States, Europe and the Asia-Pacific region. Houlihan annually serves more than 1,000 clients ranging from closely held companies to Global 500 corporations.

       5.     Houlihan's Financial Restructuring Group, which has approximately 235 professionals, is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers and other parties in interest involved in financially troubled companies requiring complex financial restructurings, both in and outside of bankruptcy. Houlihan has represented debtors in some of the largest restructuring cases in the United States, including:  In re Briggs & Stratton Corporation, No. 20-43597-399 (BSS) (Bankr. E.D. Mo. Aug. 19, 2020); In re Ditech Holding Corp., No. 19-10412 (JLG) (Bankr. S.D.N.Y. Mar. 20, 2019); In re Waypoint Leasing Holdings Ltd., No. 18-13648 (SMB) (Bankr. S.D.N.Y. Jan. 18, 2019); In re Heritage Home Grp. LLC, No. 18-11736 (KG) (Bankr. D. Del. Aug. 24, 2018); In re Walter Inv. Mgmt. Corp., No. 17-13446 (JLG) (Bankr. S.D.N.Y. Dec. 22, 2017); In re Angelica Corp., No. 17-10870 (JLG) (Bankr. S.D.N.Y. May 9, 2017); In re Gawker Media LLC, No. 16-11700 (SMB) (Bankr. S.D.N.Y. July 14, 2016); In re Phoenix Brands LLC, No. 16-11242 (BLS) (Bankr. D. Del. July 5, 2016); In re Relativity Fashion, LLC, No. 15-11989 (MEW) (Bankr. S.D.N.Y. Feb. 1, 2016); In re Trump Ent. Resorts, Inc., No. 14-12103 (KG) (Bankr. D. Del. Oct. 6, 2014); In re Northhampton Generating Co., LP, No. 11-33095 (JCW) (Bankr. W.D.N.C. Jan. 3, 2012); In re AES Thames, L.L.C., No. 11-10334 (KJC) (Bankr. D. Del. Mar. 30, 2011); In re MSR Resort Golf Course LLC, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Mar. 16, 2011); In re Truvo USA LLC, No. 10-13513 (AJG) (Bankr. S.D.N.Y Oct 12, 2010); In re Premier Inter. Holdings, Inc., No. 09-12019 (CSS) (Bankr. D. Del. Oct 8, 2009); In re Aventine Renewable Energy Holdings, Inc., No. 09-11214 (KG) (Bankr. D. Del. June 19, 2009); In re Foamex Inter.

Inc., No. 09-10560 (KJC) (Bankr. D. Del. Mar. 17, 2009); and In re Buffets Holdings, Inc., No. 08-10141 (MFW) (Bankr. D. Del. Mar. 12, 2008).

6.    I have over twenty years of restructuring experience, most recently as a Director at Houlihan, where I have executed numerous in-court and out-of-court restructuring and special situations transactions while representing companies, creditors (or committees of creditors), and other constituents across a wide spectrum of industries, including financial services, real estate, transportation and logistics and general industrials.  Furthermore, I have substantial experience marketing, structuring and evaluating debtor in possession financings, secured debt, and exit financing, including assisting the debtors in the following recent matters: In re Briggs & Stratton Corporation, No. 20-43597-399 (Bankr. E.D. Mo. Aug. 20, 2020), In re Ditech Holding Corporation, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 17, 2019), In re Orchids Paper Products Company, No. 19-10729 (MFW) (Bankr. D. Del. Apr. 1, 2019) and In re Walter Inv. Mgmt. Corp., Case No. 17-13446 (JLG) (Bankr. S.D.N.Y. Dec. 22, 2017).

7.    Prior to joining Houlihan in 2009, I spent approximately twelve years in the restructuring practice at PricewaterhouseCoopers Corporate Finance LLC.  I hold a B.A. in Government and a B.B.A. in Finance from the University of Texas, and an MBA in Finance and Accounting from the Vanderbilt University Owen Graduate School of Management.

8.    Since Houlihan was engaged on May 11, 2020, Houlihan has provided financial advisory and investment banking services to the Debtors, including with respect to the Debtors' strategic evaluation of postpetition financing alternatives.  During this time, I have worked with the Debtors and their other retained professionals.

**The Debtors' Original Efforts to Obtain Financing**

9.      In May of 2020, the Debtors asked Houlihan to assist them in pursuing in earnest two alternative potential value maximizing transactions in parallel:  (a) refinancing the Prepetition Credit Agreement or (b) the sale of substantially all of their assets.  Accordingly, Houlihan worked with the Debtors and their other advisors to develop a marketing process to either obtain financing that could supplement or replace the Prepetition Credit Agreement or identify a buyer willing to purchase substantially all of the Debtors' assets on terms acceptable to the Debtors and, to the extent their consent would be necessary to consummate the sale, to the Prepetition Lenders.  Given the Debtors' financial condition, Houlihan had to work expeditiously to complete the marketing process.

10.      That same month, Houlihan, in coordination with the Debtors' other advisors, launched that marketing process.  During the process, Houlihan contacted over 125 parties, which represented both financial and strategic investors.  Of the entities contacted, approximately 64 executed non-disclosure agreements in order to receive additional materials and become actively involved in the process.

11.      In mid-June, Houlihan distributed a process letter to all active investors, which requested initial indications by June 29, 2020, and contemplated various structures and alternatives.  In the interim, the Debtors' management conducted a webinar for all interested parties that had executed a confidentiality agreement.  Management participated in subsequent one-on-one calls with select potential investors.

12.      On or around June 29, 2020, Houlihan received 17 non-binding initial indications of interest ("Indications of Interest") representing a broad range of transaction structures and terms.  Of the 17 Indications of Interest received, 12 were offers to purchase the

company in some form, while five Indications of Interest provided financing/recapitalization offers to supplement the Prepetition Credit Agreement.  Of the five financing/recapitalization Indications of Interest, zero offered financing fully junior to that of the Prepetition Lenders. In Houlihan's judgment, in consultation with the Debtors and their other advisors, the financing/recapitalization proposals submitted were either too onerous on the cash flows of the business and/or would require the Prepetition Lenders' consent.  In consultation with the Debtors and their other advisors, Houlihan determined that obtaining the Prepetition Lenders' consent was unlikely based on conversations with the Prepetition Lenders and their advisors and because the financing proposals would require the Prepetition Lenders to take a meaningful haircut in order to allow for incremental liquidity to come into the business.  As a result, Houlihan concluded that all of the financing proposals had significant execution risks and that pursuing a sale transaction would provide a much greater opportunity for the Debtors to maximize the value for the benefit of all stakeholders.  Accordingly, Houlihan recommended that the Debtors focus their efforts on finding a buyer for their assets.  The Debtors instructed Houlihan to proceed with this recommendation.

### The Debtors' Efforts to Obtain DIP Financing

13.    Based on the Indications of Interest for the purchase of the Debtors' assets, Houlihan in consultation with the Debtors and their other advisors determined in July 2020 that a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code would allow the Debtors to receive more value for their assets than an out-of-court sale. Houlihan in consultation with the Debtors and their other advisors further determined that the Debtors did not have sufficient cash on hand to fund a chapter 11 sale process and, thus, would need postpetition financing to consummate a value maximizing transaction.  Accordingly,

- 6 -

the Debtors and their advisors, including Houlihan, began pursuing debtor-in-possession financing that would provide the Debtors with sufficient liquidity to operate during the pendency of the contemplated chapter 11 cases.

14.    In August of 2020, Houlihan, in coordination with the Debtors' other advisors, commenced a process to raise postpetition financing to fund the Debtors' potential chapter 11 cases.  At the outset of this process, the Debtors instructed Houlihan to focus on raising postpetition financing that would address their principal goals and objectives, including, among others (a) allowing the Debtors to promptly file their chapter 11 cases due to the Debtors' current financial condition, (b) raising sufficient new capital to finance the Debtors' chapter 11 cases, and (c) maximizing the chances of the Debtors' having a "soft-landing" in chapter 11 by minimizing the amount of litigation at the outset of the chapter 11 cases to the extent possible. Houlihan considered which parties to contact based on a number of factors, including, but not limited to:  (x) institutions who could provide the entire amount of the postpetition financing in an expedited time frame, (y) institutions known to have interest in providing postpetition financing and (z) institutions known to be familiar with the Debtors.

15.    During the process to obtain postpetition financing, Houlihan contacted seven third-parties.  Based on the size and seniority of the Prepetition Credit Agreement, Houlihan focused on trying to obtain postpetition financing that was either:  (a) junior in right of payment to the Prepetition Lenders or; (b) sufficiently large to refinance and upsize the Prepetition Credit Agreement.  Consistent with the results of the May and June 2020 process, Houlihan received no formal or informal proposal to provide postpetition financing.  In explaining to Houlihan their reasons for declining to provide proposals, the seven contacted third-parties cited concerns about the loan-to-value of any proposed third-party postpetition

financing, potential litigation risk tied to priming efforts and the relatively low return on invested dollars.

16.    Concurrently with the efforts to obtain third-party postpetition financing, the Debtors with the assistance of their professionals, including Houlihan, engaged in extensive arm's length negotiations with the Prepetition Lenders regarding potential postpetition financing. Ultimately, after these extensive arm's length negotiations and concluding that there were not viable alternatives on substantially equal or better terms, Houlihan recommended that the Debtors enter into an agreement with the Prepetition Lenders containing the terms described in the DIP Financing Motion.  The DIP Facility achieves the Debtors' principal goals and objectives for postpetition for financing.  It provides them quickly with the capital they need to promptly file these chapter 11 cases.  It provides the Debtors sufficient capital to fund these cases based upon current projections.  And it minimizes the risk of early litigation because,  among things, the Debtors entered into the DIP Facility after Houlihan determined there were not viable alternatives and the Debtors obtained the Prepetition Lenders' consent for the Debtors' use of the Prepetition Lenders' Cash Collateral in connection with entering into the DIP Facility.

17.    The DIP Credit Agreement contains certain sale milestones ("Sale Milestones") that the Debtors must meet throughout the chapter 11 cases, and a failure to meet such Milestones constitutes an event of default under the DIP Credit Agreement.  These Milestones were heavily negotiated at arm's-length and required by the DIP Lenders as a condition to the DIP Facility.  The DIP Lenders told Houlihan and the Debtors that the DIP Lenders would not provide the financing under the DIP Documents without the Sale Milestones. I believe the Sale Milestones are reasonable under the circumstances and will allow the Debtors to run a value-maximizing sale process in the timeline proscribed.

18.     In consultation with the Debtors and their other advisors, Houlihan concluded that, given the circumstances, the proposed financing from the DIP Lenders reflected in the DIP Credit Agreement and the Interim and Final Orders (a) is appropriate and (b) provides the most cost-effective and beneficial financing available to the Debtors given the circumstances.

19.     Based on the information available to me, and my observations during the course of the negotiations over the DIP Facility, it is my opinion that (a) the terms and conditions of the DIP Facility were negotiated by the parties in good faith and at arm's-length, (b) the DIP Facility is the only financing currently available to the Debtors, and (c) entering into the DIP Facility is in the best interests of the Debtors' estates.

20.     Based on my experience, the proposed DIP Facility is reasonable given current market conditions, the Debtors' circumstances, and the terms of the Prepetition Credit Agreement.  I believe that the economic terms of the proposed DIP Facility is within the range of other similarly sized DIP facilities provided to debtors-in-possession in recent years.

21.     I believe the fees, interest rate and other economics of the DIP Facility are consistent with market rates for other postpetition financing facilities in similar circumstances and are reasonable under the circumstances.  As such, in my opinion, it was prudent for the Debtors to enter into the DIP Facility and their decision to do so is a reasonable exercise of their business judgment.

Dated:    August 30, 2020                    */s/ Jeffrey Lewis*
                                             Jeffrey Lewis
                                             Houlihan Lokey Capital, Inc.

NAI-1514147743v6

**<u>Exhibit D</u>**

**13-Week Budget**

## Shiloh Industries Inc., et al
### DIP Cash Flow Forecast

*($ in thousands)*

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 1-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 9/4/20 | 9/11/20 | 9/18/20 | 9/25/20 | 10/2/20 | 10/9/20 | 10/16/20 | 10/23/20 | 10/30/20 | 11/6/20 | 11/13/20 | 11/20/20 | 11/27/20 | 13 Week Total |
| **DIP Cash Flow Forecast** | | | | | | | | | | | | | | |
| **Total Receipts** | $ 4,906 | $ 6,697 | $ 10,624 | $ 12,419 | $ 10,958 | $ 9,697 | $ 13,485 | $ 10,118 | $ 13,067 | $ 10,022 | $ 9,441 | $ 10,075 | $ 10,189 | $ 131,699 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Materials & Supplies | (7,487) | (8,274) | (8,147) | (8,439) | (6,616) | (7,374) | (3,185) | (5,639) | (5,660) | (5,410) | (5,694) | (4,964) | (5,297) | (82,187) |
| Wages & Benefits | (1,245) | (4,984) | (1,213) | (4,114) | (1,258) | (4,691) | (1,134) | (4,287) | (1,134) | (4,287) | (1,134) | (4,287) | (1,134) | (34,900) |
| Other | (1,282) | (1,200) | (1,183) | (858) | (1,681) | (936) | (1,311) | (1,003) | (2,082) | (1,508) | (1,490) | (1,651) | (1,724) | (17,908) |
| **Total Operating Disbursements** | (10,013) | (14,458) | (10,543) | (13,410) | (9,555) | (13,002) | (5,630) | (10,929) | (8,876) | (11,205) | (8,318) | (10,902) | (8,155) | (134,995) |
| **Net Operating Cash Flow** | $ (5,107) | $ (7,761) | $ 81 | $ (991) | $ 1,403 | $ (3,305) | $ 7,855 | $ (811) | $ 4,192 | $ (1,182) | $ 1,123 | $ (827) | $ 2,034 | $ (3,296) |
| **Restructuring Disbursements** | | | | | | | | | | | | | | |
| DIP Interest and Fees | (250) | (517) | - | - | - | - | (1,245) | - | - | - | (1,036) | - | (809) | (3,858) |
| Restructuring Professionals and UST Fees | (1,205) | (1,205) | (1,355) | (1,040) | (1,040) | (1,190) | (985) | (985) | (1,367) | (985) | (1,135) | (985) | (1,572) | (15,043) |
| Adequate Protection Payment | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (280) | (3,645) |
| Utility Deposit | - | (509) | - | - | - | - | - | - | - | - | - | - | - | (509) |
| **Total Restructuring Disbursements** | (1,735) | (2,511) | (1,635) | (1,320) | (1,320) | (1,470) | (2,510) | (1,265) | (1,647) | (1,265) | (2,451) | (1,265) | (2,661) | (23,055) |
| **Net Cash Flow** | $ (6,842) | $ (10,272) | $ (1,554) | $ (2,311) | $ 83 | $ (4,775) | $ 5,344 | $ (2,076) | $ 2,544 | $ (2,447) | $ (1,328) | $ (2,092) | $ (627) | $ (26,352) |
| **Beginning Cash Balance** [1] | $ 3,919 | $ 1,077 | $ 1,005 | $ 1,051 | $ 1,040 | $ 1,123 | $ 1,049 | $ 6,393 | $ 4,317 | $ 6,861 | $ 4,414 | $ 3,086 | $ 1,094 | $ 3,919 |
| Net Cash Flow | (6,842) | (10,272) | (1,554) | (2,311) | 83 | (4,775) | 5,344 | (2,076) | 2,544 | (2,447) | (1,328) | (2,092) | (627) | (26,352) |
| Revolver Activity | 4,000 | 10,200 | 1,600 | 2,300 | - | 4,700 | - | - | - | - | - | 100 | 600 | 23,500 |
| **Ending Cash Balance** | $ 1,077 | $ 1,005 | $ 1,051 | $ 1,040 | $ 1,123 | $ 1,049 | $ 6,393 | $ 4,317 | $ 6,861 | $ 4,414 | $ 3,086 | $ 1,094 | $ 1,068 | $ 1,068 |
| **DIP Loan** | | | | | | | | | | | | | | |
| **Beginning Balance** | $ - | $ 4,000 | $ 14,200 | $ 15,800 | $ 18,100 | $ 18,100 | $ 22,800 | $ 22,800 | $ 22,800 | $ 22,800 | $ 22,800 | $ 22,800 | $ 22,900 | $ - |
| Draw Down / (Repayment) | 4,000 | 10,200 | 1,600 | 2,300 | - | 4,700 | - | - | - | - | - | 100 | 600 | 23,500 |
| **Ending Balance** | $ 4,000 | $ 14,200 | $ 15,800 | $ 18,100 | $ 18,100 | $ 22,800 | $ 22,800 | $ 22,800 | $ 22,800 | $ 22,800 | $ 22,800 | $ 22,900 | $ 23,500 | $ 23,500 |

Footnotes:

(1) Preliminary estimate pending confirmation from banks