**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---

| | |
|---|---|
| In re:<br><br>SHILOH INDUSTRIES, INC.,[1]<br>  *et al.*,<br><br>  Debtors. | Chapter 11<br><br>Case No. 20-12024 (LSS)<br><br>(Jointly Administered) |

---

# DECLARATION OF D. REID SNELLENBARGER IN SUPPORT OF THE SALE OF SHILOH INDUSTRIES, INC. TO GROUPER HOLDINGS, LLC, AN AFFILIATE OF MIDDLEGROUND CAPITAL LLC

I, D. Reid Snellenbarger, hereby declare as follows:

1. I am a Managing Director and shareholder at Houlihan Lokey Capital, Inc. ("Houlihan"), a global investment bank with expertise in financial restructuring, capital markets and valuation. I am a senior member of Houlihan's Financial Restructuring Group.

2. Houlihan is the investment banker for the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") with respect to the Debtors' Sale Process (as defined below), as set forth more fully in the Houlihan Retention Application.[2]

---

[1] The Debtors are the following nineteen entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Shiloh Industries, Inc. (7683), Greenfield Die & Manufacturing Corp. (8114), Jefferson Blanking Inc. (7850), Shiloh Automotive, Inc. (1339), Shiloh Corporation (5101), Shiloh Industries, Inc. Dickson Manufacturing Division (5835), Shiloh Holdings International, Inc. (1446), C&H Design Company (9432), Liverpool Coil Processing, Incorporated (0571), Medina Blanking, Inc. (0707), The Sectional Die Company (3562), VCS Properties, LLC (1094), Shiloh Die Cast LLC (5814), Shiloh Manufacturing Holdings LLC (0853), FMS Magnum Holdings LLC (6471), Sectional Stamping, Inc. (8967), Albany-Chicago Company LLC (4687), Shiloh Die Cast Midwest LLC (4114), and Shiloh Manufacturing LLC (1628). The Debtors' noticing address in these chapter 11 cases is 880 Steel Drive, Valley City, Ohio 44280.

[2] On October 6, 2020, the Court entered an order [Docket No. 254] (the "Houlihan Retention Order") approving the *Application of the Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 327 and 328(a),*

3. I submit this supplemental declaration (this "Declaration") in support of the *Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Authorizing the Debtors to Enter into Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Granting Related Relief* [Docket No. 77] (including all exhibits thereto, the "Motion").[3] In particular, I submit this Declaration in support of my opinions that (a) the Debtors have been thoroughly and extensively marketed and (b) the Stalking Horse Agreement (as defined below) is the highest and otherwise best bid for the sale of the Debtors' assets.

4. Except as otherwise indicated, all facts and statements set forth in this Declaration are based upon the following: (a) my personal knowledge; (b) information provided to me by the Debtors' management team, other members of the Houlihan team and the Debtors' other advisors; (c) my review of relevant documents; and/or (d) my opinion based upon my experience. I have been involved in the Debtors' restructuring and the prepetition marketing and sale process (together with postpetition marketing and sale efforts, the "Sale Process"). I have reviewed, and am familiar with, the terms and provisions of the Bidding Procedures and the

---

*Fed. R. Bankr. P. 2014 and 5002, and Local Rules 2014-1 and 2016-2 Authorizing Retention and Employment of Houlihan Lokey Capital, Inc. as Financial Advisor and Investment Banker to the Debtors* Nunc Pro Tunc *to Petition Date* [Docket No. 135] (the "Houlihan Retention Application").

[3] Capitalized but undefined terms herein have the meanings provided in the Motion.

- 3 -

Stalking Horse Agreement. I am not being compensated specifically for this testimony other than through payments that Houlihan will receive in accordance with the terms of the Debtors' prepetition engagement of Houlihan for work performed prepetition and in accordance with the terms of the Houlihan Retention Order. I am authorized to submit this declaration in support of the Motion. If called upon to testify, I could and would competently testify to the facts and opinions set forth herein.

### Houlihan's Qualifications

5.     Houlihan is a publicly traded, internationally recognized investment banking and financial advisory firm with expertise in mergers and acquisitions, capital markets, financial restructuring, valuation and strategic consulting. The firm serves corporations, institutions and governments worldwide from twenty-three offices located in the United States, Europe and the Asia-Pacific region. Houlihan annually serves more than 1,000 clients ranging from closely held companies to Global 500 corporations.

6.     Houlihan's Financial Restructuring Group, which has approximately 235 professionals, is one of the leading advisors and investment bankers to debtors, secured and unsecured creditors, acquirers and other parties in interest involved in financially troubled companies requiring complex financial restructurings, both in and outside of bankruptcy. Houlihan has represented debtors in some of the largest restructuring cases in the United States, including: *In re Briggs & Stratton Corporation*, No. 20-43597-399 (BSS) (Bankr. E.D. Mo. Aug. 19, 2020); *In re Ditech Holding Corp.*, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Mar. 20, 2019); *In re Waypoint Leasing Holdings Ltd.*, No. 18-13648 (SMB) (Bankr. S.D.N.Y. Jan. 18, 2019); *In re Heritage Home Grp. LLC*, No. 18-11736 (KG) (Bankr. D. Del. Aug. 24, 2018); *In re Walter Inv. Mgmt. Corp.*, No. 17-13446 (JLG) (Bankr. S.D.N.Y. Dec. 22, 2017*); In re Angelica*

- 3 -

*Corp.*, No. 17-10870 (JLG) (Bankr. S.D.N.Y. May 9, 2017); *In re Gawker Media LLC*, No. 16-11700 (SMB) (Bankr. S.D.N.Y. July 14, 2016); *In re Phoenix Brands LLC*, No. 16-11242 (BLS) (Bankr. D. Del. July 5, 2016); *In re Relativity Fashion, LLC*, No. 15-11989 (MEW) (Bankr. S.D.N.Y. Feb. 1, 2016); *In re Trump Ent. Resorts, Inc.*, No. 14-12103 (KG) (Bankr. D. Del. Oct. 6, 2014); *In re Northhampton Generating Co., LP*, No. 11-33095 (JCW) (Bankr. W.D.N.C. Jan. 3, 2012); *In re AES Thames, L.L.C.*, No. 11-10334 (KJC) (Bankr. D. Del. Mar. 30, 2011); *In re MSR Resort Golf Course LLC*, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Mar. 16, 2011); *In re Truvo USA LLC*, No. 10-13513 (AJG) (Bankr. S.D.N.Y Oct 12, 2010); *In re Premier Inter. Holdings, Inc.*, No. 09-12019 (CSS) (Bankr. D. Del. Oct 8, 2009); *In re Aventine Renewable Energy Holdings, Inc.*, No. 09-11214 (KG) (Bankr. D. Del. June 19, 2009); *In re Foamex Inter. Inc.*, No. 09-10560 (KJC) (Bankr. D. Del. Mar. 17, 2009); and *In re Buffets Holdings, Inc.*, No. 08-10141 (MFW) (Bankr. D. Del. Mar. 12, 2008).

7. During my over 20-year professional career, I have gained significant experience in: (1) mergers and acquisitions, (2) raising various forms of capital and (3) negotiations relating to the restructuring of private and public securities as an advisor. I have been involved in restructurings of private and public securities in chapter 11 and out-of-court distressed M&A transactions and recapitalizations since 1998. My experience includes representing debtors, creditors and investors in large and middle-market domestic and crossborder companies, including assisting the debtors in the following recent matters: *In re Briggs & Stratton Corporation, No. 20-43597-399 (Bankr. E.D. Mo. Aug. 20, 2020), In re Ditech Holding Corporation, No. 19-10412 (JLG) (Bankr. S.D.N.Y. Apr. 17, 2019), In re Orchids Paper Products Company*, No. 19-10729 (MFW) (Bankr. D. Del. Apr. 1, 2019) and *In re Walter Inv. Mgmt. Corp.*, Case No. 17-13446 (JLG) (Bankr. S.D.N.Y. Dec. 22, 2017).

8. Prior to joining Houlihan in 2005, I was a Vice President of PricewaterhouseCoopers' Corporate Finance Group in Chicago, Illinois. I have a bachelor's of science degree in finance from Purdue University.

9. Since Houlihan was engaged on May 11, 2020, Houlihan has provided financial advisory and investment banking services to the Debtors, including with respect to the Debtors' evaluation of strategic alternatives, including a sale of any or substantially all of their assets. During this time, I have worked with the Debtors and their other retained professionals.

## The Debtors' Marketing and Sale Process

### I. Prepetition Marketing Process

10. As set forth in greater detail in the Bidding Procedures Declaration,[4] in May 2020, the Debtors asked Houlihan to assist them in pursuing in earnest two alternative potential value maximizing transactions in parallel: (a) refinancing the Prepetition Credit Agreement or (b) the sale of any or substantially all of their assets. Accordingly, Houlihan worked with the Debtors and their other advisors to develop a comprehensive marketing process targeting these dual objectives.

11. Given the Debtors' financial condition, Houlihan had to work expeditiously to complete the prepetition portion of the Sale Process. Ultimately, the Debtors received three strong and viable bids for the purchase of substantially all of their assets prior to the filing of these cases. After further discussions and negotiations with these parties that helped

---

[4] *Declaration of D. Reid Snellenbarger in Support of Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (B) Authorizing the Debtors to Enter into Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* [Docket No. 78] (the "Bidding Procedures Declaration")

increase value and execution certainty, the Debtors, in their business judgment, selected the revised and final bid (the "Stalking Horse Bid") submitted by Grouper Holdings, LLC (the "Stalking Horse Bidder"), an affiliate of MiddleGround Capital LLC, as the stalking horse bid for the sale of the Debtors' assets in these chapter 11 cases.

12.   The competitive Sale Process conducted by the Debtors and their advisors allowed the Debtors to negotiate a favorable stock and asset purchase agreement that (among other items) (i) allowed the Debtors to continue marketing the assets after the signing of the Stalking Horse Agreement without interruption; (ii) contains a fair purchase price adjustment for working capital that is based upon the Debtors' postpetition financing budget; (iii) requires the Stalking Horse Buyer to assume approximately $150 million[5] of liabilities, including payment of all cure costs associated with assigned executory contracts; and (iv) contains few closing contingencies, including no contingency associated with the pandemic.

13.   On August 30, 2020, Shiloh Industries Inc. and certain of its affiliates[6] entered into that certain *Stock and Asset Purchase Agreement* with the Stalking Horse Bidder for the sale of substantially all of the Debtors' assets for total consideration of approximately $400 million, comprised of a base purchase price of $218 million plus acquired cash and approximately $150 million of assumed liabilities, as adjusted pursuant to the Stalking Horse Agreement.  Executing the Stalking Horse Agreement was a critical step in support of the

---

[5] This is an estimated amount based on recent trial balance data and working capital forecasts, and is subject to change.

[6] In addition to Shiloh Industries, Inc., the other Sellers under the Stalking Horse Agreement are:  Shiloh Corporation; The Sectional Die Company; Sectional Stamping, Inc.; Medina Blanking, Inc.; Liverpool Coil Processing, Incorporated; VCS Properties, LLC; Greenfield Die & Manufacturing Corp.; Shiloh Holdings International, Inc.; C & H Design Company; Jefferson Blanking Inc.; Shiloh Automotive, Inc.; Shiloh Industries, Inc. Dickson Manufacturing Division; Shiloh Die Cast LLC; Albany-Chicago Company, LLC; Shiloh Die Cast Midwest, LLC; FMS Magnum Holdings LLC; Shiloh Manufacturing Holdings LLC; and Shiloh Manufacturing LLC.

Debtors' ability to conduct a competitive postpetition Sale Process that would allow the Debtors to maximize value for their estates and creditor recoveries, including by maintaining the confidence and support of the Debtors' key customer, supplier and employee constituencies during the Sale Process.

**II.     The Post-Petition Sale Process**

14. Following the Petition Date, the Debtors continued the Sale Process without pause. Shortly after the filing of the Bidding Procedures Motion on September 2, 2020, Houlihan contacted and distributed an overbid process letter and term sheet summarizing the opportunity to bid for any and all of the assets of the Company to over 90 parties, 86 of which were part of the pre-petition process and showed interest in acquiring the Debtors' assets. Over the next few weeks, Houlihan held over 20 calls with the most competitive prepetition overbid parties and responsive bidders to walk them through the process in greater detail or get them up to speed on the opportunity.

15. Throughout September, the Debtors and their advisors continued to process non-disclosure agreements with interested parties and support diligence by prospective bidders. Certain investors showing interest in mid-to-late September were not interested in acquiring substantially all of the Debtors' assets, and instead were interested in either casting, stamping or blanking assets.

16. In light of the limited timeline, complicated business unit intertwinement, including consolidated customer and supplier relationships, and mix of shared services that made it difficult for bidders to understand the value of individual business units, Houlihan believed that forming a consortium of bidders that would act as a single bidder could be the best way to create competition for an overbid of the Stalking Horse Bid while creating as much transaction certainty as possible. To help build confidence in parties' individual bids and incentivize

participation, Houlihan attempted to pair up interested parties so that they could determine their interest in potentially bidding together ahead of the auction, but was unable to successfully connect any parties. No party removed themselves from the process on the basis of being unable to form a consortium. Parties instead preferred to move forward on their own, with full knowledge of the inherent risks in submitting a partial bid. To further canvass the market of potential bidders, Houlihan contacted over 50 less active parties to re-engage those parties and evaluate their interest for any piece of the business. Houlihan also began reaching out to select parties highlighted by the Committee's financial advisor. Only a handful of these parties responded, and most expressed their lack of interest in pursuing a bid for any of the assets.

17. By the second week of October, only two parties, both of which were strategic buyers, remained in active dialogue with Houlihan and showed a true interest in acquiring select assets of the Debtors (casting and blanking assets, respectively), with a few select parties expressing a potential interest in the stamping business. The Debtors and their advisors processed additional diligence requests, facilitated site visits and coordinated calls, as needed, with these parties.

18. On October 26, 2020 (the Bid Deadline), the Debtors received three separate partial bids for the assets of each of the Debtors' business lines, namely their casting, blanking and stamping businesses (collectively, the "Product Line Bids"), and a non-binding letter of interest from a fourth party for certain of the Debtors' foreign businesses across casting, stamping and blanking.

### Cancellation of the Auction and
### Selection of the Stalking Horse Bidder as the Successful Bidder

19. Except for the Stalking Horse Bid, no Qualified Bids were received before the Bid Deadline. As noted above, on the Bid Deadline, the Debtors received the three Product

Line Bids (one for each of casting, stamping and banking), and a non-binding letter of interest from a fourth party for certain of the Debtors' foreign businesses across casting, stamping and blanking.  The three Product Line Bids collectively provided only $202 million of cash proceeds and included provisions that made the closing of the transaction contemplated under the respective Product Line Bids far less certain than the transactions contemplated by the Stalking Horse Agreement.  Thus, even ignoring the other contingencies and risks contained in the three separate bids, their collective cash purchase price was $25.1 million less than required to qualify as a "Qualified Bid" under the Bidding Procedures.  Because two of the Product Line Bids provided the vast majority of the collective purchase price, the Debtors focused on increasing the value of these bids to a point where they could hold an auction.  Beyond issues in the headline purchase price, there were major contingencies and infirmities in the two primary Product Line Bids that were not present in the Stalking Horse Bid.

20. On October 27, 2020, the Debtors' advisors consulted with the Debtors and the Consultation Parties to discuss the bids and their respective infirmities.  Subsequently, the Debtors' advisors communicated to the bidders the deficiencies contained in their respective Product Line Bids and requested that the bidders respond the next day.  On October 28, 2020, the bidders advised the Debtors that they were unable to modify their respective offers in a manner sufficient and satisfactory to the Debtors to qualify their bids under the Bidding Procedures.  The Debtors promptly conveyed this information to the Consultation Parties and thereafter filed the *Notice of (I) Cancellation of Auction and (II) Successful Bid* [Docket No. 387].

21. The Debtors, in consultation with Houlihan and the Debtors' other advisors, as well as the Consultation Parties, selected the Stalking Horse Bid as the Successful Bid.  Given the comprehensive marketing process, the number of parties contacted (over 140)

and the extensive diligence conducted by the potential buyers, I believe that the Debtors' assets have been fairly and thoroughly marketed, and it is likely that all potentially interested and capable buyers for the Debtors' assets have been contacted and given an adequate opportunity to conduct diligence and bid. Throughout the Sale Process, the Debtors and their advisors considered a number of alternatives and paths, all of which repeatedly and ultimately pointed to a comprehensive sale of the business as the most viable and value-maximizing transaction. Further, given my analysis of the bids received to date and the presence of a single remaining Qualified Bid, I believe that the consideration being given under the Stalking Horse Agreement represents the highest and otherwise best offer for the Debtors' assets.

Dated:   November 6, 2020                      /s/  *D. Reid Snellenbarger*
                                                              D. Reid Snellenbarger
                                                              Houlihan Lokey Capital, Inc.